UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

.....................................
                                        .
BOSTON AND MAINE CORPORATION,           .
                                        .
          Plaintiff,                    .
                                        .
     v.                                 .   CIVIL ACTION No. 05-11656-RCL
                                        .
MASSACHUSETTS BAY                       .
TRANSPORTATION AUTHORITY,               .
                                        .
          Defendant.                    .
                                        .
.....................................

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON THE ISSUE OF DISCHARGE IN BANKRUPTCY**

**INTRODUCTION**

Defendant Massachusetts Bay Transportation Authority ("MBTA") submits this memorandum in support of its Motion for Partial Summary Judgment pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1.  More particularly, the Court should enter judgment dismissing Counts I, II and III of the complaint filed by plaintiff Boston and Maine Corporation (the "B&M").  By those counts, the B&M seeks a declaration that its 1983 bankruptcy discharge in large part shields it from claims for reimbursement for all or a portion of the millions of dollars of environmental response costs incurred by the MBTA years after the discharge cleaning up oil contamination caused by the B&M.  The statute under which the MBTA incurred those costs, chapter 21E of the Massachusetts General Laws, was enacted only a few months before the effective date of the discharge.  During those months and for years thereafter, it is undisputed, the agency charged with enforcement of the statute, the Massachusetts Department of

Environmental Protection (then, the Department of Environmental Quality Engineering) (the "DEP"), gave no indication that it would require anyone -- much less the MBTA, which had not conducted any of the operations responsible for the contamination -- to incur response costs to clean up the Site.  Nor during that period, the undisputed facts show, did either the MBTA or the B&M manifest any appreciation of a possibility that the MBTA would incur such costs and, accordingly, have occasion to seek indemnification or contribution from the B&M.  Therefore, the parties cannot be said to have foreseen or fairly contemplated the claims by which the MBTA seeks reimbursement from the B&M for the response costs it incurred, and as a matter of law, the MBTA is entitled to judgment that the B&M's discharge in bankruptcy bars no part of those claims.

## SUMMARY STATEMENT OF UNDISPUTED FACTS

The property at issue in this dispute is the Boston Engine Terminal (the "Terminal" or the "Site"), a 34-acre parcel of property in Boston, Somerville and Cambridge, Massachusetts that has been used as an active railroad maintenance facility and rail yard since the late 1800s. (Concise Statement of Undisputed Material Facts In Support of MBTA's Motion for Summary Judgment, hereinafter "CSUMF", at ¶¶1-2).  Plaintiff Boston and Maine Corporation ("B&M") owned and operated the Terminal from approximately 1926 through December 1976.  (CSUMF at ¶3).

Beginning in or about the 1940's, the B&M switched from steam-powered coal-burning locomotives to diesel-powered locomotives.  (CSUMF at ¶4).  As a result of the change to diesel-powered trains "more and more oil was spilled onto the ground during fueling and maintenance operations."  (CSUMF at ¶5).  Confirming that assessment, witnesses who worked

at the Terminal during the period of B&M's operations testified that oil was spilled frequently during fueling and maintenance operations. (CSUMF at ¶6). As each of the witnesses in this case testified at deposition, B&M employees were solely responsible for these operations. (CSUMF at ¶6).

The B&M filed for bankruptcy protection in 1970. (CSUMF at ¶7). The Federal District Court for the District of Massachusetts presided over the bankruptcy proceedings, which were styled *In the Matter of Boston and Maine Corporation, Debtor*, Bankr. No. 70-250-M. (CSUMF at ¶7). In the course of the bankruptcy, the MBTA purchased the Terminal and other properties used by the B&M to provide commuter rail service in the Boston area in December 1976. Following the purchase and until December 31, 1986, the B&M continued as the operator of the Terminal. (CSUMF at ¶¶8-9).

The MBTA's presence at the Terminal during B&M's operations was minimal. The B&M operated the Terminal on behalf of the MBTA pursuant to two consecutive Operating Agreements between the parties dated March 26, 1976 and February 23, 1982. (CSUMF at ¶9). The Operating Agreements made no reference to environmental contamination or claims. (CSUMF at ¶9). Under the terms of the Operating Agreements, the B&M operated the Terminal for the MBTA using B&M employees as an "independent contractor," and B&M employees were subject to the direction, supervision and control of solely the B&M, and not the MBTA. (CSUMF at ¶¶10-11). Although other MBTA personnel visited the Terminal from time to time, during the period in which the B&M operated the Site for the MBTA, the MBTA had only a single employee who worked the Terminal on a full-time basis, Richard House. (CSUMF at ¶12). Mr. House was a mechanical officer for the MBTA and his job responsibilities included procuring and inspecting new equipment; he was not in a managerial position. (CSUMF at ¶13).

One witness, who worked for the B&M at the Terminal and the adjacent Yard 7 for approximately a two and a half to three-year period during the MBTA's ownership, was not even aware that the Terminal was owned by the MBTA, and believed instead that it was owned by the B&M.  (CSUMF at ¶14).

On March 24, 1983, the Massachusetts Oil and Hazardous Material Release Prevention Act, M.G.L. ch. 21E ("Chapter 21E") was passed and signed into law, effective immediately. See M.G.L. ch. 21E, §1.  Chapter 21E was enacted as a state-law analog to the federal Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. §9601, *et. seq.*  However, whereas oil was not a "hazardous substance" covered by CERCLA, releases of oil did give rise to liability under Chapter 21E.  See 42 U.S.C. §9601(14) (hazardous substance "does not include petroleum, including crude oil or any fraction thereof…"); M.G.L. ch. 21E, §2.

On June 17, 1983, the Court (U.S.D.J. Murray) issued a Consummation Order confirming the B&M's plan of reorganization and enjoining claims of creditors arising on or before June 30, 1983.  (CSUMF at ¶15).  The B&M emerged from the Court's bankruptcy protection as a re-organized entity pursuant to the terms of the Consummation Order on that date.  (CSUMF at ¶15).  The B&M had not scheduled any liability or potential liability under chapter 21E to the MBTA in contribution or indemnity for contamination of the Terminal.  (CSUMF at ¶16).  Nor did the MBTA file a proof of claim for such contribution or indemnity.  (CSUMF at ¶16).  Indeed, as of June 1983 and for years thereafter, there seems to have been no communication between the B&M and the MBTA or within either organization as to the potential applicability of Chapter 21E to contamination of the Terminal.

Releases of oil by the B&M at the Terminal continued to occur after June 30, 1983. (CSUMF at ¶17). By 1986, Lawrence B. Boyd, a consultant for the B&M's parent corporation and long-time employee of the B&M prepared a report describing the oil use at the Terminal by stating that, "at the [Terminal], there are certain places where oil spillage is constant and often excessive." (CSUMF at ¶18).

In July 1984, consultants acting on behalf of the MBTA undertook an Oil Recovery Study at the Terminal. (CSUMF at ¶19). This inquiry apparently was the first study undertaken by either of the parties to assess either the presence or extent of oil in the soils on the Site. The purpose of the study was to assess not potential environmental liability but rather the economic feasibility of recovering oil from the soils on the Site for reuse, as had sometimes been done with oil from a separator at the Site. (CSUMF at ¶19). The 1984 Oil Recovery Study concluded that recovered oil could not be reused as a diesel fuel and contained a recommendation to notify the DEP of conditions at the Site. (CSUMF at ¶20).

In April 1989, as the result of an oil spill that occurred at the Site in November 1988, the DEP issued a Notice of Responsibility and request for information to AMTRAK, who had taken over operations of the Terminal on January 1, 1987 after the B&M's contract with the MBTA ended. (CSUMF at ¶21). This Notice of Responsibility to AMTRAK in response to the November 1988 oil spill was the first notification that DEP might require remedial activities to clean up the Site. There is no evidence suggesting that DEP was aware of the contamination problems at the Site prior to 1988, and the DEP's own Keeper of the Records has confirmed that there is nothing in DEP's files suggesting that it contacted the MBTA concerning environmental conditions at the Terminal prior to 1988. (CSUMF at ¶22). According to the MBTA's records, the first notices of responsibility that the MBTA received from the DEP in connection with

potential liability under Chapter 21E for any site in Massachusetts were issued in 1986. (CSUMF at ¶23).

The MBTA did not have an internal department responsible for handling environmental matters until 1990. (CSUMF at ¶24). The only MBTA employees with responsibilities relating to environmental issues prior to 1990 were Jane Chmielinski and Michael Diggin, neither of whom was aware of the MBTA's potential liability for the oil contamination at the Terminal until after DEP became involved with the Site in 1989. (CSUMF at ¶25). Even further, neither Ms. Chmielinski nor Mr. Diggin is aware of any information suggesting that anyone at the MBTA was aware of the MBTA's potential liability for cleanup of the Terminal prior to the late 1980's. (CSUMF at ¶26).

Moreover, there is no evidence suggesting that the B&M itself was aware of the Chapter 21E liability it would bear with respect to releases at the Terminal. There is no indication that the B&M ever notified the DEP of the ongoing releases at the Terminal occurring subsequent to the passage of Chapter 21E, even though notification of such releases is required under the act. See M.G.L. ch. 21E, §7. And the report prepared by B&M's former employee and consultant, Larry Boyd, concerning the history of "Oil Pollution Problems" at the Terminal contained no reference to Chapter 21E though it was written in 1986. (CSUMF at ¶18).

On July 31, 1989, the DEP sent AMTRAK a follow-up letter indicating that no further emergency measures related to the November 1988 spill were required, but that the DEP had concerns as to the "long term environmental/public impact of the contaminant conditions at the site." (CSUMF at ¶27). The letter stated that further investigative and/or remedial response measures were required at the Site. Id. As owner of the property, the MBTA responded to DEP's requests and submitted a Preliminary Site Assessment and Phase I Limited Site

investigation to the DEP in November 1989. (CSUMF at ¶28). That study and subsequent investigations undertaken by the MBTA identified extensive contamination of the Site, and the MBTA was ultimately required to undertake significant remedial actions to address the oil present in the soil and groundwater at the Site. (CSUMF at ¶29). The primary contaminant driving remediation of the Site was oil. (CSUMF at ¶30).

On May 4, 2004, as remediation of the Terminal was beginning to draw to a close, the MBTA's attorneys sent a demand letter to the B&M pursuant to Section 4A of Chapter 21E, seeking contribution and reimbursement for the B&M's equitable share of the costs of cleaning up the oil contamination at the Terminal under Section 4 of Chapter 21E. (CSUMF at ¶31); M.G.L. ch. 21E, §4 ("any person who undertakes necessary and appropriate response action regarding the release or threat of release of oil or hazardous material shall be entitled to reimbursement from any other person liable for such release or threat of release for the reasonable costs of such response action"). The B&M responded to the MBTA's demand letter on June 18, 2004. (CSUMF at ¶32). In its response, the B&M asserted the defense that the B&M's liability to the MBTA for contamination of the Terminal had been discharged in the course of the B&M's prior bankruptcy proceedings. (CSUMF at ¶32).

## PROCEDURAL POSTURE OF THIS CASE

On August 10, 2005, the B&M filed a Complaint for Enforcement of Bankruptcy Consummation Order, Injunctive Relief and Contempt. (CSUMF at ¶33). This motion for partial summary judgment seeks judgment in favor of the MBTA dismissing Count I ("Enforcement of June 17, 1983 Consummation Order"), Count II ("Injunctive Relief") and Count III ("Contempt of Consummation Order") of that complaint, which collectively seek a

judgment foreclosing liability under Chapter 21E for releases occurring prior to June 30, 1983. Because releases after June 30, 1983 are alleged, whatever action the Court takes on the motion, the next phase of the case will involve adjudication of the merits of the Chapter 21E claims against the B&M that the MBTA has asserted by way of counterclaim.

## ARGUMENT

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories and affidavits demonstrate that there is no genuine issue of material fact as to a particular issue. Fed. R. Civ. P. 56(f). A genuine issue of material fact exists only where the dispute as to a material fact "is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." Id.

Here, the MBTA is entitled to partial summary judgment in its favor dismissing the B&M's claims that the defense of discharge in bankruptcy precludes liability under Chapter 21E on account of releases occurring before June 30, 1983, the date the B&M's discharge was effective. Summary judgment is mandated because the undisputed material facts demonstrate that neither the MBTA nor the B&M fairly contemplated those Chapter 21E claims prior to June 30, 1983.

### A.  An Unscheduled Claim For Contribution Or Indemnity Arising From Liability For Environmental Response Costs Is Not Discharged In Bankruptcy Unless It Was In The Fair Contemplation Of The Parties At The Time Of Discharge.

The B&M's bankruptcy petition was filed under the Bankruptcy Act of 1898 in 1970. The June 17, 1983 Consummation Order effectively concluded the B&M's thirteen-year bankruptcy, and the reorganized B&M emerged. Although the Consummation Order contained an injunction prohibiting claims[1] from being brought against the reorganized B&M subsequent to June 30, 1983, that injunction is not absolute-- as numerous other courts have found in similar cases, the test for determining when unscheduled claims for contribution or indemnity relating to environmental response costs have accrued for purposes of a bankruptcy discharge is to examine whether those claims were in the "fair contemplation" of the parties at the time the discharge took place. See Reynolds Bros., Inc. v. Texaco, Inc., 647 N.E.2d 1205 (Mass. 1995); Mesiti v. Microdot, Inc., 156 B.R. 113, 117 (D. NH 1993); In re Jensen, 995 F.2d 925, 930-31(9th Cir. 1993).

In deciding when a claim against a debtor in bankruptcy accrues, a court should first look to the non-bankruptcy substantive law applicable to the underlying claim. See In the Matter of Reading Co., 115 F.3d 1111, 1123 (3rd Cir. 1997) (In bankruptcy discharge case involving CERCLA claims, stating "To determine whether a claim existed, we look to the substantive area of law governing the underlying claim."); In the Matter of Penn Central Transportation Co., 71 F.3d 1113, 1115 (3rd Cir. 1995) (in examining whether anti-trust claims were discharged "we look to non-bankruptcy law to determine when these claims accrued."); In re National Gypsum,

---

[1]   Section 77(b) of the Bankruptcy Act of 1898 act defined claims broadly "to include debts, whether liquidated or unliquidated… or other interests of whatever character." In the matter of Chicago, Milwaukee, St. Paul & Pacific Railroad, 974 F.2d 775, 780 (7th Cir. 1992)("In re Chicago I") (quoting former 11 U.S.C. §205(b), (repealed 1978)).

139 B.R. 397, 405 (ND Tx. 1992) ("Determination of whether a claim arises in bankruptcy requires an analysis of interests created by non-bankruptcy substantive law.").

Here, the Massachusetts Supreme Judicial Court has expressly decided the question of when a claim for contribution under Chapter 21E arises for the purposes of discharge in bankruptcy. See Reynolds Bros. v. Texaco, Inc., 647 N.E.2d 1205 (Mass. 1995). In Reynolds Bros., the Court examined several approaches to assessing when environmental liability arising from a debtor's pre-petition conduct becomes a claim for bankruptcy purposes and then unequivocally stated: "We prefer the fair contemplation-forseeability approach as the means to determine when a cause of action under [Chapter 21E] becomes a claim for purposes of the Bankruptcy Code." Id. at 1208. As explained by the court, this test provides that only those response costs and natural resource damage costs based on pre-petition conduct that can be fairly contemplated by the parties at the time of the debtor's bankruptcy should be considered discharged. See id. at 1208, citing In re Jensen, 995 F.2d 925, 930 (9th Cir. 1993).

Although the Court of Appeals for the First Circuit has not addressed the issue, the decisions of other courts in the Circuit agree with the fair contemplation approach. For example, the United States Bankruptcy Court for the District of Massachusetts has approved the fair contemplation/forseeability test as the proper analysis where statutory environmental liability is concerned. See In re CD Realty Partners, 205 B.R. 651, 656 (D. Mass. 1997) (noting that in the context of statutory environmental claims, the test for determining when a claim arises "correctly" requires "a relationship of such degree that the claim could fairly have been contemplated by the parties pre-petition."). Similarly, the Federal District Court for the District of New Hampshire has stated that in attempting to reconcile the competing policy objectives of CERCLA and the Bankruptcy Acts, "[t]he preferred means of doing so involves judicial

application of a 'forseeability' test when deciding whether post-bankruptcy CERCLA claims are discharged." <u>Mesiti v. Microdot</u>, 156 B.R. 113, 117 (D. NH 1993).[2]

A majority of the Federal courts in other circuits that have addressed the issue also have adopted the fair contemplation/forseeability test as the proper approach. See <u>In re Jensen</u>, 995 F.2d 925, 930-31(9th Cir. 1993) (fair contemplation standard carefully balances the sometimes competing goals of environmental law and bankruptcy); <u>In the matter of Chicago, Milwaukee, St. Paul & Pacific Railroad</u>, 974 F.2d 775 (7th Cir. 1992) ("In re Chicago I") (applying forseeability standard); <u>In the matter of Chicago, Milwaukee, St. Paul & Pacific Railroad</u>, 3 F.3d 200 (7th Cir. 1993) ("In re Chicago II"); <u>AM Int'l, Inc. v. Datacard Corp.</u>, 106 F.3d 1342, 1348 (7th Cir. 1997); <u>In re National Gypsum</u>, 139 B.R. 397, 407-09 (ND Tx. 1992) (only meaningful distinction between CERCLA claims in bankruptcy is whether claims are fairly contemplated); <u>Signature Combs v. U.S.</u>, 253 F. Supp. 2d. 1028, 1038 (W.D.Tenn. 2003) ("fair contemplation standard is the appropriate standard to apply"); <u>In re Hexcel Corp.</u>, 239 B.R. 564, 570 (N.D. Cal. 1999) ("the common thread running through the case law is that the [bankruptcy Code] does not suggest that a creditor's claim is to be discharged if the parties could not reasonably contemplate the existence of that claim prior to the reorganization."); <u>Sylvester Brothers v. Burlington Northern</u>, 133 B.R. 648, 653 (D. Minn. 1991) (applying fair contemplation standard). These

---

[2]   In dictum in <u>Providence and Worcester R.R.C. v. The Penn Central Corp.</u>, 1989 U.S. Dist. LEXIS 7259 (D. Mass. 1989), without discussing the fair contemplation test or any competing approach, the Court suggested that a party's environmental response cost claims against the reorganized Penn Central railroad would be discharged even where the consummation order was issued years prior to the passage of CERCLA or Chapter 21E.  The Court's holding was that the United States District Court for the Eastern District of Pennsylvania (the "Reorganization Court") retained exclusive jurisdiction to enforce the terms of the Consummation Order and that CERCLA and Chapter 21E claims could not be litigated without first obtaining leave to file them from the Reorganization Court. <u>See id.</u> at *7 ("This Court cannot exercise jurisdiction until such permission is obtained").  On appeal of a decision by the Reorganization Court involving Penn Central and concerning precisely the same issue, the Third Circuit reached a result expressly contrary to the Massachusetts District Court's dictum, holding that CERCLA claims could not have been discharged by the Penn Central's bankruptcy consummation order pre-dating the passage of CERCLA because "the CERCLA claims were not then in existence."  See <u>In the Matter of Penn Central Trans. Co.</u>, 944 F.2d 164, 165 (3rd Cir. 1991).

courts have followed the fair contemplation approach because they have recognized it as the preferable means of balancing the competing policy objectives underlying the federal bankruptcy acts and the environmental cleanup statutes.[3]

Because the highest state court in Massachusetts[4] and the greater weight of authority in the federal courts[5] both indicate that the fair contemplation test is the proper means of determining when an unscheduled claim for contribution or indemnity accrues in the context of Chapter 21E environmental liability, the Court should follow the approach set forth in those cases and adopt the fair contemplation test for purposes of this motion.

### B. The MBTA's Chapter 21E Claims Against The B&M Relating To The Contamination Of The Terminal Were Not In The Fair Contemplation Of The Parties Prior To June 30, 1983.

---

[3] As several courts and commentators have noted, "the policies underlying CERCLA and the Bankruptcy Code clash when those responsible for pollution at a CERCLA site attempt to avoid liability for the site's cleanup by seeking the protection afforded under the Bankruptcy Code." John C. Ryland, When Policies Collide: The Conflict Between the Bankruptcy Code and CERCLA, 24 Mem. St. U.L. Rev. 739, 740 (1994). But when faced with this clash, courts have most often asked whether such a claim was in the fair contemplation of the parties at the time of the bankruptcy, or, in other words, whether those claims were foreseeable. See, e.g., Signature Combs v. U.S., 253 F. Supp. 2d. 1028, 1038 (W.D. Tenn. 2003) (citing the fair contemplation test as "the only test which tries to accommodate both the fresh start goal of bankruptcy and the speedy cleanup and polluter accountability CERCLA goals."); In the matter of Chicago, Milwaukee, St. Paul & Pacific Railroad, 3 F.3d 200, 201 (7th Cir. 1993)(noting that in reconciling the competing goals of CERCLA and bankruptcy, "the tension between these fundamental aspects of our national policy is profound," and deciding to apply fair contemplation/forseeability analysis as the preferable reconciliation of that tension). In addition, although the bankruptcy system does seek in large part to protect debtors from future claims to allow them a "Fresh Start," courts have reminded us that in evaluating whether the goal of a Fresh Start or rather that of protecting public health and environment by facilitating cleanup of contaminated sites should take precedence "some commentators have opined that the fresh start policy applies in the context of individual bankruptcy but not… in the context of continuing corporations seeking reorganization," such as in the case of B&M's bankruptcy reorganization. Signature Combs, 253 F. Supp. 2d at 1040.

[4] The Supreme Judicial Court's decision in Reynolds Bros. has been cited with approval by at least one federal court. See Signature Combs, 253 F. Supp. 2d. at 1034.

[5] See e.g., Signature Combs v. U.S., 253 F. Supp. 2d. at 1038 ("Courts and commentators have offered little criticism for the fair contemplation approach"); Dale Ellen Azaria, "When is a Claim a Claim? A Bankruptcy Code Riddle," 62 Tenn. L. Rev. 205, 206 (1995) ("In the context of environmental claims, recent opinions and commentary have begun to coalesce around an intermediate standard: an environmental claim arises when the claim is within the fair contemplation of the parties involved").

The undisputed facts present here demonstrate that the MBTA's Chapter 21E contribution claims against the B&M for its contamination of the Terminal were not in the fair contemplation of the parties on or before June 30, 1983, and the MBTA is therefore entitled to partial summary judgment as a matter of law. At that point in time, neither the MBTA nor the B&M had received any indication from regulatory authorities or others that they might be subject to liability under the newly-enacted Chapter 21E for releases of oil at the Terminal. No investigation or cleanup activities had taken place, and no response costs had been incurred. In short, the MBTA lacked any tangible indication that it might be required to perform the remedial activities at the Terminal for which it ultimately took responsibility and, consequently, any indication that it might need to seek indemnification or contribution for those costs from the B&M. Under these circumstances, courts have not found claims for indemnification or contribution to be in the fair contemplation of the parties at the time of discharge.

In determining whether a claim to recover costs of responding to environmental contamination is within the fair contemplation of the parties, it is first necessary to distinguish between two categories of claims. The first category involves claims asserted by federal or state regulatory authorities against the owner or operator of property contaminated by releases of prohibited contaminants. There, the question establishing forseeability or fair contemplation is whether the claimant regulatory authority knew of both the contamination and the debtor's connection to the property before the date on which claims were barred. See, e.g., In re Chicago I, 974 F.2d at 786; In re Jensen, 995 F.2d at 930; In re National Gypsum, 139 B.R. at 407-09. The second category, which is where this case falls, involves claims asserted for contribution or indemnity by one private owner/operator against another. There, in the absence of evidence that the parties made express provision for environmental claims between them,

courts have found a claim to be within the fair contemplation of the parties only if there was not only awareness of contamination but also an indication, before the date on which claims were barred, that environmental regulators would seek to hold the claimant liable for that contamination and therefore, that the claimant should have foreseen or contemplated a need to seek indemnification or contemplation from other liable parties. See, e.g., Reynolds Bros., 647 N.E.2d at 1208; In re Chicago II, 3 F.3d at 207; AM Int'l Inc., 106 F.3d at 1348. It is from this vantage that the MBTA's claims should be viewed.

In the CERCLA context, it is now evident that, in the second category of cases, the circumstances in which a discharge in bankruptcy bans claims for indemnification or contribution for responding to environmental contamination are even more limited. The Supreme Court has made it clear that a CERCLA contribution claim may not be asserted until after the Environmental Protection Agency (the "EPA") has brought suit against or reached settlement with the party who would seek indemnification contribution. See Cooper Industries, Inc. v. Aviall Services, Inc., 125 S. Ct. 577 (2004). In the absence of such a suit, the claimant could not have been expected to contemplate that it had an action for contribution or indemnification because, in fact, it did not have such an action.

In cases falling into the second category decided under statutes other than CERCLA or under CERCLA before the Supreme Court's decision in Cooper Industries, claims will, of course, be found to be barred by a discharge if it is evident that the parties expressly contemplated them before the bankruptcy. Thus, in NCL Corp. v. Lone Star Building Centers (Eastern) Inc., 144 B.R. 170 (S.D. Fla. 1992), the court found that the lease agreement between the parties, executed six years prior to the debtor's bankruptcy petition, specifically addressed the environmental dangers associated with debtor's uses of the site and required the debtor to

indemnify the defendant for any liability it incurred if debtor failed to properly maintain the premises. Id. at 177. The court concluded that the claimant and debtor "had a contractual relationship which contemplated the very facts that give rise to Lone Star's pre-petition claims." Id. In these circumstances, it was immaterial whether there had been pre-bankruptcy regulatory involvement, and the court did not address that issue. Here, the parties made no reference to environmental contamination or conduct giving rise thereto in the agreements under which the B&M operated the Site. (CSUMF at ¶9).

In the absence of a manifestation that the parties, in fact, did contemplate environmental claims between them pre-bankruptcy, the decisions reflect the recognition that regulatory involvement is necessary before one liable party is deemed to have foreseen or contemplated that it should seek indemnification or contribution from another liable party. Id. In this regard, the facts presented by Reynolds Bros. are instructive. The site at issue there was an oil storage facility that had, as here, been contaminated with oil as a result of the debtor's historic operations. The court reasoned that the claimant should have fairly contemplated the claims at issue because it had been notified of its liability for environmental cleanup years prior to the debtor's discharge. See 647 N.E.2d at 1208-09. Specifically, the court noted the following forms of regulatory involvement prior to the discharge: as many as six years prior to the bankruptcy discharge, the DEP had issued a notice of responsibility to the claimant concerning oil contamination at the site; for a period of two years prior to the discharge, the local board of health repeatedly informed the claimant and its lessee of the need to remediate the site; and the DEP later issued a notice of non-compliance to the claimant for failure to comply with its cleanup obligations. Id. at 1208.

Similarly, the Court of Appeals for the Seventh Circuit has twice decided cases involving indemnification/contribution claimants in which it looked to the presence or absence of regulatory involvement as a critical factor.  As in Reynolds Bros., the court in In re Chicago II was persuaded that the claimant's environmental indemnification claims against the reorganized debtor had been discharged in bankruptcy where there was regulatory action prior to the court's consummation order.  3 F.3d at 207.  In particular, the court found it significant that the site at issue was part of a CERCLA listed Superfund site, that EPA had undertaken environmental investigation of the site and that the claimant knew of EPA investigations of the area.  3 F.3d at 206-07 ("With EPA conducting a massive investigation of one of the ten most hazardous sites in the country, in which the [site at issue] was located, [the claimant] cannot now argue that it did not know of potential environmental claims…").

In contrast, where "unlike [In Re Chicago II], there had been … no EPA involvement ...," the court reached the opposite result, holding that a claim for CERCLA response costs was not discharged in the debtor's bankruptcy.  AM Int'l, 106 F.3d at 1348.  In so ruling, the court expressly rejected the debtor's argument that the claimant should have affirmatively investigated potential contamination of the site, even in the absence of any regulatory notice that remediation would be necessary, and filed a claim on that basis.  Id.  Without some form of notice that it would have to eventually incur cleanup costs, the claimant could not have reasonably foreseen the future response cost claim against the debtor.  See also, Sylvester Brothers v. Burlington Northern, 133 B.R. 648, 653 (D. Minn. 1991) (holding that contribution claims under CERCLA and the Minnesota state analog were not discharged).

Under these standards, there can be no question that, on the undisputed facts, the MBTA's claims for contribution cannot be deemed to have been in the fair contemplation of

either party prior to June 30, 1983. It is undisputed that the DEP's involvement at the Site did not commence until five years after that date -- the Terminal had not been placed on any list of contaminated sites (state or federal) and DEP had not issued a notice of responsibility to either the B&M as operator of the Site or to the MBTA as its owner. (CSUMF at ¶¶21-22). And it was not until 1986 that the MBTA was advised by DEP that it had Chapter 21E liability at any site in Massachusetts. That in the year following the enactment of Chapter 21E and the bankruptcy discharge the MBTA commissioned a study by a consultant to determine whether, as had sometimes been done with oil in a separator at the Site, oil in soil could be recovered for use in a boiler, indicates that it viewed that oil more as a potential asset than as a potential liability. (CSUMF at ¶19).

Perhaps even more telling is the absence of any evidence suggesting that the B&M itself recognized the import of Chapter 21E until years after its passage. Indeed, by failing to report ongoing loses of oil while it operated the Terminal for years after Chapter 21E was enacted, the B&M demonstrated that it did not contemplate liability under the statute. Even in 1986, a report from the B&M's former employee and consultant detailing the "Oil Pollution Problems" at the Site made no mention of Chapter 21E. (CSUMF at ¶18). In <u>AM Int'l Inc.</u>, the court found this factor significant (holding the claimant's CERCLA reimbursement claim not to have been discharged where the debtor itself had not realized it faced CERCLA liability prior to the bankruptcy proceedings and had never reported its releases to EPA). 106 F.3d at 1348.

In sum, although Chapter 21E was enacted in March 1983, there was neither regulatory involvement nor any prospect that there would be regulatory involvement until long after the consummation order became effective on June 30, 1983. The DEP did not begin investigating the Site or issue a notice of responsibility to the B&M's successor as its operator until 1988. The

earliest occurrence suggesting that there might be future regulatory concern involving the MBTA was a report in 1984 (by a consultant retained to ascertain whether oil in the soils could be recovered for use as fuel), which advised the MBTA that the Site should be reported to the DEP. Accordingly, it cannot be said that the parties should fairly have contemplated the MBTA's current claims under Chapter 21E against the B&M until after June 30, 1983.

## CONCLUSION

For the reasons set forth above, the MBTA requests that the Court grant its Motion for Partial Summary Judgment dismissing Counts I, II and III of B&M's complaint relating to the bankruptcy discharge issue.

                Respectfully submitted,

                /s/ John M. Stevens
                John M. Stevens (BBO #480140)
                Alicia Barton McDevitt (BBO #655184)
                Foley Hoag LLP
                155 Seaport Boulevard
                Boston, Massachusetts   02210
                (617)  832-1000
                amcdevitt@foleyhoag.com
                Attorneys for Defendant
                  Massachusetts Bay Transportation Authority

Dated:  June 2, 2006

B3205960.3