# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BOSTON AND MAINE CORPORATION )<br><br>Plaintiff, )<br><br>-v.- )<br><br>MASSACHUSETTS BAY )<br>TRANSPORTATION AUTHORITY )<br><br>Defendant. ) | Civil Action No. 05-11656-RCL<br>Judge Reginald C. Lindsay |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Eric L. Hirschhorn
Winston & Strawn LLP
1700 K Street N.W.
Washington DC 20006
Tel. 202-282-5706
Fax 202-282-5100
E-mail: ehirschhorn@winston.com

Robert B. Culliford, BBO #638468
Pease International Tradeport
14 Aviation Avenue
Manchester NH 03801
Tel. 603-766-2002
Fax 603-766-2094
E-mail: rculliford@flypanam.com
*Counsel for Plaintiff Boston and Maine
Corporation*

June 2, 2006

# TABLE OF CONTENTS

**Page**

Facts ................................................................................................................................2

    The Parties .................................................................................................................2

    The Boston Engine Terminal .....................................................................................3

    Environmental Laws ..................................................................................................9

    The B&M Bankruptcy Case......................................................................................11

Argument … ...................................................................................................................13

    I.    Most, If Not All, of MBTA's Claim for Cleanup Costs at the BET Relates to Releases Occurring on or before June 30, 1983, and Such Claim Was Discharged and Released in B&M's Bankruptcy Case...........................................14

        A.    MBTA Had a Claim Prior to the Bankruptcy Consummation Date…......................................................................................................14

            1.    Under the Applicable Relationship Test, MBTA's Claim Arose When the Releases Occurred .........................................................15

            2.    Even Under the Fair Contemplation Test, MBTA Had a Claim Prior to the Bankruptcy Consummation Date................................19

        B.    MBTA's Claim Was Discharged Pursuant to the Consummation Order in B&M's Bankruptcy ...................................................................21

    II.    Any MBTA Claim for Environmental Cleanup at the BET that Survived Discharge in the Bankruptcy Proceedings is Contractually Limited ...................23

Conclusion ......................................................................................................................27

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................14

*In re Chicago, Milwaukee, St. Paul & Pacific Railroad. Co.*, 974 F.2d
775 (7th Cir. 1992) .................................................................................14, 15, 16, 23

*In re Edge*, 60 B.R. 690 (Bankr. D. Tenn. 1986) ............................................................16

*Gardner v. New Jersey*, 329 U.S. 565 (1947) ....................................................................15

*Hays v. Mobil Oil Corp.*, 930 F.2d 96 (1st Cir. 1991) ......................................................25

*In re Hemingway Trans., Inc.*, 73 B.R. 494 (Bankr. D. Mass. 1987) ................................16

*In re Hemingway Trans., Inc.*, 993 F.2d 915 (1st Cir. 1993) ......................................15, 16

*In re Jensen*, 127 B.R. 27 (B.A.P. 9th Cir. 1991) .............................................................16

*In re Jensen*, 995 F.2d 925 (9th Cir. 1993) ......................................................................19

*Mesiti v. Microdot Inc.*, 156 B.R. 113 (D.N.H. 1993) .........................................15, 21, 23

*NCL Corp. v. Lone Star Bldg. Ctrs. (Eastern) Inc.*, 144 B.R. 170
(S.D. Fla. 1992) ...................................................................................................18, 19

*In re National Gypsum Co.*, 139 B.R. 397 (N.D. Tex. 1992) ...........................................19

*Roberts v. Maine*, 48 F.3d 1287 (1st Cir. 1995) ..............................................................20

*Rochester Ford Sales Inc. v. Ford Motor Co.*, 287 F.3d 32 (1st Cir. 2002).......................14

*Schweitzer v. Consolidated Rail Corp.*, 748 F.2d 936, 941 (3d Cir. 1985) ......................14

*Town of Sturbridge v. Mobil Corp.*, 195 F. Supp. 2d 330 (D. Mass. 2002) ......................26

*United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997
(2d Cir. 1991).........................................................................................15, 16, 17, 18

### STATE CASES

*Hazen Paper Co. v. U.S. Fidelity & Guar. Co.*, 555 N.E.2d 576
(Mass. 1990) ............................................................................................................25

*Nassr v. Commonwealth*, 394 Mass. 767 (1985) ....................................................9, 20, 25

# FEDERAL STATUTES

The Bankruptcy Act of 1898 ("Bankruptcy Act") (repealed 1978) ....................................11

    Section 77 of the Bankruptcy Act ..........................................................................14, 21

Comprehensive Environmental Response, Compensation and Liability Act
("CERCLA" or "Superfund"), 42 U.S.C. § 9601 *et seq*....................................................9

Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 *et
seq* (Clean Water Act") ................................................................................................9

Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 *et seq*
(RCRA) ........................................................................................................................9

Pub. L. No. 950598, § 403(a), 92 Stat. 263 (1978) ........................................................11

11 U.S.C. §101(5) (2000) ..............................................................................................15

11 U.S.C. § 205(b) (1976) .............................................................................................21

11 U.S.C. §205 (1976) ..................................................................................................14

11 U.S.C. §205(f) (1976) ...............................................................................................21

42 U.S.C. § 9607(a)(1)....................................................................................................9

42 U.S.C. § 9607(a)(2)....................................................................................................9

# STATE STATUTES

1692 Mass. Acts Ch. 23 §1 (current version at M.G.L. Ch. 111 §143) .........................9, 20

1816 Mass. Acts Ch. 44 §3 (current version at M.G.L. Ch. 111 §31) ...........................9, 20

1816 Mass. Acts Ch. 44 §11 (current version at M.G.L. Ch. 111 §31) .........................9, 20

1983 Mass Acts p. 4 Ch. 7 §5 (codified at M.G.L. Ch. 21E
(Chapter 21E)) ..........................................................................9, 10, 19, 20, 23, 25, 26

M.G.L. Ch. 21E § 11(A) (2006) ....................................................................................26

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
——————————————————————  x
BOSTON AND MAINE                  :
CORPORATION,                      :
                                  :
                  Plaintiff,      :
                                  :
                                  :
        -v.-                      :        Civil Action No. 05-11656-RCL
                                  :
                                  :
MASSACHUSETTS BAY                 :
TRANSPORTATION AUTHORITY          :
                                  :
                  Defendant.      :
                                  :
——————————————————————  x
```

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Boston and Maine Corporation ("B&M") moves this Court for partial summary judgment in this action. In large part, this case turns on whether the pre-June 30, 1983 claims of the defendant Massachusetts Bay Transportation Authority ("MBTA") for environmental cleanup at the Boston Engine Terminal ("BET") are barred by this Court's Consummation Order in B&M's bankruptcy proceedings. The definition of a "claim" under the Bankruptcy Act of 1898 is broad, and the Consummation Order expressly discharges any "claims" not brought before the Consummation Date of June 30, 1983. MBTA had claims for environmental cleanup of the BET property that existed before June 30, 1983 under Massachusetts General Laws ch. 21E ("Chapter 21E") and other law that long antedated Chapter 21E. Because MBTA failed to assert any such claim in the B&M bankruptcy, any claim MBTA had or might have had was

discharged in the bankruptcy and may not now be resurrected. In seeking to assert its claim

against B&M at this late date, MBTA is attempting to circumvent the Consummation Order and

to deny B&M the fresh start to which it is entitled under the bankruptcy laws. Accordingly, this

Court should grant B&M partial summary judgment and enforce the Consummation Order,

enjoining MBTA's assertion of such claim.

In addition, this Court should grant B&M summary judgment on the issue that MBTA's

claim (either in its entirety or, at the least, the portion incurred *following* the Consummation

Order (i.e., July 1, 1983 through December 31, 1986)) is limited by the 1982 operating

agreement between MBTA and B&M to the lesser of $1 million or the amount of property

damage, if any, ultimately proven to be attributable to B&M.

## FACTS

### A.    *The Parties*

B&M is a rail common carrier providing railroad freight services in the northeastern

United States. Declaration of Roger Bergeron in Support of Motion for Partial Summary

Judgment ("Bergeron Decl.") ¶ 4. B&M owned and operated the BET from 1929 until

December 1976. Answer and Counterclaims of Defendant Massachusetts Bay Transportation

Authority ("Answer") ¶ 6 (attached as Exhibit 1 hereto). After December 1976, B&M continued

to operate the BET until December 31, 1986. Bergeron Decl. ¶ 26.

MBTA is a political subdivision of the Commonwealth of Massachusetts. Complaint ¶ 4;

Answer ¶ 2. MBTA provides mass transportation service throughout eastern Massachusetts by

means of bus, subway, light rail, and otherwise. Bergeron Decl. ¶ 5. MBTA, which is the

second largest landowner in Massachusetts, purchased the BET from B&M's bankruptcy estate

in December 1976 and continues to own the BET. Bergeron Decl. ¶¶ 6, 25 & Exh. 1. On May 4,

2

2004, more than twenty years after the conclusion of B&M's bankruptcy proceedings and nearly thirty years after MBTA's purchase of the BET from B&M, MBTA made a demand of B&M under Chapter 21E for reimbursement of environmental cleanup costs with respect to contamination at the BET.  Complaint ¶¶ 7-8 ; Answer ¶ 1.

## B.    The Boston Engine Terminal

The BET, which is now known as the MBTA Commuter Rail Maintenance Facility, occupies approximately 34 acres in Somerville, Boston, and Cambridge, Massachusetts.  Answer ¶¶ 4 & 5.  It has been used as an active railroad maintenance facility and rail yard since the late 1800's.  Complaint at p. 2 ¶ 1; Answer ¶¶ 4 & 5.

As such, for approximately a century, up through MBTA's ownership in the 1970's and early 1980's, the BET site was used for activities including fueling, maintenance, and washing of locomotives and other rail cars.  Declaration of James Hennemann in Support of Motion for Partial Summary Judgment ("Hennemann Decl.") ¶ 4.  Prior to June 1983, frequent spills of fuel oil occurred at the BET, the ground at the site became saturated with fuel oil, and the odor of diesel fuel constantly filled the air.  Hennemann Decl. ¶¶ 5, 7 & Exhs. 1-11 (Deposition of Richard House ("House Dep.") at 56:2-57:6; Deposition of Peter Wilson ("Wilson Dep.") at 40:2-23; 45:8-15; 20:21-22:4; 42:2-13; 46:18-47:7; 39:9-11; BM 000025[1]; House Dep. 30:1-23; Wilson Dep. 50:16-51:11); Areas at the BET where fuel oil spillage was frequent and excessive included the fueling stands, the filling points for the storage tanks, the service areas of the shop, the ready tracks where locomotives and self-propelled cars were stored awaiting dispatch, and the fuel storage tanks (including a leaking one million gallon fuel oil storage tank and a 100,000

---

[1] The prefix "BM" signifies documents produced in this action by Plaintiff B&M.  These documents are authentic copies of business records maintained by B&M in the ordinary course of business, and it was the regular practice of B&M to keep such records.  *See* Declaration of Robert Culliford in Support of Plaintiff's Motion for Partial Summary Judgment ("Culliford Decl.") ¶ 3.

gallon fuel oil storage tank). Hennemann Decl. ¶ 8 & Exhs. 12-13 (BM 000007; Deposition of Roger Bergeron ("Bergeron Dep.") at 137:22-138:10). MBTA employee Richard House, who worked at the BET, specifically recalled that the bottom of the one million gallon fuel storage tank had to be replaced in approximately 1981. Hennemann Decl. ¶ 9 & Exh. 14-15 (House Dep. at 41:14-23; 43:16-24).

By the late 1970's and early 1980's, any contact with the oily, black ground at the BET resulted in soiling and staining of clothes and footwear. Hennemann Decl. ¶ 10 & Exh. 16-18 (Wilson Dep. at 50:21-51:11; House Dep. at 53:8-54:10; Deposition of James Hennemann ("Hennemann Dep.") at 53:10-54:15). MBTA employees Richard House and Peter Wilson were well aware of the oil-saturated ground at the site prior to June 1983. Hennemann Decl. ¶ 11 & Exhs. 19-21 (House Dep. at 30:1-23; 52:14-22; Wilson Dep. at 50:16-51:11). According to Mr. House, "[t]here was areas that were pretty saturated with oil, fuel oil." Hennemann Decl. ¶ 12 & Exh. 22 (House Dep. at 52:15-16). Mr. House observed pooled oil on the ground at the BET during the 1979 to 1983 time period, Hennemann Decl. ¶ 13 & Exh. 23 (House Dep. at 52:18-22), and Mr. Wilson similarly observed oil-saturated puddles on the ground in fueling areas at the BET from 1979 to 1983. Hennemann Decl. ¶ 14 & Exh. 24 (Wilson Dep. at 28:11-16).

In addition to the constant state of fuel oil saturation on the grounds of the BET, several large releases of fuel oil or hazardous materials occurred during the late 1970's and early 1980's, when MBTA owned the BET. Hennemann Decl. ¶ 15 & Exhs. 25-28 (BM 000025; Bergeron Dep. at 108:8-109:15; BM 000037-38; MBTA 00003089[2]). For example, on December 14, 1980, approximately 14,000 gallons of No. 2 fuel oil spilled at the BET and made its way to the Yard 14 oil pit, where it was pumped out by contractors. Hennemann Decl. 16 & Exh. 27 (BM

---

[2] The prefix "MBTA" signifies documents produced in this action by Defendant MBTA.

4

000037-38). Documents also indicate that as of July 19, 1979, Pit 42 at the BET (measuring 64 feet long by 5 feet wide) was filled up to track level with oil and water. Hennemann Decl. ¶ 17 & Exh. 25 (BM 000025). The pit was constantly filling with oil and had to be pumped out about every week and a half to two weeks. *Id.*

In addition, during the late 1970's and early 1980's, oil was often released to the Millers River or the Charles River, and the United States Coast Guard was issuing fines and penalties for such releases. Bergeron Decl. ¶¶ 7-9 & Exhs. 2-6 (MBTA 00003089; MBTA 00002595; MBTA 00002900-01; BM 000040; BM 000026). The Metropolitan District Commission and B&M were cited by the Coast Guard for an oil spill into the Millers River on March 4, 1977. Bergeron Decl. ¶ 8 & Exh. 5 (BM 0000040). Again, on July 19, 1979, the Metropolitan District Commission and the Coast Guard responded to an oil spill in the Millers River. Bergeron Decl. ¶ 9 & Exh. 6 (BM 000026). The Coast Guard came to the office at the BET and informed B&M personnel of the severity of the spill. *Id.* As of the late 1970's, MBTA was aware that discharges of petroleum products originating at the BET occurred to the Millers River and occasionally the Charles River, and MBTA was aware that the United States Coast Guard was issuing warnings and fines for these discharges. Bergeron Decl. ¶¶ 10, 11 & Exh. 7 (BM 000003). MBTA's own documents indicate that in June 1982, 300 to 500 gallons of No. 2 fuel oil was released from the oil/water separator to the Millers River. Bergeron Decl. ¶ 12 & Exh. 2 (MBTA 00003089).

Another regulatory agency, the Massachusetts Department of Environmental Quality Engineering ("DEQE"), which later became the Massachusetts Department of Environmental Protection ("DEP"), kept incident files on releases at or from the BET during the late 1970's and early 1980's. Bergeron Decl. ¶ 13 & Exhs. 2-4 (MBTA 00003089; MBTA 00002595; MBTA 00002900-01). These included DEP incident response files on a fuel spill of approximately

1,100 gallons of No. 2 fuel oil at the BET in October 1981, and files on releases of oil from the BET into the Millers River and the Charles River. Bergeron Decl. ¶ 14 & Exhs. 2-4.

Also in the late 1970's and early 1980's, B&M maintained an oil trap at the BET where oil was pumped into tanks and carried off by contractors. Bergeron Decl. ¶ 15 & Exh. 8 (BM 000007). The volume of oil recovered reached 90,000 gallons per year, but the volume began to subside as the oil was pressed out of the mud surrounding the oil trap. Bergeron Decl. 16 & Exh. 8 (BM 000007). For a number of years in the 1970's, B&M (as operator) tried to convince MBTA to allow it to upgrade the oil trap. Bergeron Decl. ¶ 17 & Exh. 8 (BM 000007). In 1978, MBTA finally funded additional pumps and an above-ground oil separator for the system. Bergeron Decl. ¶ 18 & Exhs. 7-8 (BM 000003; BM 000007). As a requirement for funding the additional separator unit, MBTA requested that it receive the recovered petroleum product to burn in the BET boilers. Bergeron Decl. ¶ 19 & Exh. 7 (BM 000003). Initially, in the late 1970's, approximately 35,000 gallons of petroleum product were recovered for MBTA per year as a result of this process. Bergeron Decl. ¶ 20 & Exh. 7 (BM 000003).

Thus, although B&M operated the BET until December 1986, MBTA, as owner from December 1976 on, had extensive knowledge of the environmental condition of the BET site, releases of oil and hazardous substances at the site, and the involvement of regulators at the site. Hennemann Decl. ¶ 18 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39 (for Exhibits 29-39: Wilson Dep. at 53:5-12; BM 000003; Wilson Dep. at 7:3-22; House Dep. at 6:4-15; Wilson Dep. at 11:4-13:9; House Dep. at 10:9-12:15; Wilson Dep. at 15:9-16:8; Bergeron Dep. at 100:22-102:8; House Dep. at 29:3-24; 35:2-8; 34:4-24). MBTA maintained an office at the BET and had personnel on site who exchanged information on environmental conditions at the BET with their MBTA supervisors. Hennemann Decl. ¶ 19 & Exhs. 1-3, 5-7, 31-34, 36. In particular, MBTA

6

employee Richard House recalled recurring discussions with his MBTA supervisor, Mr. Walter

Mark, regarding whether there had been an oil spill "how much it was, how bad it was, and what

we were doing to clean it up." Hennemann Decl. ¶ 20 & Exh. 1. Mr. House indicated that

between 1979 and 1983, fuel spills occurred during fueling operations at the BET when the fuel

nozzle would not be turned off and would overflow. Hennemann Decl. ¶ 21 & Exh. 40 (House

Dep. at 29:3-9). Also during this time period, Mr. House recalled an instance in which a hose

broke in the Budd House at the BET and leaked fuel oil three to four inches deep on the ground.

Hennemann Decl. ¶ 22 & Exh. 38. In general, according to Mr. House, the motorized Budd cars

at the BET were an oily mess and spills and drips ran onto the ground during the 1979 to 1983

time period. Hennemann Decl. ¶ 23 & Exh. 39.

   For his part, MBTA employee Peter Wilson observed fuel on the ground after a fuel spill

in the area of the BET in the early 1980's. Hennemann Decl. ¶ 24 & Exh. 4. Mr. Wilson did not

report the spill to officials at MBTA because it had already been reported to them. *Id.* In fact,

Mr. Wilson's information on spills at the BET prior to June 1983 generally came *from his*

*supervisors at MBTA.* Hennemann Decl. ¶ 25 & Exhs. 2-3. Mr. Wilson also received

information from other MBTA employees concerning a spill of lubricating oil at the BET during

the 1979 to mid-1983 time period. Hennemann Decl. ¶ 26 & Exh. 6. On another occasion

between 1979 and 1983, William MacDonald of MBTA informed Mr. Wilson that there was an

oil spill and asked Mr. Wilson to check the booms on the Millers River. Hennemann Decl. ¶ 27

& Exh. 7. Mr. Wilson observed an oil sheen and reported it to Mr. MacDonald. *Id.*

Accordingly, MBTA had direct, actual knowledge of releases of fuel oil at the BET from at least

the late 1970's until 1983.

In addition to direct knowledge of releases of fuel oil at the BET, MBTA had oversight of expenses at the BET site prior to June 1983. Hennemann Decl. ¶ 28 & Exh. 35. MBTA employee Peter Wilson expressly recalled that this included environmental expenses such as those incurred to clean up spills. *Id.*

Furthermore, during the early 1980's MBTA personnel attended meetings regarding environmental issues at the BET and recognized the need for cleanup at the site. Hennemann Decl. ¶ 29 & Exhs. 30, 41-45 (BM 000003; Hennemann Dep. at 42:11-44:21; 47:5-49:7; Bergeron Dep. at 127:1-128:23; Hennemann Dep. 59:24-60:8; BM 000008); Bergeron Decl. ¶ 21 & Exh. 9. For instance, MBTA employees Walter Mark and Richard House attended meetings regarding environmental issues at the BET, including the leak in the one million gallon tank. Hennemann Decl. ¶ 30 & Exh. 41. Discussion at the meetings included concern about stopping any leaks to prevent further complaints from the Coast Guard and to prevent pollution of the property. Hennemann Decl. ¶ 31 & Exh. 42. At another meeting around 1980 or 1981, B&M employees Roger Bergeron and Gary Gordon and MBTA employees Bill MacDonald and Gene Scoroposki discussed environmental cleanup at areas at the BET that involved an accumulation of heavy greases, lubricants, and diesel fuel. Bergeron Decl. ¶ 22 & Exh. 9.

George Covino of B&M and Walter Mark of MBTA were also involved in meetings at the BET to develop a more efficient fueling system for the BET. Hennemann Decl. ¶ 32 & Exhs. 32, 44. These discussions began in approximately 1982. Hennemann Decl. ¶ 41 & Exh. 44. The old fueling system caused a problem because it did not have automatic shutoff and fuel was leaking onto the ground right outside the main offices where the MBTA office was located. Hennemann Decl. ¶ 33 & Exh. 42. In or about 1984, MBTA installed new fueling nozzles at the

BET with an automatic shut-off to address the fuel spillage problem. Hennemann Decl. ¶ 34 & Exhs. 30, 45 (BM 000003; BM 0000008).

In addition, in the 1982 to 1983 time period, in a discussion that took place at the MBTA's general office, Dan Breen of the MBTA engineering staff indicated to Peter Wilson that there might have to be a cleanup of hazardous substances at the BET site. Hennemann Decl. ¶ 35 & Exh. 46 (Wilson Dep. at 48:4-50:13). Mr. Wilson further stated that between 1982 and 1984 MBTA was aware of fill, contaminated with fuel oil and lubricants, that had to be analyzed so it could be handled properly. Hennemann Decl. ¶ 36 & Exhs. 46-47 (Wilson Dep. 48:4-50:13; 35:17-36:12).

## C.    *Environmental Laws*

Long before the 1980's, Massachusetts state and local authorities had the power to make reasonable health regulations and to remove or prevent nuisances, sources of filth and causes of sickness. 1816 Mass. Acts Ch. 44 §§ 3, 11 (current version at M.G.L. ch. 111, § 31) (health regulations); 1692 Mass. Acts Ch. 23 § 1 (current version at M.G.L. ch. 111 § 143) (noisome trades). Massachusetts common law also imposed upon a landowner the duty to clean up a nuisance, which included hazardous environmental conditions, on its land. *See Nassr v. Commonwealth,* 394 Mass. 767, 773-75 (1985).

In the 1970's and early 1980's, the concept of responsibility for environmental conditions on one's property gained even greater prominence as the federal government passed major environmental laws addressing water pollution (1972), the treatment, storage, and disposal of hazardous waste (1976), and the cleanup of historic contamination (1980).[3] On March 24, 1983,

---

[3] *See* Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 *et seq.* ("Clean Water Act"), Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 *et seq.* ("RCRA"), and Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA" or "Superfund"), 42 U.S.C. § 9601 *et seq.* (providing for liability for environmental cleanup costs for "the owner or operator of a vessel or facility," 42

Massachusetts followed suit, enacting Chapter 21E, the Massachusetts Oil and Hazardous Material Release Prevention and Response Act (attached as Exhibit 2 hereto). 1983 Mass. Acts p. 4, ch. 7 § 5 (codified at M.G.L. ch. 21E). Chapter 21E and its legislative consideration were well publicized prior to its enactment. Declaration of Robert Culliford in Support of Motion for Partial Summary Judgment ("Culliford Decl.") ¶ 10 & Exhs. 2, 5-11. MBTA was aware or should have been aware of the consideration and enactment of Chapter 21E. Culliford Decl. ¶ 11 & Exhs. 2-3. In particular, two expert witnesses (one of them MBTA's) have opined that it is not plausible that MBTA, as one of the largest landowners in Massachusetts—one that owned numerous commuter rail/railroad facilities—was unaware of the enactment of Chapter 21E in March 1983. Culliford Decl. ¶ 5 & Exhs. 2-3.

Chapter 21E provided for liability for owners and operators of property at which there had been releases of hazardous materials. Chapter 21E § 5. In addition, Chapter 21E was broader than its federal counterpart, CERCLA, in that it also imposed cleanup liability on owners and operators of property where oil, including "crude or fuel oils, lube oil or sludge" had been released. Chapter 21E §§ 2, 5. Pursuant to Chapter 21E, an owner or operator had an obligation to notify the DEQE as soon as the owner or operator had knowledge of a release or threat of release of oil or hazardous material. Chapter 21E § 7. Chapter 21E provided for strict, joint and several liability for cleanup costs for owners and operators of property contaminated with oil or hazardous materials. Chapter 21E § 5(a).

Increasing environmental regulation in the late 1970's and early 1980's affected MBTA. In 1979, state and local environmental officials investigated an illegal dump filled with hazardous material on MBTA property in Woburn and indicated that a cleanup would be

---

U.S.C. § 9607(a)(1), and "any person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2)).

required. *Hazardous Materials Found on MBTA Site*, THE DAILY TIMES, (Woburn, Mass.) May 7, 1979 (attached as Exhibit 3 hereto). The DEQE was involved (see Exhibit 3 hereto). Also, during the period from 1979 to 1983, Peter Wilson stated MBTA was aware of spills or releases of oil or hazardous substances at MBTA facilities other than the BET, including South Station and South Hampton Street, that required cleanup efforts by the MBTA. Hennemann Decl. ¶ 37 & Exh. 29. In July 1984 MBTA's consultants completed an Oil Recovery Study at the BET that identified floating product at the site, and the consultants recommended notifying DEQE of the condition of the site. Answer ¶ 10.

### D.    The B&M Bankruptcy Case

B&M filed for bankruptcy protection in this Court in 1970, and operated under bankruptcy court protection from 1970 to June 1983. Bergeron Decl. ¶ 23. The bankruptcy case was filed under the Bankruptcy Act of 1898.[4] Bergeron Decl. ¶ 24. During B&M's bankruptcy proceedings, with approval of the Court, MBTA purchased the BET from B&M's bankruptcy estate in December 1976. Bergeron Decl. ¶ 25. The purchase and sale agreement authorized MBTA to inspect the BET property prior to delivery of a deed. Bergeron Decl. ¶ 27 & Exh. 10.

During the course of the bankruptcy, the trustees of B&M's bankruptcy estate ("Trustees") entered into several agreements with MBTA regarding B&M's operation of the BET. Bergeron Decl. ¶¶ 28-29 & Exh. 11-12. These included a February 23, 1982 Agreement ("1982 Agreement") that provided that MBTA would indemnify B&M for certain property damage claims at the BET. Bergeron Decl. ¶ 29 & Exh. 12 (MBTA 00001605-00001749). The

---

[4] The Bankruptcy Act of 1898 ("Bankruptcy Act") was repealed and replaced by a codified Title 11 of the United States Code in 1978 (the "Bankruptcy Code"). The Bankruptcy Code subsequently has been amended on a number of occasions. The Bankruptcy Act governs cases filed before October 1, 1979, and "the substantive rights of parties in connection with any such bankruptcy case, matter, or proceeding shall continue to be governed by the law applicable to such case, matter, or proceeding as if the [Bankruptcy Code] had not been enacted." Pub. L. No. 95-598, § 403(a), 92 Stat. 2683 (1978). Accordingly, the B&M bankruptcy, which was filed in 1970, is governed by the Bankruptcy Act rather than more recent bankruptcy legislation.

1982 Agreement contained provisions relating to "Accident Responsibility" that included the establishment of an "Indemnification and Liability Fund." Bergeron Decl. ¶ 30 & Exh. 13 (MBTA 00001647-00001650). In particular, the 1982 Agreement provided that:

> The Authority [MBTA] agrees to indemnify and hold the Operator [B&M] harmless from any loss not fully insured against and with respect to losses incurred during the term of this Agreement and not fully covered by the Liability Fund hereinafter described, arising from injury (including death) to persons or *damage to property, including but not limited to the Authority's Property, which shall arise out of or be in any way connected with the [contract] Service* and from any such losses which remain unsettled as of the date hereof and which occurred during the term of the Agreement between Boston and Maine Corporation and the Massachusetts Bay Transportation Authority dated December 14, 1964, as amended and extended; the operating agreement by and between Robert W. Meserve and Benjamin H. Lacey, Trustees of the property of Boston and Maine Corporation and the Massachusetts Bay Transportation Authority, dated March 18, 1976; and the operating agreement between Robert W. Meserve and Benjamin H. Lacey, Trustees of the property of Boston and Maine Corporation and the Massachusetts Bay Transportation Authority, dated March 9, 1977.

(emphasis added); Bergeron Decl. ¶ 31 & Exh. 14 (MBTA 00001647-00001648).

The 1982 Agreement required B&M to establish a Liability Fund by depositing a maximum of $200,000 each year into the Fund to "provide for the payment of damages for claims resulting from events occurring during the term of this Agreement covered by this indemnity provision." Bergeron Decl. ¶ 32 & Exh. 15 (MBTA 00001648). B&M was under no obligation to make payments of more than $200,000 per year into the Fund, and the 1982 Agreement further provided that "[w]hen all claims for damages arising during the term of this Agreement for which there is liability have been satisfied, any funds remaining in the Liability Fund shall be retained by the Operator [B&M]." Bergeron Decl. ¶ 33 & Exh. 15 (MBTA 00001648). Finally, the 1982 Agreement provided that "[t]he provisions of this paragraph shall survive the term of this Agreement with respect to all causes of action which arise prior to the termination of this agreement." Bergeron Decl. ¶ 34 & Exh. 16 (MBTA 00001649).

On June 17, 1983, more than six years after MBTA purchased the BET from B&M, this Court entered the Consummation Order in the B&M bankruptcy ("Consummation Order") (attached as Exhibit 4 hereto), closing the B&M bankruptcy and discharging B&M from all claims that existed prior to June 30, 1983.[5]  Consummation Order § 5.03(a) & p. 33.  The Consummation Order provides that as of the Consummation Date, B&M and its Trustees were *discharged and released from all claims and liabilities, whether or not filed in the bankruptcy*. Consummation Order § 5.03(a) (emphasis added).  Significantly, the Consummation Order also enjoins the assertion of any and all claims against B&M or any successor entity existing on or before the Consummation Date.  Consummation Order § 8.01.  The Consummation Order established June 30, 1983 as the Consummation Date.  Consummation Order § 2.01.

Despite its knowledge of: (1) the B&M bankruptcy proceedings, (2) the prevalent environmental contamination at the BET, and (3) the potential liability of itself and B&M under environmental and other laws, MBTA failed to file any claim in the B&M bankruptcy. Complaint ¶¶ 16, 17; Answer ¶ 42.  On May 4, 2004, however, nearly thirty years after MBTA purchased the BET from B&M's bankruptcy estate and more than twenty years after the Consummation Date, MBTA asserted its discharged claim for clean up costs against B&M. Complaint ¶ 8 & Exh. B thereto; Answer ¶ 1.

## ARGUMENT

"Summary judgment may be granted only when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

---

[5] The language in the Consummation Order is extremely broad as to discharge of claims.  For instance, the Consummation Order transfers all remaining property to the Reorganized Company "free and clear of all claims, rights, demands, interests, liens and encumbrances of every kind and character, whether or not properly or timely filed and whether or not approved, acknowledged or allowed in these proceedings..."  Consummation Order § 5.01.

matter of law.' Fed. R. Civ. P. 56(c). 'The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.'" *Rochester Ford Sales Inc. v. Ford Motor Co.*, 287 F.3d 32, 38 (1st Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). Rather, "[t]o be considered material, a disputed fact must have the potential to 'affect the outcome of the suit under the governing law.'" *Id.* at 38 (quoting *Anderson,* 477 U.S. at 248).

I.     **Most, If Not All, of MBTA's Claim for Cleanup Costs at the BET Relates to Releases Occurring on or before June 30, 1983, and Such Claim Was Discharged and Released in B&M's Bankruptcy Case.**

The Consummation Order in B&M's bankruptcy case discharged B&M from all claims that existed before June 30, 1983, Consummation Order § 5.03(a) & (b), and enjoined their later assertion. Consummation Order § 8.01. Accordingly, to the extent that MBTA's claim arose pre-June 30, 1983, it was discharged in the bankruptcy.

A.     **MBTA Had a Claim Prior to the Bankruptcy Consummation Date.**

Section 77 of the Bankruptcy Act of 1898 (repealed 1978) (attached as Exhibit 5 hereto), which governed railroad bankruptcies such as that of B&M, "clearly provides broad authorization for the discharge in bankruptcy of claims against the debtor in order to secure a fresh start for a company resulting from a [S]ection 77 reorganization." *In re Chicago, M., St. P. & Pac. R. Co.*, 974 F.2d 775, 780 (7th Cir. 1992) ("*Chicago, Milwaukee*") (quoting *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 941 (3d Cir. 1985)). A creditor who fails to file a claim prior to the applicable bar date in a Section 77 reorganization "is forever discharged from raising this claim against the debtor or its successors." *See Chicago, Milwaukee,* 974 F.2d at 780.

Section 77 broadly defined "claims" to include "debts, whether liquidated or unliquidated ...or other interests of whatever character," 11 U.S.C. § 205 (1976), and the courts have

consistently interpreted broadly the Bankruptcy Act's definition of "claim."[6] *See, e.g. Chicago,*

*Milwaukee,* 974 F.2d at 781 (party may have preconsummation claim which must be raised in

order to avoid discharge under Section 77 even before the party has a cause of action); *Gardner*

*v. New Jersey,* 329 U.S. 565, 573 (1947) (noting the sweeping, all inclusive definition of

"claims" in Section 77). Courts have also specifically acknowledged that contingent claims for

environmental cleanup costs fall within the broad definition of "claims" under bankruptcy law.

*See In re Hemingway Transp., Inc.*, 993 F.2d 915, 923 (1st Cir. 1993); *United States v. LTV*

*Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1005-06 (2d Cir. 1991) (determining EPA had

contingent claim under bankruptcy law for CERCLA response costs, despite fact that EPA did

not know extent of removal costs it might incur and seek to impose on debtor, or location of all

sites at which such wastes might be found); *Mesiti v. Microdot Inc.*, 156 B.R. 113, 118 & n. 4

(D.N.H. 1993) (noting that even when environmental response costs have not actually been

incurred, but may or are likely to be incurred, a "contingent debt" exists for Bankruptcy Act

purposes).

> **1.    Under the Applicable Relationship Test, MBTA's Claim Arose When the Releases Occurred.**

For a contingent claim for environmental cleanup costs to be discharged in bankruptcy, it

must exist before the bankruptcy court orders a discharge of claims and liabilities against the

debtor. *See Chicago, Milwaukee,* 974 F.2d at 779 (analyzing when a party has an environmental

claim such that failure to raise the claim before the bankruptcy bar date forever bars the claim

from being brought). In determining when a claim arises, numerous courts have held that

environmental cleanup claims arise for purposes of bankruptcy at the time of the actual or

---

[6] Though inapplicable to this case, the definition of "claim" in the Bankruptcy Code—a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured"—is similarly broad. 11 U.S.C. § 101(5) (2000).

threatened release of the hazardous materials. *See, e.g. Chateaugay*, 944 F.2d at 1002-06

(holding that claim arises when release of hazardous substances occurs, without regard to when

contamination is discovered or response costs incurred); *In re Jensen*, 127 B.R. 27, 30 (B.A.P.

9th Cir. 1991) (concluding that claim arises upon actual or threatened release of hazardous waste

by debtor), *aff'd*, 995 F.2d 925 (9th Cir. 1993).

In the purchase and sale context, the First Circuit and this Court have recognized that a

creditor's right to payment from a bankruptcy debtor typically arises at a similarly early point–

either before or when the creditor purchases the contaminated facility from the bankruptcy estate.

*Hemingway*, 993 F.2d at 926, 928 (citing *Chateaugay* and indicating that creditor's right to

payment accrued when debtors still owned and operated facility where hazardous waste disposal

occurred); *see also In re Hemingway Transport, Inc.*, 73 B.R. 494, 503 (Bankr. D. Mass. 1987)

(recognizing that purchaser's cause of action against bankruptcy debtor under environmental law

arose when contaminated property was transferred to purchaser). Following this approach "gives

effect to the important bankruptcy goal of providing a fresh start to the debtor and discourag[ing]

manipulation of the bankruptcy process."[7] *Jensen,* 127 B.R. at 33.

Courts such as the Second Circuit in *Chateaugay* have concluded that the conduct giving

rise to the release or threatened release of hazardous substances and the relationship between the

parties provide "sufficient 'contemplation' of contingencies to bring most ultimately maturing

payment obligations based on [the debtor's] conduct within the definition of 'claims.'"

*Chateaugay*, 944 F.2d at 1005. For instance, in *Chateaugay,* the Second Circuit considered that

the relationship between environmental regulatory agencies and those subject to regulation was

---

[7] Timely filing of claims is vital because bankruptcy's goal of providing debtors a fresh start would be frustrated if creditors who failed to file timely claims later could bring such claims against the reorganized company after the close of bankruptcy. *See, e.g. Chicago, Milwaukee*, 974 F.2d at 779; *see also In re Edge*, 60 B.R. 690, 700 n. 8

sufficient to create a contingent claim for environmental cleanup as of the time the hazardous substances were released. *Id.* According to the Second Circuit, although "there does not yet exist . . . the degree of relationship between claimant and debtor typical of an existing though unmatured contract claim . . . EPA [the Environmental Protection Agency] is acutely aware of [the debtor] and vice versa." *Id.* at 1005.

In the instant case, the relationship between B&M and MBTA is significantly closer than the relationship between EPA and the debtor that was found sufficient in *Chateaugay*. In *Chateaugay*, EPA did not even know the location of some of the contaminated sites. Here, by contrast, MBTA purchased the BET from B&M's bankruptcy estate in December 1976 and continued to own the BET at the time of, and after, the enactment of Chapter 21E in March 1983. Bergeron Decl. ¶ 25. B&M also operated the BET on behalf of MBTA as owner for the decade between December 1976 and December 1986. Bergeron Decl. ¶ 26. Also, the bankruptcy trustees entered into several agreements with MBTA for the operation of the BET during the 1970's and 1980's. Bergeron Decl. ¶ 28-29 & Exhs. 11-12. The Purchase and Sale Agreement gave MBTA the right to inspect property conditions, Bergeron Decl. ¶ 27 & Exh. 10, and the 1982 Agreement specifically addressed liability for property damage. Bergeron Decl. ¶ 30-31 & Exhs. 13-14.

In addition to the contractual relationship between MBTA and B&M, MBTA had an ongoing business relationship with B&M. MBTA maintained an office at the BET, staffed by MBTA employees, and MBTA personnel had actual, direct knowledge of environmental conditions at the site, including releases of fuel oil, during at least the 1979 to 1983 time period. Hennemann Decl. ¶¶ 18, 19 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39. Prior to 1984, MBTA was

---

(Bankr. D. Tenn. 1986) (noting that existence of a claim in bankruptcy "should not depend on whether the estate has assets or on the victim's appraisal of the likely success of post-bankruptcy collection efforts").

aware of contamination at the BET and the need for potential environmental cleanup. Hennemann Decl. ¶¶ 11-14, 18-27 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-40 (¶¶ 68-72). MBTA also had payment responsibility for expenses at the BET site, including environmental expenses. Hennemann Decl. ¶ 28 & Exh. 35. Under these circumstances, MBTA and B&M clearly had the requisite relationship for MBTA to have sufficient contemplation of contingencies to bring environmental cleanup obligations regarding the BET within the definition of contingent "claims." *See Chateaugay*, 944 F.2d at 1005; *see also NCL Corp. v. Lone Star Bldg. Ctrs. (Eastern) Inc.*, 144 B.R. 170, 177 (S.D. Fla. 1992) (holding sufficient relationship existed between creditor and debtor to give rise to claim where creditor owned and operated site for long period, creditor leased site with indemnification provisions applicable if debtor did not maintain property, and creditor had right to inspect property).

In sum, not only did MBTA and B&M have a contractual relationship that contemplated the very issues giving rise to MBTA's claims, *see NCL Corp.*, 144 B.R. at 177, but MBTA's own personnel were aware of the releases giving rise to MBTA's claims for some time prior to the enactment of Chapter 21E and prior to the Consummation Date. *See id.* at 179 (where bankruptcy creditor had actual knowledge of debtor's bankruptcy and site's environmental condition, as well as ability to inspect property, inevitable finding is that creditor fairly contemplated claims but chose not to file claims in bankruptcy). Accordingly, the considerable relationship between MBTA and B&M–which included both contractual interaction and business interaction–gave MBTA adequate knowledge regarding B&M's operations and releases at the site for MBTA to sufficiently contemplate its contingent claims for cleanup, under Chapter 21E or other laws, prior to the bankruptcy Consummation Date.

##### 2. Even Under the Fair Contemplation Test, MBTA Had a Claim Prior to the Bankruptcy Consummation Date.

Even if the foregoing test does not apply, MBTA's claim was discharged by the plain language of the Consummation Order. Certain courts have required that claims for environmental cleanup *actually* be fairly contemplated by the parties, rather than arising as of the date of release based on the relationship of the parties. *NCL Corp.,* 144 B.R. at 177. Under this standard as well, MBTA had a contingent claim prior to the June 1983 Consummation Date. *See, e.g. In re Jensen,* 995 F.2d 925, 930 (9th Cir. 1993) (limiting relationship test to situations where some actual interaction between debtor and creditor existed); *In re National Gypsum Co.,* 139 B.R. 397, 409 (N.D. Tex. 1992) (concluding that any future environmental response costs that can be fairly contemplated by the parties at the time of the debtor's bankruptcy are "claims" for purposes of bankruptcy law). In addition to the relationship between the debtor and creditor, these cases focus on a non-exhaustive list of factors, including knowledge by the parties of a site at which a party may be liable for cleanup costs and action by a regulatory agency, to establish that a contingent claim for environmental cleanup costs exists for bankruptcy purposes. *Jensen,* 995 F.2d at 930; *National Gypsum,* 139 B.R. at 408 (finding that at least one of factors relevant to determination that claim had arisen was present for sites listed by EPA for future response costs).

Under this "fair contemplation" analysis, MBTA possessed contingent claims for environmental cleanup before the Consummation Date. MBTA cannot seriously contest that from 1979 to 1983 it knew of B&M's bankruptcy and of releases of fuel oil that had occurred at the BET. All available evidence is to the contrary. *See* Bergeron Decl. ¶¶ 25-29; Hennemann Decl. ¶¶ 11-14, 18-27 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-40. Chapter 21E, which was enacted on March 24, 1983, more than three months before B&M's Consummation Date, immediately

imposed cleanup liability on owners and operators of property where releases of oil had occurred. Chapter 21E § 5. The legislative consideration and enactment of Chapter 21E were well publicized, Culliford Decl. ¶ 10 & Exhs. 2, 5-11, and not only B&M's expert witness but also MBTA's expert witness has stated that it is implausible to suggest that MBTA, a political subdivision of the state and one of the largest landowners in Massachusetts—one that owned numerous commuter rail and railroad facilities—was completely unaware of its enactment. Culliford Decl. ¶ 5-9, 12 & Exhs. 2-4.[8]

Furthermore, long before the enactment of Chapter 21E, Massachusetts state agencies had the authority to make reasonable health regulations and to remove or prevent nuisances, sources of filth and causes of sickness. M.G.L. ch. 111, § 31 (dating to 1816); M.G.L. ch 111 § 143 (dating to 1692-93). Massachusetts common law also imposed upon landowners the duty to abate a nuisance, which included the cleanup of hazardous environmental conditions, on their land. *Nassr v. Commonwealth,* 394 Mass. 767, 773-75 (1985). Therefore, based on releases of fuel oil and hazardous materials at the BET, MBTA had a contingent claim against B&M for environmental cleanup costs at the BET even before the enactment of Chapter 21E.

Like every other citizen, MBTA is presumed to know the law. *Roberts v. Maine,* 48 F.3d 1287, 1300 (1st Cir. 1995). Thus, the combination of knowledge by MBTA of releases at the BET during B&M's operations in the late 1970's and early 1980's, knowledge by MBTA of the enactment of Chapter 21E, and presumed knowledge on the part of MBTA of the common and statutory law that antedated the enactment of Chapter 21E, created a situation in which a

---

[8] MBTA's ownership, in the late 1970's and early 1980's, of several other sites where petroleum products or hazardous materials had been released, and where cleanups were required by state regulators, Hennemann Decl. ¶ 37 & Exh. 29, further demonstrates MBTA's obvious knowledge of Chapter 21E and the environmental laws that antedated it, and of MBTA's liability for cleanup costs at sites such as the BET. In particular, MBTA was required to perform cleanups at South Station, South Hampton Street, and Woburn properties. Hennemann Decl. ¶ 37 & Exh 29; *see also* Exhibit 3 hereto.

contingent claim for environmental cleanup was within the fair contemplation of MBTA before

the Consummation Date. *See Mesiti*, 156 B.R. at 118 (determination of whether claims were

foreseeable and at least contingent before Consummation Order's bar date for purposes of

Section 77 depends on information purchaser had available to it regarding: contamination at site,

debtor's possible link to contamination, and whether information was reasonably available

between enactment of relevant law and consummation date). To conclude otherwise would

reward MBTA for its lack of diligence and violate the fresh-start policy of the federal bankruptcy

laws.

**B.      MBTA's Claim Was Discharged Pursuant to the Consummation Order in B&M's Bankruptcy.**

Section 77 of the Bankruptcy Act of 1898 states that the confirmation of a plan of

reorganization for a railroad such as B&M is binding and discharges the debtor from its

liabilities. 11 U.S.C. § 205(f) (1976). In particular, "[u]pon confirmation by the judge, the

provisions of the plan and the order of confirmation shall, subject to the right of judicial review,

be binding upon the debtor, . . . and all creditors secured or unsecured, whether or not adversely

affected by the plan, and whether or not their claims shall have been filed." *Id.* Under Section

77(b), "creditors" include "all holders of claims of whatever character against the debtor or its

property, whether or not such claims would otherwise constitute provable claims under this title."

11 U.S.C. § 205(b) (1976). As noted above, Section 77(b) also broadly defined "claims" to

include "debts, whether liquidated or unliquidated ...or other interests of whatever character."

*Id.*

On June 17, 1983, this Court entered the Consummation Order in B&M's bankruptcy

proceedings, which recognized that B&M's Plan of Reorganization had been approved and

confirmed. Consummation Order at p. 1, 34. The Consummation Order provided that as of the

Consummation Date of June 30, 1983, B&M and the Trustees and B&M's bankruptcy estate

would be discharged and released from all claims and liabilities, whether or not a proof of claim

was filed in the bankruptcy. Consummation Order §§ 2.01, 5.03(a). The Consummation Order

does not distinguish between claims that existed before (pre-petition claims) or after (post-

petition claims) the filing of the bankruptcy, but instead discharges and releases *all* pre-

Consummation Date claims. Specifically, the Consummation Order states that—

> the Debtor and the Debtor's Trustees shall, as of the Consummation Date,
> be discharged and released forever from: (a) all obligations, debts,
> liabilities and claims against the Debtor's Trustees or the Debtor, whether
> or not filed or presented, whether or not approved, acknowledged or
> allowed in these proceedings and whether or not provable in bankruptcy,
> including without limitation all claims assumed or guaranteed by the
> Debtor's Trustees or the Debtor or enforceable against the property of the
> Debtor.

Consummation Order § 5.03(a). The Consummation Order further provides that—

> the Debtor and the Debtor's Trustees shall, as of the Consummation Date,
> be discharged and released forever from: (b) all obligations, debts,
> liabilities, claims costs and expenses arising out of or in connection with
> the Debtor's Trustees' administration of the property, business and affairs
> of the Debtor, whether or not filed or presented and whether or not
> approved, acknowledged or allowed in these proceedings, accruing prior
> to the Consummation Date.

Consummation Order § 5.03(b).

In addition to these blanket discharge provisions, the Consummation Order enjoins the

assertion of claims against B&M and successors arising on or before the Consummation Date:

> All persons, firms, governmental entities and corporations, wherever
> situated, located or domiciled, are hereby permanently restrained and
> enjoined from instituting, prosecuting or pursuing, or attempting to
> institute, prosecute or pursue, any suits or proceedings, at law or in equity
> or otherwise, against the Debtor's Trustees or the Reorganized Company
> or its or their successors or assigns or against the Segregated Account or
> any of the assets or property of the Reorganized Company or its
> successors or assigns, directly or indirectly, on account of or based upon
> any right, claim or interest of any kind or nature whatsoever which any

22

> person, firm, governmental entity or corporation may have in, to or against
> the Debtor, the Debtor's Trustees or any of their assets or properties. . . on
> or at any time after the Consummation Date....

Consummation Order § 8.01; *see also Mesiti,* 156 B.R. at 118 (indicating that claim by former

owner of contaminated property, which had previously been site of railroad roundhouse, against

reorganized successor, seeking contribution toward claims for environmental response costs,

fairly came within reach of reorganization court's injunction).

　　As set forth above, MBTA had a contingent claim for environmental cleanup costs prior

to the Consummation Date. "[A] creditor who fails to file a preconsummation claim before the

applicable bar dates is forever discharged from raising this claim against the debtor or its

successors." *Chicago, Milwaukee,* 974 F.2d at 780. Moreover, the Consummation Order could

not be clearer that failure to file a claim in B&M's bankruptcy would result in the extinction of

that claim. Consummation Order §§ 5.03(a), 5.03(b), 8.01. Nevertheless, despite MBTA's

actual knowledge of the B&M bankruptcy proceedings (out of which it had purchased the BET),

its knowledge of environmental conditions at the BET, and its knowledge of liability for cleanup

at the BET pursuant to Chapter 21E and prior law, MBTA did not file a claim in the B&M

bankruptcy. Complaint ¶ 17; Answer ¶ 42. Consequently, pursuant to the Consummation Order,

MBTA's claim against B&M was discharged in 1983 and is now barred.

**II.    Any MBTA Claim for Environmental Cleanup at the BET that Survived Discharge
in the Bankruptcy Proceedings is Contractually Limited.**

　　Even if MBTA's claims for environmental cleanup at the BET were not discharged in

B&M's bankruptcy proceedings, or if MBTA has a claim for environmental costs that accrued

during the post-discharge period in which B&M operated the BET (July 1, 1983 through

December 31, 1986), MBTA's claims are contractually limited to a maximum of $1 million,

rather than the claimed $15.3 million. Specifically, during the bankruptcy proceedings, MBTA

and the Trustees entered into the 1982 Agreement that generally addressed B&M's operation of the BET. Bergeron Decl. ¶¶ 29 & Exh. 12 (MBTA 00001605-00001749). The 1982 Agreement also covered "Accident Responsibility" and called for the establishment of an "Indemnification and Liability Fund." Bergeron Decl. ¶ 30 & Exh. 13. (MBTA 00001647-00001650). The relevant provisions of the 1982 Agreement provide that:

> The Authority [MBTA] agrees to indemnify and hold the Operator [B&M] harmless from any loss not fully insured against and with respect to losses incurred during the term of this Agreement and not fully covered by the Liability Fund hereinafter described, arising from injury (including death) to persons or *damage to property*, including but not limited to the Authority's Property, which shall arise out of or be in any way connected with the Service [B&M's operations] and from any such losses which remain unsettled as of the date hereof and which occurred during the term of the Agreement between Boston and Maine Corporation and the Massachusetts Bay Transportation Authority dated December 14, 1964, as amended and extended; the operating agreement by and between Robert W. Meserve and Benjamin H. Lacey, Trustees of the property of Boston and Maine Corporation and the Massachusetts Bay Transportation Authority, dated March 18, 1976; and the operating agreement between Robert W. Meserve and Benjamin H. Lacey, Trustees of the property of Boston and Maine Corporation and the Massachusetts Bay Transportation Authority, dated March 9, 1977.

Bergeron Decl. ¶ 31 & Exh. 14 (MBTA 00001647-00001648) (emphasis added). MBTA thus agreed to indemnify B&M for property damage claims to the extent that there were no paid-in funds in the Liability Fund that was to be established.

The 1982 Agreement further required B&M to deposit a maximum of $200,000 each year from 1982 to 1986 into the Liability Fund for the payment of damages for claims resulting from events occurring during the term of the Agreement covered by the indemnity provision. Bergeron Decl. ¶ 32 & Exh. 15 (MBTA 00001648). B&M was not required to pay more than $200,000 per year into the Fund, and B&M could retain any funds remaining in the Liability

24

Fund when all claims for damages arising during the term of the Agreement for which there was liability had been satisfied. Bergeron Decl. ¶ 33 & Exh. 15 (MBTA 00001648).

Importantly, the 1982 Agreement also provides that MBTA's indemnification obligations continue even after the term of the Agreement with respect to all causes of action arising prior to the termination of the Agreement. Bergeron Decl. ¶ 34 & Exh. 16 (MBTA 00001649). Consequently, B&M's liability for claims arising prior to January 1, 1987, due to property damage at the BET going back to 1964, is limited to $1 million, the total amount required to be deposited in the Liability Fund by B&M. MBTA agreed to indemnify B&M for any claims exceeding that amount.[9]

The term "property damage" in the 1982 Agreement encompasses claims for environmental clean up. *See Hays v. Mobil Oil Corp.,* 930 F.2d 96, 101-02 (1st Cir. 1991) (applying Massachusetts law); *Hazen Paper Co. v. U.S. Fidelity & Guar. Co.,* 555 N.E.2d 576, 582-84 (Mass. 1990) (claim for cleanup costs constitutes claim for "damage on account of property damage"). Furthermore, by signing the 1982 Agreement, MBTA expressly agreed that its indemnification obligations, and the $1 million cap on B&M's obligations, would continue after 1986 as to all causes of action that arose on or before December 31, 1986, the termination date of the 1982 Agreement. Chapter 21E, which was enacted in 1983 during the term of the 1982 Agreement, imposed liability on the owner or operator of a site from or at which there is or has been a release or threat of release of oil or hazardous material. M.G.L. Ch. 21E § 5(a)(1).

---

[9]  Although the 1982 Agreement states that MBTA will not be required to indemnify B&M for losses arising out of any act or omission occurring during the term of the Agreement for which B&M, as the operator of the freight service is legally responsible and for which the Authority and B&M as the operator of the (commuter) Service, is not legally responsible, Bergeron Decl. ¶ 35 & Exh. 17 (MBTA 00001650), this provision is inapplicable to the environmental claims at issue. MBTA, as owner of the BET, is jointly and severally liable, or has independent liability, on these environmental claims. *See* Chapter 21E § 5(a) (establishing joint and several liability to the Commonwealth); *see also Nassr,* 394 Mass. at 773-75 (landowner has duty to abate hazardous environmental conditions on its land caused by lessee).

Chapter 21E also provided that any person who undertook an assessment, containment or removal action regarding the release or threatened release of oil or hazardous materials shall be entitled to reimbursement of costs from any other person liable for such release or threat of release. Chapter 21E § 4. MBTA unquestionably owned the BET, where there had been releases of oil and hazardous substances, before and after the enactment of Chapter 21E.

A cause of action under Chapter 21E accrues when the plaintiff discovered or reasonably should have discovered the damage and the cause of the damage. *See, e.g., Town of Sturbridge v. Mobil Corp.,* 195 F. Supp. 2d 330, 333-34 (D. Mass. 2002). In *Town of Sturbridge*, the court determined that the town "had known for years that [contaminants] had leaked into the soil and groundwater from defendants' gasoline storage tanks located in close proximity to the Well and was, therefore, also aware of the cause of its contamination at that time." 195 F. Supp. 2d at 335; *see also* M.G.L. ch. 21E § 11(A) (2006) (stating accrual dates for bringing cause of action, including that actions brought by persons other than Commonwealth may be commenced within three years after the date such person discovers or reasonably should have discovered that the person against whom action is brought is liable for release or threat of release). Here, both MBTA and the Commonwealth of Massachusetts (through DEQE/DEP) had knowledge of releases of contamination at and from the BET by the time Chapter 21E was enacted in 1983, if not earlier. Bergeron Decl. at ¶¶ 13-14 & Exhs. 2-4 (MBTA 00003089; MBTA 00003089; MBTA 00002595; MBTA 00002900-01). MBTA employees were aware of fuel spills at the BET at least as of the early 1980's. Hennemann Decl. ¶¶ 11-14, 18-27 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39. By the late 1970's MBTA also was aware that discharges of oil from the BET entered the Millers River and the Charles River, and that the Coast Guard was issuing warnings and fines for these discharges. Bergeron Decl. ¶¶ 10-11 & Exh. 7 (BM 000003). In fact, MBTA

26

funded additional equipment in approximately 1978 that initially recovered approximately 35,000 gallons of petroleum products per year for reuse by MBTA. Bergeron Decl. ¶¶ 15-20 & Exhs. 7-8 (BM 000003; 000007).

DEP incident response files similarly reflect knowledge of a fuel spill of approximately 1,100 gallons of No. 2 fuel oil at the BET in October 1981. Bergeron Decl. ¶¶ 14 & Exh. 2 (MBTA 00003089). DEP also maintained files on releases of oil from the BET into the Millers River and the Charles River in the late 1970's and early 1980's. Bergeron Decl. ¶ 13-14 & Exhs. 2-4 (MBTA 00003089; MBTA 00002595; MBTA 00002900-01). At the latest, a cause of action for state law purposes under Chapter 21E accrued in July 1984—a time when the 1982 Agreement was in effect—when MBTA's consultants completed an Oil Recovery Study at the BET that identified floating product at the BET and the consultants recommended notifying DEQE of the condition of the site. Answer ¶ 10.

Because a cause of action under Chapter 21E existed while the 1982 Agreement was in effect, MBTA's claims for environmental cleanup costs continue to be subject to the indemnification provisions and liability cap provided in the Agreement.

### CONCLUSION

MBTA had a claim against B&M for environmental cleanup costs at the BET prior to the bankruptcy Consummation Date. MBTA's failure to assert that claim in B&M's bankruptcy case discharged the claim and bars its assertion at this late date. This Court accordingly should enforce its Consummation Order, grant B&M's motion for partial summary judgment, and enjoin MBTA from assertion of its claim for reimbursement of cleanup costs at the BET as to contamination occurring on or before June 30, 1983.

Moreover, this Court should adjudge that under the 1982 Agreement, B&M's liability for claims arising from cleanup costs for contamination occurring at the BET is limited to the lesser of $1 million or the amount of cleanup liability (if any) ultimately proven to be attributable to B&M.

Respectfully submitted,

WINSTON & STRAWN LLP

By: _____
    Eric L. Hirschhorn
    Winston & Strawn LLP
    1700 K Street, N.W.
    Washington DC  20006
    202-282-5000
    Attorneys for Plaintiff,
    Boston & Maine Corporation


    Robert B. Culliford (BBO#638468)
    14 Aviation Avenue
    Pease International Tradeport
    Portsmouth NH  03801
    603-766-2002
    Counsel for Plaintiff,
    Boston & Maine Corporation

Dated:  June 2, 2006

28

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 2, 2006.

John M. Stevens
Alicia Barton McDevitt
Foley Hoag LLP
155 Seaport Blvd.
Boston, MA  02210-2600
(617) 832-1000

Eric L. Hirschhorn