UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

BOSTON AND MAINE
CORPORATION,

          Plaintiff,

    -v.-                             Civil Action No. 05-11656-RCL

MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY

          Defendant.

---

**DECLARATION OF ROGER D. BERGERON IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Roger D. Bergeron declares as follows:

1.     I am the Assistant Vice President, Engineering, at Boston & Maine Corporation ("B&M"), the Plaintiff in this action, and I worked for B&M at the Boston Engine Terminal ("BET") prior to June 1983. As such I am familiar with the facts and circumstances of this case. My knowledge comes from my own personal knowledge, from corporate records, and from documents cited herein.

2.     I make this declaration in support of the Plaintiff's Motion for Partial Summary Judgment

to enforce the Consummation Order issued in B&M's bankruptcy proceedings and to enjoin the Massachusetts Bay Transportation Authority's ("MBTA") assertion of a claim for environmental cleanup costs at the BET for releases prior to June 30, 1983. I also make this motion in support of a declaratory judgment by this Court that MBTA's claim is contractually limited by a prior contractual arrangement between MBTA and the Trustees of B&M's bankruptcy estate.

3. A declaration as to the admissibility and authenticity of the documents produced in this action by B&M, with Bates labels bearing the prefix "BM," and a declaration as to the admissibility and authenticity of the documents produced in this action by MBTA, Bates labeled with prefix "MBTA," appears in the Declaration of Robert B. Culliford in Support of Plaintiff's Motion for Partial Summary Judgment ¶ 3.

4. B&M is a rail common carrier providing railroad freight services in the Northeastern United States.

5. MBTA provides mass transportation service throughout eastern Massachusetts by means of bus, subway, light rail, and otherwise.

6. MBTA has indicated that it is the second largest property owner in Massachusetts (document from MBTA web site attached hereto as Exhibit 1).

7. On several occasions in the 1970's and early 1980's, oil was released from the BET into the Miller's River and/or the Charles River (relevant documents attached hereto as Exhibits 2-4).

8. Both the Metropolitan District Commission and B&M were cited by the Coast Guard for an oil spill into the Millers River on March 4, 1977 (relevant documents attached as Exhibit 5).

9. Again, on July 19, 1979, the Metropolitan District Commission and the Coast Guard responded to an oil spill in the Millers River. The Coast Guard came to the office at the BET

and informed B&M personnel of the severity of the spill (relevant documents attached as Exhibit 6).

10.  As of the late 1970's, MBTA was aware that discharges of petroleum products originating at the BET occurred to the Millers River and occasionally the Charles River (relevant documents attached as Exhibit 7).

11.  MBTA was aware that the United States Coast Guard was issuing warnings and fines for these discharges. (relevant documents attached as Exhibit 7).

12.  MBTA's own documents indicate that in June 1982, 300 to 500 gallons of No. 2 fuel oil was released from the oil/water separator to the Millers River (relevant documents attached as Exhibit 2).

13.  Another regulatory agency, the Massachusetts Department of Environmental Quality Engineering ("DEQE"), which later became the Massachusetts Department of Environmental Protection ("DEP"), kept incident files on releases at or from the BET during the late 1970's and early 1980's (relevant documents attached as Exhibits 2-4).

14.  These included DEP incident response files on a fuel spill of approximately 1,100 gallons of No. 2 fuel oil at the BET in October 1981, and files on releases of oil from the BET into the Miller's River and the Charles River (relevant documents attached as Exhibits 2-4).

15.  Also in the late 1970's and early 1980's, B&M maintained an oil trap at the BET where oil was pumped into tanks and carried off by contractors (relevant documents attached as Exhibit 8).

16.  The volume of oil recovered reached 90,000 gallons per year, but the volume began to subside as the oil was pressed out of the mud surrounding the oil trap (relevant documents attached as Exhibit 8).

17. For a number of years in the 1970's, B&M tried to convince MBTA to allow it to upgrade the oil trap (relevant documents attached as Exhibit 8).

18. In 1978, MBTA funded additional pumps and an above-ground oil separator for the system (relevant documents attached as Exhibits 7-8).

19. As a requirement for funding the additional separator unit, MBTA requested that it could have the recovered petroleum products to burn in the BET boilers (relevant documents attached as Exhibit 7).

20. Initially, in the late 1970's, approximately 35,000 gallons of petroleum product were recovered for MBTA per year (relevant documents attached as Exhibit 7).

21. During the early 1980's MBTA personnel attended meetings regarding environmental issues at the BET and recognized the need for cleanup at the site (relevant documents attached as Exhibit 9).

22. During the 1980 to 1981 time period, B&M employees Roger Bergeron and Gary Gordon, and MBTA employees Bill MacDonald and Gene Scoroposki, met to discuss environmental cleanup at areas at the BET that involved an accumulation of heavy greases, lubricants and diesel fuel (relevant documents attached as Exhibit 9).

23. B&M filed for bankruptcy in 1970, and operated under Bankruptcy Court protection from 1970 to June 1983.

24. This Court presided over the bankruptcy proceedings, which were held pursuant to the Bankruptcy Act of 1898 (subsequently repealed).

25. During B&M's Bankruptcy proceedings, with approval of the Court, MBTA purchased the Boston Engine Terminal ("BET") from B&M's bankruptcy estate in December 1976 and MBTA continues to own the BET.

26.     Although MBTA owned the BET, B&M continued to operate the site until December 31, 1986.

27.     The purchase and sale agreement for MBTA's acquisition of the BET from B&M authorized MBTA to inspect the BET property (relevant documents attached as Exhibit 10).

28.     During the bankruptcy proceedings, MBTA entered into agreements with B&M's bankruptcy trustees regarding B&M's operation of the BET (relevant documents attached as Exhibit 11).

29.     MBTA and B&M's bankruptcy trustees entered into a February 23, 1982 Agreement ("1982 Agreement") that provided for MBTA's indemnification of B&M for certain property damage claims at the BET (relevant documents attached as Exhibit 12).

30.     The 1982 Agreement contained provisions relating to "Accident Responsibility" that included the establishment of an "Indemnification and Liability Fund" (relevant documents attached as Exhibit 13).

31.     The 1982 Agreement provided as follows:

> The Authority [MBTA] agrees to indemnify and hold the Operator [B&M] harmless from any loss not fully insured against and with respect to losses incurred during the term of this Agreement and not fully covered by the Liability Fund hereinafter described, arising from injury (including death) to persons or damage to property, including but not limited to the Authority's Property, which shall arise out of or be in any way connected with the Service [B&M's operations] and from any such losses which remain unsettled as of the date hereof and which occurred during the term of the Agreement between Boston and Maine Corporation and the Massachusetts Bay Transportation Authority dated December 14, 1964, as amended and extended; the operating agreement by and between Robert W. Meserve and Benjamin H. Lacey, Trustees of the property of Boston and Maine Corporation and the Massachusetts Bay Transportation Authority, dated March 18, 1976; and the operating agreement between Robert W. Meserve and Benjamin H. Lacey, Trustees of the property of Boston and Maine Corporation and the Massachusetts Bay Transportation Authority, dated March 9, 1977.

(relevant documents attached as Exhibit 14).

32.     The 1982 Agreement required B&M to deposit a maximum of $200,000 each year into the Liability Fund to "provide for the payment of damages for claims resulting from events occurring during the term of this Agreement covered by this indemnity provision" (relevant documents attached as Exhibit 15).

33.     Pursuant to the 1982 Agreement, B&M was under no obligation to make payments of more than $200,000 per year into the Fund, and "[w]hen all claims for damages arising during the term of this Agreement for which there is liability have been satisfied, any funds remaining in the Liability Fund shall be retained by the Operator [B&M]" (relevant documents attached as Exhibit 15).

34.     The 1982 Agreement also provided that "[t]he provisions of this paragraph shall survive the term of this Agreement with respect to all causes of action which arise prior to the termination of this agreement" (relevant documents attached as Exhibit 16).

35.     The 1982 Agreement states that MBTA will not be required to indemnify B&M for losses arising out of any act or omission occurring during the term of the Agreement for which B&M, as the operator of the freight service, is legally responsible and for which the Authority and B&M as the operator of the (commuter) Service is not legally responsible (relevant documents attached as Exhibit 17).

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed May 31, 2006.

_____
Roger D. Bergeron