## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| )<br>BOSTON AND MAINE CORPORATION )<br>)<br>Plaintiff, )<br>)<br>-v.- )<br>)<br>MASSACHUSETTS BAY )<br>TRANSPORTATION AUTHORITY )<br>)<br>Defendant. )<br>) | Civil Action No. 05-11656-RCL<br>Judge Reginald C. Lindsay |

## PLAINTIFF BOSTON AND MAINE CORPORATION'S OPPOSITION TO DEFENDANT MASSACHUSETTS BAY TRANSPORTATION AUTHORITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Eric L. Hirschhorn
Winston & Strawn LLP
1700 K Street N.W.
Washington DC 20006
Tel. 202-282-5706
Fax 202-282-5100
E-mail: ehirschhorn@winston.com

Robert B. Culliford, BBO #638468
Pease International Tradeport
14 Aviation Avenue
Manchester NH 03801
Tel. 603-766-2002
Fax 603-766-2094
E-mail: rculliford@flypanam.com
*Counsel for Plaintiff Boston and Maine Corporation*

June 23, 2006

## TABLE OF CONTENTS

Page

FACTS .................................................................................................................................3

    A.    The Parties ................................................................................................3

    B.    The Boston Engine Terminal ....................................................................3

    C.    Regulatory Involvement at the BET ..........................................................9

    D.    Environmental Laws ................................................................................10

    E.    The B&M Bankruptcy Case.......................................................................13

ARGUMENT .......................................................................................................................16

    I.    The Relationship Test Provides the Appropriate Standard for Determining Whether MBTA Had a Claim for Purposes of the Bankruptcy..............................................................................................17

    II.    Even if the Fair Contemplation Test is Applied, MBTA Had a Claim Prior to the Bankruptcy Consummation Date ..............................20

        A.    Regulatory Notification is Not a Prerequisite for the Existence of a Claim................................................................................24

        B.    Additional Arguments by MBTA to Show Lack of Fair Contemplation Fail..................................................................27

CONCLUSION ....................................................................................................................29

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......................................................16

*In re CD Realty Partners*, 205 B.R. 651 (D. Mass. 1997)................................................ 20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..................................................................16

*Hays v. Mobil Oil Corp.*, 930 F.2d 96 (1st Cir. 1991) .......................................................26

*In re Hemingway Transp., Inc.*, 993 F.2d 915 (1st Cir. 1993) ..........................................17

*In re Hemingway Transport, Inc.*, 73 B.R. 494 (Bankr. D. Mass. 1987)...........................17

*In re Jensen*, 127 B.R. 27 (B.A.P. 9th Cir. 1991) ..............................................................17

*Mesiti v. Microdot Inc.*, 156 B.R. 113 (D.N.H. 1993)...........................................21, 23, 28

*NCL Corp. v. Lone Star Bldg. Ctrs. (Eastern) Inc.*, 144 B.R. 170 (S.D. Fla. 1992) ...19, 20

*In re National Gypsum Co.*, 139 B.R. 397 (N.D. Tex. 1992) .............................................24

*In re Penn Cent. Transp. Co.*, 944 F.2d 164 (3d Cir. 1991) ..............................................23

*Providence & Worcester R.R.Co. v. Penn Cent. Corp.*, 1989 U.S. Dist. LEXIS
    7259 (D. Mass. 1989)................................................................................................23

*Roberts v. Maine*, 48 F.3d 1287 (1st Cir. 1995) ................................................................27

*Signature Combs, Inc. v. United States*, 253 F. Supp. 2d 1028 (W.D. Tenn. 2003)..........24

*Sylvester Bros. Dev. Co. v. Burlington N.R.R.*, 133 B.R. 648 (Bankr. D. Minn.
    1991) ........................................................................................................................23

*In re Chateaugay Corp.*, 944 F.2d 997 (2d Cir. 1991) .....................................17, 18, 19, 25

## STATE CASES

*Alholm v. Town of Wareham et al.*, 371 Mass. 621 (1976) ...............................................11

*Hayon v. Coca Cola Bottling Co.*, 375 Mass. 644 (1978) ...............................................11

*Hazen Paper Co. v. U.S. Fidelity & Guar. Co.*, 555 N.E.2d 576 (Mass. 1990)................26

*Nassr v. Commonwealth*, 394 Mass. 767 (1985) ....................................................11, 22, 23

*Pritchard v. Mabrey*, 358 Mass. 137 (1970) ...................................................................11

*Reynolds Bros, Inc. v. Texaco, Inc.*, 420 Mass. 115 (1995)................................................20

## FEDERAL STATUTES

Bankruptcy Act of 1898 ("Bankruptcy Act") ...................................................13

Comprehensive Environmental Response, Compensation and Liability Act of
    1980 ("CERCLA" or "Superfund"), 42 U.S.C. § 9601 *et seq.*...............................11, 12

Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 *et
    seq.* ......................................................................................................................11

Pub. L. No. 95-598, § 403(a), 92 Stat. 2683 (1978) .........................................................13

Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 *et seq.* ..................11

## STATE STATUTES

1692 Mass. Acts Ch. 23 §1 (current version at M.G.L. Ch.111 §143)........................11, 23

1816 Mass. Acts Ch. 44 §§ 3, 11 (current version at M.G.L. Ch.111 §31)................11, 23

1983 Mass. Acts Ch 7 §5 (codified at M.G.L. Ch. 21E
    (Chapter 21E)) .................................................... 2, 12, 18, 22, 23, 24, 25, 27

M.G.L. Ch. 231B (Uniform Contribution Among Tortfeasors Act (1962))......................11

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
——————————————————————— x
BOSTON AND MAINE                  :
CORPORATION,                      :
                                  :
              Plaintiff,          :
                                  :
                                  :
       -v.-                       :        Civil Action No. 05-11656-RCL
                                  :
                                  :
MASSACHUSETTS BAY                 :
TRANSPORTATION AUTHORITY          :
                                  :
              Defendant.          :
                                  :
——————————————————————— x
```

**PLAINTIFF BOSTON AND MAINE CORPORATION'S OPPOSITION TO
DEFENDANT MASSACHUSETTS BAY TRANSPORTATION AUTHORITY'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Boston and Maine Corporation ("B&M") hereby opposes defendant

Massachusetts Bay Transportation Authority's ("MBTA") motion for partial summary judgment.

MBTA asserts that its claim against B&M for environmental cleanup costs at the Boston Engine

Terminal ("BET") was not discharged in the B&M bankruptcy because MBTA could not have

fairly contemplated that it had such a claim at that time.  Both the facts and the law applicable to

this case demonstrate that MBTA's motion should be denied.

MBTA purchased the BET from B&M out of B&M's bankruptcy proceeding and in

connection therewith the parties entered into various agreements that addressed the

environmental condition of the property.  In addition, MBTA's own employees worked at or

visited the BET site, had extensive knowledge of the environmental condition of the BET and

releases of hazardous materials at the BET, and reported to, or learned of such releases from, their MBTA supervisors. Furthermore, longstanding common law and statutory law imposed environmental cleanup liability on a landowner such as MBTA even before the passage of Chapter 21E, a well-publicized state statute enacted several months before B&M's bankruptcy Consummation Date. Chapter 21E, which even MBTA's own expert witness agrees could not have escaped MBTA's knowledge, specifically imposed liability on both MBTA and B&M for releases of oil and hazardous substances at the BET. Given these uncontrovertible facts, the only logical conclusion is that MBTA knew that it had a claim against B&M for environmental clean up prior to the Consummation Date, yet failed to assert it in the bankruptcy proceedings.

MBTA contends that it had no claim against B&M before the Consummation Date because the Massachusetts authorities had not taken action to compel MBTA to clean up the BET. However, as B&M demonstrates below, MBTA's liability—under Chapter 21E and other applicable law—did not depend upon predicate action by the Commonwealth and existed as a contingent claim before B&M's Consummation Date (*i.e.* June 30, 1983). Thus, even if MBTA's proposed "fair contemplation" standard were the applicable law, MBTA had every reason to know, prior to the Consummation Date, of its claim against B&M.

In seeking to assert its claim against B&M now—over twenty years after the bankruptcy Consummation Order was entered—MBTA seeks to circumvent the express provisions of the Consummation Order and to deny B&M the fresh start to which it is entitled under the bankruptcy laws. Accordingly, this Court should deny MBTA's motion for partial summary judgment, enforce the Consummation Order, and enjoin MBTA's assertion of such claim.

## FACTS

### *A.    The Parties*

B&M is a rail common carrier providing railroad freight services in the northeastern United States.  Declaration of Roger Bergeron in Opposition to Defendant's Motion for Partial Summary Judgment ("Bergeron Decl.") ¶ 4.  B&M owned and operated the BET from 1929 until December 1976.  Answer and Counterclaims of Defendant Massachusetts Bay Transportation Authority ("Answer") ¶ 6 (attached as Exhibit 1 hereto).  After December 1976, B&M continued to operate the BET until December 31, 1986.  Bergeron Decl. ¶ 26.

MBTA is a political subdivision of the Commonwealth of Massachusetts.  Complaint ¶ 4; Answer ¶ 2.  MBTA provides mass transportation service throughout eastern Massachusetts by means of bus, subway, light rail, and otherwise.  Bergeron Decl. ¶ 5.  MBTA, which is the second largest landowner in Massachusetts, purchased the BET from B&M's bankruptcy estate in December 1976 and continues to own the BET.  Bergeron Decl. ¶¶ 6, 25 & Exh. 1.  On May 4, 2004, more than twenty years after the conclusion of B&M's bankruptcy proceedings and nearly thirty years after MBTA's purchase of the BET from B&M, MBTA made a demand of B&M under Chapter 21E for reimbursement of environmental cleanup costs with respect to contamination at the BET.  Complaint ¶¶ 7-8 ; Answer ¶ 1.

### *B.    The Boston Engine Terminal*

The BET, which is now known as the MBTA Commuter Rail Maintenance Facility, occupies approximately 34 acres in Somerville, Boston, and Cambridge, Massachusetts.  Answer ¶¶ 4 & 5.  It has been used as an active railroad maintenance facility and rail yard since the late 1800's.  Complaint at p. 2 ¶ 1; Answer ¶¶ 4 & 5.

As such, for approximately a century, up through MBTA's ownership in the 1970's and early 1980's, the BET site was used for activities including fueling, maintenance, and washing of locomotives and other rail cars. Declaration of James Hennemann in Opposition to Defendant's Motion for Partial Summary Judgment ("Hennemann Decl.") ¶ 4. Prior to June 1983, frequent spills of fuel oil occurred at the BET, the ground at the site became saturated with fuel oil, and the odor of diesel fuel constantly filled the air. Hennemann Decl. ¶¶ 5, 7 & Exhs. 1-11 (Deposition of Richard House ("House Dep.") at 56:2-57:6; Deposition of Peter Wilson ("Wilson Dep.") at 40:2-23; 45:8-15; 20:21-22:4; 42:2-13; 46:18-47:7; 39:9-11; BM 000025[1]; House Dep. 30:1-23; Wilson Dep. 50:16-51:11); Areas at the BET where fuel oil spillage was frequent and excessive included the fueling stands, the filling points for the storage tanks, the service areas of the shop, the ready tracks where locomotives and self-propelled cars were stored awaiting dispatch, and the fuel storage tanks (including a leaking one million gallon fuel oil storage tank and a 100,000 gallon fuel oil storage tank). Hennemann Decl. ¶ 8 & Exhs. 12-13 (BM 000007; Deposition of Roger Bergeron ("Bergeron Dep.") at 137:22-138:10). MBTA employee Richard House, who worked at the BET, specifically recalled that the bottom of the one million gallon fuel storage tank had to be replaced in approximately 1981. Hennemann Decl. ¶ 9 & Exh. 14-15 (House Dep. at 41:14-23; 43:16-24).

By the late 1970's and early 1980's, any contact with the oily, black ground at the BET resulted in soiling and staining of clothes and footwear. Hennemann Decl. ¶ 10 & Exh. 16-18 (Wilson Dep. at 50:21-51:11; House Dep. at 53:8-54:10; Deposition of James Hennemann ("Hennemann Dep.") at 53:10-54:15). MBTA employees Richard House and Peter Wilson were

---

[1] The prefix "BM" signifies documents produced in this action by Plaintiff B&M. These documents are authentic copies of business records maintained by B&M in the ordinary course of business, and it was the regular practice of B&M to keep such records. *See* Declaration of Robert Culliford in Opposition to Defendant's Motion for Partial Summary Judgment ("Culliford Decl.") at ¶ 3.

well aware of the oil-saturated ground at the site prior to June 1983. Hennemann Decl. ¶ 11 &

Exhs. 19-21 (House Dep. at 30:1-23; 52:14-22; Wilson Dep. at 50:16-51:11). According to Mr.

House, "[t]here was areas that were pretty saturated with oil, fuel oil." Hennemann Decl. ¶ 12 &

Exh. 22 (House Dep. at 52:15-16). Mr. House observed pooled oil on the ground at the BET

during the 1979 to 1983 time period, Hennemann Decl. ¶ 13 & Exh. 23 (House Dep. at 52:18-

22), and Mr. Wilson similarly observed oil-saturated puddles on the ground in fueling areas at

the BET from 1979 to 1983. Hennemann Decl. ¶ 14 & Exh. 24 (Wilson Dep. at 28:11-16).

In addition to the constant state of fuel oil saturation on the grounds of the BET, several

large releases of fuel oil or hazardous materials occurred during the late 1970's and early 1980's,

when MBTA owned the BET. Hennemann Decl. ¶ 15 & Exhs. 25-28 (BM 000025; Bergeron

Dep. at 108:8-109:15; BM 000037-38; MBTA 00003089[2]). For example, on December 14,

1980, approximately 14,000 gallons of No. 2 fuel oil spilled at the BET and made its way to the

Yard 14 oil pit, where it was pumped out by contractors. Hennemann Decl. 16 & Exh. 27 (BM

000037-38). Documents also indicate that as of July 19, 1979, Pit 42 at the BET (measuring 64

feet long by 5 feet wide) was filled up to track level with oil and water. Hennemann Decl. ¶ 17

& Exh. 25 (BM 000025). The pit was constantly filling with oil and had to be pumped out about

every week and a half to two weeks. *Id.*

Also in the late 1970's and early 1980's, B&M maintained an oil trap at the BET where

oil was pumped into tanks and carried off by contractors. Bergeron Decl. ¶ 15 & Exh. 8 (BM

000007). The volume of oil recovered reached 90,000 gallons per year, but the volume began to

subside as the oil was pressed out of the mud surrounding the oil trap. Bergeron Decl. 16 & Exh.

8 (BM 000007). For a number of years in the 1970's, B&M (as operator) tried to convince

---

[2] The prefix "MBTA" signifies documents produced in this action by Defendant MBTA.

MBTA to allow it to upgrade the oil trap. Bergeron Decl. ¶ 17 & Exh. 8 (BM 000007). In 1978, MBTA finally funded additional pumps and an above-ground oil separator for the system. Bergeron Decl. ¶ 18 & Exhs. 7-8 (BM 000003; BM 000007). As a requirement for funding the additional separator unit, MBTA requested that it receive the recovered petroleum product to burn in the BET boilers. Bergeron Decl. ¶ 19 & Exh. 7 (BM 000003). Initially, in the late 1970's, approximately 35,000 gallons of petroleum product were recovered for MBTA per year as a result of this process. Bergeron Decl. ¶ 20 & Exh. 7 (BM 000003).

Thus, although B&M operated the BET until December 1986, MBTA, as owner from December 1976 on, had extensive knowledge of the environmental condition of the BET site and releases of oil and hazardous substances at the site. Hennemann Decl. ¶ 18 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39 (for Exhs. 29-39: Wilson Dep. at 53:5-12; BM 000003; Wilson Dep. at 7:3-22; House Dep. at 6:4-15; Wilson Dep. at 11:4-13:9; House Dep. at 10:9-12:15; Wilson Dep. at 15:9-16:8; Bergeron Dep. at 100:22-102:8; House Dep. at 29:3-24; 35:2-8; 34:4-24). MBTA maintained an office at the BET and had personnel on site who exchanged information on environmental conditions at the BET with their MBTA supervisors. Hennemann Decl. ¶ 19 & Exhs. 1-3, 5-7, 31-34, 36. In particular, MBTA employee Richard House recalled recurring discussions with his MBTA supervisor, Mr. Walter Mark, regarding whether there had been an oil spill "how much it was, how bad it was, and what we were doing to clean it up." Hennemann Decl. ¶ 20 & Exh. 1. Mr. House indicated that between 1979 and 1983, fuel spills occurred during fueling operations at the BET when the fuel nozzle would not be turned off and would overflow. Hennemann Decl. ¶ 21 & Exh. 40 (House Dep. at 29:3-9). Also during this time period, Mr. House recalled an instance in which a hose broke in the Budd House at the BET and leaked fuel oil three to four inches deep on the ground. Hennemann Decl. ¶ 22 & Exh. 38. In

general, according to Mr. House, the motorized Budd cars at the BET were an oily mess and spills and drips ran onto the ground during the 1979 to 1983 time period. Hennemann Decl. ¶ 23 & Exh. 39.

For his part, MBTA employee Peter Wilson observed fuel on the ground after a fuel spill in the area of the BET in the early 1980's. Hennemann Decl. ¶ 24 & Exh. 4. Mr. Wilson did not report the spill to officials at MBTA because it had already been reported to them. *Id*. In fact, Mr. Wilson's information on spills at the BET prior to June 1983 generally came *from his supervisors at MBTA*. Hennemann Decl. ¶ 25 & Exhs. 2-3. Mr. Wilson also received information from other MBTA employees concerning a spill of lubricating oil at the BET during the 1979 to mid-1983 time period. Hennemann Decl. ¶ 26 & Exh. 6. On another occasion between 1979 and 1983, William MacDonald of MBTA informed Mr. Wilson that there was an oil spill and asked Mr. Wilson to check the booms on the Millers River. Hennemann Decl. ¶ 27 & Exh. 7. Mr. Wilson observed an oil sheen and reported it to Mr. MacDonald. *Id*. Accordingly, MBTA had direct, actual knowledge of releases of fuel oil at the BET from at least the late 1970's until 1983.

In addition to direct knowledge of releases of fuel oil at the BET, MBTA had oversight of expenses at the BET site prior to June 1983. Hennemann Decl. ¶ 28 & Exh. 35. MBTA employee Peter Wilson expressly recalled that this included environmental expenses such as those incurred to clean up spills. *Id*.

Furthermore, during the early 1980's MBTA personnel attended meetings regarding environmental issues at the BET and recognized the need for cleanup at the site. Hennemann Decl. ¶ 29 & Exhs. 30, 41-45 (BM 000003; Hennemann Dep. at 42:11-44:21; 47:5-49:7; Bergeron Dep. at 127:1-128:23; Hennemann Dep. 59:24-60:8; BM 000008); Bergeron Decl. ¶ 21

& Exh. 9. For instance, MBTA employees Walter Mark and Richard House attended meetings regarding environmental issues at the BET, including the leak in the one million gallon tank. Hennemann Decl. ¶ 30 & Exh. 41. Discussion at the meetings included concern about stopping any leaks to prevent further complaints from the Coast Guard and to prevent pollution of the property. Hennemann Decl. ¶ 31 & Exh. 42. At another meeting around 1980 or 1981, B&M employees Roger Bergeron and Gary Gordon and MBTA employees Bill MacDonald and Gene Scoroposki discussed environmental cleanup at areas at the BET that involved an accumulation of heavy greases, lubricants, and diesel fuel. Bergeron Decl. ¶ 22 & Exh. 9.

George Covino of B&M and Walter Mark of MBTA were also involved in meetings at the BET to develop a more efficient fueling system for the BET. Hennemann Decl. ¶ 32 & Exhs. 32, 44. These discussions began in approximately 1982. Hennemann Decl. ¶ 41 & Exh. 44. The old fueling system caused a problem because it did not have automatic shutoff and fuel was leaking onto the ground right outside the main offices where the MBTA office was located. Hennemann Decl. ¶ 33 & Exh. 42. In or about 1984, MBTA installed new fueling nozzles at the BET with an automatic shut-off to address the fuel spillage problem. Hennemann Decl. ¶ 34 & Exhs. 30, 45 (BM 000003; BM 0000008).

In addition, in the 1982 to 1983 time period, in a discussion that took place at the MBTA's general office, Dan Breen of the MBTA engineering staff indicated to Peter Wilson that there might have to be a cleanup of hazardous substances at the BET site. Hennemann Decl. ¶ 35 & Exh. 46 (Wilson Dep. at 48:4-50:13). Mr. Wilson further stated that between 1982 and 1984 MBTA was aware of fill, contaminated with fuel oil and lubricants, that had to be analyzed so it could be handled properly. Hennemann Decl. ¶ 36 & Exhs. 46-47 (Wilson Dep. 48:4-50:13; 35:17-36:12).

## C.    *Regulatory Involvement at the BET*

During the late 1970's and early 1980's, oil was often released to the Millers River or the

Charles River, and the United States Coast Guard was issuing fines and penalties for such

releases. Bergeron Decl. ¶¶ 7-9 & Exhs. 2-6 (MBTA 00003089; MBTA 00002595; MBTA

00002900-01; BM 000040; BM 000026). The Metropolitan District Commission and B&M

were cited by the Coast Guard for an oil spill into the Millers River on March 4, 1977. Bergeron

Decl. ¶ 8 & Exh. 5 (BM 0000040). Again, on July 19, 1979, the Metropolitan District

Commission and the Coast Guard responded to an oil spill in the Millers River. Bergeron Decl.

¶ 9 & Exh. 6 (BM 000026). The Coast Guard came to the office at the BET and informed B&M

personnel of the severity of the spill. *Id.*

As of the late 1970's, MBTA was aware that discharges of petroleum products originating

at the BET occurred to the Millers River and occasionally the Charles River, and MBTA was

aware that the United States Coast Guard was issuing warnings and fines for these discharges.

Bergeron Decl. ¶¶ 10, 11 & Exh. 7 (BM 000003). MBTA's own documents indicate that in June

1982, 300 to 500 gallons of No. 2 fuel oil was released from the oil/water separator to the Millers

River. Bergeron Decl. ¶ 12 & Exh. 2 (MBTA 00003089).

Another regulatory agency, the Massachusetts Department of Environmental Quality

Engineering ("DEQE"), which later became the Massachusetts Department of Environmental

Protection ("DEP"), kept incident files on releases at or from the BET during the early 1980's.

Bergeron Decl. ¶ 13 & Exhs. 2-4 (MBTA 00003089; MBTA 00002595; MBTA 00002900-01).

These included DEP incident response files on a fuel spill of approximately 1,100 gallons of No.

2 fuel oil at the BET in October 1981, and files on releases of oil from the BET into the Millers

River and the Charles River. Bergeron Decl. ¶ 14 & Exhs. 2-4. Despite MBTA's contention that

DEP was unaware of contamination at the BET prior to 1988, DEP was recently able to locate several records in its possession that show DEP knew of, and addressed, contamination problems at the BET prior to 1988. *See* Declaration of Adeline DelBene ("DelBene Decl.") & Exhs. 1-7 thereto. In particular, DEP maintained records on the following releases at the BET prior to June 30, 1983:

1.      December 14, 1980 spill of 15,000 gallons of No. 2 fuel oil from a pipeline in the B&M Bud Yard at the BET to the MDC Prison Point Pumping Station;

2.      July 22, 1981 spill of No. 2 fuel oil (amount unknown) from B&M to Charles River; DEP indicates the case is closed;

3.      October 11, 1981 spill of 1,100 gallons of No. 2 Fuel Oil at the B&M Yard 5 at the BET; DEP indicates the case is closed;

4.      October 19, 1981 spill of 20 gallons of No. 6 Fuel Oil from the BET oil-water separator to the Millers River;

5.      December 16, 1981 spill of 100 gallons of No. 2 Fuel Oil from the B&M Railroad to the Millers River; DEP indicates the case is closed;

6.      March 8, 1982 spill of 20 gallons of No. 2 fuel oil from the B&M to the Mystic Junction; DEP indicates the case is closed.

Thus, there is evidence that DEP was aware of the contamination problems, and opened and monitored cases regarding such problems, at the BET prior to the Consummation Date. DelBene Decl. & Exhs. 1-7 thereto.

**D.      *Environmental Laws***

Long before the 1980's, Massachusetts state and local authorities had the power to make reasonable health regulations and to remove or prevent nuisances, sources of filth and causes of

sickness. 1816 Mass. Acts Ch. 44 §§ 3, 11 (current version at M.G.L. ch. 111, § 31) (health

regulations); 1692 Mass. Acts Ch. 23 § 1 (current version at M.G.L. ch. 111 § 143) (noisome

trades). Massachusetts common law also imposed upon a landowner the duty to clean up a

nuisance, which included hazardous environmental conditions, on its land. *See Nassr v.*

*Commonwealth,* 394 Mass. 767, 773-75 (1985). Accordingly, MBTA could have instituted an

action against B&M based on its portion of liability for cleanup costs, *see* M.G.L. ch. 231B

(Uniform Contribution Among Tortfeasors Act (1962)) (stating where two or more persons

become jointly liable in tort for the same injury to person or property, there shall be a right of

contribution among them even though judgment has not been recovered against all or any of

them*); Hayon v. Coca Cola Bottling Co.,* 375 Mass. 644, 648-49 (1978) (indicating that under

Chapter 231B term "liable in tort," is "broad in scope and is not suitable language for implying a

narrow or restricted range of application within the framework of potential tort defendants");

*Alholm v. Town of Wareham et al.,* 371 Mass. 621, 626 at n. 3 (1976) (noting potential liability

resulting from maintenance of public nuisance subject to well established tort principles

regarding when action in public nuisance will lie); *Pritchard v. Mabrey,* 358 Mass. 137, 143-44

(1970) (discussing action in tort for maintenance of public nuisance); RESTATEMENT (SECOND)

OF TORTS § 822 cmt. a (1979) (stating public and private nuisance constitute fields of tort

liability).

   In the 1970's and early 1980's, the concept of responsibility for environmental conditions

on one's property gained even greater prominence as the federal government passed major

environmental laws addressing water pollution (1972), the treatment, storage, and disposal of

hazardous waste (1976), and the cleanup of historic contamination (1980).[3] On March 24, 1983,

---

[3] *See* Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 *et seq.* ("Clean Water Act"), Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 *et seq.* ("RCRA"), and Comprehensive

Massachusetts followed suit, enacting Chapter 21E, the Massachusetts Oil and Hazardous Material Release Prevention and Response Act (attached as Exhibit 2 hereto). 1983 Mass. Acts p. 4, ch. 7 § 5 (codified at M.G.L. ch. 21E). Chapter 21E and its legislative consideration were well publicized prior to its enactment. Declaration of Robert Culliford in Support of Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment ("Culliford Decl.") ¶ 10 & Exhs. 2, 5-11. MBTA was aware or should have been aware of the consideration and enactment of Chapter 21E. Culliford Decl. ¶ 11 & Exhs. 2-3. In particular, two expert witnesses (one of them MBTA's) have opined that it is not plausible that MBTA, as one of the largest landowners in Massachusetts—one that owned numerous commuter rail/railroad facilities—was unaware of the enactment of Chapter 21E in March 1983. Culliford Decl. ¶ 5 & Exhs. 2-3.

Chapter 21E provided for liability for owners and operators of property at which there had been releases of hazardous materials. Chapter 21E § 5. In addition, Chapter 21E was broader than its federal counterpart, CERCLA, in that it also imposed cleanup liability on owners and operators of property where oil, including "crude or fuel oils, lube oil or sludge" had been released. Chapter 21E §§ 2, 5. Importantly, action by state regulators is not a prerequisite for liability under Chapter 21E—the statute imposes liability for environmental cleanup costs upon occurrence of releases. Chapter 21E § 5(a). Pursuant to Chapter 21E, an owner or operator had an obligation to notify the DEQE as soon as the owner or operator had knowledge of a release or threat of release of oil or hazardous material. Chapter 21E § 7. Chapter 21E provided for strict, joint and several liability for cleanup costs for owners and operators of property contaminated with oil or hazardous materials. Chapter 21E § 5(a).

---

Environmental Response, Compensation and Liability Act of 1980 ("CERCLA" or "Superfund"), 42 U.S.C. § 9601 *et seq*. (providing for liability for environmental cleanup costs for "the owner or operator of a vessel or facility," 42 U.S.C. § 9607(a)(1), and "any person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2)).

Increasing environmental regulation in the late 1970's and early 1980's affected MBTA. In 1979, state and local environmental officials investigated an illegal dump filled with hazardous material on MBTA property in Woburn and indicated that a cleanup would be required. *Hazardous Materials Found on MBTA Site*, THE DAILY TIMES, (Woburn, Mass.) May 7, 1979 (attached as Exhibit 3 hereto). The DEQE was involved (see Exhibit 3 hereto). Also, during the period from 1979 to 1983, Peter Wilson stated MBTA was aware of spills or releases of oil or hazardous substances at MBTA facilities other than the BET, including South Station and South Hampton Street, that required cleanup efforts by the MBTA. Hennemann Decl. ¶ 37 & Exh. 29. In July 1984 MBTA's consultants completed an Oil Recovery Study at the BET that identified floating product at the site, and the consultants recommended notifying DEQE of the condition of the site. Answer ¶ 10.

### E.    *The B&M Bankruptcy Case*

B&M filed for bankruptcy protection in this Court in 1970, and operated under bankruptcy court protection from 1970 to June 1983. Bergeron Decl. ¶ 23. The bankruptcy case was filed under the Bankruptcy Act of 1898.[4] Bergeron Decl. ¶ 24. During B&M's bankruptcy proceedings, with approval of the Court, MBTA purchased the BET from B&M's bankruptcy estate in December 1976. Bergeron Decl. ¶ 25. The purchase and sale agreement authorized MBTA to inspect the BET property prior to delivery of a deed. Bergeron Decl. ¶ 27 & Exh. 10.

During the course of the bankruptcy, the trustees of B&M's bankruptcy estate ("Trustees") entered into several agreements with MBTA regarding B&M's operation of the

---

[4] The Bankruptcy Act of 1898 ("Bankruptcy Act") was repealed and replaced by a codified Title 11 of the United States Code in 1978 (the "Bankruptcy Code"). The Bankruptcy Act governs cases filed before October 1, 1979, and "the substantive rights of parties in connection with any such bankruptcy case, matter, or proceeding shall continue to be governed by the law applicable to such case, matter, or proceeding as if the [Bankruptcy Code] had not been enacted." Pub. L. No. 95-598, § 403(a), 92 Stat. 2683 (1978). Accordingly, the B&M bankruptcy, which was filed in 1970, is governed by the Bankruptcy Act rather than more recent bankruptcy legislation.

BET. Bergeron Decl. ¶¶ 28-29 & Exh. 11-12. These included a February 23, 1982 Agreement

("1982 Agreement") that provided that MBTA would indemnify B&M for certain property

damage claims at the BET. Bergeron Decl. ¶ 29 & Exh. 12 (MBTA 00001605-00001749). The

1982 Agreement contained provisions relating to "Accident Responsibility" that included the

establishment of an "Indemnification and Liability Fund" for property damage claims. Bergeron

Decl. ¶ 30 & Exh. 13 (MBTA 00001647-00001650). In particular, the 1982 Agreement

provided that:

> The Authority [MBTA] agrees to indemnify and hold the Operator [B&M]
> harmless from any loss not fully insured against and with respect to losses
> incurred during the term of this Agreement and not fully covered by the Liability
> Fund hereinafter described, arising from injury (including death) to persons or
> *damage to property, including but not limited to the Authority's Property, which*
> *shall arise out of or be in any way connected with the [contract] Service* and
> from any such losses which remain unsettled as of the date hereof and which
> occurred during the term of the Agreement between Boston and Maine
> Corporation and the Massachusetts Bay Transportation Authority dated December
> 14, 1964, as amended and extended; the operating agreement by and between
> Robert W. Meserve and Benjamin H. Lacey, Trustees of the property of Boston
> and Maine Corporation and the Massachusetts Bay Transportation Authority,
> dated March 18, 1976; and the operating agreement between Robert W. Meserve
> and Benjamin H. Lacey, Trustees of the property of Boston and Maine
> Corporation and the Massachusetts Bay Transportation Authority, dated March 9,
> 1977.

(emphasis added); Bergeron Decl. ¶ 31 & Exh. 14 (MBTA 00001647-00001648).

The 1982 Agreement required B&M to establish a Liability Fund by depositing a

maximum of $200,000 each year into the Fund to "provide for the payment of damages for

claims resulting from events occurring during the term of this Agreement covered by this

indemnity provision." Bergeron Decl. ¶ 32 & Exh. 15 (MBTA 00001648). B&M was under no

obligation to make payments of more than $200,000 per year into the Fund, and the 1982

Agreement further provided that "[w]hen all claims for damages arising during the term of this

Agreement for which there is liability have been satisfied, any funds remaining in the Liability

Fund shall be retained by the Operator [B&M]." Bergeron Decl. ¶ 33 & Exh. 15 (MBTA

00001648). Finally, the 1982 Agreement provided that "[t]he provisions of this paragraph shall

survive the term of this Agreement with respect to all causes of action which arise prior to the

termination of this agreement." Bergeron Decl. ¶ 34 & Exh. 16 (MBTA 00001649).

On June 17, 1983, more than six years after MBTA purchased the BET from B&M, this

Court entered the Consummation Order in the B&M bankruptcy ("Consummation Order")

(attached as Exhibit 4 hereto), closing the B&M bankruptcy and discharging B&M from all

claims that existed prior to June 30, 1983.[5] Consummation Order § 5.03(a) & p. 33. The

Consummation Order provides that as of the Consummation Date, B&M and its Trustees were

***discharged and released from all claims and liabilities, whether or not filed in the bankruptcy***.

Consummation Order § 5.03(a) (emphasis added). Significantly, the Consummation Order also

enjoins the assertion of any and all claims against B&M or any successor entity existing on or

before the Consummation Date as follows:

> All persons, firms, governmental entities and corporations, wherever
> situated, located or domiciled, are hereby permanently restrained and
> enjoined from instituting, prosecuting or pursuing, or attempting to
> institute, prosecute or pursue, any suits or proceedings, at law or in equity
> or otherwise, against the Debtor's Trustees or the Reorganized Company
> or its or their successors or assigns or against the Segregated Account or
> any of the assets or property of the Reorganized Company or its
> successors or assigns, directly or indirectly, on account of or based upon
> any right, claim or interest of any kind or nature whatsoever which any
> person, firm, governmental entity or corporation may have in, to or against
> the Debtor, the Debtor's Trustees or any of their assets or properties. . . on
> or at any time after the Consummation Date....

Consummation Order § 8.01. The Consummation Order established June 30, 1983 as the

Consummation Date. Consummation Order § 2.01.

---

[5] The language in the Consummation Order is extremely broad as to discharge of claims. For instance, the
Consummation Order transfers all remaining property to the Reorganized Company "free and clear of all claims,

Despite its knowledge of: (1) the B&M bankruptcy proceedings, (2) the prevalent environmental contamination at the BET, and (3) the potential liability of itself and B&M under environmental and other laws, MBTA failed to file any claim in the B&M bankruptcy. Complaint ¶¶ 16, 17; Answer ¶ 42. Notwithstanding such failure, on May 4, 2004—**nearly thirty years after MBTA purchased the BET from B&M's bankruptcy estate and more than twenty years after the Consummation Date**—MBTA asserted its discharged claim for cleanup costs against B&M. Complaint ¶ 8 & Exh. B thereto; Answer ¶ 1. This end-run around the bankruptcy laws and the fresh start they provide to debtors seeking their protection cannot be allowed.

## ARGUMENT

Summary judgment may be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Ultimately, the court must examine the facts in the light most favorable to the nonmoving party, draw all inferences in its favor, and determine whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Where, as here, there is a genuine issue as to the material facts relied upon by MBTA, summary judgment in MBTA's favor is not appropriate. Accordingly, MBTA's motion should be denied.

---

rights, demands, interests, liens and encumbrances of every kind and character, whether or not properly or timely filed and whether or not approved, acknowledged or allowed in these proceedings..." Consummation Order § 5.01.

I.    **The Relationship Test Provides the Appropriate Standard for Determining Whether MBTA Had a Claim for Purposes of the Bankruptcy**

The First Circuit and this Court have recognized, in the context of a bankruptcy purchase of contaminated property, that a creditor's right to payment from a bankrupt debtor typically arises at an early point–either before or when the creditor purchases the contaminated facility from the bankruptcy estate. *See In re Hemingway Transp., Inc.*, 993 F.2d 915, 928 (1st Cir. 1993) (indicating that creditor's right to payment accrued when debtors still owned and operated facility where hazardous waste disposal occurred); *see also In re Hemingway Transport, Inc.*, 73 B.R. 494, 503 (Bankr. D. Mass. 1987) (recognizing that purchaser's cause of action against bankruptcy debtor under environmental law arose when contaminated property was transferred to purchaser). This approach comports with the "relationship test" set forth in cases such as *In re Chateaugay Corp.*, 944 F.2d 997, 1005-06 (2d Cir. 1991), in which the Second Circuit determined that, based on the relationship of the parties, the U.S. Environmental Protection Agency ("EPA") had a contingent claim under bankruptcy law for environmental response costs as of the time the releases of hazardous substances occurred, despite the fact that EPA did not know the extent of the removal costs it might incur and seek to impose on the debtor, or even the location of all the sites at which wastes might be found. *See also In re Jensen*, 127 B.R. 27, 30 (B.A.P. 9th Cir. 1991) (concluding bankruptcy claim arises upon actual or threatened release of hazardous waste by debtor), *aff'd*, 995 F.2d 925 (9th Cir. 1993). In short, it is clear that the conduct giving rise to the release or threatened release of hazardous substances and the relationship between the parties provide "sufficient 'contemplation' of contingencies to bring most ultimately maturing payment obligations based on [the debtor's] conduct within the definition of 'claims.'" *Chateaugay*, 944 F.2d at 1005.

Moreover, while in *Chateaugay* the Second Circuit considered that the mere relationship between environmental regulatory agencies and those subject to regulation was sufficient to create a contingent claim for environmental cleanup as of the time the hazardous substances were released, *id.,* in the present case the degree of relationship between B&M and MBTA is significantly closer than that in *Chateaugay.* Specifically: MBTA purchased the BET from B&M's bankruptcy estate in December 1976 and continued to own the BET at the time of, and after, the enactment of Chapter 21E in March 1983. Bergeron Decl. ¶ 25. B&M's bankruptcy trustees entered into several agreements with MBTA for the operation of the BET during the 1970's and 1980's. Bergeron Decl. ¶ 28-29 & Exhs. 11-12. The Purchase and Sale Agreement gave MBTA the right to inspect property conditions and referenced environmental assessments, Bergeron Decl. ¶ 27 & Exh. 10; and the 1982 Agreement specifically addressed liability for property damage at the BET, Bergeron Decl. ¶ 30-31 & Exhs. 13-14.

Moreover, MBTA's relationship with B&M regarding the BET was not simply contractual. MBTA had an ongoing business relationship with B&M wherein MBTA maintained an office at the BET, staffed by MBTA employees, who had actual, direct knowledge of environmental conditions at the BET, including releases of fuel oil, during at least the 1979 to 1983 time period. Hennemann Decl. ¶¶ 18, 19 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39. The relevant documents and testimony show that prior to June 1983, MBTA was aware of contamination at the BET and the need for potential environmental cleanup there. Hennemann Decl. ¶¶ 11-14, 18-27 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-40 (¶¶ 68-72). MBTA employees also attended meetings regarding environmental issues at the BET, which included discussions regarding environmental cleanup. Hennemann Decl. ¶ 29 & Exhs. 30, 41-45 (BM 000003; Hennemann Dep. at 42:11-44:21; 47:5-49:7; Bergeron Dep. at 127:1-128:23; Hennemann Dep.

59:24-60:8; BM 000008); Bergeron Decl. ¶ 21 & Exh. 9. Furthermore, MBTA was responsible for approving payment for all expenses at the BET site, including environmental expenses. Hennemann Decl. ¶ 28 & Exh. 35. Under these circumstances, MBTA and B&M surely had the requisite relationship for MBTA to have possessed a contingent claim prior to the conclusion of the bankruptcy. *See Chateaugay*, 944 F.2d at 1005.

The case of *NCL Corp. v. Lone Star Bldg. Ctrs. (Eastern) Inc.*, 144 B.R. 170, 177 (S.D. Fla. 1992), which is similar to the present case, is illustrative. In *NCL,* the court held that a sufficient relationship existed between a creditor and debtor to give rise to claim where the creditor owned and operated the contaminated site for a long period, the creditor leased the site with indemnification provisions applicable if the debtor did not maintain the property, and the creditor had a right to inspect the property. As in *NCL,* MBTA owned the BET for many years prior to the Consummation Date, Bergeron Decl. ¶ 25, MBTA and B&M had a contractual relationship that contemplated the very issues giving rise to MBTA's claims, Bergeron Decl. ¶¶ 29-35 & Exhs. 12-17; *see NCL Corp.*, 144 B.R. at 177, and MBTA not only had a right of entry to inspect the property at the time of purchase, Bergeron Decl. ¶ 27 & Exh. 10, but also had personnel onsite who were aware of actual environmental conditions at the property. Hennemann Decl. ¶ 19 & Exhs. 1-3, 5-7, 31-34, 36; *see NCL,* 144 B.R. at 179 (bankruptcy creditor had claim where it had actual knowledge of debtor's bankruptcy and site's environmental condition, as well as ability to inspect property). Accordingly, the considerable relationship between MBTA and B&M–which included both contractual interaction and day-to-day business interaction–gave MBTA adequate knowledge regarding B&M's operations and releases at the site for MBTA to sufficiently contemplate its contingent claims for cleanup, under Chapter 21E or other laws, prior to the bankruptcy Consummation Date.

In addition, although MBTA incorrectly asserts that the relationship test is not the appropriate standard in this case, certain cases it cites in support of its position actually examine the existence of a claim pursuant to the relationship test. For example, in the primary case relied upon by MBTA, *Reynolds Bros, Inc. v. Texaco, Inc.,* 420 Mass. 115 (1995), the Massachusetts Supreme Court analyzed the potential claim under not only the fair contemplation test, but also the relationship test. *See id.* at n. 12 (finding relationship test compels conclusion that plaintiff had claim in bankruptcy because relationship between plaintiff and debtor was such that the plaintiff was aware of contamination at site, knew debtor was previous owner, and knew debtor had used site as oil storage facility); *see also NCL Corp.*, 144 B.R. 170, 177 (concluding both relationship test and fair contemplation tests dispositive). As in *Reynolds Bros.*, in the instant case MBTA was aware of the contamination at the BET, Hennemann Decl. ¶¶ 18, 19 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39, knew B&M was the previous owner, MBTA's Concise Statement of Undisputed Material Facts in Support of MBTA Motion for Summary Judgment ("CSUMF") at ¶¶ 3, and knew that the site had long been used as a railroad maintenance and fueling facility. CSUMF at ¶¶ 1-2. Thus, even MBTA's own authority compels the conclusion that MBTA had a "claim" in B&M's bankruptcy.

## II.     Even if the Fair Contemplation Test is Applied, MBTA Had a Claim Prior to the Bankruptcy Consummation Date

As an initial matter, MBTA incorrectly states that the United States Bankruptcy Court for the District of Massachusetts has approved the fair contemplation test in the environmental context. Memorandum of Law in Support of Defendant Massachusetts Bay Transportation Authority's Motion for Partial Summary Judgment on the Issue of Discharge in Bankruptcy ("MBTA Mem.") at p. 10. The case relied upon by MBTA, *In re CD Realty Partners*, 205 B.R. 651 (D. Mass. 1997), is not an environmental case, but instead involves a claim for withdrawal

liability under the Employee Retirement Income Security Act ("ERISA"). In the course of the court's discussion, it recognizes that in environmental cases, other courts have employed both the conduct (a contingent claim arises upon occurrence of the conduct giving rise to the claim) and relationship tests. *Id.* at 656. The court further indicates that one version of the relationship test requires "a relationship of such degree that the claim could fairly have been contemplated by the parties...." *Id.* Contrary to MBTA's assertion, the court in *CD Realty Partners* did not determine the appropriate test to be applied in the environmental context, nor did it give further indicia of when a debtor and creditor have "a relationship of such degree that the claim could fairly have been contemplated by the parties...."

However, in *Mesiti v. Microdot Inc.*, 156 B.R. 113 (D.N.H. 1993), the district court did give further guidance as to what constitutes a foreseeable or fairly contemplated claim for environmental cleanup. *Mesiti*, like this case, involved the attempted assertion of a claim against B&M for environmental cleanup following the entry of the Consummation Order in B&M's bankruptcy. *Id.* at 115. Microdot argued that it was unaware of B&M's potential link to the contamination on the property before the Consummation Order was issued and that because its claims were not reasonably foreseeable, they were not discharged in the bankruptcy. *Id.* at 117. The court recognized that whether Microdot's claims were foreseeable before the Consummation Order's bar date would depend on (1) what information Microdot actually or constructively had available to it regarding the contamination at the site; (2) what information it had regarding B&M's possible link to the contamination; and (3) whether that information was reasonably available to Microdot between the enactment of the governing environmental statute and B&M's bankruptcy Consummation Date. *Id.* at 118.

Applying this test, as MBTA urges the court to do, plainly shows that MBTA had a claim for environmental cleanup prior to the bankruptcy Consummation Date. Regarding information on contamination at the site, from at least 1979 to 1983 MBTA actually knew of numerous releases of fuel oil that had occurred at the BET. Hennemann Decl. ¶¶ 11-14, 18-27 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-40. Regarding MBTA's knowledge of B&M's link to the contamination, MBTA's own witnesses have testified that oil was spilled frequently during fueling and maintenance operations and that B&M employees were responsible for these operations. CSUMF ¶ 6. Finally, Chapter 21E, which was enacted on March 24, 1983, more than three months before B&M's Consummation Date, immediately imposed cleanup liability on owners and operators of property where releases of oil had occurred. Chapter 21E § 5. The legislative consideration and enactment of Chapter 21E were well publicized, Culliford Decl. ¶ 10 & Exhs. 2, 5-11, and both expert witnesses in this case—MBTA's as well as B&M's—acknowledge that it is implausible to conclude that MBTA, a political subdivision of the state and one of the largest landowners in Massachusetts—one that owned numerous commuter rail and railroad facilities—was unaware of the enactment of Chapter 21E. Culliford Decl. ¶ 5-9, 12 & Exhs. 2-4. Moreover, even before Chapter 21E's enactment, landowners such as MBTA had a common law duty to abate nuisances—including environmental contamination—caused by the activities of others on their property. *Nassr*, 394 Mass. at 773-75. Accordingly, MBTA clearly had a foreseeable claim because it was aware of releases at the BET, aware of B&M's involvement regarding the releases, and had access to this information between the enactment of Chapter 21E and the conclusion of the bankruptcy.

Furthermore, where courts have determined "unforeseeable" environmental claims have not been discharged, this generally occurs because either the applicable environmental statute

was "not in effect at the time of reorganization (obviating any finding of a legal relationship between the claimant and the debtor from which even a cognizable contingent bankruptcy claim might arise), or because under particular factual circumstances neither the debtor nor claimant could have reasonably contemplated the existence of an actual or contingent bankruptcy claim." *Mesiti*, 156 B.R. at 118 (citing *In re Penn Cent. Transp. Co.*, 944 F.2d 164, 167-68 (3d Cir. 1991) (cleanup claims not discharged where CERCLA enacted after consummation date); *Sylvester Bros. Dev. Co. v. Burlington N. R.R.*, 133 B.R. 648, 653 (Bankr. D. Minn. 1991) (when government agency did not have actual knowledge that debtor was a potentially responsible party before conclusion of bankruptcy proceedings, potential CERCLA claim not discharged). This is just not the case here. Here, it is undisputed that Chapter 21E was in effect prior to B&M's bankruptcy Consummation Date, even aside from the fact that other common and statutory law imposing liability on property owners for environmental hazards has existed in Massachusetts for centuries. 1816 Mass. Acts Ch. 44 §§ 3, 11 (current version at M.G.L. ch. 111, § 31) (health regulations); 1692 Mass. Acts Ch. 23 § 1 (current version at M.G.L. ch. 111 § 143) (noisome trades); *see also Nassr v. Commonwealth,* 394 Mass. 767, 773-75 (1985) (property owner liable for environmental cleanup costs based on nuisance law). In addition, this Court has previously indicated that environmental cleanup claims against a reorganized railroad can be discharged even where the bankruptcy consummation order was issued years before CERCLA or 21E were passed. *Providence & Worcester R.R. Co. v. Penn Cent. Corp.,* 1989 U.S. Dist. LEXIS 7259 at *5 (D. Mass. 1989).

In summary, the contractual history between B&M and MBTA, Bergeron Decl. ¶¶ 25-31 & Exhs. 11-14, MBTA's involvement in B&M's bankruptcy proceedings, Bergeron Declaration

¶ 25, and the extensive knowledge of MBTA personnel regarding environmental contamination at the site, Hennemann Decl. ¶¶ 18, 19 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39, clearly indicate that in the factual circumstances of this case, MBTA was aware of its potential claim and should have asserted such claim in the bankruptcy in order to preserve such claim.

### A.    Regulatory Notification is Not a Prerequisite for the Existence of a Claim

MBTA contends that it could not have fairly contemplated making a claim for environmental cleanup at the BET before June 30, 1983. These arguments can be quickly dismissed. First, MBTA claims that because it had not received notification from DEP that a cleanup would be required at the BET and had not yet incurred response costs, it could not have fairly contemplated a claim against B&M for cleanup costs. MBTA's argument is unavailing because this level of regulatory involvement is not required to bring a claim into existence. Although various factors have been set forth by courts to determine whether environmental claims can be fairly contemplated, this list is non-exhaustive, and not all factors need be present in a given case. *See, e.g., In re National Gypsum Co.,* 139 B.R. 397, 408 (N.D. Tex. 1992) (finding that at least one of factors relevant to determination that claim had arisen was present for sites listed by EPA for future response costs); *Signature Combs, Inc. v. United States*, 253 F. Supp. 2d 1028, 1037 (W.D. Tenn. 2003) (recognizing potential claimant need not incur response costs for contingent claim to arise under fair contemplation standard). In the face of MBTA's extensive knowledge regarding the contaminated condition of the site, the existing common law of nuisance in Massachusetts, and the recent enactment of Chapter 21E, which imposed instant

liability for just such releases, it is disingenuous of MBTA to suggest that it could not have fairly contemplated a contingent claim for environmental liability as of June 1983.[6]

In addition, MBTA ignores the fact that regulators were aware of the environmental contamination at the BET in the late 1970's and early 1980's. The Coast Guard was issuing fines and penalties for releases of oil from the BET to the Millers River and the Charles River, Bergeron Decl. ¶¶ 7-9 & Exhs. 2-6 (MBTA 00003089; MBTA 00002595; MBTA 00002900-01; BM 000040; BM 000026), and MBTA was aware of the releases and of the involvement of regulators, Bergeron Decl. ¶¶ 10, 11 & Exh. 7 (BM 000003). The DEQE also had incident files on releases at or from the BET during the early 1980's, Bergeron Decl. ¶ 13 & Exhs. 2-4 (MBTA 00003089; MBTA 00002595; MBTA 00002900-01), including files on numerous fuel spills at the BET and files on releases of oil from the BET into the Millers River and the Charles River. *See* DelBene Decl. & Exhs. 1-7 thereto; Bergeron Decl. ¶ 14 & Exhs. 2-4. Because MBTA was aware that there were releases and that regulators were involved, and because such releases guaranteed automatic liability under Chapter 21E, it is not necessary for MBTA to have received a specific cleanup order before a contingent claim in the bankruptcy existed.

Notwithstanding the evidence to the contrary, MBTA erroneously states that "[t]here is no evidence suggesting that the DEP was aware of the contamination problems at the [BET] prior to 1988." CSUMF ¶ 22. MBTA's own documents demonstrate that this statement is incorrect. In particular, MBTA's consultant, GZA, in the course of preparing environmental reports regarding the BET in the early 1990's, was specifically able to review incident files maintained by the DEQE relating to releases at the BET prior to June 30, 1983. Bergeron Decl. ¶ 13 & Exhs. 2-4 (MBTA 00003089; MBTA 00002595; MBTA 00002900-01). These included

---

[6] MBTA also suggests that under CERCLA a contribution claim may not be asserted until a regulator has brought suit or reached a settlement with the party seeking contribution. However, none of MBTA's claims arises under

DEP incident response files on a large fuel spill at the BET in October 1981, and files on releases of oil from the BET into the nearby rivers. Bergeron Decl. ¶ 14 & Exhs. 2-4. In addition, DEP recently located additional files on numerous releases of oil at or from the BET prior to the Consummation Date of June 30, 1983. *See* DelBene Decl. & Exhs. 1-7 thereto.

Finally, even MBTA acknowledges that where the parties contemplated environmental contamination claims between them before the bankruptcy consummation, actual regulatory involvement is unnecessary to a determination of whether a potential claimant fairly contemplates an environmental claim. MBTA erroneously insists, however, that the agreements entered into between MBTA and B&M for operation of the BET "made no reference to environmental contamination or claims." MBTA Mem. at 3. In fact, the Purchase and Sale Agreement between MBTA and B&M's bankruptcy trustees specifically provided that MBTA had a right of entry to inspect the property (Art. XII), and expressly indicated that each party shall bear the cost of any environmental impact study required by a government agency with regard to the purchase (Art. XIII). Bergeron Decl. ¶ 27 & Exh. 10. Moreover, the 1982 Operating Agreement between MBTA and B&M contains specific indemnification language with regard to property damage, Bergeron Decl. ¶ 29-35, which encompasses claims for environmental clean up. *See Hays v. Mobil Oil Corp.,* 930 F.2d 96, 101-02 (1st Cir. 1991) (applying Massachusetts law); *Hazen Paper Co. v. U.S. Fidelity & Guar. Co.,* 555 N.E.2d 576, 582-84 (Mass. 1990) (claim for cleanup costs constitutes claim for "damage on account of property damage"). Consequently, even assuming that fair contemplation is the appropriate standard, regulatory involvement was not a necessary prerequisite to bring a claim for environmental cleanup costs within the fair contemplation of MBTA prior to the Consummation Date.

---

CERCLA and the interpretation of that statute is irrelevant to the present case.

**B.    Additional Arguments by MBTA to Show Lack of Fair Contemplation Fail**

MBTA also emphasizes that a 1984 Oil Recovery Study performed by its consultants at the BET was "the first *study* undertaken by either of the parties to assess either the presence or extent of oil in the soils on the Site." MBTA Mem. at 5 (emphasis added). However, in making this assertion MBTA fails to state the obvious—that everyone at the BET site, including MBTA personnel, knew there was significant oil contamination at the site well before 1984. MBTA employees Peter Wilson and Richard House describe oil saturated ground and pooled oil at the site during the 1979 to 1983 time period. Hennemann Decl. ¶ 10-13 & Exhs. 16-17, 19-24 (Wilson Dep. at 50:21-51:11; House Dep. at 53:8-54:10; House Dep. at 30:1-23; 52:14-22; Wilson Dep. at 50:16-51:11, House Dep. at 52:15-16; House Dep. at 52:18-22; Wilson Dep. at 28:11-16). In short, MBTA was all too aware, well before the Consummation Date, that the BET was contaminated from many years of releases of oil during fueling and maintenance operations there. A study was hardly required to establish this fact.

MBTA further claims that it only had two employees responsible for environmental issues prior to 1990, and that neither "was aware of the MBTA's potential liability for the oil contamination at the Terminal until after DEP became involved with the Site in 1989." MBTA Mem. at 6. This is irrelevant to whether MBTA had a claim prior to the conclusion of B&M's bankruptcy. Other MBTA personnel, in particular those who worked at the site and their supervisors, were aware of the environmental condition of the BET and the need for cleanup at the site. Hennemann Decl. ¶¶ 11-14, 18-27 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39. In addition, Chapter 21E imposed immediate, strict, joint and several liability on owners and operators of contaminated sites, Chapter 21E § 5(a), and MBTA, like any other citizen, is presumed to know the law, *Roberts v. Maine,* 48 F.3d 1287, 1300 (1st Cir. 1995).

Finally, MBTA incorrectly implies that whether B&M recognized the import of Chapter 21E and the potential for liability at the BET is relevant to whether MBTA possessed a contingent claim at the time of the bankruptcy. MBTA's argument is misleading. Even under the fair contemplation test, the cases universally focus on the knowledge of the party asserting the contingent claim (the creditor), rather than the debtor's knowledge. *See, e.g., Mesiti*, 156 B.R. at 118 (focus is on what information claimant actually or constructively had available to it). Thus, the proper inquiry is the state of MBTA's knowledge prior to June 30, 1983.

Although MBTA asserts that its knowledge was limited and its "presence at the Terminal during B&M's operations was minimal," MBTA Mem. at p. 3, the opposite is true. MBTA had at least two employees, Richard House and Peter Wilson, on site nearly full time from 1979 to 1983, Hennemann Decl. ¶ 19 & Exhs. 31-32 (Wilson Dep. 7:3-10; House Dep. 6:4-12). MBTA personnel maintained an office at the BET, and House and Wilson exchanged information on environmental conditions at the BET with their MBTA supervisors. Hennemann Decl. ¶ 19 & Exhs. 1-3, 5-7, 31-34, 36. MBTA employee Peter Wilson's information on spills at the BET prior to June 1983 generally came *from his supervisors at MBTA*. Hennemann Decl. ¶ 25 & Exhs. 2-3. Also during the early 1980's MBTA personnel attended meetings regarding environmental issues at the BET and recognized the need for cleanup at the site. Hennemann Decl. ¶ 29 & Exhs. 30, 41-45 (BM 000003; Hennemann Dep. at 42:11-44:21; 47:5-49:7; Bergeron Dep. at 127:1-128:23; Hennemann Dep. 59:24-60:8; BM 000008); Bergeron Decl. ¶ 21 & Exh. 9.

Moreover, far from being uninvolved with the BET, as MBTA suggests, MBTA had oversight of expenses at the BET site prior to June 1983. Hennemann Decl. ¶ 28 & Exh. 35. MBTA employee Peter Wilson recalled that this included environmental expenses such as those

incurred to clean up spills. *Id.* More specifically, as early as 1978 MBTA funded an upgrade to the oil trap at the BET, Bergeron Decl. ¶ 17-18 & Exh. 7-8 (BM 00003; BM 000007), and MBTA's own document shows that in the late 1970's, approximately 35,000 gallons of petroleum product were recovered from the oil trap per year *for use by MBTA*. Bergeron Decl. ¶ 20 & Exh. 7 (BM 000003). Under these circumstances, MBTA undoubtedly had a sufficient presence at the site to gather direct, actual knowledge of releases of fuel oil at the BET from at least the late 1970's until 1983, and MBTA certainly possessed adequate knowledge to fairly contemplate a claim in B&M's bankruptcy.

## CONCLUSION

MBTA had a claim against B&M for environmental cleanup costs at the BET prior to B&M's bankruptcy Consummation Date yet failed to assert it. MBTA possessed constructive knowledge of its claim against B&M based on the close relationship of the parties throughout the bankruptcy proceedings, the agreements entered into by the parties that contemplated environmental conditions at the BET, and the existence of controlling common law and statutory law regarding environmental liability for releases such as those occurring at the BET. Furthermore, MBTA possessed actual knowledge of its claims against B&M for environmental contamination at the BET prior to June 30, 1983 based on the extensive involvement and knowledge of MBTA's own employees, and their supervisors, at the BET site. Under these circumstances, MBTA's failure to assert a claim in B&M's bankruptcy case discharged the claim and bars its attempted assertion at this late date. This Court accordingly should enforce the Consummation Order, deny MBTA's motion for partial summary judgment in all respects, and enjoin MBTA from assertion of its claim for reimbursement of cleanup costs at the BET as to contamination occurring on or before June 30, 1983.

Respectfully submitted,

WINSTON & STRAWN LLP


By:    /s/ Eric L. Hirschhorn
        Eric L. Hirschhorn
        Winston & Strawn LLP
        1700 K Street, N.W.
        Washington DC  20006
        202-282-5000
        Attorneys for Plaintiff,
        Boston & Maine Corporation


        Robert B. Culliford (BBO#638468)
        14 Aviation Avenue
        Pease International Tradeport
        Portsmouth NH  03801
        603-766-2002
        Counsel for Plaintiff,
        Boston & Maine Corporation


Dated:  June 23, 2006


## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 23, 2006.

John M. Stevens
Alicia Barton McDevitt
Foley Hoag LLP
155 Seaport Blvd.
Boston, MA  02210-2600
(617) 832-1000


        /s/ Eric L. Hirschhorn
        Eric L. Hirschhorn

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BOSTON AND MAINE CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -v.- | ) | Civil Action No. 05-11656-RCL |
| | ) | Judge Reginald C. Lindsay |
| MASSACHUSETTS BAY TRANSPORTATION AUTHORITY | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF ADELINE DELBENE

Eric L. Hirschhorn
Winston & Strawn LLP
1700 K Street N.W.
Washington DC 20006
Tel. 202-282-5706
Fax 202-282-5100
E-mail: ehirschhorn@winston.com

Robert B. Culliford, BBO #638468
Pease International Tradeport
14 Aviation Avenue
Manchester NH 03801
Tel. 603-766-2002
Fax 603-766-2094
E-mail: rculliford@flypanam.com
*Counsel for Plaintiff Boston and Maine Corporation*

June 23, 2006



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION
NORTHEAST REGIONAL OFFICE
205B Lowell Street, Wilmington, MA 01887 • (978) 694-3200

MITT ROMNEY
Governor

KERRY HEALEY
Lieutenant Governor

STEPHEN R. PRITCHARD
Secretary

ROBERT W. GOLLEDGE, Jr.
Commissioner

June 22, 2006

**VIA EMAIL @ SmacIntyre@Winston.com**
**Original via 1st Class US Mail**

Susan MacIntyre, Esq.
Winston & Strawn LLP
1700 K Street, N.W
Washington, District of Columbia 20006-3817

Dear Ms. MacIntyre:

I, as Keeper of the Records for the Department of Environmental Protection's (MassDEP's) Northeast Regional Office, hereby certify and affirm that the attached records regarding various sites identified in your email request of June 21, 2006, a copy of which is attached as Attachment A are true and accurate copies of records maintained by the MassDEP.

Executed as a sealed instrument under the pains and penalties of perjury this twenty-second day of June, 2006

Adeline DelBene
Management Analyst III

This information is available in alternate format. Call Donald M. Gomes, ADA Coordinator at 617-556-1057. TDD Service 1-978-694-3492.

http://www.mass.gov/dep • Fax (978) 694-3499
♻ Printed on Recycled Paper

BM002710

# EXHIBIT 1



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION
NORTHEAST REGIONAL OFFICE
205B Lowell Street, Wilmington, MA  01887 • (978) 694-3200

MITT ROMNEY
Governor

KERRY HEALEY
Lieutenant Governor

STEPHEN R. PRITCHARD
Secretary

ROBERT W. GOLLEDGE, Jr.
Commissioner

June 21, 2006

Sue MacIntyre, Esq.
Winston & Strawn LLP
1700 K Street, N.W.
Washington, D.C.20006

Dear Ms. MacIntyre:

        The Massachusetts Department of Environmental Protection ("MassDEP") is in receipt of your June 21, 2006 electronic mail request for documents.  As an attachment to your electronic mail you provided several pages from GZA Reports.  The GZA Reports reference MassDEP Spill Reports dating back prior to 1988.  MassDEP has reviewed its files and has complied below a summary of the information we have regarding the documents.  MassDEP has attached a "Keeper of the Records Affidavit" identifying these documents as true and authentic copies of our original files.

- **December 1980** – Cambridge, MA – MDC Prison Point Pumping Station
  15,000 gallons of No. 2 Oil and 1,000 gallons of No. 6 Oil
  The Oil Spill Reports are attached.

- **October 1981** – Charlestown, MA – Miller River
  20 gallons No. 6 Oil
  The Oil Spill Report is attached.

- **October 1981** – Yard No 5
  1100 gallon No. 2 fuel oil spill at the B & M Yard 5, Somerville MA
  The Oil Spill Log Sheet is attached.

- **December 1981** – Boston, MA – Boston & Maine RR, Miller River,
  10 – 50  gallons of No. 2 Fuel oil (note: you identified the release to be a 100 gallon release)
  The Oil Spill Report is attached.

- **June 1982** – Miller's River

This information is available in alternate format. Call Donald M. Gomes, ADA Coordinator at 617-556-1057. TDD Service 1-978-694-3492.

http://www.mass.gov/dep • Fax (978) 694-3499
Printed on Recycled Paper

BM002708

300 to 500 gallon spill of No. 2 Fuel Oil
Based upon our extensive review of MassDEP files we have not located any record of this spill in the Oil Spill Log nor have not found an Oil Spill Report.

- **December 1983** – Somerville, MA – B & M Washington & Joy Street
  2000 gallons of diesel fuel
  The Oil Spill Report is attached.

- **June 2, 1984** – Boston, MA – B & M Yard
  Diesel/gasoline on the Charles River
  The Oil Spill Report is attached.

- **June 4, 1984** – Charlestown/Somerville/Cambridge Line – B & M
  >100 oil
  The Oil Spill Report is attached.

- **November 18, 1988** – Boston/Somerville – Amtrack
  60,000 gallons of diesel fuel
  Multiple Oil Spill Reports dated November 18, 1988 – December 21, 1988 are attached.

While searching the Oil Spill Logs for the information you specifically requested above, MassDEP noticed a number of other spills, from different dates, which may have impacted the area in and around the Boston Engine Terminal. We have provided these Oil Spill Logs for your review. If you want additional information, please feel free to make an appointment at the MassDEP Northeast Regional Office for file review.

Very truly yours,

Maureen Vallatini
Regional Counsel

BM002709

# EXHIBIT 2

DIVISION OF WATER POLLUTION CONTROL
EASTERN REGIONAL OFFICE
OIL SPILL REPORT

INLAND  X

COASTAL  X

DATE OF SPILL: ___December 14, 1980___ TIME: _____ A.M. _____ P.M.

DATE REPORTED: ___December 16, 1980___ TIME: _____ A.M. ___1:15___ P.M.

LOCATION OF SPILL: MUNICIPALITY ___Cambridge___

EXACT ADDRESS OR LOCATION ___M.D.C. - Prison Point Pumping Station___

SOURCE:

| | |
|---|---|
| UNDERGROUND TANK _____ | OIL/WATER SEPARATOR _____ |
| ABOVEGROUND TANK _____ | PIPELINE ___X___ |
| TANK TRUCK _____ | SHIP OR BARGE _____ |
| STORM DRAIN _____ | SEWERAGE SYSTEM _____ |

OTHER (SPECIFY) ___B & M Bud Yard___

QUANTITY SPILLED: ___15,000 gallons_____ gals/bbls.

TYPE: JET; KERO; GASOLINE - REGULAR, UNLEADED - FUEL OIL -②, 4, 5, 6; BUNKER

PERSON OR AGENCY REPORTING SPILL TO THIS OFFICE:

NAME ___Jim Jones MDC___ TITLE ___(No knowledge of Source)___

ADDRESS ___727-5288___ PHONE _____

RESPONSIBLE PARTY: NAME ___B & M Railroad___

ADDRESS _____

PERSON OR AGENT CONTACTED ___Larry Boyd___ TITLE _____

ADDRESS (IF DIFFERENT FROM ABOVE) _____

PHONE NUMBER ___667-8100___

RESPONSIBILITY ACCEPTED BY: ___Larry Boyd - B&M (Dec.22,1981 4:30 p.m.)___

NAME OF CLEANUP CONTRACTOR: ___Coastal Service___

ENFORCEMENT ACTION NECESSARY: YES ___X___ NO _____

IF YES EXPLAIN: _____

OTHER AGENCIES CONTACTED: ___U.S.C.G., Jim McCann M.D.C 523-1583___

ADDITIONAL INFORMATION: ___No notification on spill - thought all oil in oil separator, but___ ___oil entered the MDC Prison Point Pumping Station.  Most oil held in separator.___

ENGINEER IN CHARGE OF INVESTIGATION: ___William Cashins___

SAMPLES COLLECTED: YES ___X___ NO _____ TYPE COLLECTED ___by U.S.C.G.___

SAMPLES DELIVERED TO LAB: YES _____ NO _____

`TE SAMPLES DELIVERED _____

DATE OF FINAL INSPECTION: _____

BM002712

# EXHIBIT 3

MA DEP NORTHEAST REGIONAL OFFICE SPILLS LIST UP TO 09/30/93

Page 24
02/14/94

| City/Town | Responsible Party Address/Location of Spill | Material Spilled Quantity/Reported | Quantity/Actual | Contractor/State Contractor/Private | Staff Person / UST / Case Status | Date: Spilled Reported | Spill ID Site ID |
|---|---|---|---|---|---|---|---|
| BOSTON | UNKNOWN CHANDLER ST | MISCELLANEOUS OIL NONE | NONE | NOT USED | ROBERSON, S  DNK  Closed | 12/29/88 | N88-2060 0000 |
| BOSTON | UNKNOWN CHARLES & FRUIT STS | OTHER MATERIAL 10-50 BAGS | --> MEDICAL WASTE | NOT USED | FONKEM, V  NO  Closed | 06/27/89 06/27/89 | N89-1067 0000 |
| BOSTON | B. & M. CHARLES & MILLER | #2 FUEL OIL | | | | 07/22/81 | 0000 |
| BOSTON | CHARLES RIVER | | | COASTAL SERVICES | DNK  Closed | 03/21/84 | N84-0158 0000 |
| BOSTON | N/A CHARLES RIVER / ESPLANADE | OTHER MATERIAL 1-10 | --> ONE BARREL 1-10 | NOT USED | CHU, R  NO  Closed | 04/16/90 04/16/90 | N90-0549 0000 |
| BOSTON | CHARLES RIVER DAM | GASOLINE SHEEN | SHEEN | NOT USED | PENTA, E  NO  Closed | 07/24/89 07/24/89 | N89-1228 0000 |
| BOSTON | AMTRAK CHARLES RIVER LOCKS | GASOLINE 10-50 GALLONS | UNKNOWN GALLONS | CLEAN HARBORS CLEAN HARBORS | OTTENHEIMER, D  NO  Closed | 07/18/89 07/18/89 | N89-1194 0000 |
| BOSTON | CHARLES RIVER NEAR PENN CENTRA | SLICK | | PENTA | DNK  Closed | 10/26/83 | N83-0348 0000 |
| BOSTON | ROSCO IDDING PAINT CO. CHARLES RIVER-SOLDIERS FIELD R | MISCELLANEOUS OIL SHEEN | | NOT / BESTER DNK | Closed | 03/15/85 | N85-0194 0000 |
| BOSTON | CHARLES RIVER/BY MDC POLICE | MISCELLANEOUS OIL 101-250 GALLONS | | NOT USED | GORBASI, M  NO  Closed | 01/03/90 01/03/90 | N90-0017 0000 |
| BOSTON | CHARLES RIVER&U BRIDGE | OTHER MATERIAL | --> BLACK OIL??? | OTHER - UNSPECIFIED CRV ENV | FONKEM, V  NO  Pending | 11/06/92 | N92-4474 0000 |
| BOSTON | 1 CHARLES ST | OTHER MATERIAL 51-100 LBS | --> FREON 12 51-100 LBS | OTHER | NO  Closed | 07/13/93 07/13/93 | N93-0947 0000 |
| BOSTON | 44-46 CHARLES ST | | | OTHER | BOYLE, T  DNK  Closed | | N93-0494 0000 |
| BOSTON | 243 CHARLES ST | HYDRAULIC FLUID 10-50 GALLONS | 10-50 GALLONS | NOT USED | BOYLE, T  DNK  Closed | 09/17/90 09/17/90 | N90-1528 0000 |
| BOSTON | CHARLES ST/MARTHA RD/RT 93 | OTHER MATERIAL 11-50 CUBIC YDS | --> CONTAMINATED SOIL CUBIC YDS | NOT USED | FONKEM, V  NO  Closed | 01/23/91 | N93-0092 0000 |
| BOSTON | 10 CHARLESGATE EAST | #6 FUEL OIL UNKNOWN | UNKNOWN | NOT USED | ARMSTONG, V  NO  Closed | 04/08/91 04/04/91 | N91-0469 3-3863 |
| CHARLESTOWN | CHARLESTOWN LOCKS | MISCELLANEOUS OIL UNKNOWN | UNKNOWN | NOT USED | STEWART, B  NO  Closed | 11/03/92 11/03/92 | N92-1442 0000 |

BM002733

# EXHIBIT 4

MA DEP NORTHEAST REGIONAL OFFICE SPILLS LIST UP TO ~ 0/93

Page    15    02/14/94

| City/Town | Responsible Party Address/Location of Spill | Material Spilled Quantity/Reported | Quantity/Actual | Contractor/State Contractor/Private | Staff Person UST    Case Status | Date: Spilled Reported | Spill ID Site ID |
|---|---|---|---|---|---|---|---|
| SOMERVILLE | 50 WEBSTER AVE | #2 FUEL OIL UNKNOWN | UNKNOWN | NOT USED | MACAFEE, K YES    Closed | 01/21/93 01/21/93 | N93-0086 3-4446 |
| SOMERVILLE | 84-86 WEBSTER AVE | OTHER MATERIAL UNKNOWN    DRUMS | --> BURIED DRUMS ........... | OTHER - UNSPECIFIED | BRESNAHAN, C NO    Closed | 06/18/93 | N93-0828 0000 |
| SOMERVILLE | ZENITH AUTO BODY 47 WEBSTER AVE. | WASTE OIL / ANTIFREEZE | | | CHU UNK    Closed | 02/20/86 | N86-0114 0000 |
| SOMERVILLE | TOWN OF SOMERVILLE 561 WINDSOR ST | UNKNOWN NONE | NONE | NOT USED | JONSSON, I NO    Closed | 10/14/87 | N87-1458 0000 |
| SOMERVILLE | CENTRAL DISPOSAL CO 30 WOODBINE AVE | MISCELLANEOUS OIL UNKNOWN    GALLONS | UNKNOWN    GALLONS | NOT USED | BOYLE, T NO    Closed | 03/15/90 03/15/90 | N90-0342 0000 |
| SOMERVILLE | B. & M. YARD 5 | #2 FUEL OIL 1100 GAL | | PEABODY COASTAL | DORANT UNK    Closed | 10/11/81 | 0000 |

BM002715

# EXHIBIT 5

5

DIVISION OF WATER POLLUTION CONTROL
EASTERN REGIONAL OFFICE
OIL SPILL REPORT

INLAND ✓

COASTAL _____

DATE OF SPILL: _Prior 10/19/81_ TIME: _____ A.M. _____ P.M.

DATE REPORTED: _10/19/81_ TIME: _____ A.M. _4:00 pm_ P.M.

LOCATION OF SPILL: MUNICIPALITY _Pti Charlestown_

EXACT ADDRESS OR LOCATION _Miller River_

SOURCE:

| | |
|---|---|
| UNDERGROUND TANK _____ | OIL/WATER SEPARATOR ✓ |
| ABOVEGROUND TANK _____ | PIPELINE _____ |
| TANK TRUCK _____ | SHIP OR BARGE _____ |
| STORM DRAIN _____ | SEWERAGE SYSTEM _____ |

OTHER (SPECIFY) _____

QUANTITY SPILLED: _Blk oil_ – _20_ (gals)/bbls.

TYPE: JET; KERO; GASOLINE - REGULAR, UNLEADED - FUEL OIL - 2, 4, 5, (6) BUNKER

PERSON OR AGENCY REPORTING SPILL TO THIS OFFICE:

NAME _Lou Merrell – Boston_ TITLE _____

ADDRESS _B+M – Boston Eng._ PHONE _367-3497_

RESPONSIBLE PARTY: NAME _B+M_

ADDRESS _Yard 5 Somerville_

PERSON OR AGENT CONTACTED _Gary Boyd_ TITLE _Env. Eng._

ADDRESS (IF DIFFERENT FROM ABOVE) _____

PHONE NUMBER _____

RESPONSIBILITY ACCEPTED BY: _B+M_

NAME OF CLEANUP CONTRACTOR: _Corotel Sons - Peabody (Clean Industry)_

ENFORCEMENT ACTION NECESSARY: YES _____ NO ✓

IF YES EXPLAIN: _____

OTHER AGENCIES CONTACTED: _____

ADDITIONAL INFORMATION: _Possibly caused by Heavy Rain Last Nyt flooding
out Separator_

ENGINEER IN CHARGE OF INVESTIGATION: _WXC on phone Joe Drout_

SAMPLES COLLECTED: YES _____ NO ✓ TYPE COLLECTED _____

SAMPLES DELIVERED TO LAB: YES _____ NO ✓

ATE SAMPLES DELIVERED _____

DATE OF FINAL INSPECTION: _____

BM002714

# EXHIBIT 6

MA DEP NORTHEAST REGIONAL OFFICE SPILLS LIST UP TO 09/30/93

Page 66    02/14/94

| City/Town | Responsible Party Address/Location of Spill | Material Spilled Quantity/Reported | Quantity/Actual | Contractor/State Contractor/Private | Staff Person / UST | Case Status | Date: Spilled / Reported | Spill ID / Site ID |
|---|---|---|---|---|---|---|---|---|
| BOSTON | 470 MERIDIAN ST. | GASOLINE UNKNOWN GALLONS | UNKNOWN GALLONS | NOT USED | OTTENHEIMER, D / YES | Closed | 04/03/90 04/03/90 | N90-0444 3-0700 |
| BOSTON | ROSS'S LAUNDRY 411 MERIDIAN ST. | MISCELLANEOUS OIL PUDDLE | | PCT / CLEAN HARBOR | DUGGAN / UNK | Closed | 07/20/84 | N84-0458 0000 |
| BOSTON | AMBASSADOR / BRATTLE TAXI MERRIMAC ST. & NEW CHARDON ST. | GASOLINE 10 GAL. | | CLEAN HARBORS | CHAPMAN / UNK | Closed | 10/27/85 | N85-0824 0000 |
| BOSTON | 101 MERRIMAC STREET | MISCELLANEOUS OIL UNKNOWN | UNKNOWN | NOT USED | BRADLEY, R / YES | Closed | 03/17/89 03/17/89 | N99-0375 0000 |
| BOSTON | H.N. GORIN ASSOCIATES 53-67 MERRIMACK ST | GASOLINE NONE | NONE | NOT USED | BRADLEY, R | Closed | 07/20/87 | N87-0967 3-1258 |
| BOSTON | KENTUCKY FRIED CHICKEN 6 MESHARA ST. | COOKING OIL 20 GAL | | NOT USED HALEY & ALDRICH TO | DORANT / UNK | Closed | 06/30/81 | 0000 |
| BOSTON | HYDE PARK HIGH SCHOOL 655 METROPOLITAN AVE | #2 FUEL OIL UNKNOWN GALLONS | 1-10 GALLONS | NOT USED IN HOUSE | CORBASI, M / NO | Closed | 01/25/90 01/25/90 | N90-0119 0000 |
| BOSTON | BOSTON WHARF CO. 50 MIDWAY ST. | CHEMICALS DRUMS | | | GUARCIARIELLO / UNK | Closed | 04/30/83 | 0000 |
| BOSTON | 35 MILDRED AVE. | OTHER MATERIAL 1-10 DRUMS | 1-10 DRUMS | NOT USED | OTTENHEIMER, D / NO | Closed | 12/22/89 12/22/89 | N89-2088 0000 |
| BOSTON | 2 MILES OFF BOSTON HARBOR | #2 FUEL OIL UNKNOWN | ? | NOT USED | CHU, R / NO | Closed | 04/26/93 04/26/93 | N93-0527 0000 |
| BOSTON | MILK ST | OTHER MATERIAL 11-50 CUBIC YDS | #6 OIL & SPEEDI DRI 11-50 CUBIC YDS | NOT USED NA | BOYLE, T / NO | Closed | 11/23/91 | N91-1668 0000 |
| BOSTON | CRIS PAPAS 152-154 MILK ST. | GREEN DYE & FINES | | | CHU / UNK | Closed | 05/03/85 | N85-0343 0000 |
| BOSTON | BOSTON & MAINE MILLER | MISCELLANEOUS OIL 20 GAL. | | PEABODY CLEAN INDUST | CASHINS / DORANT / UNK | Closed | 10/19/81 | 0000 |
| BOSTON | ✶ BOSTON & MAINE MILLER R. | #2 FUEL OIL 100 GAL. | | PEABODY COASTAL | CASHINS / UNK | Closed | 12/16/81 | 0000 |
| BOSTON | NOT LISTED/MYSTERY MILLERS RIVER/BARRENS SANDGRA | MISCELLANEOUS OIL UNKNOWN | UNKNOWN | NOT USED | BRADLEY, R / NO | Closed | 07/07/89 07/07/89 | N89-1119 0000 |
| BOSTON | MILTON ST.(NEPONSET VALLEY) | TRANSFORMER OIL 10-50 GALLONS | 10-50 GALLONS | NOT USED | STEWART, B / NO | Closed | 12/01/89 12/01/89 | N89-2013 0000 |

BM002716

# EXHIBIT 7

MA DEP NORTHEAST REGIONAL OFFICE SPILLS LIST UP TO ...30/93

Page  11    02/14/94

| City/Town | Responsible Party Address/Location of Spill | Material Spilled Quantity/Reported | Quantity/Actual | Contractor/State Contractor/Private | Staff Person | Case Status | Date: Spilled Reported | Spill ID Site ID |
|---|---|---|---|---|---|---|---|---|
| SOMERVILLE | MCGRATH/BROADWAY | UNKNOWN 10-50 GALLONS | 10-50 GALLONS | NOT USED | NDI, K  UNK | Closed | 08/05/87 08/05/87 | N87-1076 0000 |
| SOMERVILLE | MERIT OIL CO 709 MCGRATH/O'BRIEN HWY | GASOLINE UNKNOWN | 10-50 GALLONS | ZECCO | PENTA, E  YES | Closed | 06/16/87 06/16/87 | N87-0838 0000 |
| SOMERVILLE | MISTERY SPILL MDC CHLORINATION STATION | #4 FUEL OIL >100 GAL. | | COASTAL SERVICES | CASHINS  UNK | Closed | 01/28/77 | 0000 |
| SOMERVILLE | 5 MEACHEN RD | #4 FUEL OIL 10-50 GALLONS | 10-50 GALLONS | NOT USED | JONSSON, I  YES | Closed | 02/16/88 02/17/88 | N88-0219 0000 |
| SOMERVILLE | 30 MEMORIAL RD | ASBESTOS UNKNOWN | UNKNOWN | NOT USED | OTHER | Closed | 02/15/91 02/14/91 | N91-0210 0000 |
| SOMERVILLE | 12 MONTGOMERY AVE | TRANSFORMER OIL LESS THAN 1 GALLONS | LESS THAN 1 GALLONS | NOT USED | BOYLE, T  NO | Closed | 07/22/91 07/22/91 | N91-0993 0000 |
| SOMERVILLE | MONTGOMERY/MELVIN | PAINT THINNER VAPORS | VAPORS | NOT USED | CASEY, M  NO | Closed | 05/29/92 05/29/92 | N92-0672 0000 |
| SOMERVILLE | MYSTIC AVE | DIESEL FUEL 101-250 GALLONS | 101-250 GALLONS | NOT USED | JONSSON, I  NO | Closed | 08/12/87 08/12/87 | N87-1123 0000 |
| SOMERVILLE | 55 MYSTIC AVE | OTHER MATERIAL UNKNOWN | WASTE OIL UNKNOWN | NOT USED | SAYERS, S  YES | Closed | 03/04/92 03/04/92 | N92-0983 0000 |
| SOMERVILLE | 712 MYSTIC AVE | WASTE OIL UNKNOWN | UNKNOWN | NOT USED | STEWART, B  YES | Closed | 06/27/89 06/27/89 | N89-1058 0000 |
| SOMERVILLE | MYSTIC AVE & NEW ST | OTHER MATERIAL ---------- | --> CONTAMINATED SOIL ---------- | NOT USED | ARMSTRONG, V  NO | Closed | 10/15/92 10/15/92 | N92-1334 3-2140 |
| SOMERVILLE | KHOA-VAN-NGUYEN MYSTIC AVE @ HOUSING PROJECT | WASTE OIL NONE | NONE | NOT USED DPW | MACAFEE, K  UNK | Closed | 09/23/88 09/23/88 | N88-1496 0000 |
| SOMERVILLE | B.& M. MYSTIC JUNCTION | #2 FUEL OIL 20 GAL. | | PEABODY CLEAN INDUST | UNK | Closed | 03/08/82 | 0000 |
| SOMERVILLE | CHARLES MELVIN NEAR AMELIA EARHART DRIVE 74 F | WASTE OIL 200 GAL. | | JET LINE | CASHINS  UNK | Closed | 07/02/79 | 0000 |
| SOMERVILLE | NEW RD/MYSTIC AVE | OTHER MATERIAL 1-10 GALLONS | --> BLACK PETROLEUM PRODUCT ---------- GALLONS | NOT USED | FONKEM, V  NO | Closed | 09/02/92 09/02/92 | N92-1117 0000 |
| SOMERVILLE | NO. UNION ST. MANHOLE #20510 | TRANSFORMER OIL | | JET LINE | DORANT  UNK | Closed | 10/07/81 | 0000 |
| SOMERVILLE | 15 NORTH UNION ST | #2 FUEL OIL UNKNOWN | UNKNOWN | NOT USED | FAGAN, J  YES | Closed | 05/18/92 05/18/92 | N92-0625 3-2453 |

BM002740

# EXHIBIT 8

MA DEP NORTHEAST REGIONAL OFFICE SPILLS LIST UP TO 30/93

Page   6   02/14/94

| City/Town | Responsible Party Address/Location of Spill | Material Spilled Quantity/Reported | Quantity/Actual | Contractor/State Contractor/Private | Staff Person Case Status | Date: Spilled Reported | Spill ID Site ID |
|---|---|---|---|---|---|---|---|
| SOMERVILLE | 50 BROADWAY STREET | WASTE OIL NONE | NONE | NOT USED | MICHAUD, J NO Closed | 09/06/88 | N88-1388 0000 |
| SOMERVILLE | BY ASSEMBLY SQUARE MALL | GASOLINE NONE | NONE | NOT USED | GORRASI, M YES Closed | 01/12/89 | N89-0056 0000 |
| SOMERVILLE | 5 CAMERON ST | OTHER MATERIAL UNKNOWN | VAPORS UNKNOWN | CLEAN HARBORS | MICHAUD, J NO Closed | 09/26/89 09/26/89 | N89-1552 0000 |
| SOMERVILLE | 2 CAPEN CT | GASOLINE UNKNOWN | | NOT USED | GORRASI, M YES Closed | 02/28/91 03/01/91 | N91-0294 3-4146 |
| SOMERVILLE | BAYMETA 150 CAUSEWAY ST/OLD POWER HOUS | PCB OIL APPROX 1 GA | | CLEAN HARBORS | PENTA, E UNK Closed | 10/21/86 | N86-1041 0000 |
| SOMERVILLE | BOSTON EDISON CENTRAL AVE. & VERNON ST. | TRANSFORMER OIL | | BOSTON EDISON | UNK Closed | 09/17/84 | N84-0617 0000 |
| SOMERVILLE | 111 CENTRAL ST | DIESEL FUEL --- CUBIC YDS | --- CUBIC YDS | NOT USED | BRESNAHAN, C YES Closed | 11/12/92 11/12/92 | N92-1495 3-4584 |
| SOMERVILLE | 111 CENTRAL ST | DIESEL FUEL UNKNOWN | UNKNOWN | NOT USED | SAYERS, S YES Pending | 12/30/92 12/30/92 | N92-1706 0000 |
| SOMERVILLE | MYSTERY CHARLES RIVER @ B&M RR | MISCELLANEOUS OIL | | N/A MDC ENVIR. POLIC | NO1, K UNK Closed | 04/21/87 | N87-0531 0000 |
| SOMERVILLE | 100 CHARLESTOWN ST | DIESEL FUEL 1-10 GALLONS | --- GALLONS | NOT USED | MACAFEE, K NO Closed | 10/15/92 10/15/92 | N92-1326 0000 |
| SOMERVILLE | 26 CHESTNUT ST. | TRICHLOROETHYLENE | | NOT USED | FONKEM, V NO Closed | 02/03/88 | N89-0521 0000 |
| SOMERVILLE | 38-42 CLARENDON AVE | OTHER MATERIAL 1-10 DRUMS | UNKNOWN 1-10 DRUMS | NOT USED | BRESNAHAN, C NO Closed | 04/30/92 04/30/92 | N92-0545 0000 |
| SOMERVILLE | CASH OIL CO/MR. BARRETTO 65 CLARENDON AVE | #2 FUEL OIL LEAK 30-40 GALS | | CLEAN HARBORS | PENTA, E Closed | 04/27/87 | N87-0560 0000 |
| SOMERVILLE | 61 CLYDE STREET | #6 FUEL OIL 501-1000 GALLONS | 501-1000 GALLONS | NOT USED | OTTENHEIMER, D NO Closed | 05/16/88 | N88-0689 0000 |
| SOMERVILLE | MYSTERY COBBLE HILL ROAD | UNKNOWN NONE | NONE | NOT USED | FONKEM, V UNK Closed | 09/29/88 09/29/88 | N88-1525 0000 |
| SOMERVILLE | WEST SOMERVILLE DENTAL ASSOC. 120 COLLEGE AVE | METHICULATE 1 QT. | | N/A | JOHNSON, I UNK Closed | 04/29/87 | N87-0572 0000 |
| SOMERVILLE | 480 COLUMBIA RD | #2 FUEL OIL 101-250 GALLONS | 11-50 GALLONS | NOT USED | OTHER NO Closed | 08/25/90 08/25/90 | N90-1413 0000 |

BM002738

**EXHIBIT 9**

MA DEP NORTHEAST REGIONAL OFFICE SPILLS LIST UP TO 09/30/93

Page    48                                                                                          02/14/94

| City/Town | Responsible Party Address/Location of Spill | Material Spilled Quantity/Reported | Quantity/Actual | Contractor/State Contractor/Private | Staff Person Case Status | Date: Spilled Reported | Spill ID Site ID |
|---|---|---|---|---|---|---|---|
| BOSTON | 9 GRANT STREET | GASOLINE UNKNOWN GALLONS | UNKNOWN GALLONS | NOT USED | BRADLEY, R Closed | 01/10/90 01/10/90 | N90-0056 0000 |
| BOSTON | 23 GRANTLEY | OTHER MATERIAL UNKNOWN GALLONS | --- OIL, ANTIFREEZE, KEROSENE, G NOT USED UNKNOWN GALLONS | | FONKEM, V NO Closed | 04/06/90 04/06/90 | N90-0478 0000 |
| BOSTON | META.PROPERTY OWNER GRAVEL YARD ACROSS BOSTON EDIS | MISCELLANEOUS OIL 20 GAL. | | CLEAN INDUSTRY, CLEAN | DUGAN DNK Closed | 06/27/85 | N85-0471 0000 |
| BOSTON | CLOROBUSTERS GRAY STREET, | UNKNOWN NONE | NONE | NOT USED N/A | ROBERSON, S DNK Closed | 11/30/88 11/30/88 | N88-1880 0000 |
| BOSTON | BNS CONSULTING/BIRKENDAHN 380 GREEN STREET | GASOLINE | | SOMERVILLE ENG. /21 | REFERRED TO S.A. DNK Closed | 12/24/86 12/24/86 | N86-1324 0000 |
| BOSTON | 14-16 GREENBAUM ST | #2 FUEL OIL 251-500 GALLONS | 251-500 GALLONS | NOT USED | HOSSAN, G NO Pending | 03/22/93 03/22/93 | N93-0310 0000 |
| BOSTON | COURT SQUARE PRESS 16 GREENBAUM ST. | UNKNOWN LIQUIDS 2 DRUM LIQU | | I.P.C. | NDI DNK Closed | 08/18/86 | N86-0391 0000 |
| BOSTON | NETTLE FUEL 19 GREENWICH PARK | #2 FUEL OIL 100 GALS | | CLEAN HARBORS | FONKEM, V DNK Closed | 02/17/87 | N87-0189 0000 |
| BOSTON | BOSTON EDISON GREENWICH PARK | TRANSFORMER OIL 8 GAL. | | | DNK Closed | 02/24/83 | 0000 |
| BOSTON | BOSTON EDISON GREENWICH PLACE SOUTH END | HYDRAULIC FLUID 25 GAL. | | CLEAN HARBORS | CORACIANIELLO DNK Closed | 02/24/83 | 0000 |
| BOSTON | 6 GROVE STREET | GASOLINE 1-10 | | --- | BOLSTER, H NO Closed | 10/26/88 | N88-1691 0000 |
| BOSTON | JOSEPH BOTTI CO. GROVELAND ST.(REAR OF #14 & #1 | GREASE & HYDRAULIC OIL | --- | | DNK Closed | 03/14/86 | N86-0167 0000 |
| BOSTON | HELEN TRANSPORT GUEST ST. | #4 FUEL OIL 10-50 | 10-50 GALLONS | NOT USED ZECCO | CHU, R Closed | 04/24/90 04/24/90 | N90-0548 0000 |
| BOSTON | BOSTON EDISON H STREET& EAST EIGHT/HOLE12308 | TRANSFORMER OIL UNKNOWN GALLONS | UNKNOWN GALLONS | NOT USED CLEAN HARBORS | FONKEM, V NO Closed | 09/20/89 09/20/89 | N89-1584 0000 |
| BOSTON | 9 HAMILTON PLACE | UNKNOWN GALLONS | UNKNOWN GALLONS | NOT USED | STIGER, B NO Closed | 10/11/90 | N90-1677 0000 |
| BOSTON | 83 HAMPDEN STREET | #2 FUEL OIL NONE | NONE | NOT USED | LEBLANC, M YES Closed | 11/15/88 | N88-1795 3-2034 |
| BOSTON | 23 HANCOCK ST | #2 FUEL OIL UNKNOWN | NOT USED | | FONKEM, V NO Closed | 02/26/91 02/26/91 | N91-0272 0000 |

BM002734

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
                                                    x
BOSTON AND MAINE                                    :
CORPORATION,                                        :
                                                    :
                        Plaintiff,                  :
                                                    :
                                                    :
              -v.-                                  :        Civil Action No. 05-11656-RCL
                                                    :
                                                    :
MASSACHUSETTS BAY                                   :
TRANSPORTATION AUTHORITY                            :
                                                    :
                        Defendant.                  :
                                                    :
                                                    x
```

## DECLARATION OF JOHN COLLINS IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

John Collins declares as follows:

1.      I am employed by the Environmental Department of Pan Am Railways, which is affiliated with Boston &

Maine Corporation ("B&M"), the Plaintiff in this action. My knowledge comes from my own personal knowledge

and from documents cited herein.

2.      I make this declaration in Opposition to Defendant's Motion for Partial Summary Judgment.

3.      In May 2006 I reviewed files regarding the Boston Engine Terminal ("BET") at the Massachusetts

Department of Environmental Protection's ("DEP") Northeast Regional Office in Wilmington, Massachusetts.

4.    During the course of the file review, I met with Holly Migliacci, who is employed by DEP as the custodian of such records.

5.    After reviewing the available files, which primarily involved environmental activities at the BET during the 1990's, I explained to Ms. Migliacci that I was also interested in reviewing DEP records regarding the BET from earlier time periods.

6.    No documents or files from earlier time periods were located.

7.    Ms. Migliacci indicated that DEP may have documents filed under another release tracking number. She also stated that DEP has made a number of moves over the years and that DEP employees sometimes remove files. Thus, Ms. Migliacci indicated that it is possible that documents or files from earlier time periods may be missing or may not be available for review.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on June 21, 2006.

John Collins

DC:472926.1

2

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ──────────────────────── x | |
| BOSTON AND MAINE CORPORATION, : : | |
| : | |
| Plaintiff, : | |
| : | |
| : | |
| -v.- : | Civil Action No. 05-11656-RCL |
| : | |
| : | |
| MASSACHUSETTS BAY TRANSPORTATION AUTHORITY : : | |
| : | |
| Defendant. : | |
| : | |
| ──────────────────────── x | |

## DECLARATION OF ROBERT B. CULLIFORD IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Robert B. Culliford declares as follows:

1.      I am the Senior Vice President and General Counsel to Boston & Maine Corporation ("B&M"), the Plaintiff in this action.  As such I am familiar with the facts and circumstances of this case.  My knowledge comes from my own personal knowledge, from corporate records, and from documents cited herein.

2.      I make this declaration in Opposition to Defendant's Motion for Partial Summary Judgment.

3.      The documents produced in this action by B&M, with bates labels bearing the prefix "BM," are authentic copies of business records maintained by B&M in the ordinary course of

business, and it was the regular practice of B&M to keep such records. All documents produced in this action by MBTA, Bates labeled with prefix "MBTA," were produced by MBTA in response to B&M's discovery requests and are presumed to be authentic.

4.    MBTA itself has indicated that it is the second largest property owner in Massachusetts (See Declaration of Roger Bergeron in Opposition to Defendant's Motion for Partial Summary Judgment ¶ 6 & Exh. 1) (relevant documents attached as Exhibit 1).

5.    MBTA's expert witness in this matter, supported by B&M's expert witness, has testified that it would not have been plausible that MBTA, as one of the largest landowners in Massachusetts—one that owned numerous commuter rail/railroad facilities—was unaware of the enactment of Chapter 21E in March 1983 (relevant documents attached as Exhibits 2-3).

6.    Specifically, John C. Drobinski, B&M's expert witness, stated that it is reasonable to assume that the owner-operator of a commuter railroad in the Boston, Massachusetts area in 1982 and the first half of 1983 would have been aware of the consideration and enactment by the Massachusetts General Court of the legislation now known as the Massachusetts Oil and Hazardous Material Release Prevention Act, Chapter 21E of the Massachusetts General Laws, and the likely consequences of such enactment (relevant documents attached as Exhibit 2).

7.    Mr. Drobinski further stated that "since MBTA is a quasi-governmental agency it is hard to imagine it was not aware of the legislative process" (relevant documents attached as Exhibit 4).

8.    Mr. Drobinski also stated that "it is my opinion that it is reasonable to assume and was likely that by no later than the first half of 1983, MBTA was aware of the consideration and enactment of Chapter 21E" (relevant documents attached as Exhibit 4).

9.     Mr. Drobinski additionally stated that "it is reasonable to assume and likely that by no later than the first half of 1983 MBTA would have been aware of its potential liability for clean-up or clean-up costs based on MGL 21E or other laws" (relevant documents attached as Exhibit 4).

10.     M.G.L. Chapter 21E and its legislative consideration were well publicized prior to its enactment (relevant documents attached as Exhibits 2, 5-11).

11.     MBTA was aware or should have been aware of the consideration and enactment of Chapter 21E (relevant documents attached as Exhibits 2-3).

12.     MBTA's own expert, Wesley Stimpson, testified in his deposition that, regarding the enactment of Chapter 21E, "[i]t is possible there is someone within the MBTA structure that might have known about it, yes" (relevant documents attached as Exhibit 3).

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed June 20, 2006.

_____
Robert B. Culliford

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

————————————————————— x

BOSTON AND MAINE : 
CORPORATION, :
 :
          Plaintiff, :
 :
 :
      -v.- :      Civil Action No. 05-11656-RCL
 :
 :
MASSACHUSETTS BAY :
TRANSPORTATION AUTHORITY :
 :
        Defendant. :
 :

————————————————————— x

## DECLARATION OF ROGER D. BERGERON IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Roger D. Bergeron declares as follows:

1.     I am the Assistant Vice President, Engineering, at Boston & Maine Corporation

("B&M"), the Plaintiff in this action, and I worked for B&M at the Boston Engine Terminal

("BET") prior to June 1983. As such I am familiar with the facts and circumstances of this case.

My knowledge comes from my own personal knowledge, from corporate records, and from

documents cited herein.

2.     I make this declaration in Opposition to Defendant's Motion for Partial Summary

Judgment.

3.    A declaration as to the admissibility and authenticity of the documents produced in this action by B&M, with Bates labels bearing the prefix "BM," and a declaration as to the admissibility and authenticity of the documents produced in this action by MBTA, Bates labeled with prefix "MBTA," appears in the Declaration of Robert B. Culliford in Opposition to Defendant's Motion for Partial Summary Judgment ¶ 3.

4.    B&M is a rail common carrier providing railroad freight services in the Northeastern United States.

5.    MBTA provides mass transportation service throughout eastern Massachusetts by means of bus, subway, light rail, and otherwise.

6.    MBTA has indicated that it is the second largest property owner in Massachusetts (document from MBTA web site attached hereto as Exhibit 1).

7.    On several occasions in the 1970's and early 1980's, oil was released from the BET into the Miller's River and/or the Charles River (relevant documents attached hereto as Exhibits 2-4).

8.    Both the Metropolitan District Commission and B&M were cited by the Coast Guard for an oil spill into the Millers River on March 4, 1977 (relevant documents attached as Exhibit 5).

9.    Again, on July 19, 1979, the Metropolitan District Commission and the Coast Guard responded to an oil spill in the Millers River.  The Coast Guard came to the office at the BET and informed B&M personnel of the severity of the spill (relevant documents attached as Exhibit 6).

10.    As of the late 1970's, MBTA was aware that discharges of petroleum products originating at the BET occurred to the Millers River and occasionally the Charles River (relevant documents attached as Exhibit 7).

11.     MBTA was aware that the United States Coast Guard was issuing warnings and fines for these discharges.  (relevant documents attached as Exhibit 7).

12.     MBTA's own documents indicate that in June 1982, 300 to 500 gallons of No. 2 fuel oil was released from the oil/water separator to the Millers River (relevant documents attached as Exhibit 2).

13.     Another regulatory agency, the Massachusetts Department of Environmental Quality Engineering ("DEQE"), which later became the Massachusetts Department of Environmental Protection ("DEP"), kept incident files on releases at or from the BET during the late 1970's and early 1980's (relevant documents attached as Exhibits 2-4).

14.     These included DEP incident response files on a fuel spill of approximately 1,100 gallons of No. 2 fuel oil at the BET in October 1981, and files on releases of oil from the BET into the Miller's River and the Charles River (relevant documents attached as Exhibits 2-4).

15.     Also in the late 1970's and early 1980's, B&M maintained an oil trap at the BET where oil was pumped into tanks and carried off by contractors (relevant documents attached as Exhibit 8).

16.     The volume of oil recovered reached 90,000 gallons per year, but the volume began to subside as the oil was pressed out of the mud surrounding the oil trap (relevant documents attached as Exhibit 8).

17.     For a number of years in the 1970's, B&M tried to convince MBTA to allow it to upgrade the oil trap (relevant documents attached as Exhibit 8).

18.     In 1978, MBTA funded additional pumps and an above-ground oil separator for the system (relevant documents attached as Exhibits 7-8).

19.     As a requirement for funding the additional separator unit, MBTA requested that it could have the recovered petroleum products to burn in the BET boilers (relevant documents attached as Exhibit 7).

20.     Initially, in the late 1970's, approximately 35,000 gallons of petroleum product were recovered for MBTA per year (relevant documents attached as Exhibit 7).

21.     During the early 1980's MBTA personnel attended meetings regarding environmental issues at the BET and recognized the need for cleanup at the site (relevant documents attached as Exhibit 9).

22.     During the 1980 to 1981 time period, B&M employees Roger Bergeron and Gary Gordon, and MBTA employees Bill MacDonald and Gene Scoroposki, met to discuss the construction of a Coach House, during which environmental cleanup at areas at the BET that involved an accumulation of heavy greases, lubricants and diesel fuel were discussed (relevant documents attached as Exhibit 9).

23.     B&M filed for bankruptcy in 1970, and operated under Bankruptcy Court protection from 1970 to June 1983.

24.     This Court presided over the bankruptcy proceedings, which were held pursuant to the Bankruptcy Act of 1898 (subsequently repealed).

25.     During B&M's Bankruptcy proceedings, with approval of the Court, MBTA purchased the Boston Engine Terminal ("BET") from B&M's bankruptcy estate in December 1976 and MBTA continues to own the BET.

26.     Although MBTA owned the BET, B&M continued to operate the site until December 31, 1986.

27.    The purchase and sale agreement for MBTA's acquisition of the BET from B&M

authorized MBTA to inspect the BET property (relevant documents attached as Exhibit 10).

28.    During the bankruptcy proceedings, MBTA entered into agreements with B&M's

bankruptcy trustees regarding B&M's operation of the BET (relevant documents attached as

Exhibit 11).

29.    MBTA and B&M's bankruptcy trustees entered into a February 23, 1982 Agreement

("1982 Agreement") that provided for MBTA's indemnification of B&M for certain property

damage claims at the BET (relevant documents attached as Exhibit 12).

30.    The 1982 Agreement contained provisions relating to "Accident Responsibility" that

included the establishment of an "Indemnification and Liability Fund" (relevant documents

attached as Exhibit 13).

31.    The 1982 Agreement provided as follows:

>    The Authority [MBTA] agrees to indemnify and hold the Operator [B&M]
>    harmless from any loss not fully insured against and with respect to losses
>    incurred during the term of this Agreement and not fully covered by the
>    Liability Fund hereinafter described, arising from injury (including death)
>    to persons or damage to property, including but not limited to the
>    Authority's Property, which shall arise out of or be in any way connected
>    with the Service [B&M's operations] and from any such losses which
>    remain unsettled as of the date hereof and which occurred during the term
>    of the Agreement between Boston and Maine Corporation and the
>    Massachusetts Bay Transportation Authority dated December 14, 1964, as
>    amended and extended; the operating agreement by and between Robert
>    W. Meserve and Benjamin H. Lacey, Trustees of the property of Boston
>    and Maine Corporation and the Massachusetts Bay Transportation
>    Authority, dated March 18, 1976; and the operating agreement between
>    Robert W. Meserve and Benjamin H. Lacey, Trustees of the property of
>    Boston and Maine Corporation and the Massachusetts Bay Transportation
>    Authority, dated March 9, 1977.

(relevant documents attached as Exhibit 14).

32.     The 1982 Agreement required B&M to deposit a maximum of $200,000 each year into the Liability Fund to "provide for the payment of damages for claims resulting from events occurring during the term of this Agreement covered by this indemnity provision" (relevant documents attached as Exhibit 15).

33.     Pursuant to the 1982 Agreement, B&M was under no obligation to make payments of more than $200,000 per year into the Fund, and "[w]hen all claims for damages arising during the term of this Agreement for which there is liability have been satisfied, any funds remaining in the Liability Fund shall be retained by the Operator [B&M]" (relevant documents attached as Exhibit 15).

34.     The 1982 Agreement also provided that "[t]he provisions of this paragraph shall survive the term of this Agreement with respect to all causes of action which arise prior to the termination of this agreement" (relevant documents attached as Exhibit 16).

35.     The 1982 Agreement states that MBTA will not be required to indemnify B&M for losses arising out of any act or omission occurring during the term of the Agreement for which B&M, as the operator of the freight service, is legally responsible and for which the Authority and B&M as the operator of the (commuter) Service is not legally responsible (relevant documents attached as Exhibit 17).

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed June 20, 2006.

Roger D. Bergeron

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————— x

BOSTON AND MAINE
CORPORATION,
                     Plaintiff,

         -v.-                                  Civil Action No. 05-11656-RCL

MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY
                     Defendant.

———————————————————— x

## DECLARATION OF JAMES HENNEMANN IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

James Hennemann declares as follows:

1.     I am the Director of Automotive of Springfield Terminal Railway Company, a division of Boston & Maine Corporation ("B&M"), the Plaintiff in this action, and I worked at the Boston Engine Terminal ("BET") as a B&M employee from approximately 1979 to 1986. As such I am familiar with the facts and circumstances of this case. My knowledge comes from my own personal knowledge, from corporate records, and from documents cited herein.

2.     I make this declaration in Opposition to Defendant's Motion for Partial Summary Judgment.

3.     A declaration as to the admissibility and authenticity of the documents produced in this action by B&M, with Bates labels bearing the prefix "BM," and a declaration as to the

admissibility and authenticity of the documents produced in this action by MBTA, Bates labeled with prefix "MBTA," appears in the Declaration of Robert B. Culliford in Opposition to Defendant's Motion for Partial Summary Judgment ¶ 3.

4.    Daily activities at the BET included fueling, maintenance and washing of large quantities of rail cars.

5.    Frequent spills of fuel oil occurred at the BET prior to June 1983.

6.    Prior to June 1983, MBTA employees were aware that releases of fuel oil occurred at the BET (relevant documents attached hereto as Exhibits 1-8).

7.    While I was employed at the BET, the ground there became saturated with fuel oil, and the odor of diesel fuel was always present at the site (relevant documents attached hereto as Exhibits 9-11).

8.    While I worked at the BET, areas at the site where fuel oil spillage was constant and excessive included the fueling stands, at the filling points for the storage tanks, the service areas of the shop, the ready tracks where locomotives and self-propelled cars were stored awaiting dispatch, and the fuel storage tanks (including a leaking one million gallon fuel oil storage tank and a 100,000 gallon fuel oil storage tank) (relevant documents attached hereto as Exhibits 12-13).

9.    MBTA employee Richard House, who worked at the BET, specifically recalled that the bottom of the one million gallon fuel storage tank had to be replaced in approximately 1981. (relevant documents attached hereto as Exhibits 14-15).

10.    By the late 1970's and early 1980's, any contact with the oily, black ground at the BET resulted in soiling and staining of clothes and footwear (relevant documents attached hereto as Exhibits 16-18).

11.    MBTA employees Richard House and Peter Wilson were well aware of the oil-saturated ground at the site prior to June 1983 (relevant documents attached as Exhibits 19-21).

12.    Mr. House conceded that "[t]here was areas that were pretty saturated with oil, fuel oil" (relevant documents attached as Exhibit 22).

13.    Mr. House admitted that he had observed pooled oil on the ground at the BET during the 1979 to 1983 time period (relevant documents attached as Exhibit 23).

14.    Mr. Wilson similarly admitted having observed oil-saturated puddles on the ground in fueling areas at the BET from 1979 to 1983 (relevant documents attached as Exhibit 24).

15.    Several large releases of fuel oil or hazardous materials occurred during the late 1970's and early 1980's, when MBTA owned the BET (relevant document attached hereto as Exhibits 25-28).

16.    Documents indicate that on December 14, 1980, approximately 14,000 gallons of No. 2 fuel oil spilled at the BET and made its way to the Yard 14 oil pit, where it was pumped by contractors. The spill was reported to the National Spill Response telephone number (relevant documents attached as Exhibit 27).

17.    Documents also indicate that as of July 19, 1979, Pit 42 at the BET (measuring 64 feet long by 5 feet wide) was filled up to track level with oil and water. The pit was constantly filling up with oil and had to be pumped out about every week and a half to two weeks (relevant documents attached as Exhibit 25).

18.    MBTA had knowledge of the environmental condition of the BET site, releases of oil and hazardous substances at the site, and the involvement of regulators at the site (relevant documents attached as Exhibits 1-12, 16-17, 19-24, 29-39).

19.     MBTA maintained an office at the BET and had personnel on site who exchanged information on environmental conditions at the BET with their MBTA supervisors (relevant documents attached as Exhibits 1-3, 5-7, 31-34, 36).

20.     In his deposition, MBTA employee Richard House recalled usual discussions with his MBTA supervisor, Mr. Walter Mark, regarding whether there had been an oil spill "how much it was, how bad it was, and what we were doing to clean it up" (relevant documents attached as Exhibit 1).

21.     Mr. House testified that between 1979 and 1983, fuel spills occurred during fueling operations at the BET when the fuel nozzle would not be turned off and would overflow (relevant documents attached as Exhibit 40).

22.     Mr. House recalled an instance, also during this time period, in which a hose broke in the Budd House at the BET and there was fuel oil three to four inches deep (relevant documents attached as Exhibit 38.

23.     Mr. House testified that the Budd cars at the BET were an oily mess and spills and drips ran onto the ground during the 1979 to 1983 time period (relevant documents attached as Exhibit 39).

24.     MBTA employee Peter Wilson admitted that he observed fuel in the ground after a fuel spill in the area of the BET in the early 1980's.  Mr. Wilson testified that he did not report the spill to officials at MBTA because it had already been reported to them  (relevant documents attached as Exhibit 4).

25.     Mr. Wilson also testified that his information regarding spills at the BET prior to June 1983 generally came from his supervisors at MBTA (relevant documents attached as Exhibits 2-3).

26.     Mr. Wilson further testified that he received information from other MBTA employees concerning a spill of lubricating oil at the BET during the 1979 to mid-1983 time period (relevant documents attached as Exhibit 6).

27.     Mr. Wilson testified that sometime between 1979 and 1983 , William MacDonald of MBTA told Mr. Wilson that there was an oil spill at the site and asked Mr. Wilson to check the booms on the Miller's River.  Mr. Wilson saw an oil sheen and reported it to Mr. MacDonald (relevant documents attached as Exhibit 7).

28.     Mr. Wilson also testified that MBTA had oversight of expenses at the BET site prior to June 1983, which included environmental expenses such as spills (relevant documents attached as Exhibit 35).

29.     During the early 1980's MBTA personnel attended meetings regarding environmental issues at the BET and recognized the need for cleanup at the site (relevant documents attached as Exhibits 30, 41-45).

30.     In the 1980 to 1982 period, MBTA employees Walter Mark and Richard House attended meetings regarding environmental issues at the BET, including the leak in the one million gallon tank (relevant documents attached as Exhibit 41).

31.     Discussion at these meetings included concern about stopping any leak to prevent any more complaints from the Coast Guard and to make sure they were not polluting the property (relevant documents attached as Exhibit 42).

32.     George Covino of B&M and Walter Mark of MBTA were also involved in meetings at the BET to develop a more efficient fueling system for the BET.  These discussions began in approximately 1982 (relevant documents attached as Exhibits 41, 44).

33.     The old fueling system at the BET caused a problem because it did not have automatic shutoff and fuel was going onto the ground right outside the main offices (relevant documents attached as Exhibit 42).

34.     In or about 1984, MBTA installed new fueling nozzles at the BET with automatic shut-off to address the fuel spillage problem (relevant documents attached as Exhibits 30, 45).

35.     Peter Wilson testified that in the 1982 to 1983 time period, a discussion took place at the MBTA's general office in which Dan Breen of the MBTA engineering staff indicated to Mr. Wilson that there might have to be a cleanup of hazardous substances at the BET site (relevant documents attached as Exhibit 46).

36.     Mr. Wilson testified that in the 1982 to 1984 time period MBTA was aware of fill contaminated with fuel oil and lubricants that had to be analyzed so it could be handled properly (relevant documents attached as Exhibits 46-47).

37.  Mr. Wilson also testified that during the period from 1979 to 1983, MBTA was aware of spills or releases of oil or hazardous substances at MBTA facilities other than the BET, including South Station and South Hampton Street, which required cleanup efforts by MBTA (relevant documents attached as Exhibit 29).

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed on June 20, 2006.


                                                                James Hennemann