UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOSTON AND MAINE CORPORATION, | |
| Plaintiff, | |
| v. | CIVIL ACTION No. 05-11656-RCL |
| MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, | |
| Defendant. | |

**MEMORANDUM OF DEFENDANT MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY IN OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

Defendant Massachusetts Bay Transportation Authority (the "Authority" or the "MBTA") submits this memorandum in opposition to the motion of plaintiff Boston and Maine Corporation (the "B&M") for partial summary judgment. By its motion, the B&M requests a declaration that, to the extent the MBTA's counterclaims seek damages for events occurring before June 30, 1983, they are barred as a matter of law by the defense of discharge in bankruptcy. The Court should deny the B&M's motion because, as stated in the MBTA's Motion for Partial Summary Judgment, the MBTA is entitled to partial summary judgment dismissing the counts of the B&M's complaint that relate to the issue of discharge in bankruptcy.

Moreover, even if the MBTA were not itself entitled to summary judgment on the issue, the B&M's motion still should be denied because there are genuine disputes as to facts material to the effect of the B&M's discharge in bankruptcy, effective June 30, 1983, on the claims the MBTA has asserted against the B&M to the extent they arise from events occurring on or before that date. In that regard, it is important to keep in mind that the MBTA's claim is for indemnity

B3215772.1

or contribution for the Authority's liability to the Commonwealth under Chapter 21E of the Massachusetts General Laws ("Chapter 21E"). The B&M has put forward no evidence that either the MBTA or the B&M contemplated this claim until well after June 30, 1983; indeed, the MBTA's liability to the Commonwealth was not established or even alleged until long afterwards. The lengthy memorandum filed by the B&M in support of its motion devotes very little attention to these issues. Rather, it discusses at considerable length other claims, not brought by the MBTA, that might have been barred had the MBTA attempted to pursue them. In addition, the B&M devotes almost one-third of its argument to a contractual defense, not mentioned in its pleadings, that, if cognizable at all, is to be considered, under the schedule established by the Court at the request of the parties, only after the adjudication of the applicability of the defense of discharge in bankruptcy.

## SUMMARY STATEMENT OF FACTS

In the Concise Statement of Undisputed Material Facts In Support of its Motion for Partial Summary Judgment, the Authority set forth the facts material to its motion, with all disputes resolved in favor of the B&M. The undisputed fact crucial to the MBTA's motion is the absence of contact between the Authority and the agency charged with enforcing Chapter 21E, the Commonwealth's Department of Environmental Protection (then the Department of Environmental Quality Engineering and hereinafter the "DEP"), concerning the Boston Engine Terminal (the "Terminal" or the "Site") before June 30, 1983. (Concise Statement of Undisputed Material Facts In Support of MBTA's Motion for Summary Judgment, ¶¶ 21-26). Here, in opposition to the B&M's motion for partial summary judgment, the Authority shows through documentary evidence and expert opinion that, even if there are circumstances in which parties

should have contemplated a claim for indemnity or contribution for liability to environmental authorities before those authorities were involved in any way, those circumstances are not present here.  There is no evidence that before June 30, 1983, the B&M or the MBTA, in fact, contemplated that it would have to bring or would bring a claim for indemnity or contribution against the B&M.  More generally, at that time parties who, like the MBTA, owned contaminated property but had not carried out the operations that gave rise to the contamination did not contemplate that regulatory enforcement efforts would focus on them, requiring them to respond to the contamination and making it necessary for them to seek indemnification or contribution from those who had caused the contamination.

### Enactment and Enforcement of Chapter 21E

The precursor to chapter 21E, the Federal Superfund Law ("CERCLA") was enacted in 1980. 42 U.S.C., §9601 *et. seq.*  CERCLA made, among others, owners and operators of sites where there had been releases of "hazardous substances" liable for costs of responding to resulting contamination.  The definition of the term "hazardous substance" in CERCLA does not include oil, the contaminant of concern at the Boston Engine Terminal.  42 U.S.C., §9601(14).

When the bill that became Chapter 21E was before the Massachusetts legislature in 1982 and early 1983, press accounts portrayed it as a state counterpart to CERCLA.  (Culliford Decl. Exhs. 5-11).[1]  They did not indicate that, unlike CERCLA, the proposed state bill regulated releases of oil.  Id.  Nor did they focus on the liability of property owners by reason of that status, other than indirectly by references to the so-called Superlien, a provision alternatively

---

[1] Citations to "Culliford Decl.", "Bergeron Decl." or "Hennemann Decl." refer to the affidavits filed by B&M in support of its Motion for Partial Summary Judgment.

included within and deleted from the bill, which would establish a lien on property to secure costs of responding to contamination required to be paid by the Commonwealth. Id.

At the time of the enactment of Chapter 21E in March of 1983, and for the remainder of that year, landowners typically did not anticipate liability under the statute. Prior to and immediately after enactment of chapter 21E, Wesley Stimpson of the leading environmental and geotechnical firm Haley & Aldrich, attempted unsuccessfully to market to purchasers of property likely to be contaminated services designed to assess their potential statutory liability. (MBTA's Response to Plaintiff's Statement of Material Facts and Statement of Additional Relevant Facts, hereinafter "MBTA's S.O.F.", ¶29). The potential landowners were not interested. They assumed that the operators who had caused contamination would be the ones contacted by DEP. Existing landowners were even less interested in contracting for site assessment services. (MBTA's S.O.F., ¶30). Mr. Stimpson judged it plausible that in mid-1983 a landowner like the MBTA would not even have been aware of the enactment of Chapter 21E.[2]

Like landowners generally, the MBTA did not contemplate its potential liability to the DEP under Chapter 21E for any site prior to June of 1983. The MBTA's records indicate that the first notices of responsibility it received from the DEP in connection with potential Chapter 21E liability for any site in Massachusetts were issued in 1986. (MBTA's S.O.F., ¶32). Furthermore, the only MBTA employees with responsibilities relating to environmental issues prior to 1990 have certified that they were not aware of the MBTA's potential liability for the oil contamination at the Terminal until after DEP became involved with the Site in 1989 and that

---

[2] In its papers, the B&M overtly mis-characterizes Mr. Stimpson's deposition testimony by representing that Mr. Stimpson opined that it is not plausible that the MBTA was unaware of the enactment of Chapter 21E in March 1983. See B&M's Memorandum at p. 10 and 20. In fact, Mr. Stimpson stated his opinion was exactly the opposite: "Q: In your opinion, is it plausible that one of the largest landowners in Massachusetts and one that owned a site like the BET was unaware of the enactment of Chapter 21E? A: Yes, that's my opinion." (Culliford Decl., Exh. 3, Stimpson Dep. at 46:6-10).

they are not currently aware of any information suggesting that anyone at the MBTA was aware of the MBTA's potential liability for cleanup of the Terminal prior to the late 1980's. (MBTA's S.O.F., ¶33).

### Events At The Boston Engine Terminal

Experience at the Boston Engine Terminal was consistent with the response of landowners to the enactment of Chapter 21E. Witnesses who worked at the Terminal prior to, and after, the passage of Chapter 21E indicated that they were unaware that oil spills at the Site would necessitate the type of soil and groundwater cleanup ultimately required by the DEP. For example, Richard House, the only MBTA employee who worked at the Terminal full-time during the B&M's operations said he never heard anyone mention that there might be a need to conduct environmental cleanup at the Site and never heard of any state or federal environmental regulators coming to the Site. (MBTA's S.O.F., ¶34).

Former employees of the B&M confirmed Mr. House's testimony. Although meetings were held at the Terminal concerning oil spill-related issues such as a suspected leak in a large oil storage tank or the need to upgrade fueling equipment that leaked, the B&M witness who attended the meetings testified that there was no discussion of either the need to clean up soils as a result of the leaking tank or of the need to involve environmental regulators in the issue. (MBTA's S.O.F., ¶35, Hennemann Dep. at 44:11-47:4 and 48:2-7(meetings related to leaking oil storage tank), and 48:8-49:16 (meetings discussing need to replace fueling nozzles that had potential to cause spills)). Likewise, nothing from the files of either party from that period mentions Chapter 21E or a clean-up of the soil or groundwater at the terminal. (MBTA's S.O.F., ¶36). Although the B&M highlights brief testimony from one MBTA employee indicating that

the MBTA cleaned up spills of oil at a couple other locations prior to 1983, nothing in the testimony suggested a clean up of soil and groundwater as mandated by Chapter 21E or, indeed, anything more than standard mopping up of accidental spills or splashes as they occurred in areas used by the MBTA's employers or patrons. (MBTA's S.O.F., ¶37).

In only one instance did the need to address soil soaked with oil arise -- and it is certainly subject to dispute whether this event occurred prior to the B&M's bankruptcy discharge. See B&M's Memorandum at 8. The conversations recalled by witnesses apparently involved discussion of the need to properly dispose of soil that would be excavated during the construction of the Coach House on the site, because those soils would likely contain oil. (MBTA's S.O.F., ¶38, Wilson Dep. at 48:4-50:15, Bergeron Dep. at 127:1-128:2). However, the B&M's own witness indicated the conversations may have occurred in 1984. (MBTA's S.O.F., ¶38, Bergeron Dep. at 130:3-17). Whenever these conversations may have occurred, the requirement to dispose of excavated oil-contaminated soil arose independent of, and prior to, the enactment of Chapter 21E, and therefore would have had no impact upon the parties' recognition of any obligations under Chapter 21E. (MBTA's S.O.F., ¶39).

The conduct of the B&M itself belies its contention that any reasonable party would have been aware of the ramifications of Chapter 21E immediately after its enactment. No evidence indicates that the B&M itself ever notified DEP of ongoing releases at the Terminal occurring subsequent to the enactment of Chapter 21E as required under the act. See M.G.L. c. 21E, §7. Rather, the concerns to which the oil spills gave rise were the need to prevent them from reaching the Millers and Charles Rivers and the wish to avoid losses of a valuable asset.[3] A

---

[3] The year following the B&M's discharge in bankruptcy, the MBTA commissioned a study by a consultant, not to assess potential environmental liability but to ascertain the feasibility of recovering oil from the soil and groundwater and using it as fuel. (MBTA's S.O.F., ¶41).

report prepared by the B&M's former employee and consultant, Larry Boyd, in 1986, three years after enactment of Chapter 21E, concerning the history of "Oil Pollution Problems" at the Terminal contained no reference to the statute. (MBTA's S.O.F., ¶42).

Indications were that, if remediation were required, it would not be by the MBTA. When citations were issued for releases of oil from the Site into the nearby Miller's River, they were issued to the operator, the B&M, and not to the owner, the MBTA. (Bergeron Decl. ¶¶7-9, Exhs. 2-5). When the Coast Guard wished to emphasize that such events should not be repeated, it contacted employees of the B&M, not the MBTA. (Bergeron Decl. at ¶¶7-9).

DEP did not begin to investigate the need for remediation of the Terminal until years after the B&M's discharge. The investigation began in early 1989, following an oil spill that occurred at the Site in November 1988. (MBTA's S.O.F., ¶46). The Notice of Responsibility DEP then issued was directed not to the MBTA but to Amtrak, the B&M's successor as the operator of the Terminal. (MBTA's S.O.F., ¶47). Neither party has located any documents indicating earlier cleanup requests by the DEP, and DEP's own Keeper of the Records has confirmed that there is nothing in DEP's files suggesting that it contacted the MBTA concerning environmental conditions at the Terminal prior to 1988. (MBTA's S.O.F., ¶48).[4]

---

[4]   In it's motion, B&M asserts that DEP kept incident response on the Terminal in the late 1970's. <u>See</u> B&M's Memorandum at 5. However, the incident response files themselves were not produced by B&M. Rather, B&M refers to environmental reports drafted in the late 1980s and early 1990s containing an second-hand account of those files. (Bergeron Decl. at Exhs. 2-4). The environmental reports contain no information describing the nature of those incident response files, such as whether they were prepared by DEP or by another party (such as B&M) and copies simply forwarded to DEP's files. Significantly, the B&M, not the MBTA, was listed as the responsible party. <u>Id</u>. The incident response files do not indicate that either the MBTA or the DEP was directly involved in either the occurrence or cleanup of the spills, nor do they indicate that cleanup of contaminated soils was required as a result of the spills. As noted above, the DEP's own Keeper of the Records has indicated that there is nothing in DEP's files suggesting that it contacted the MBTA concerning environmental conditions at the Terminal prior to 1988. (MBTA's S.O.F., ¶48).

**ARGUMENT**

On June 2, 2006, the MBTA filed its own motion for partial summary judgment on the issue of the B&M's bankruptcy discharge claims. When facing cross-motions for summary judgment, "a court must rule on each motion independently, deciding in each instance whether moving party has met its burden under Rule 56." See Dan Barclay, Inc. v. Stewart & Stevenson Services, Inc., 761 F. Supp. 194, 198 (D. Mass. 1991). The B&M's motion for summary judgment must therefore stand alone. As the moving party, the B&M bears the burden of demonstrating that its motion for summary judgment presents no genuine issue of fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Thus for purposes of this motion, all facts are to be construed in the light most favorable to the MBTA. See Fleet Nat'l Bank v. H&D Entertainment, Inc., 96 F.3d 532, 537 (1st Cir. 1996)(inferences and credibility are taken in favor of the opposing party); Coll v. PB Diagnostic Systems, Inc., 50 F.3d 1115, 1121 (1st Cir. 1995)(on review the court must "read the record in a light most favorable to the non-moving party, drawing all inferences in the non-moving party's favor.").

**I.   The MBTA's Claims Against The B&M Were Not Discharged In Bankruptcy.**

Because the B&M has put forth no undisputed facts demonstrating that either party anticipated prior to June 30, 1983 that the MBTA would be required to incur response costs under Chapter 21E and, therefore, to seek indemnification or contribution from the B&M, it cannot establish that the parties fairly contemplated the MBTA's current claims for contribution pursuant to Chapter 21E on or before that date. Accordingly, the B&M's motion fails as a matter

of law, entitling the MBTA to pursue its counter-claims based on events occurring both before and after June 30, 1983.[5]

Although the B&M devotes considerable effort to arguing that the MBTA possessed potential claims against the B&M pursuant to Massachusetts common law or the federal CERCLA statute, the arguments are a red herring because the MBTA is not pressing any such claims. Indeed, by focusing exclusively on the passage of Massachusetts' "landmark" Chapter 21E legislation, the B&M's own expert report recognized that the crucial issue in this case is the passage and anticipated enforcement of Chapter 21E, not some hypothetical pre-existing common law claims. (Culliford Decl., Exh. 2 at p. 2). Prior to the enactment of Chapter 21E, the Commonwealth simply was not taking action to enforce environmental clean up of contaminated sites, even if the common law may have provided a basis for it to do so. The matter at issue, therefore, is when the parties contemplated that the MBTA would have a claim against the B&M under Chapter 21E. Such a claim could not have arisen before March 24, 1983, with the passage of that statute. See, e.g., In the Matter of Penn Central Transp. Co., 944 F.2d 164, 167 (3rd Cir. 1991) (CERCLA claims against debtor were not discharged in bankruptcy because discharge occurred prior to enactment of CERCLA because "at the time of the Consummation Order, there was no statutory basis for liability to be asserted against [the debtor] by the [claimants]").

---

[5] In its counter-claims, the MBTA has alleged that the B&M is responsible for releases occurring both prior to and after June 30, 1983. (Affidavit of Alicia B. McDevitt in Opposition to Plaintiff's Motion for Partial Summary Judgment, hereinafter "McDevitt Aff. in Opp.," Exh. 13, MBTA's Answer and Counterclaims). Thus, even if B&M somehow prevails on its motion, the next phase of the case will still involve adjudication of the MBTA's Chapter 21E counter-claims, to the extent they relate to post-June 30, 1983 releases. See e.g. NCL Corp. v. Lone Star Bldg. Ctrs. (Eastern) Inc., 144 B.R. 170, 178 (S.D. Fla. 1992)(bankruptcy only discharged liability for pre-petition releases and debtor may still be liable for any post-petition releases for which it bears responsibility).

### A.   The Fair Contemplation Approach Is The Proper Standard For Claims Arising Under Chapter 21E.

The B&M advocates use of a standard for determining when a claim has been discharged in bankruptcy that, in the view of almost all courts, grants too much deference to the interest a bankrupt has in a fresh start at the expense of society's interests in a speedy cleanup of environmental contamination and polluter accountability.  See e.g., Signature Combs, Inc.  v. U.S., 253 F. Supp. 2d. 1028, 1038 (W.D. Tenn. 2003) (citing the fair contemplation test as "the only test which tries to accommodate both the fresh start goal of bankruptcy and the speedy cleanup and polluter accountability CERCLA goals."); In the matter of Chicago, Milwaukee, St. Paul & Pacific Railroad, 3 F.3d 200, 201 (7th Cir. 1993) (noting that in reconciling the competing goals of CERCLA and bankruptcy, "the tension between these fundamental aspects of our national policy is profound," and deciding to apply fair contemplation/foreseeability analysis as the preferable reconciliation of that tension).  In urging the Court to adopt the "relationship test," the B&M entirely ignores Massachusetts case law and the weight of Federal authority adopting the fair contemplation/foreseeability approach as the appropriate test for assessing whether environmental claims are barred by a discharge in bankruptcy.  The B&M offers no persuasive reason why the Court should adopt a view rejected by most Federal courts and criticized by commentators.  It puts forward no reason why the Court should -- or may -- disregard a controlling determination of Massachusetts law.

It is well settled that, in deciding when a claim against a debtor in bankruptcy accrues, courts should look first to the non-bankruptcy substantive law applicable to the underlying claim. See In the Matter of Reading Co., 115 F.3d 1111, 1123 (3rd Cir. 1997) ("To determine whether a claim existed, we look to the substantive area of law governing the underlying claim."); In re National Gypsum, 139 B.R. 397, 405 (N.D. Tex. 1992)("Determination of whether a claim arises

in bankruptcy requires an analysis of interests created by non-bankruptcy substantive law."); In the Matter of Penn Central Transportation Co., 71 F.3d 1113, 1115 (3rd Cir. 1995)(same). That process is made easy here, because the Massachusetts Supreme Judicial Court has expressly decided it "[prefers] the fair contemplation-foreseeability approach as the means to determine when a cause of action under [Chapter 21E] becomes a claim for purposes of the Bankruptcy Code." See Reynolds Bros. v. Texaco, Inc., 647 N.E.2d 1205, 1208 (Mass. 1995). Notably, the B&M makes no reference to this significant decision in its motion.

As pointed out in Reynolds Bros., courts around the country have applied at least three different standards in order to determine when environmental liability arising from the debtor's pre-discharge conduct becomes a claim for bankruptcy purposes:

> (1) the claim arises upon the establishment of a certain relationship between the debtor and the creditor (the relationship test), see e.g. In re Chateaugay Corp., 944 F.2d 997, 1005 (2d Cir. 1991); (2) the claim arises at the time the claim could have been fairly contemplated or was reasonably foreseeable by the creditor (fair contemplation/foreseeability test), see e.g. In re Chicago, Milwaukee, St. Paul & Pac. R.R., 974 F.2d 775, 787 (7th Cir. 1992); In re Nat'l Gypsum Co., 139 B.R. 397, 409 (Bankr. N.D. Tex. 1992); and (3) the claim arises when the creditor actually incurs the response costs (right to payment approach), see United States v. Union Scrap Iron & Metal, 123 B.R. 831, 838-839 (Bankr. D. Minn. 1990).

Id. at 1207-08. After considering the options, the Reynolds Bros. court determined unequivocally that the intermediate standard of fair contemplation/foreseeability is the proper test for claims such as this one arising under Chapter 21E. Id. at 1207.

Although the Court of Appeals for the First Circuit has not addressed the issue, the decisions of other courts in the Circuit are in accord with the fair contemplation approach. See In re CD Realty Partners, 205 B.R. 651, 656 (Bankr. D. Mass. 1997) (noting that in the context of statutory environmental claims, the test for determining when a claim arises "correctly" requires "a relationship of such degree that the claim could fairly have been contemplated by the parties pre-petition."); Mesiti v. Microdot, 156 B.R. 113, 117 (D. N.H. 1993)(in attempting to

reconcile the competing policy objectives of CERCLA and the Bankruptcy Acts, "[t]he preferred means of doing so involves judicial application of a 'foreseeability' test when deciding whether post-bankruptcy CERCLA claims are discharged."). The fair contemplation/foreseeability test has also been adopted by the great majority of federal courts that have examined the issue. See In re Jensen, 995 F.2d 925, 930-31(9th Cir. 1993) (fair contemplation standard carefully balances the sometimes competing goals of environmental law and bankruptcy);[6] In the matter of Chicago, Milwaukee, St. Paul & Pacific Railroad, 974 F.2d 775 (7th Cir. 1992) ("In re Chicago I") (applying foreseeability standard); In the matter of Chicago, Milwaukee, St. Paul & Pacific Railroad, 3 F.3d 200 (7th Cir. 1993) ("In re Chicago II"); AM Int'l, Inc. v. Datacard Corp., 106 F.3d 1342, 1348 (7th Cir. 1997); In re National Gypsum, 139 B.R. 397, 407-09 (N.D. Tex. 1992) (only meaningful distinction between CERCLA claims in bankruptcy is whether claims are fairly contemplated); In re Hexcel Corp., 239 B.R. 564, 570 (N.D. Cal. 1999); Sylvester Brothers v. Burlington Northern, 133 B.R. 648, 653 (D. Minn. 1991) (applying fair contemplation standard); Signature Combs, Inc. v. U.S., 253 F. Supp. 2d., 1028 1038 (W.D.Tenn. 2003); Dale Ellen Azaria, "When is a Claim a Claim? A Bankruptcy Code Riddle," 62 Tenn. L. Rev. 205, 206 (1995) ("In the context of environmental claims, recent opinions and commentary have begun to coalesce around an intermediate standard: an environmental claim arises when the claim is within the fair contemplation of the parties involved").

The cases cited by the B&M provide no persuasive basis for departing from the majority approach. In its memorandum, the B&M states that "numerous courts have held that

---

[6]   The B&M cites the lower court decision of In re Jensen, 127 B.R. 27, 30 (B.A.P. 9th Cir. 1991) as supporting application of the relationship test. The citation is blatantly misleading because, on appeal of that decision, the Ninth Circuit criticized the relationship test and in fact adopted the fair contemplation approach (although it technically affirmed the Bankruptcy Appellate Panel by reaching the same result in applying a different standard). See In re Jensen, 995 F.2d at 930-31(9th Cir. 1993)(criticizing relationship test employed in B.A.P. decision); see also In re Hexcel Corp., 239 B.R. 564, 569-70 (N.D. Cal. 1999)(citing Ninth Circuit decision in In Re Jensen as adopting fair contemplation/ foreseeability test).

environmental cleanup claims arise for purposes of bankruptcy at the time of the actual or threatened release of the hazardous materials"-- but it cites only two. See B&M's Memorandum at 15-16, citing United States v. LTV Corp. (In Re Chateaugay Corp.), 944 F.2d 997 (2nd Cir. 1991); In re Jensen, 127 B.R. 27, 30 (B.A.P. 9th Cir. 1991).  Of those cases, the Bankruptcy Appellate Panel's decision in In re Jensen has been overruled by the Ninth Circuit,[7] and the Second Circuit's decision in In Re Chateaugay Corp., has been widely criticized.  See In re Jensen, 995 F.2d 925, 930-31(9th Cir. 1993) ("The 'relationship' approach, when defined as broadly as in *In re Chateaugay,* undermines the rationale for considering whether or not a relationship exists, namely that a creditor with a relationship may anticipate its potential claim"), quoting Discharging CERCLA Liability in Bankruptcy, 76 Minn. L. Rev. 327, 353 (1991)(internal quotations omitted).  Indeed, in the environmental context, it appears that application of the relationship test may be limited to the Second Circuit courts that are obligated to follow In Re Chateaugay Corp. ruling.

     Of equally little merit is the B&M's argument that the relationship test has been accepted in the First Circuit "in the purchase and sale context."  See B&M's memorandum at 16.  The argument rests upon misleading use of parentheticals in citing from a Bankruptcy Court decision. See In re Hemingway Transport, Inc., 73 B.R. 494 (Bankr. D. Mass. 1987), aff'd, 993 F.2d 915 (1st Cir. 1993).  The Bankruptcy Court did not hold, as the B&M would have it, that a "purchaser's cause of action against [a] bankruptcy debtor under environmental law arose when [the] contaminated property was transferred to [the] purchaser." See B&M's Memorandum at 16.  The B&M can make this argument only by omitting the second half of the court's statement. What the court actually stated is that "[purchaser's] cause of action under CERCLA arose when

---

[7]     See Footnote 6, supra.

the property containing the drums was transferred to [purchaser], or alternatively, when [purchaser] expended money in response to the EPA's administrative order." See 73 B.R. at 503; see also In re Hemingway Transport, Inc. 993 F.2d at 929, n16 (quoting same section). The B&M's selective quotation aside, the two decisions in In Re Hemingway Transport fairly stand for, at most, the proposition that a cause of action under an environmental cleanup statute arises for bankruptcy purposes at some point between the time in which the claim would arise under the relationship test and when it would arise under the right to payment approach at the opposite end of the spectrum. Under the latter approach, the B&M would have no argument that the MBTA's claim was discharged in bankruptcy.

### B. The Parties Did Not Fairly Contemplate The MBTA's Chapter 21E Claims Prior To June 30, 1983.

The claim the MBTA has brought against the B&M in this action is a claim for contribution or indemnity for the expenses it was required by DEP to incur under Chapter 21E to clean up oil-contaminated soil and groundwater at the Boston Engine Terminal. In order for the parties to have contemplated that claim on or before June 30, 1983, they must have anticipated, first, that a clean-up of soil and groundwater contaminated by oil at the Site would be required and, second, that the clean-up would be required to be performed by the MBTA. In fact, there is no evidence that the parties actually anticipated either of those contingencies before June 30, 1983. Nor did others similarly situated contemplate at that time that DEP would enforce Chapter 21E against landowners like the MBTA, who were not responsible for causing contamination, as opposed to operators like the B&M, who had caused contamination.

There is no indication that, before June 30, 1983, the MBTA or the B&M actually contemplated that the MBTA might have a claim for indemnification of contribution against the

B&M as a result of costs required to be incurred under Chapter 21E to clean up oil-contaminated soil and groundwater at the Site.  Nothing from the files of either party from that period mentions Chapter 21E or a clean-up of the soil or groundwater at the terminal.  No deposition witness recalls any mention of Chapter 21E or a discussion of plans to clean up the soil or groundwater.  (MBTA's S.O.F., ¶¶34-38).  The B&M did not report historic and ongoing spills of oil to the DEP in the months following the enactment of Chapter 21E.  Rather, the concerns to which the oil spills gave rise were the need to prevent them from reaching the Millers and Charles Rivers and the wish to avoid losses of a valuable asset.  In that regard, the year following the B&M's discharge in bankruptcy, the MBTA commissioned a study by a consultant, not to assess potential environmental liability but to ascertain the feasibility of recovering oil from the soil and groundwater and using it as fuel. (MBTA's S.O.F., ¶41).

      The MBTA and the B&M were not alone in failing to anticipate the potential effect of Chapter 21E on owners of oil-contaminated property in the months after enactment of the statute.  An experienced consultant who took a lead role in attempting to market environmental site assessment services to existing and potential owners of contaminated properties views it as entirely plausible that a landowner like the MBTA would not even have been aware of the Act's passage.  (Culliford Decl., Exh. 2, Stimpson Dep. at 46:6-10).  Even if a landowner knew of the enactment, Chapter 21E was characterized as a state counterpart to CERCLA, which did not regulate releases of oil, and Chapter 21E's applicability releases of oil was not widely publicized.  (Culliford Decl., Exhs. 5-11).  Even when they were advised of the statute and its reach, prospective purchasers of contaminated property declined to perform site assessments, believing that any enforcement by the DEP would be against operators who had caused the contamination rather than an owner who had not. (MBTA's S.O.F., ¶¶29-30).  This expectation was consistent

with experience of owners of sites like the Boston Engine Terminal, where the Coast Guard's enforcement efforts focused on the operator, the B&M, rather than the owner. (MBTA's S.O.F., ¶¶43-45). Landowners continued to be reluctant to perform environmental assessments until 1984, when concerns first expressed by a title insurance company caused the lending community to insist that potential environmental liabilities be assessed. (MBTA's S.O.F., ¶¶30).

Not for years after the B & M's discharge in bankruptcy was there reason to anticipate that the MBTA would be required under Chapter 21E to incur costs associated with cleaning up oil-contaminated soil and groundwater at the Site. The first suggestion that the DEP would have interest in the Site pursuant to Chapter 21E was by the consultant who performed the oil recovery study in 1984. (MBTA's S.O.F., ¶41). The first action by DEP that it would require anyone to incur costs of responding to contamination at the Site was a Notice of Responsibility issued five years later and directed -- not to the MBTA -- but to Amtrak, the B&M's successor as operator of the Terminal. (MBTA's S.O.F., ¶¶46-47).

Nor can B&M argue that the 1982 Operating Agreement between the parties supplies evidence that the parties contemplated environmental claims prior to the discharge. (Bergeron Decl., Exh. 12). Unlike the parties in <u>NCL Corp. v. Lone Star Bldg. Ctrs. (Eastern) Inc.</u>, 144 B.R. 170 (S.D. Fla. 1992), who had executed a lease specifically requiring the debtor to comply with applicable environmental regulations, the 1982 Operating Agreement contains no reference to environmental damage, pollution, or oil spills. In comparison, the Agreement's general reference to property damage is plainly insufficient to indicate contemplation of the environmental cleanup liabilities ultimately borne by the parties.

In sum, a prerequisite to a finding that the MBTA's claim for indemnification or contribution on account of costs it was required to incur by DEP to clean up oil contamination at

the Boston Engine Terminal was within the fair contemplation of the parties at the time of the B&M's discharge in bankruptcy is lacking.  That prerequisite is contact between the DEP and the MBTA with respect to contamination before the date of the discharge.  See, e.g., Reynolds Bros., 647 N.E.2d at 1208; In re Chicago II, 3 F.3d at 207; AM Int'l Inc., 106 F.3d at 1348.  Here, not only was there no such contact, but in the circumstances present here, landowners in the position of the MBTA in the months following enactment of Chapter 21E did not anticipate that there would be any such contact leading to their being required to incur expenses for response costs.

## II.     The 1982 Operating Agreement Does Not Preclude The MBTA's Environmental Response Cost Claims Against The B&M.

Perhaps realizing that it is unlikely to succeed on its bankruptcy discharge defense, the B&M presents a new theory for blocking or reducing the MBTA's recovery for claims not discharged in bankruptcy based on the contractual relationship between the parties.  This argument, which was not raised either in the pleadings or in statutorily mandated pre-litigation negotiation, must fail here for two reasons.  First, the contractual defenses of the B&M to the MBTA's Chapter 21E claims, if any, are not properly raised in this phase of the litigation, which by agreement of the parties and order of the Court, is to relate solely to the bankruptcy discharge issue.  Second, even if the B&M's contract arguments were properly presented at this stage, these arguments amount to nothing more than a selective mis-reading of the agreement's terms.

### A.     The B&M's Contract Arguments Are Premature.

According to the Court's docket entry specifying the schedule for this case, Phase I relates to the "Bankruptcy Discharge Issue."  (McDevitt Aff. in Opp., Exh. 14).  Despite that mandate, the B&M is attempting to present in Phase I a contractual defense under the parties'

1982 Operating Agreement to claims not discharged in bankruptcy. The B&M made no mention of the possibility that it might raise a contractual defense in Phase I (or in any phase of the case for that matter) at the parties' joint Scheduling Conference with the Court. Nor did the B&M give any such indication in the parties' Joint Statement Pursuant to Local Rule 16.1(D). (McDevitt Aff. in Opp., Exh. 15). In fact, until the filing of its motion the B&M had given no indication whatsoever of its intent to present a defense to the MBTA's environmental claims based in contract. The B&M's complaint contains no reference to such a cause of action or defense; nor does B&M's answer to MBTA's Chapter 21E counter-claims. (McDevitt Aff. in Opp., Exhs. 16 and 17).

As a consequence, the parties have not conducted any discovery concerning such topics as the parties' understanding of their respective rights and obligations under the Agreement or the course of dealings between the parties under the Agreement. It is impossible at this stage even to speculate what facts material to the contract issue might be disputed by the parties in the absence of any such discovery. Because the B&M's contractual defense is beyond the scope of the Court's phasing of proceedings so as to address the "Bankruptcy Discharge Issue" first, the Court should deny the B&M's Motion for Partial Judgment without prejudice insofar as it relates to the 1982 Operating Agreement.

**B.   Environmental Response Cost Claims Against The B&M Are Not Addressed By the 1982 Operating Agreement.**

Because the B&M's premature attempt to limit the MBTA's recovery on claims not discharged in bankruptcy is not properly before the Court, the substance of the B&M's contention requires only brief discussion. As would be expected, a defense the B&M did not see fit to raise either in pre-litigation negotiation or the pleadings is without merit. The thrust of the

B&M's argument is that Section 14.01 of the Operating Agreement, "Accident Responsibility," grants the B&M a broad indemnity from the MBTA requiring the MBTA to bear ultimate responsibility for millions of dollars of environmental response costs with no recompense beyond a $1 million Liability Fund established by the Agreement.

The B&M's construction of the 1982 Operating Agreement is as contrary to the Agreement's terms as it is to common sense. When examined in full, it is evident that the 1982 Operating Agreement does not intend this result. First, the Agreement makes no reference to environmental liabilities or the conditions likely to give rise to them. Second, when read in context, it is apparent that the provision in which the B&M relies is intended at most as an allocation of liability arising from injuries to persons and damage to property arising from accidents in the course of the B&M's operation of a portion of the MBTA's commuter rail service. For example, the B&M is required to notify the MBTA in writing "as soon as practicable after receipt of a claim arising out of or in any way connected with [B&M's operations]," and the B&M is given primary responsibility for investigation and disposition of claims, but the MBTA may participate in the investigation or defense of any claim brought against the B&M, at its sole election. (Bergeron Decl., Exh. 12 at p. 45). Third, contracts are to be construed to give force and effect to each of their provisions, and the B&M's sweeping interpretation would render Section 3.05 of the Operating Agreement, "Operator's Duty of Care," which requires the B&M to maintain and return the MBTA's property in the same condition as at the start of the agreement term of no effect. See J.A. Sullivan Corp. v. Commonwealth, 949 N.E.2d 374, 378 (Mass. 1986) ("A contract is to be construed to give reasonable effect to each of its provisions"); Shea v. Bay State Gas Co., 418 N.E.2d 597, 602 (Mass. 1981) (a contract must not be construed so as to render any of its terms meaningless).

The B&M's lengthy discussion about whether the term "property damage" in the indemnity section encompasses environmental clean up costs or whether the MBTA's cause of action accrued during the term of the agreement -- all based on inapposite decisions arising in different circumstances -- simply misses the point. As the MBTA will demonstrate should the B&M's argument be renewed at a later state of the proceedings, the indemnity provision does not shield the B&M from any claims made by the MBTA, whether or not they happen to be for property damage and irrespective of when the claim arose. The Court should therefore deny the B&M's motion for summary judgment without prejudice insofar as it relates to the 1982 Operating Agreement.

## CONCLUSION

For the reasons set forth above, the Court should deny the B&M's Motion for Partial Summary Judgment in its entirety.

Respectfully submitted,

/s/ John M. Stevens
John M. Stevens (BBO #480140)
Alicia Barton McDevitt (BBO #655184)
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts   02210
(617)  832-1000
amcdevitt@foleyhoag.com
Attorneys for Defendant
  Massachusetts Bay Transportation Authority

Dated:  June 23, 2006