UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

.....................................
.
BOSTON AND MAINE CORPORATION,     .
.
        Plaintiff,     .
.
     v.     .     CIVIL ACTION No. 05-11656-RCL
.
MASSACHUSETTS BAY     .
TRANSPORTATION AUTHORITY,     .
.
        Defendant.     .
.
.....................................

**MASSACHUSETTS BAY TRANSPORTATION AUTHORITY'S
RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL
FACTS AND STATEMENT OF ADDITIONAL RELEVANT FACTS**

**I.    Response to Plaintiff's Statement of Material Facts.**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Defendant Massachusetts Bay Transportation Authority ("MBTA"), by and through its undersigned counsel, hereby makes the following response to the Plaintiff Boston and Maine Corporation's ("B&M") Statement of Material Facts (hereinafter "B&M's S.O.F.") in support of its Motion for Partial Summary Judgment:

      1.     Admitted.

      2.     Admitted.

      3.     Admitted.

      4.     Admitted.

      5.     Admitted.

      6.     Admitted in part and disputed in part. The MBTA admits that the 1976 Purchase

B3218634.1

and Sale Agreement provided MBTA with the ability to inspect the Boston Engine Terminal property (the "Terminal" or the "Site"), but only for certain purposes and under certain conditions. Specifically, the agreement provides that MBTA may enter the Terminal:

> for the purpose of surveying, boring, planning and all other acts related to such purposes, provided that any entry and acts related thereto shall not interfere with the transportation operations of [B&M], and that, prior to any entry, [MBTA] shall have given [B&M] duly executed releases and indemnity agreements covering any claim arising out of such entry.

(Bergeron Decl., Exh. 10).[1]

    7.    Admitted.

    8.    Admitted in part and disputed in part. The MBTA admits that the 1982 Operating Agreement between B&M and MBTA contained a provision requiring the MBTA to indemnify B&M for certain "Accident Liability", including property damage, but MBTA disputes that this provision governs environmental contamination of the Terminal. The MBTA asserts that Section 14.01 of the Operating Agreement, "Accident Liability", speaks for itself and objects to the B&M's characterization of the agreement's terms. (Bergeron Decl., Exh. 12).

    9.    Admitted.

    10.    Admitted.

    11.    Admitted.

    12.    Admitted in part and disputed in part. The MBTA admits that there was an office at the Terminal which housed a single MBTA employee, Richard House. (Hennemann Decl., Exh. 32). MBTA disputes that MBTA personnel on site exchanged information on environmental conditions at the Terminal with their supervisors. Richard House testified that he discussed spills of oil that occurred on the Site (not "environmental conditions") with one of his

---

[1] Citations to "Bergeron Decl.", "Hennemann Decl." or "Culliford Decl." refer to the affidavits filed by B&M in support of its Motion for Partial Summary Judgment.

supervisors, Walter Mark. (Hennemann Decl., Exh. 1). On the contrary, Mr. House specifically testified that he did not recall environmental conditions being discussed at meetings held at the Site. (Affidavit of Alicia B. McDevitt in Opposition to Plaintiff's Motion for Partial Summary Judgment, hereinafter "McDevitt Aff. in Opp.", Exh. 1, House Dep. at 17:22-18:1).

13.   Admitted in part and disputed in part. The MBTA admits that it had some responsibility for payment of expenses at the Terminal Site, but disputes that it had responsibility for all expenses at the Site. The testimony cited by B&M was not based upon personal knowledge of the financial operation of the Terminal. (Hennemann Decl., Exh. 35); (McDevitt Aff. in Opp., Exh. 2, Wilson Dep. at 58:20-59:5).

14.   Admitted.

15.   The MBTA admits that certain MBTA employees were aware that releases of fuel oil occurred at the Terminal prior to June, 1983.

16.   Admitted.

17.   Disputed. The MBTA disputes that it was aware of Coast Guard issued fines or warnings relating to releases of oil to the Millers River or the Charles River in the 1970s and 1980s. The correspondence cited by B&M was created many years after the fact, and does not provide any indication that the MBTA possessed contemporaneous knowledge of these fines or warnings. (Bergeron Decl., ¶ 17, Exh. 7). MBTA employees who worked at the Site testified that they were not aware of any such fines or penalties being issued to the B&M or MBTA prior to 1983. (Hennemann Decl., Exh. 3 (MBTA employee Peter Wilson was unaware of notices or fines or penalties issued to B&M or MBTA relating to releases at the Terminal prior to 1983)); (Hennemann Decl., Exh. 7 (Mr. Wilson did not know of any involvement by the Coast Guard or the the Department of Environmental Protection ("DEP"), formerly the Department of

Environmental Quality Engineering ("DEQE"), in response to spill of oil to Millers River)); (Hennemann Decl., Exh. 14 (Mr. Wilson never heard of any state or federal regulators coming to the Site)); Hennemann Decl., Exh. 10 (MBTA employee Richard House did not recall any spills of oil to Millers River in 1979 or 1982)); (McDevitt Aff. in Opp., Exh. 1, House Dep. at 18:2-6 (Mr. House testified that he did not recall the Coast Guard or other regulators ever being discussed at meetings held at the Site).

18. Admitted in part and disputed in part. The MBTA admits that certain Massachusetts authorities, specifically the Metropolitan District Commission, may have been aware of releases of oil from the Terminal prior to June, 1983. (Bergeron Decl., ¶¶8-9, Exhs. 5-6). The MBTA disputes that any other Massachusetts authorities, including specifically the DEP, were aware of releases of oil at the Terminal prior to June, 1983. The presence of "Incident Response Files" in DEP's files in 1988 (as reported by consultants subsequent to a review of DEP files in 1988) does not establish that the DEP was contemporaneously aware of such spills at the Terminal prior to June, 1983. (Bergeron Decl., Exhs. 2-4). To the contrary, DEP's own Keeper of the Records has confirmed that there is nothing in DEP's files suggesting that it contacted the MBTA concerning environmental conditions at the Terminal prior to 1988. (McDevitt Aff. in Opp., Exh. 3, Delbene Affidavit).

19. Disputed. The MBTA disputes that it, as owner of the Terminal, would have had a duty to abate a nuisance at the Terminal and states that any such duty should have fallen upon B&M as the sole operator of the Site. In addition, the MBTA disputes that this is a "statement of fact" rather than a legal conclusion.

20. Admitted.

21. Disputed. The MBTA disputes that it either was aware or should have been

aware of the consideration and enactment of Chapter 21E. Nothing in the after-the-fact opinion of B&M's expert, John C. Drobinski, establishes that the MBTA was in fact aware of the enactment of Chapter 21E. (Culliford Decl., Exh. 2). In addition, the MBTA's expert, Wesley Stimpson, testified it was entirely plausible that the MBTA was unaware of the passage of Chapter 21E. (Culliford Decl., Exh. 3, Stimpson Dep. at 46:6-10).

22. Disputed in part. The MBTA states that M.G.L. Chapter 21E, §5 speaks for itself, and disputes B&M's characterization of M.G.L. Chapter 21E, §5 to the extent it differs from the language used in M.G.L. Chapter 21E, §5.

23. Admitted.

24. Admitted in part and disputed in part. The MBTA admits that the Consummation Order contained a Consummation date, but states that §5.03(a) of Consummation Order speaks for itself and disputes B&M's characterization of that section to the extent it differs from the language used in §5.03(a).

25. Disputed in part. The MBTA admits that the Comsummation Order contained a Consummation date, but states that §8.01 of Consummation Order speaks for itself and disputes B&M's characterization of that section to the extent it differs from the language used in §8.01.

26. Admitted.

27. The MBTA admits that it did not file in the B&M bankruptcy proceeding any proof of claim relating to clean-up of contamination at the Terminal.

28. Admitted.

In making the above-response, the MBTA does not admit that any of the facts contained in B&M's S.O.F. are in fact material to the B&M's motion for partial summary judgment.

## II. MBTA's Statement of Additional Relevant Facts.

29. Prior to and immediately after enactment of chapter 21E, Wesley Stimpson of the leading environmental and geotechnical firm Haley & Aldrich, attempted unsuccessfully to market to purchasers of property likely to be contaminated services designed to assess their potential statutory liability. (McDevitt Aff. in Opp., Exh. 4, Stimpson Expert Report at 2).

30. The potential landowners were not interested. They assumed that the operators who had caused contamination would be the ones contacted by DEP. Existing landowners were even less interested in contracting for site assessment services. (McDevitt Aff. in Opp., Exh. 4, Stimpson Expert Report at 2). Landowners continued to be reluctant to perform environmental assessments until 1984, when concerns first expressed by a title insurance company caused the lending community to insist that potential environmental liabilities be assessed. Id.

31. Mr. Stimpson judged it plausible that in mid-1983 a landowner like the MBTA would not even have been aware of the enactment of Chapter 21E. (Culliford Decl., Exh. 2, Stimpson Dep. at 46:6-10).

32. The MBTA's records indicate that the first notices of responsibility it received from the DEP in connection with potential Chapter 21E liability for any site in Massachusetts were issued in 1986. (McDevitt Aff. in Opp., Exh. 5, MBTA's Supplemental Objections and Responses to Plaintiff's First Set of Interrogatories at 9-10).

33. The only MBTA employees with responsibilities relating to environmental issues prior to 1990 have certified that they were not aware of the MBTA's potential liability for the oil contamination at the Terminal until after DEP became involved with the Site in 1989 and that they are not currently aware of any information suggesting that anyone at the MBTA was aware of the MBTA's potential liability for cleanup of the Terminal prior to the late 1980's. (McDevitt

Aff. in Opp., Exh. 6, Chmielinski Affidavit at ¶¶4-7); (McDevitt Aff. in Opp., Exh. 7, Diggin Affidavit at ¶¶4-7).

34. Richard House, the only MBTA employee who worked at the Terminal full-time during the B&M's operations said he never heard anyone mention that there might be a need to conduct environmental cleanup at the Site (McDevitt Aff. in Opp., Exh. 1, House Dep. at 52:11-13) and never heard of any state or federal environmental regulators coming to the Site (McDevitt Aff. in Opp., Exh. 1, House Dep. at 40:22-41:13).

35. Former employees of the B&M confirmed Mr. House's testimony. Although meetings were held at the Terminal concerning oil spill-related issues such as a suspected leak in a large oil storage tank, or the need to upgrade fueling equipment that leaked, the B&M witness who attended the meetings testified that there was no discussion of either the need to clean up soils as a result of the leaking tank or of the need to involve environmental regulators in the issue. (McDevitt Aff. in Opp., Exh. 8, Hennemann Dep. at 44:11-47:4 and 48:2-7(meetings related to leaking oil storage tank)), and 48:8-49:16 (meetings discussing need to replace fueling nozzles that had potential to cause spills)).

36. Nothing from the files of either party from that period mentions Chapter 21E or a clean-up of the soil or groundwater at the terminal.

37. Although the B&M highlights brief testimony from one MBTA employee indicating that the MBTA cleaned up spills of oil at a couple other locations prior to 1983, nothing in the testimony suggested that Chapter 21E type cleanup was undertaken, rather than merely cleaning up accidental spills of oil as they occurred. (McDevitt Aff. in Opp., Exh. 2, Wilson Dep. at 53:13-54:6).

38. In only one instance did the need to address soil soaked with oil come up. The

conversations recalled by witnesses apparently involved discussion of the need to properly dispose of soil that would be excavated during the construction of the Coach House on the site, because those soils would likely contain oil. (McDevitt Aff. in Opp., Exh. 2, Wilson Dep. at 48:4-50:15); (McDevitt Aff. in Opp., Exh. 9, Bergeron Dep. at 127:1-128:2). However, the B&M's own witness indicated the conversations may have occurred in 1984. (McDevitt Aff. in Opp., Exh. 9, Bergeron Dep. at 130:3-17).

39.    The requirement to dispose of oil-contaminated soil arose independent of, and prior to, the enactment of Chapter 21E, and therefore would have had no impact upon the parties' recognition of their Chapter 21E obligations for the Site. (McDevitt Aff. in Opp., Exh. 4, Stimpson Expert Report at 2, 3).

40.    No evidence indicates that the B&M itself ever notified DEP of ongoing releases at the Terminal occurring subsequent to the enactment of Chapter 21E as required under the act. See M.G.L. c. 21E, §7.

41.    The concerns to which the oil spills gave rise were the need to prevent them from reaching the Millers and Charles Rivers and the wish to avoid losses of a valuable asset. The year following the B&M's discharge in bankruptcy, the MBTA commissioned a study by a consultant, not to assess potential environmental liability but to ascertain the feasibility of recovering oil from the soil and groundwater and using it as fuel. (McDevitt Aff. in Opp., Exh. 10, Phase II Comprehensive Site Assessment, without attachments, at 8). The 1984 Oil Recovery Study concluded that recovered oil could not be reused as a diesel fuel and contained a recommendation to notify the Massachusetts Department of Environmental Quality and Engineering ("DEQE"), the predecessor agency to the Massachusetts Department of Environmental Protection ("DEP"), of conditions at the Site. Id. at 9.

42. A report prepared by the B&M's former employee and consultant, Larry Boyd, in 1986, three years after enactment of Chapter 21E, concerning the history of "Oil Pollution Problems" at the Terminal contained no reference to the statute. (McDevitt Aff. in Opp., Exh. 11, A Brief Background of Boston Engine Terminal Oil Pollution Problems).

43. It was not until years later that the DEP began to focus enforcement of Chapter 21E on landowners because indications were that, if remediation were required, it would not be by the MBTA. When citations were issued for releases of oil from the Site into the nearby Miller's River, they were issued to the operator, the B&M, and not to the owner, the MBTA. (Bergeron Decl., ¶¶7-9, Exhs. 2-5).

44. The Coast Guard issued fines and penalties to the B&M and the Metropolitan District Commission ("MDC") in the late 1970's; however, none of those fines, penalties or citations were issued to the MBTA. (Bergeron Decl., ¶¶7-9).

45. Indeed, only B&M and the MDC ever responded to such spills, and B&M provides no contemporaneous evidence suggesting that the MBTA was involved in those releases at the time, citing instead to documents created many years after the relevant time period. Id.; (Bergeron Decl., ¶¶10-12).

46. DEP did not begin to investigate the need for remediation of the Terminal until years after the B&M's discharge. The investigation began in early 1989, following an oil spill that occurred at the Site in November 1988. (McDevitt Aff. in Opp., Exh. 12, Notice of Responsibility).

47. The Notice of Responsibility DEP then issued was directed not to the MBTA but to Amtrak, the B&M's successor as the operator of the Terminal. (McDevitt Aff. in Opp., Exh. 12, Notice of Responsibility).

48.     Neither party has located any documents indicating earlier cleanup requests by the DEP, and DEP's own Keeper of the Records has confirmed that there is nothing in DEP's files suggesting that it contacted the MBTA concerning environmental conditions at the Terminal prior to 1988. (McDevitt Aff. in Opp., Exh. 3, Delbene Affidavit at ¶4).

          Respectfully submitted,

          /s/ John M. Stevens
          John M. Stevens (BBO #480140)
          Alicia Barton McDevitt (BBO #655184)
          Foley Hoag LLP
          155 Seaport Boulevard
          Boston, MA 02210
          (617) 832-1000
          amcdevitt@foleyhoag.com
          Attorneys for Defendant
           Massachusetts Bay
           Transportation Authority

Dated: June 23, 2006