UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BOSTON AND MAINE CORPORATION )<br>)<br>Plaintiff, )<br>)<br>-v.- )<br>)<br>MASSACHUSETTS BAY )<br>TRANSPORTATION AUTHORITY )<br>)<br>Defendant. )<br>) | Civil Action No. 05-11656-RCL<br>Judge Reginald C. Lindsay |

**REPLY MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Eric L. Hirschhorn
Winston & Strawn LLP
1700 K Street N.W.
Washington DC 20006
Tel. 202-282-5706
Fax 202-282-5100
E-mail: ehirschhorn@winston.com

Robert B. Culliford, BBO #638468
Pease International Tradeport
14 Aviation Avenue
Manchester NH 03801
Tel. 603-766-2002
Fax 603-766-2094
E-mail: rculliford@flypanam.com
*Counsel for Plaintiff Boston and Maine Corporation*

July 14, 2006

## TABLE OF CONTENTS

**Page**

I.   MBTA's Claim for Environmental Cleanup Costs at the BET Existed
     Pre-Consummation and Was Discharged in B&M's Bankruptcy Proceedings ................2

     A.   MBTA Had a Claim Under the Relationship Test .................................................3

     B.   MBTA Had a Claim Under the Fair Contemplation Test........................................5

II.  The 1982 Operating Agreement Limits MBTA's Environmental Cleanup
     Claim Against B&M..................................................................................................7

     A.   The Impact of the 1982 Agreement is Properly Addressed at
          This Time..........................................................................................................8

     B.   The 1982 Agreement Limits MBTA's Claim Against B&M................................9

Conclusion .................................................................................................................10

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Chateaugay Corp.*, 944 F.2d 997 (2d Cir. 1991) ...................................................... 2, 4

*Hays v. Mobil Oil Corp.*, 930 F.2d 96 (1st Cir. 1991) ........................................................... 9

*In re Hemingway Transp., Inc.*, 73 B.R. 494 (Bankr. D. Mass. 1987) ................................. 3

*In re Hemingway Transp., Inc.*, 993 F.2d 915 (1st Cir. 1993) ........................................... 3, 4

*ITT Corp. v. LTX Corp.*, 926 F.2d 1258 (1st Cir. 1991) ....................................................... 9

*In re Jensen*, 127 B.R. 27 (B.A.P. 9th Cir. 1991) *aff'd*, 995 F.2d 925 (9th Cir. 1993) ............................................................................................................................. 4

*Mesiti v. Microdot Inc.*, 156 B.R. 113 (D.N.H. 1993) ...................................................... 6, 7

*NCL Corp v. Lone Star Bldg. Ctrs. (Eastern) Inc.*, 144 B.R. 170 (S.D. Fla. 1992) ............. 2

*In re National Gypsum Co.*, 139 B.R. 397 (N.D. Tex. 1992) ............................................... 3

*Providence & W. R.R. Co. v. Penn Cent. Corp.*, 1989 U.S. Dist. LEXIS 7259 (D. Mass. 1989) ...................................................................................................................... 2

*Roberts v. Maine*, 48 F.3d 1287 (1st Cir. 1995) .................................................................. 7

## STATE CASES

*Hazen Paper Co. v. U.S. Fidelity & Guar. Co.*, 555 N.E.2d 576 (Mass. 1990) .................. 9

*Nassr v. Commonwealth*, 394 Mass. 767 (1985) ............................................................. 3, 5

*Reynolds Bros., Inc. v. Texaco, Inc.*, 420 Mass. 115 (1995) .......................................... 3, 4, 7

## STATE STATUTES

M.G.L. ch. 21E ("Chapter 21E") ........................................................................... 1, 3, 4, 5, 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

————————————————————— x
BOSTON AND MAINE
CORPORATION,

            Plaintiff,

         -v.-

MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY

            Defendant.
————————————————————— x

Civil Action No. 05-11656-RCL

## REPLY MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Boston and Maine Corporation ("B&M") has asked this Court to grant partial summary judgment and find that the pre-June 30, 1983 claims of the defendant Massachusetts Bay Transportation Authority ("MBTA") for environmental cleanup at the Boston Engine Terminal ("BET") were discharged in B&M's bankruptcy case. MBTA had a claim for environmental cleanup of the BET, under M.G.L. ch. 21E ("Chapter 21E") and prior law, prior to the bankruptcy Consummation Date. The Consummation Order discharged any "claims" not made before the Consummation Date—June 30, 1983. MBTA's failure to assert its claim prior to the Consummation Date discharged the claim, and MBTA may not now—twenty years later— circumvent the Consummation Order and deny B&M the fresh start to which it is entitled under the bankruptcy laws. Therefore, this Court should grant B&M's motion for partial summary judgment, find that MBTA's claim for environmental cleanup at the BET was discharged, and

enforce the injunctive provisions of the Consummation Order against MBTA by barring MBTA's assertion of its claim.

In addition, this Court should grant B&M summary judgment on the issue that MBTA's claim (either in its entirety or, assuming the bankruptcy discharge of any portion of MBTA's claim that existed on or before the Consummation Date, any portion incurred *following* the Consummation Date (i.e., July 1, 1983 through December 31, 1986)) is limited by the 1982 operating agreement between MBTA and B&M's Trustees to the lesser of $1 million or the amount of property damage at the BET, if any, ultimately proven to be attributable to B&M.

**I.     MBTA's Claim for Environmental Cleanup Costs at the BET Existed Pre-Consummation and Was Discharged in B&M's Bankruptcy Proceedings**

The cases cited by the parties establish one basic precept: A claim for environmental cleanup will not be discharged if the claimant had no inkling of an environmental problem at the site. *See, e.g., In re Chateaugay Corp.*, 944 F.2d 997, 1005 (2d Cir. 1991); *NCL Corp v. Lone Star Bldg. Ctrs. (Eastern) Inc.*, 144 B. R. 170, 177 (S.D. Fla. 1992) (creditor's knowledge of, and relationship with, site and debtor establish claims were fairly contemplated); *see also Providence & W. R.R. Co. v. Penn Cent. Corp.*, 1989 U.S. Dist. LEXIS 7259 at *5 (D. Mass. 1989) (concluding that pre-Consummation Date claims were barred even though plaintiff did not know of contamination before conclusion of bankruptcy). Here, however, MBTA was well aware of environmental conditions at the BET and the fact that claims relating to the environmental situation were likely.

The record provides no basis for MBTA to claim ignorance of a contingent claim for environmental cleanup. Prior to the Consummation Date, MBTA: (1) knew of—and participated in—B&M's bankruptcy proceedings, *see* Declaration of Roger Bergeron in Support of Plaintiff's Motion for Partial Summary Judgment ("Bergeron Decl.") ¶¶ 25-29; (2) knew of releases of fuel

oil and/or other hazardous materials at the BET, the environmental condition of the BET (including regulatory involvement there), and the need for cleanup at the BET, *see* Declaration of James Hennemann in Support of Plaintiff's Motion for Partial Summary Judgment ("Hennemann Decl.") ¶¶ 11-14, 18-27, 29 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-45; Bergeron Decl. ¶¶ 10, 11, 12, 18-20 & Exhs. 2, 7-8 (MBTA 00003089, BM 000003, BM 000007); and (3) had owner liability not only under a prominent state statute, *see* Declaration of Robert Culliford in Support of Motion for Partial Summary Judgment ("Culliford Decl.") ¶¶ 5, 10-12, & Exhs. 2-3, 5-11,[1] but also pursuant to long-established common law upon which Chapter 21E merely elaborated, *see* M.G.L. ch. 21E; *Nassr v. Commonwealth*, 394 Mass. 767, 773-75 (1985).[2]

### A.   MBTA Had a Claim Under the Relationship Test

Contrary to MBTA's assertion that the "relationship test" is not the proper standard to apply,[3] the First Circuit and this Court have recognized, in the context of a bankruptcy purchase of contaminated property, that a creditor's right to payment from a bankrupt debtor may arise either before or when the creditor purchases the contaminated facility from the bankruptcy estate. *See In re Hemingway Transp., Inc.*, 993 F.2d 915, 928 (1st Cir. 1993); *In re Hemingway Transp.,*

---

[1] MBTA's assertion that B&M mischaracterizes the testimony of Wesley Stimpson, MBTA's expert witness, is incorrect. Although Mr. Stimpson originally stated that it is possible that MBTA was unaware of the enactment of Chapter 21E, shortly thereafter Mr. Stimpson changed his testimony, admitting that "[i]t is possible there is someone within the MBTA structure that might have known about [Chapter 21E], yes." Culliford Decl. ¶ 12 & Exh 3.

[2] MBTA's protests that it was completely unaware of the effect of environmental regulation are highly questionable. For instance, in 1979, state and local environmental officials investigated an illegal dump filled with hazardous material on MBTA property in Woburn and indicated that a cleanup would be required. *Hazardous Materials Found on MBTA Site*, THE DAILY TIMES (Woburn, Mass.), May 7, 1979 (attached as Exhibit 3 to Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment). Also, MBTA employee Peter Wilson testified that during the period from 1979 to 1983, MBTA was aware of spills or releases of oil or hazardous substances at MBTA facilities other than the BET that required cleanup efforts by the MBTA. Hennemann Decl. ¶ 37 & Exh. 29.

[3] MBTA contends that the court must apply non-bankruptcy, substantive law to determine whether a claim has been discharged and that the case of *Reynolds Bros, Inc. v. Texaco, Inc.*, 420 Mass. 115 (1995) governs. However, while non-bankruptcy law may govern the *existence* of a claim in bankruptcy, a fact that is not disputed here, *see* M.G.L. ch. 21E; *Nassr v. Commonwealth*, 394 Mass. at 773-75, non-bankruptcy law is not dispositive of the *time* at which a claim arises for purposes of discharge. *In re National Gypsum Co.*, 139 B.R. 397, 405 (N.D. Tex. 1992). For that determination, bankruptcy law is appropriate. *See id.* at 405-06 (discussing use of bankruptcy law concept of contingent claims to bring future environmental response costs within ambit of bankruptcy discharge proceedings).

*Inc.*, 73 B.R. 494, 503 (Bankr. D. Mass. 1987);[4] *see also In re Jensen*, 127 B.R. 27, 30 (B.A.P. 9th Cir. 1991) (concluding bankruptcy claim arises upon actual or threatened release of hazardous waste by debtor), *aff'd*, 995 F.2d 925 (9th Cir. 1993).[5]

MBTA and B&M had a close contractual relationship that included MBTA's 1976 purchase of the BET from B&M's bankruptcy estate and MBTA's ownership of the BET for more than six years prior to, and at the time of, the enactment of Chapter 21E in March 1983. Bergeron Decl. ¶ 25. MBTA also entered into several agreements for the operation of the BET during the 1970's and 1980's, *id.* ¶ 28-29 & Exhs. 11-12, including agreements that referenced property conditions and environmental assessments, *id.* ¶ 27 & Exh. 10, as well as liability for property damage at the BET, *id.* ¶ 30-31 & Exhs. 13-14. In addition, MBTA had an ongoing, daily business relationship with B&M wherein MBTA maintained an office at the BET, staffed by MBTA employees who had actual, direct knowledge of environmental conditions at the BET, including releases of fuel oil, during at least the 1979 to 1983 time period. Hennemann Decl. ¶¶ 11-14, 18-27, 29 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-45. During the early 1980's MBTA personnel even participated in meetings regarding environmental issues at the BET and recognized the need for cleanup at the site. *Id.* ¶ 29 & Exhs. 30, 41-45; Bergeron Decl. ¶ 21 & Exh. 9. Given these circumstances, MBTA had a contingent claim for environmental cleanup prior to the Consummation Date. *See Chateaugay*, 944 F.2d at 1005.[6]

---

[4] Although the courts indicate that alternatively, a claim may arise at a later point, such as when a purchaser expends money in response to a cleanup order, in the first instance the claim accrues when the contaminated property was transferred to the purchaser. *Hemingway*, 993 F.2d at 929, n. 16.

[5] MBTA criticizes B&M's use of the *Jensen* case, indicating that the Ninth Circuit invalidated the bankruptcy panel's use of the relationship test. However, the Ninth Circuit merely clarified that the relationship test should be used only when there has been actual interaction between the debtor and the creditor, as there clearly was between B&M and MBTA.

[6] Even the case relied upon by MBTA for the "fair contemplation" analysis, *Reynolds Bros,* found that, similar to the present situation, the relationship test compelled the conclusion that plaintiff had a dischargeable bankruptcy claim because the relationship between plaintiff and debtor was such that plaintiff was aware of contamination at the

### B. MBTA Had a Claim Under the Fair Contemplation Test

Even if the "fair contemplation" test were the applicable rule, MBTA had a claim that was discharged in B&M's bankruptcy. MBTA's primary argument is that B&M's summary judgment motion must fail because there is no evidence that regulators such as the Massachusetts Department of Environmental Protection ("DEP") or its predecessor, the Department of Environmental Quality Engineering ("DEQE") knew of releases at the BET or contacted MBTA regarding the BET site until after the Consummation Date.[7] These statements are inaccurate. The DEQE kept incident files on releases at or from the BET during the early 1980's. Bergeron Decl. ¶¶ 13-14 & Exhs. 2-4. Further, in contrast to MBTA's allegations, DEP was recently able to locate numerous records in its possession that show DEP was aware, and addressed, contamination problems at the BET prior to the Consummation Date. *See* Declaration of Adeline DelBene ("DelBene Decl.") & Exhs. 1-7 thereto.[8] Thus, there is certainly evidence that DEP was aware of contamination problems, and opened and monitored cases regarding such problems, at the BET prior to June 1983.

---

site, knew the debtor was the previous owner, and knew the debtor had used the site as an oil storage facility. 420 Mass. at 123 & n. 12.

[7] MBTA also relies heavily on allegations that DEP was not enforcing environmental cleanup of contaminated sites. However, even if true, this alleged fact does not divest MBTA of its legal responsibility, as owner of the BET, to clean up releases at the site. *See* M.G.L. ch. 21E; *Nassr v. Commonwealth*, 394 Mass. 767, 773-75 (1985).

[8] DEP-maintained records on releases at the BET prior to June 30, 1983 include: (1) December 14, 1980 spill of 15,000 gallons of No. 2 fuel oil from a pipeline in the B&M Bud Yard at the BET to the MDC Prison Point Pumping Station; (2) July 22, 1981 spill of No. 2 fuel oil (amount unknown) from B&M to Charles River; DEP indicates the case is closed; (3) October 11, 1981 spill of 1,100 gallons of No. 2 Fuel Oil at the B&M Yard 5 at the BET; DEP indicates the case is closed; (4) October 19, 1981 spill of 20 gallons of No. 6 Fuel Oil from the BET oil-water separator to the Millers River; (5) December 16, 1981 spill of 100 gallons of No. 2 Fuel Oil from the B&M Railroad to the Millers River; DEP indicates the case is closed; (6) March 8, 1982 spill of 20 gallons of No. 2 fuel oil from the B&M to the Mystic Junction; DEP indicates the case is closed.

Moreover, DEP recently located files suggesting that it contacted MBTA concerning environmental conditions at the BET prior to MBTA's claimed first contact in 1988.[9] Finally, in addition to DEP's awareness of contamination at the BET in the early 1980's, during that time or earlier, the United States Coast Guard was issuing fines and penalties for releases of oil from the BET to nearby rivers. Bergeron Decl. ¶¶ 7-9 & Exhs. 2-6. MBTA was aware that the Coast Guard was issuing warnings and fines for these discharges. *Id.* ¶¶ 10, 11 & Exh. 7.[10]

In any event, regulatory involvement *vel non* is not determinative of whether MBTA fairly contemplated a claim. Whether claims were foreseeable, and at least contingent, before the Consummation Date depends on the information available to MBTA regarding: (1) contamination at the site; (2) B&M's possible link to the contamination; (3) and whether that information was reasonably available between enactment of relevant law and the Consummation Date. *See Mesiti v. Microdot Inc.*, 156 B.R. 113, 118 (D.N.H. 1993). Thus, the test is not whether MBTA *actually* contemplated the existence of a claim but whether MBTA *should have* contemplated a claim. Before the Consummation Date, MBTA had personnel at the BET with actual knowledge of releases at the site and awareness of the need for cleanup at the site. *See supra* p. 3. MBTA also had extensive contractual relations with B&M, knowledge of B&M's bankruptcy proceedings, and knowledge of the B&M operations at the BET that resulted in releases. *Id.* Further, MBTA likely possessed actual knowledge and certainly possessed

---

[9] DEP recently was able to locate evidence of a spill of polychlorinated biphenyl ("PCB") oil at the old power house at the BET in 1986 for which both B&M and MBTA are listed as responsible parties. *See* DelBene Decl. at Exh. 8. DEP was also able to locate a record of a spill of miscellaneous oil at the gravel yard across from the Boston Edison (likely the BET) in 1985 for which MBTA is listed as the property owner. *See* DelBene Decl. at Exh. 9.

[10] Despite testimony on meetings and conversations in which MBTA employees recognized the need for cleanup at the BET, MBTA argues that it had no knowledge that the BET might be contaminated and that it might be required to notify regulators and clean up the BET site until its consultants conducted an Oil Recovery Study in 1984, approximately a year after the B&M Consummation Date. However, MBTA fails to mention that upon receiving the study results in 1984, MBTA could have petitioned the bankruptcy court to allow it to file its claim as timely. *See, e.g.*, Fed. R. Bankr. 9006(b)(1) (formerly Rule 906(b)) (noting that when an act is required to be done within a

constructive knowledge of its potential liability under Massachusetts law, including Chapter 21E, in effect prior to the Consummation Date.[11] *Id.*; *Reynolds Bros.*, 420 Mass. at 122 & n. 10 (noting Chapter 21E provides a private right of action in favor of any person who undertakes removal of oil or hazardous materials, and who seeks to recover response costs from the person liable for the contamination, *regardless of any DEP involvement*). Given these circumstances, MBTA's position that, as owner of what it knew was a highly contaminated property, it could not have foreseen that it might possess a *contingent* claim against B&M for environmental cleanup is untenable. *Mesiti v. Microdot Inc.*, 156 B.R. 113, 118 & n. 4 (D.N.H. 1993) (stating that even when environmental response costs have not actually been incurred, but may or are likely to be incurred, a "contingent debt" exists for Bankruptcy Act purposes). Even under the "fair contemplation" standard urged by MBTA, MBTA's claim was discharged.

## II.    The 1982 Operating Agreement Limits MBTA's Environmental Cleanup Claim Against B&M

During the bankruptcy proceedings MBTA and the Trustees of B&M's bankruptcy estate entered into a February 23, 1982 Agreement ("1982 Agreement") providing that MBTA would indemnify B&M for certain property damage claims at the BET. Bergeron Decl. ¶ 29 & Exh. 12 (MBTA 00001605-00001749). In particular, the 1982 Agreement provided that:

> The Authority [MBTA] agrees to indemnify and hold the Operator [B&M] harmless from any loss not fully insured against and with respect to losses incurred during the term of this Agreement and not fully covered by the Liability Fund hereinafter described, arising from injury (including death) to persons or ***damage to property, including but not limited to the Authority's Property, which shall arise out of or be in any way connected with the [contract] Service*** and from any such losses which remain unsettled as of the date hereof and which

---

specified time, "the court for cause shown may at any time in its discretion . . . on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.")

[11] If MBTA's claim that it failed to anticipate its liability under 21E is accurate, it is only because MBTA failed to read the statute. Regardless, MBTA is presumed to know the law. *See Roberts v. Maine,* 48 F.3d 1287, 1300 (1st Cir. 1995).

7

occurred during the term of [several agreements between MBTA and B&M (or its Trustees) going back to 1964].

(emphasis added); Bergeron Decl. ¶ 31 & Exh. 14 (MBTA 00001647-00001648).

The 1982 Agreement also required B&M to establish a Liability Fund by depositing a maximum of $200,000 each year into the Fund to provide for the payment of damages for any claims resulting from events occurring during the term of this Agreement. Bergeron Decl. ¶ 32 & Exh. 15 (MBTA 00001648). However, after funding the Liability Fund, B&M was under no obligation to make additional payments, and the 1982 Agreement additionally provided that "[w]hen all claims for damages arising during the term of this Agreement for which there is liability have been satisfied," B&M would retain any funds remaining in the Liability Fund. Bergeron Decl. ¶ 33 & Exh. 15 (MBTA 00001648). Moreover, the 1982 Agreement provided that MBTA's indemnification obligations would extend back to cover losses that occurred from December 14, 1964 onward, Bergeron Decl. ¶ 31 & Exh. 14, and these obligations would survive the term of the 1982 Agreement with respect to all causes of action arising prior to the termination of the Agreement. Bergeron Decl. ¶ 34 & Exh. 16 (MBTA 00001649). Thus, the 1982 Agreement limited B&M's potential exposure for property damage to $1 million.

A. **The Impact of the 1982 Agreement is Properly Addressed at This Time**

MBTA asserts that limitation of claim amounts by the 1982 Agreement is not properly before the court at this time because B&M did not raise this defense in pre-litigation negotiations or in its pleadings. This argument is meritless. B&M initially was unaware of, and later uncertain of, this defense until *MBTA produced* a signed copy of the 1982 Agreement to B&M during discovery -- well after pre-trial discussions and filing of the initial pleadings. *See* Bergeron Decl. ¶ 29 & Exh. 12 (MBTA 00001605-00001749). Accordingly, B&M properly raised the argument in its partial summary judgment motion. Furthermore, since MBTA

8

produced the signed agreement to B&M in the first instance, and presumably reviewed it beforehand, it is disingenuous for MBTA to claim that it was surprised by the argument.[12]

MBTA's contention that B&M's assertion of a contractual defense is premature likewise is incorrect. The 1982 Agreement applies to claims from 1964 through 1986, which includes the entire thirteen year bankruptcy case (1970-1983). Consequently, treatment of claims arising during the term of the 1982 Agreement are appropriately addressed during the "Bankruptcy Discharge" phase of the case. It is proper to consider now not only whether claims were discharged by the Consummation Order but also whether environmental cleanup claims by MBTA against B&M were limited to a cap of $1 million by the 1982 Agreement, thus significantly narrowing the scope of this action.

### B.   The 1982 Agreement Limits MBTA's Claim Against B&M

The 1982 Agreement provides that B&M's liability for claims arising prior to January 1, 1987, due to property damage at the BET going back to 1964, is limited to $1 million, the total amount required to be deposited into the Liability Fund by B&M. MBTA expressly agreed to indemnify B&M for any claims exceeding that amount. The provision at issue, "Accident Liability," covers all losses due to property damage, which includes environmental cleanup claims. *See Hays v. Mobil Oil Corp.,* 930 F.2d 96, 101-02 (1st Cir. 1991) (applying Massachusetts law); *Hazen Paper Co. v. U.S. Fidelity & Guar. Co.,* 555 N.E.2d 576, 582-84 (Mass. 1990) (claim for cleanup costs is claim for "damage on account of property damage").

MBTA does not seriously contest that property damage includes environmental cleanup claims, or that MBTA's cause of action is covered by the terms of the 1982 Agreement. MBTA

---

[12] MBTA also contends that the effect of the 1982 Agreement cannot be ascertained until additional discovery is conducted. MBTA fails to note that considerable discovery has already proceeded (including production of the 1982 Agreement). Moreover, the parol evidence rule mandates that no discovery is appropriate. *ITT Corp. v. LTX Corp.,*

merely asserts that the Agreement's blanket indemnification provision must be nullified because it arguably renders the "Operator's Duty of Care" provision of the contract potentially ineffectual. This is not so. The "Operator's Duty of Care" and "Accident Responsibility" provisions of the 1982 Agreement complement each other. *See* Bergeron Decl. Exh. 12 (MBTA 00001618, MBTA 00001647-50). MBTA will be liable for amounts in excess of the $1 million total B&M is required to deposit into the Liability Fund. It is only logical that MBTA would seek to impose a contractual duty of care on B&M concerning conduct of its operations since B&M's liability is limited under the 1982 Agreement and MBTA faces potentially significant indemnification obligations. Moreover, to the extent that MBTA might argue that B&M was somehow required to conduct a cleanup under the "Operator's Duty of Care" provision, such liability was either discharged in the bankruptcy or is well beyond the statute of limitations and out of time.

## CONCLUSION

Thus, MBTA had a claim against B&M for environmental cleanup at the BET prior to the bankruptcy Consummation Date. MBTA failed to assert that claim in B&M's bankruptcy case, and it cannot be resurrected over twenty years after the fact. Accordingly, this Court should grant B&M's motion for partial summary judgment, enforce the Consummation Order, and enjoin MBTA from seeking reimbursement of environmental cleanup costs at the BET as to contamination occurring on or before June 30, 1983. Further, based on the language of the 1982 Agreement, this Court should determine that any liability B&M might have to MBTA for cleanup costs for contamination at the BET is limited to the lesser of the $1 million liability cap or the amount of cleanup liability (if any) ultimately proven to be attributable to B&M.

---

926 F.2d 1258, 1261 (1st Cir. 1991) ("Under Massachusetts law, parol evidence may not be admitted to contradict the clear terms of an agreement, or to create ambiguity where none otherwise exists").

        Respectfully submitted,

        WINSTON & STRAWN LLP

By:   /s/ Eric L. Hirschhorn
       Eric L. Hirschhorn
       Winston & Strawn LLP
       1700 K Street, N.W.
       Washington DC  20006
       202-282-5000
       Attorneys for Plaintiff,
       Boston & Maine Corporation


       Robert B. Culliford (BBO#638468)
       14 Aviation Avenue
       Pease International Tradeport
       Portsmouth NH  03801
       603-766-2002
       Counsel for Plaintiff,
       Boston & Maine Corporation

Dated:  July 14, 2006

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on July 14, 2006.

John M. Stevens  
Alicia Barton McDevitt  
Foley Hoag LLP  
155 Seaport Blvd.  
Boston, MA 02210-2600  
(617) 832-1000

                              /s/ Eric L. Hirschhorn  
                              Eric L. Hirschhorn

DC:4852S1.2