UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOSTON AND MAINE CORPORATION, | |
| Plaintiff, | |
| v. | CIVIL ACTION No. 05-11656-RCL |
| MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, | |
| Defendant. | |

**REPLY MEMORANDUM OF DEFENDANT MASSACHUSETTS
BAY TRANSPORTATION AUTHORITY IN SUPPORT OF
<u>ITS MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

Defendant Massachusetts Bay Transportation Authority (the "MBTA") submits this reply memorandum in support of its motion for Partial Summary Judgment On The Issue of Discharge In Bankruptcy, filed June 2, 2006. The motion should be granted because the Boston and Maine Corporation (the "B&M") has failed to raise any legitimate dispute as to the facts material to the MBTA's motion. Though it provides the Court with a drawn-out rendition of immaterial facts in an attempt to show that the MBTA or certain regulatory agencies may have been aware of oil spills at the site during the relevant time period, nothing in the B&M's Opposition raises any dispute as to the essential fact in this case -- that prior to the B&M's bankruptcy discharge in June 1983, the Massachusetts Department of Environmental Protection (formerly the Department of Environmental Quality Engineering, the "DEQE", and hereinafter the "DEP") had given no indication that it would require anyone (much less the MBTA, who had not conducted any of the operations causing the contamination) to incur response costs to clean up soil and groundwater contamination at the Boston Engine Terminal (the "Terminal" or "Site"). Likewise, the B&M provides no evidence to suggest that either of the parties had any appreciation of the possibility

B3225149.1

that the MBTA would incur such costs and, accordingly, have occasion to seek indemnification or contribution from the B&M.  On these facts, the parties cannot be said to have fairly contemplated the MBTA's current reimbursement claims prior to the bankruptcy discharge.  In arguing the contrary proposition, the B&M completely ignores the fundamental distinction between claims brought directly by an environmental regulatory agency and those brought by another private party seeking indemnity or contribution, where courts require some indication that environmental regulators would seek to hold the claimant liable for contamination before finding that a claim was fairly contemplated or foreseeable.

**I.      The B&M Has Not Established A Genuine Dispute As To Any Material Fact.**

A sizeable portion of the B&M's lengthy brief is devoted to an exhaustive presentation of facts with little bearing on the MBTA's motion.  The B&M's reiterations that MBTA employees knew oil spills had occurred at the Site prior to June of 1983 are immaterial.  The crucial fact is whether the parties foresaw, as a consequence, the type of cleanup that occurred years later, and the undisputed evidence is that they did not.  Witnesses who worked at the Terminal prior to, and after, the passage of Chapter 21E each indicated that they were unaware that oil spills at the Site would necessitate the type of soil and groundwater cleanup ultimately required by the DEP.  For example, Richard House, the only MBTA employee who worked at the Terminal full-time during the B&M's operations testified that he never heard anyone mention a need to conduct environmental cleanup at the Site and never heard of any state or federal environmental regulators coming to the Site. (Affidavit of Alicia B. McDevitt in Support of the MBTA's Reply Memorandum, hereinafter "McDevitt Aff. in Reply", Ex. A, House Dep. at 52:11-13 and 40:22-41:13).  Former employees of the B&M confirmed Mr. House's testimony.  Although meetings were held at the Terminal concerning oil spill-related issues such as suspected leaks in an oil storage tank or the need to upgrade leaking fueling equipment, the B&M witness who attended

the meetings indicated that there was no discussion of either the need to clean up soils as a result of the leaking tank or of the need to involve environmental regulators in the issue. (McDevitt Aff. in Reply, Ex. B, Hennemann Dep. at 44:11-47:4 and 48:2-7 (meetings related to leaking oil storage tank), and 48:8-49:16 (meetings discussing need to replace fueling nozzles that had potential to cause spills)).

The documents submitted by the B&M showing that certain regulatory agencies, such as the United States Coast Guard or the Massachusetts Division of Water Pollution Control ("DWPC") issued citations or reports relating to spills of oil at the Terminal prior to June of 1983 suggest nothing to the contrary. None of the citations or spill reports presented by the B&M indicate that either of these agencies had any involvement with the administration of the statute at issue for purposes of this motion, M.G.L. c. 21E ("Chapter 21E"), that they would or could require the soil and groundwater cleanup activities ultimately undertaken to remediate the Site, or (most importantly) that the MBTA had any knowledge of the involvement of these agencies prior to the B&M's discharge date.

For example, the B&M's assertions that the Coast Guard issued fines and penalties to the B&M and the Metropolitan District Commission ("MDC") in the late 1970's in no way suggest that the MBTA had reason to believe it would later be responsible for cleaning up soil and groundwater at the site. None of those fines, penalties or citations were issued to the MBTA. (Bergeron Decl., ¶¶7-9, Exs. 2-6).[1] The documents relied on by the B&M, which were created many years after the relevant time period, do not indicate that the MBTA even knew of these fines and penalties when they occurred. (Bergeron Decl., ¶¶10-12, Exs. 2 and 7). The only witnesses who worked for the MBTA in the relevant time period each testified that they were not

---

[1] References to "Bergeron Decl.," "Delbene Decl.," "Collins Decl.," or "Culliford Decl." refer to the affidavits filed by the B&M in support of its Opposition to the MBTA's Motion for Partial Summary Judgment.

aware of the Coast Guard, or any other state or federal regulators, ever becoming involved with oils spills at the Site.  (McDevitt Aff. in Reply, Ex. A, House Dep. at 40:13-41:13; McDevitt Aff. in Reply, Ex. C, Wilson Dep. at 36:22-37:9).  In addition, the citations, which pre-date the enactment of Chapter 21E, do not suggest that the Coast Guard was concerned with on-site soil or groundwater contamination (which would have been beyond its jurisdiction in any event).  (Bergeron Decl. Exs. 6 and 7).

Similarly, documents recently provided by the DEP, entitled "Division of Water Pollution Control Eastern Regional Office Oil Spill Report," contain no reference to Chapter 21E, nor do they provide any indication that cleanup of the spills, let alone comprehensive soil or groundwater remediation, would be required.  (Delbene Decl., Exs. 2, 5).[2]  These documents are not, as the B&M would have it, investigation files created by the DEP; rather, they are just as they sound -- incident reports placed on file with the DWPC following spills of oil at the Terminal.  There is no indication that the DWPC followed up on these incident reports in any way, and the B&M has provided absolutely no evidence that the MBTA was aware of these reports prior to June 1983.

Far from undermining the MBTA's claims, the Coast Guard and DWPC documents actually bolster the MBTA's view that, at the time of the B&M's bankruptcy discharge, all

---

[2]   In support of its motion for partial summary judgment, the MBTA submitted an affidavit from the DEP's Keeper of the Records certifying that there is nothing in DEP's files suggesting that it contacted the MBTA concerning environmental conditions at the Terminal prior to 1988. (Concise Statement of Undisputed Material Facts in Support of MBTA's Motion for Partial Summary Judgment, herein after "CSUMF", at ¶22).  The B&M has now solicited a competing affidavit from DEP's Keeper of the Records, indicating that Division of Water Pollution Control Oil Spill Incident Reports pre-dating 1988 do exist in DEP's files. (Delbene Decl.).  It is easy, however, to reconcile the two certifications.  The distinction is that, for its part, the MBTA asked the DEP to search its records relating to contaminated sites, not water pollution matters, as the B&M apparently did.  An affidavit provided by the B&M's own employee in support of its Opposition confirms that ordinary site file for the Terminal at DEP does not contain any records earlier than the 1988 date earlier indicated by DEP. (Collins Decl. at ¶¶6-7).  The documents newly produced are therefore unrelated to either of the parties' potential liability for environmental cleanup, and are essentially alternate versions of the Coast Guard oil spill citations already in the B&M's possession.

indications were that if remediation were to be required at all, it would not be by the MBTA. For example, the DWPC Oil Spill Reports clearly reference the B&M as the "Responsible Party," not the MBTA. (Delbene Decl., Exs. 2, 5). And as noted above, when citations were issued for releases of oil from the Site into the nearby Miller's River, they were issued to the operator, the B&M, and not to the owner, the MBTA. (Bergeron Decl. ¶¶7-9, Exs. 2-6). Thus, to the extent these documents are relevant or material at all, they reinforce the conclusion to be drawn from all other facts in this case -- that no one -- not the MBTA, the B&M nor the DEP -- contemplated the Chapter 21E contribution liability the B&M would owe to the MBTA until many years later.

**II.    The Fair Contemplation Test Is The Adopted Standard For Cases Arising Under Massachusetts' Chapter 21E And Is The Majority Approach In Federal Cases.**

In advocating adoption of the "relationship test" for purposes of this motion, the B&M invites the Court to disregard not only the controlling decision of the Massachusetts Supreme Judicial Court holding that the fair contemplation/foreseeability approach is the proper test for determining when a cause of action under Chapter 21E becomes a claim for bankruptcy discharge purposes, but also the corresponding holdings of the great majority of Federal cases examining the issue. See, e.g., Reynolds Bros. v. Texaco, Inc., 647 N.E.2d 1205, 1208 (Mass. 1995); see also, e.g., In re Jensen, 995 F.2d 925, 930-31(9th Cir. 1993); AM Int'l, Inc. v. Datacard Corp., 106 F.3d 1342, 1348 (7th Cir. 1997); Signature Combs, Inc. v. U.S., 253 F. Supp. 2d 1028, 1038 (W.D.Tenn. 2003). However, because no persuasive reason for doing so actually exists, the B&M is forced to rely on a series of distortions to make its case.

In support of its unpopular position, the B&M begins by blatantly misrepresenting the decisions of the Bankruptcy Court for the District of Massachusetts and the First Circuit in In re Hemingway Transport, Inc., 73 B.R. 494 (Bankr. D. Mass. 1987), aff'd, 993 F.2d 915 (1st Cir. 1993). Contrary to the B&M's assertion, the Bankruptcy Court did not hold that a "purchaser's

cause of action against [a] bankruptcy debtor under environmental law arose when [the] contaminated property was transferred to [the] purchaser." B&M's Opposition at 17.  The B&M can make this argument only by omitting the second half of the court's statement, which actually read: "[purchaser's] cause of action under CERCLA arose when the property containing the drums was transferred to [purchaser], or alternatively, when [purchaser] expended money in response to the EPA's administrative order."  See 73 B.R. at 503; see also In re Hemingway Transport, Inc. 993 F.2d at 929, n16 (quoting same section).  Far from endorsing the relationship test, the court expressly recognized that a range of possibilities exists for fixing the point in time at which a claims for environmental response costs arises for bankruptcy purposes, including potentially long after the parties could have foreseen the need to incur environmental response costs, when those costs had actually been incurred.

Next, the B&M misleadingly cites to the rejected approach of the Ninth Circuit Bankruptcy Appellate Panel in In re Jensen, 127 B.R. 27 (B.A.P. 9th Cir. 1991), which indeed adopted the relationship test, but was overruled on appeal to the Ninth Circuit.  See In re Jensen, 995 F.2d 925, 930-31(9th Cir. 1993)(criticizing relationship test employed in B.A.P. decision and adopting fair contemplation approach); see also In re Hexcel Corp., 239 B.R. 564, 569-70 (N.D. Cal. 1999)(following Ninth Circuit decision in In Re Jensen and employing fair contemplation/ foreseeability test).   Likewise, the B&M's assertion that the controlling Massachusetts decision in Reynolds Bros. employed the relationship test could not be more disingenuous -- in Reynolds Bros. the Massachusetts Supreme Judicial Court unequivocally embraced the fair contemplation test as the appropriate standard for evaluating when claims arise under Chapter 21E for bankruptcy discharge purposes.  See 647 N.E.2d 1205, 1208 ("We prefer the fair contemplation-foreseeability approach as the means to determine when a cause of action

under [Chapter 21E] becomes a claim for purposes of the Bankruptcy Code."). Although the court later included dicta in a footnote commenting that the result would be the same under the relationship test (which is not surprising since the relationship test is stricter than the fair contemplation test and the court found that the claims at issue had been discharged under the fair contemplation analysis), there is no question that the Reynolds Bros. court rejected the relationship test in favor of the fair contemplation standard.

### III. The Undisputed Material Facts Demonstrate That The MBTA's Claims For Reimbursement Were Not Fairly Contemplated By The Parties Prior To June 1983.

Perhaps hoping that if it ignores the cases cited by the MBTA the Court will somehow overlook them, the B&M's Opposition completely fails to address the critical issue in this case. On not one of the 30 pages of its memorandum does the B&M address the fundamental distinction between direct claims against debtors by governmental agencies (which requires only knowledge of the contamination and the debtor's relationship to it) and those brought by private parties seeking contribution or indemnity (which require some form of regulatory involvement prior to a finding that the claims were fairly contemplated), or the cases cited by the MBTA in support. See, e.g., Reynolds Bros., 647 N.E.2d at 1208 (noting several forms of regulatory involvement prior to discharge before finding private claimant could have fairly contemplated its reimbursement claims); In the matter of Chicago, Milwaukee, St. Paul & Pacific Railroad, 3 F.3d 200, 207 (7th Cir. 1993) ("In re Chicago II") (where claimant knew of large scale EPA investigation of site at issue, contribution claims were fairly contemplated); AM Int'l Inc., 106 F.3d at 1348 (finding claims were not in fair contemplation of the claimant where, unlike In Re: Chicago II, there was no EPA involvement).

Under this standard, the undisputed facts of this case dictate a finding that the MBTA's Chapter 21E claims were not fairly contemplated by the parties. Prior to the B&M's bankruptcy

discharge in June, 1983, none of the citations or reports issued by the Coast Guard or DWPC referenced either Chapter 21E or a need to conduct soil or groundwater cleanup.[3] (Bergeron Decl. Exs. 2-6; Delbene Decl. Exs. 2, 5). Yet even if they had, the B&M has presented no evidence demonstrating that the MBTA was aware of these citations or reports until many years later. No investigation or cleanup activities had taken place, and no response costs had been incurred. (CSUMF at ¶¶21-22). In other words, upon passage of Chapter 21E in March of 1983, had the MBTA contemplated the existence of Chapter 21E liability at all (which the MBTA disputes)[4], it would have had every reason to expect that any liability for oil contamination at the Terminal would have been borne by the B&M, as had happened with the Coast Guard citations issued in the late 1970's.

It is telling that the B&M itself did not ever report ongoing releases of oil at the Terminal even years after Chapter 21E was enacted. As late as 1986, a report from the B&M's former employee and consultant detailing the "Oil Pollution Problems" at the Site made no mention of Chapter 21E. (CSUMF at ¶18). The B&M appears to argue that the MBTA should have contemplated the B&M's liability even where the B&M itself did not. The Seventh Circuit rejected this precise argument in a similar case, a decision the B&M does not mention. See

---

[3]    The B&M's persistent reliance on these documents as evidence of "regulatory involvement" illustrates its complete misunderstanding of the relevant cases. Under those cases, documents such as these tending to show that a regulatory agency knew of spills of oil at the Site prior to the B&M's discharge might serve to bar those agencies from pursuing cleanup claims. See, e.g., In re Chicago I, 974 F.2d 775, 786 (7th Cir. 1992). In re Jensen, 995 F.2d at 930; In re National Gypsum, 139 B.R. 397, 407-09 (N.D.Tex. 1992) (each case finding that the claimant regulatory authority knew of both the contamination and the debtor's connection to the property before the date on which claims were barred). However, they do not affect the MBTA's claims unless there is some indication that the MBTA was aware of them at the time, and they concerned soil and groundwater contamination.

[4]    In its Opposition, the B&M blatantly mis-characterizes the deposition testimony of the MBTA's expert witness by representing that he opined that it is not plausible that the MBTA was unaware of the enactment of Chapter 21E in March 1983. See B&M's Opp. at 12 and 22. On the contrary, his opinion was exactly the opposite: "Q: In your opinion, is it plausible that one of the largest landowners in Massachusetts and one that owned a site like the BET was unaware of the enactment of Chapter 21E? A: Yes, that's my opinion." (Culliford Decl., Ex. 3, Stimpson Dep. at 46:6-10).

AM Int'l Inc. 106 F.3d at 1348 (holding the claimant's CERCLA reimbursement claim not to have been discharged where the debtor itself had not realized it faced CERCLA liability prior to the bankruptcy proceedings and had never reported its releases to EPA).

The B&M's contractual arguments are as unavailing as those relating to the statute. Its contention that the 1976 Purchase and Sale Agreement or the 1982 Operating Agreement between the parties provide evidence that the parties expressly contemplated environmental cleanup claims prior to 1983 is simply not true. See B&M's Opp. at 26. The Purchase and Sale Agreement, which was executed in 1976, seven years prior to the enactment of Chapter 21E, indicates that each party shall bear its own costs for "Environmental Impact Studies," which were required for completion of major construction projects after the passage of the National Environmental Protection Act. (Bergeron Decl. Ex. 10). Such studies assess a multitude of "environmental" impacts such as traffic, air pollution and noise, and have nothing to do with assessment or cleanup of contamination. The B&M's argument with respect to the 1982 Operating Agreement is an even bigger stretch. The agreement makes no reference to environmental liabilities or the conditions likely to give rise to them, and contains only a general reference to "property damage." (Bergeron Decl. Ex. 12). Thus, unlike the lease agreement in NCL Corp. v. Lone Star Bldg. Ctrs. (Eastern) Inc., 144 B.R. 170 (S.D. Fla. 1992), which specifically required the debtor to comply with applicable environmental regulations and hold the lessor harmless from environmental liability, neither the Purchase and Sale Agreement nor the 1982 Operating Agreement evidence contemplation of environmental cleanup liability by the parties prior to the B&M's discharge.

And while making a half-hearted attempt at arguing that the existence of common law claims prior to the enactment of Chapter 21E precludes the MBTA's present claims, the B&M

itself proceeds to undermine its own argument. First, it acknowledges that where the applicable environmental statute was not passed prior to a bankruptcy discharge, the claims are not foreseeable, and not discharged. B&M Opp. at 22-23, citing In re Penn Cent. Transp. Co., 944 F.2d 164, 167-68 (3rd Cir. 1991). Then, in a footnote, the B&M fatally undercuts its common law arguments in stating that, because none of the MBTA's present claims arise under CERCLA, analysis of claims under that statute are, in the B&M's words, "irrelevant." B&M Opp. at FN 6. Of course, none of the MBTA's present claims arise under the common law either. Finally, by focusing exclusively on the passage of Massachusetts' "landmark" Chapter 21E legislation, the B&M's own expert report recognized that the crucial issue in this case is the passage and anticipated enforcement of Chapter 21E, not some hypothetical pre-existing common law claims. (Culliford Decl., Ex. 2 at 2).

## CONCLUSION

For all of the reasons set forth above, the Court should grant the MBTA's motion for partial summary judgment.

Respectfully submitted,

/s/ John M. Stevens
John M. Stevens (BBO #480140)
Alicia Barton McDevitt (BBO #655184)
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts   02210
(617)  832-1000
Attorneys for Defendant
  Massachusetts Bay Transportation Authority

Dated:  July 14, 2006