UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

BOSTON AND MAINE
CORPORATION,

          Plaintiff,

    -v.-                                    Civil Action No. 05-11656-RCL

MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY

          Defendant.

---

**PLAINTIFF BOSTON & MAINE CORPORATION'S OPPOSITION TO DEFENDANT MASSACHUSETTS BAY TRANSPORTATION AUTHORITY'S STATEMENT OF ADDITIONAL RELEVANT FACTS**

Plaintiff Boston and Maine Corporation ("B&M"), pursuant to Local Rule 56.1 of the United State District Court for the District of Massachusetts, hereby submits the following response to defendant Massachusetts Bay Transportation Authority's ("MBTA") Response to Plaintiff's Statement of Material Facts and Statement of Additional Relevant Facts ("Statement of Additional Facts").

29.    B&M does not dispute the facts alleged in Paragraph 29 of MBTA's Statement of Additional Facts. However, such facts are irrelevant to whether MBTA had a claim for environmental cleanup at the Boston Engine Terminal ("BET") prior to June 30, 1983. For one thing, MBTA had liability for environmental cleanup as the owner of the BET. M.G.L. ch. 21E; *see also Nassr v. Commonwealth,* 394 Mass. 767, 773-75 (1985), and could have instituted an

action against B&M based on its portion of liability for cleanup costs, *see* M.G.L. ch. 231B (Uniform Contribution Among Tortfeasors Act (1962)) (stating where two or more persons become jointly liable in tort for the same injury to person or property, there shall be a right of contribution among them even though judgment has not been recovered against all or any of them); *Hayon v. Coca Cola Bottling Co.,* 375 Mass. 644, 648-49 (1978) (indicating that under Chapter 231B term "liable in tort," is "broad in scope and is not suitable language for implying a narrow or restricted range of application within the framework of potential tort defendants"); *Alholm v. Town of Wareham,* 371 Mass. 621, 626 n. 3 (1976) (noting that potential liability resulting from maintenance of public nuisance is subject to tort principles); *Pritchard v. Mabrey,* 358 Mass. 137, 143-44 (1970) (discussing action in tort for maintenance of public nuisance); RESTATEMENT (SECOND) OF TORTS § 822 cmt. *a* (1979) (stating that public and private nuisance constitute types of tort liability).

Moreover, Mr. Stimpson's inability to market his services hardly is probative of whether MBTA had a claim, or knowledge of a claim, against B&M. There are innumerable possible explanations for his lack of results, almost all of them irrelevant to the issue at hand. To offer just a few examples, his timing could have been off, his pitch unappetizing, or his prospects poorly selected. Perhaps marketing just isn't his strong point.

30.  B&M disputes the facts alleged in Paragraph 30 of MBTA's Statement of Additional Facts insofar as MBTA states that potential landowners "assumed that the operators who had caused the contamination would be the ones contacted by DEP." Mr. Wesley Stimpson's Expert Report does not so state and MBTA provides no additional support for this statement. In any event, the facts alleged in Paragraph 30 are irrelevant to whether MBTA had a claim against B&M for environmental cleanup at the BET prior to June 30, 1983. MBTA had

liability for environmental cleanup as the owner of the BET. M.G.L. ch. 21E; see also *Nassr*, 394 Mass. at 773-75.

31.  B&M disputes the facts alleged in Paragraph 31 of MBTA's Statement of Additional Facts. Although Mr. Stimpson originally stated that it is plausible that MBTA was unaware of the enactment of Chapter 21E, upon further questioning Mr. Stimpson admitted that "[i]t is possible there is someone within the MBTA structure that might have known about [Chapter 21E], yes." Declaration of Robert Culliford in Support of Plaintiff's Motion for Partial Summary Judgment ("Culliford Decl.") ¶ 12 & Exh 3. In any event, such facts are irrelevant to whether MBTA had a claim for environmental cleanup at the BET prior to June 30, 1983. MBTA had liability for environmental cleanup as the owner of the BET, M.G.L. ch. 21E; see also *Nassr*, 394 Mass. at 773-75, and MBTA is presumed to know the law, *Roberts v. Maine*, 48 F.3d 1287, 1300 (1st Cir. 1995). Moreover, in addition to that presumption, it is inconceivable that MBTA was unaware of the enactment of Chapter 21E. To suggest otherwise is asking this Court to ignore what all know to be true.

32.  B&M disputes the facts alleged in Paragraph 32 of MBTA's Statement of Additional Facts. MBTA was aware of its obligation to clean up contaminated sites under Chapter 21E or other law well in advance of the June 30, 1983 Consummation Date. For instance, in 1979, state and local environmental officials investigated an illegal dump filled with hazardous material on MBTA property in Woburn and indicated that a cleanup would be required. *Hazardous Materials Found on MBTA Site*, THE DAILY TIMES (Woburn, Mass.), May 7, 1979 (see Exhibit 3 to Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment). The Massachusetts Department of Environmental Quality Engineering (DEQE) (the predecessor agency to the Massachusetts Department of Environmental Protection (DEP)) was

involved. *See id.* Also, during the period from 1979 to 1983, MBTA employee Peter Wilson testified that MBTA was aware of spills or releases of oil or hazardous substances at MBTA facilities other than the BET, including South Station and South Hampton Street, that required cleanup efforts by the MBTA. Declaration of James Hennemann in Support of Plaintiff's Motion for Partial Summary Judgment ("Hennemann Decl.") ¶ 37 & Exh. 29. Moreover, such facts are irrelevant to whether MBTA had a claim for environmental cleanup at the BET prior to June 30, 1983. MBTA had liability for environmental cleanup as the owner of the BET. M.G.L. ch. 21E; s*ee also Nassr,* 394 Mass. at 773-75, and MBTA is presumed to know the law, *Roberts,* 48 F.3d at 1300.

33.    B&M does not dispute the facts alleged in Paragraph 33 of MBTA's Statement of Additional Facts. However, such facts are irrelevant to whether MBTA had a claim for environmental cleanup at the BET prior to June 30, 1983. Mr. Richard House was an MBTA employee who had actual knowledge of the environmental condition of the BET and of releases of oil at the BET, and his knowledge is imputed to MBTA. Hennemann Decl. ¶¶ 9, 11, 12, 18, 19, 20, 21, 22, 23, 30 & Exhs. 1-3, 5-7, 14-15, 19-23, 31-34, 36, 38-41. The same is true for MBTA employee Mr. Peter Wilson, who testified that he learned from his supervisors at MBTA about spills of hazardous materials at the BET. Hennemann Decl. ¶ 25 & Exhs. 2-3. The knowledge, or lack thereof, of two selected MBTA employees hardly is sufficient to overcome these and many other facts of record demonstrating MBTA's substantial knowledge about the contaminated condition of the site prior to June 30, 1983. Furthermore, MBTA had liability for environmental cleanup as the owner of the BET. M.G.L. ch. 21E; *see also Nassr,* 394 Mass. at 773-75.

34.     B&M disputes the facts alleged in Paragraph 34 of MBTA's Statement of Additional Facts. MBTA employee Richard House testified concerning recurring discussions with his MBTA supervisor, Mr. Walter Mark, regarding whether there had been an oil spill "how much it was, how bad it was, and *what we were doing to clean it up*." Hennemann Decl. ¶ 20 & Exh. 1 (emphasis added). MBTA employee Peter Wilson expressly recalled that MBTA's oversight of expenses at the BET included environmental expenses such as those incurred to clean up spills. Hennemann Decl. ¶ 28 & Exh. 35.

Furthermore, during the early 1980's MBTA personnel attended meetings regarding environmental issues at the BET and recognized the need for cleanup at the site. Hennemann Decl. ¶ 29 & Exhs. 30, 41-45 (BM 000003; Hennemann Dep. at 42:11-44:21; 47:5-49:7; Bergeron Dep. at 127:1-128:23; Hennemann Dep. 59:24-60:8; BM 000008); *see also* Declaration of Roger Bergeron in Support of Plaintiff's Motion for Partial Summary Judgment ("Bergeron Decl.") ¶ 21 & Exh. 9. For instance, MBTA employees Walter Mark and Richard House attended meetings regarding environmental issues at the BET, including the leak in the one million gallon tank. Hennemann Decl. ¶ 30 & Exh. 41. Discussion at the meetings included concern about stopping any leaks to prevent further complaints from the Coast Guard and to prevent pollution of the property. Hennemann Decl. ¶ 31 & Exh. 42. At another meeting around 1980 or 1981, B&M employees Roger Bergeron and Gary Gordon and MBTA employees Bill MacDonald and Gene Scoroposki discussed environmental cleanup at areas at the BET that involved an accumulation of heavy greases, lubricants, and diesel fuel. Bergeron Decl. ¶ 22 & Exh. 9. George Covino of B&M and Walter Mark of MBTA were also involved in meetings at the BET to develop a more efficient fueling system for the BET. Hennemann Decl. ¶ 32 & Exhs. 32, 44.

These discussions began in approximately 1982. Hennemann Decl. ¶ 41 & Exh. 44. The old fueling system caused a problem because it did not have automatic shutoff and fuel was leaking onto the ground right outside the main offices where the MBTA office was located. Hennemann Decl. ¶ 33 & Exh. 42. In or about 1984, MBTA installed new fueling nozzles at the BET with an automatic shut-off to address the fuel spillage problem. Hennemann Decl. ¶ 34 & Exhs. 30, 45 (BM 000003; BM 0000008).

In addition, in the 1982 to 1983 time period, in a discussion that took place at the MBTA's general office, Dan Breen of the MBTA engineering staff indicated to Peter Wilson that there might have to be a cleanup of hazardous substances at the BET site. Hennemann Decl. ¶ 35 & Exh. 46 (Wilson Dep. at 48:4-50:13). Mr. Wilson further stated that between 1982 and 1984 MBTA was aware of fill, contaminated with fuel oil and lubricants, that had to be analyzed so it could be handled properly. Hennemann Decl. ¶ 36 & Exhs. 46-47 (Wilson Dep. 48:4-50:13; 35:17-36:12).

35.   B&M disputes the facts alleged in Paragraph 35 of MBTA's Statement of Additional Facts. The testimony of Mr. House and other MBTA and B&M witnesses indicates that MBTA was aware of cleanup responsibilities and the involvement of regulators regarding releases at the BET. For example, MBTA employee House testified concerning recurring discussions with his MBTA supervisor, Mr. Walter Mark, regarding whether there had been an oil spill "how much it was, how bad it was, and *what we were doing to clean it up*." Hennemann Decl. ¶ 20 & Exh. 1 (emphasis added).

During the early 1980's MBTA personnel attended meetings regarding environmental issues at the BET and recognized the need for cleanup at the site. Hennemann Decl. ¶ 29 & Exhs. 30, 41-45 (BM 000003; Hennemann Dep. at 42:11-44:21; 47:5-49:7; Bergeron Dep. at

127:1-128:23; Hennemann Dep. 59:24-60:8; BM 000008); *see also* Declaration of Roger Bergeron in Support of Plaintiff's Motion for Partial Summary Judgment ("Bergeron Decl.") ¶ 21 & Exh. 9. For instance, MBTA employees Walter Mark and Richard House attended meetings regarding environmental issues at the BET, including the leak in the one million gallon tank. Hennemann Decl. ¶ 30 & Exh. 41. Discussion at the meetings included *concern about stopping any leaks to prevent further complaints from the Coast Guard and to prevent pollution of the property*. Hennemann Decl. ¶ 31 & Exh. 42 (emphasis added). At another meeting around 1980 or 1981, B&M employees Roger Bergeron and Gary Gordon and MBTA employees Bill MacDonald and Gene Scoroposki *discussed environmental cleanup* at areas at the BET that involved an accumulation of heavy greases, lubricants, and diesel fuel. Bergeron Decl. ¶ 22 & Exh. 9 (emphasis added).

George Covino of B&M and Walter Mark of MBTA were also involved in meetings at the BET to develop a more efficient fueling system for the BET. Hennemann Decl. ¶ 32 & Exhs. 32, 44. These discussions began in approximately 1982. Hennemann Decl. ¶ 41 & Exh. 44. The old fueling system caused a problem because it did not have automatic shutoff and fuel was leaking onto the ground right outside the main offices where the MBTA office was located. Hennemann Decl. ¶ 33 & Exh. 42. In or about 1984, MBTA installed new fueling nozzles at the BET with an automatic shut-off *to address the fuel spillage problem*. Hennemann Decl. ¶ 34 & Exhs. 30, 45 (BM 000003; BM 0000008) (emphasis added). In addition, in the 1982 to 1983 time period, in a discussion that took place at the MBTA's general office, Dan Breen of the MBTA engineering staff indicated to Peter Wilson that *there might have to be a cleanup of hazardous substances at the BET site*. Hennemann Decl. ¶ 35 & Exh. 46 (Wilson Dep. at 48:4-50:13) (emphasis added).

36. B&M disputes the facts alleged in Paragraph 36 of MBTA's Statement of Additional Facts. MBTA employees clearly were aware of the potential need for cleanup at the BET prior to the Consummation Date. *See supra* ¶¶ 6 & 7. However, such facts are irrelevant to whether MBTA had a claim for environmental cleanup at the BET prior to June 30, 1983. MBTA had liability for environmental cleanup as the owner of the BET, M.G.L. ch. 21E; s*ee also Nassr*, 394 Mass. at 773-75, and the evidence shows that MBTA had actual knowledge of oil contamination at the BET prior to June 30, 1983, *see, e.g.,* Hennemann Decl. ¶¶ 18, 19 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39.

37. B&M disputes the facts alleged in Paragraph 37 of MBTA's Statement of Additional Facts. MBTA was aware of its obligation to clean up contaminated sites under Chapter 21E and other law well in advance of the June 30, 1983 Consummation Date. For instance, in 1979, state and local environmental officials investigated an illegal dump filled with hazardous material on MBTA property in Woburn and indicated that a cleanup would be required. *Hazardous Materials Found on MBTA Site*, THE DAILY TIMES (Woburn, Mass.), May 7, 1979 (*see* Exhibit 3 to Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment). The DEQE was involved. *See id.*

Also, MBTA employee Peter Wilson testified that during the period from 1979 to 1983, MBTA was aware of spills or releases of oil or hazardous substances at MBTA facilities other than the BET, including South Station and South Hampton Street, that required cleanup efforts by the MBTA. Hennemann Decl. ¶ 37 & Exh. 29. Although Mr. Wilson's testimony does not specifically state that such cleanups were conducted pursuant to Chapter 21E as opposed to other law, such facts are irrelevant to whether MBTA had a claim for environmental cleanup at the BET prior to June 30, 1983. MBTA had liability for environmental cleanup as the owner of the

BET, M.G.L. ch. 21E; s*ee also Nassr,* 394 Mass. at 773-75, and the evidence shows that MBTA had actual knowledge of oil contamination at the BET prior to June 30, 1983, *see, e.g.,* Hennemann Decl. ¶¶ 18, 19 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39.

38.  B&M disputes the facts alleged in Paragraph 38 of MBTA's Statement of Additional Facts. MBTA employees Richard House and Peter Wilson were well aware of the oil-saturated ground at the site prior to June 1983. Hennemann Decl. ¶ 11 & Exhs. 19-21 (House Dep. at 30:1-23; 52:14-22; Wilson Dep. at 50:16-51:11). In fact, in the late 1970's, MBTA funded additional pumps and an above-ground oil separator for the oil trap system at the BET, Bergeron Decl. ¶ 18 & Exhs. 7-8 (BM 000003; BM 000007), which initially recovered approximately 35,000 gallons of petroleum products for MBTA per year. Bergeron Decl. ¶ 20 & Exh. 7 (BM 000003).

Insofar as discussions concerning cleanup of oil-soaked soil are concerned, at a meeting around 1980 or 1981, B&M employees Roger Bergeron and Gary Gordon and MBTA employees Bill MacDonald and Gene Scoroposki *discussed environmental cleanup* at areas at the BET that *involved an accumulation of heavy greases, lubricants, and diesel fuel.* Bergeron Decl. ¶ 22 & Exh. 9 (emphasis added). In addition, in the 1982 to 1983 time period, in a discussion that took place at the MBTA's general office, Dan Breen of the MBTA engineering staff indicated to Peter Wilson that *there might have to be a cleanup of hazardous substances at the BET site.* Hennemann Decl. ¶ 35 & Exh. 46 (Wilson Dep. at 48:4-50:13) (emphasis added). Mr. Wilson further stated that between 1982 and 1984 MBTA was aware of fill, contaminated with fuel oil and lubricants, that had to be analyzed so it could be handled properly. Hennemann Decl. ¶ 36 & Exhs. 46-47 (Wilson Dep. 48:4-50:13; 35:17-36:12).

39.   B&M states that the facts alleged in Paragraph 39 of MBTA's Statement of Additional Facts are ambiguous, B&M requests clarification of such alleged facts, and B&M reserves its right to dispute such alleged facts upon clarification. As presented, the statement appears to *admit* that MBTA had a pre-Chapter 21E obligation to clean up the BET site. The fact that Chapter 21E also contains such a requirement hardly can be said to have created a new claim wholly unrelated to the original one, even if one were to accept the incredible contention that MBTA was unaware of Chapter 21E at the time of its enactment. If anything, Chapter 21E merely elaborated upon the existing common law of nuisance, pursuant to which MBTA, as owner of the BET, had an obligation to cleanup environmental contamination on its property. *See Nassr,* 394 Mass. at 773-75.

Moreover, the alleged facts as they appear to be presented by MBTA are irrelevant to whether MBTA had a claim for environmental cleanup at the BET prior to June 30, 1983. MBTA had liability for environmental cleanup as the owner of the BET, M.G.L. ch. 21E; s*ee also Nassr,* 394 Mass. at 773-75, and the evidence shows that MBTA had actual knowledge of oil contamination at the BET prior to June 30, 1983, *see, e.g.,* Hennemann Decl. ¶¶ 18, 19 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39.

40.   B&M does not dispute the facts alleged in Paragraph 40 of MBTA's Statement of Additional Facts. However, such facts are irrelevant to whether MBTA had a claim for environmental cleanup at the BET prior to June 30, 1983. MBTA had liability for environmental cleanup as the owner of the BET, M.G.L. ch. 21E; s*ee also Nassr,* 394 Mass. at 773-75, and the evidence shows that MBTA had actual knowledge of oil contamination at the BET prior to June 30, 1983, *see, e.g.,* Hennemann Decl. ¶¶ 18, 19 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39. B&M's actions or omissions are irrelevant.

41.     B&M disputes the facts alleged in Paragraph 41 of MBTA's Statement of Additional Facts insofar as MBTA states "[t]he concerns to which the oil spills gave rise were the need to prevent them from reaching the Millers and Charles Rivers and the wish to avoid losses of a valuable asset." This completely ignores obligations under Chapter 21E and other common and statutory law that certainly should have been of concern to MBTA. *See, e.g.,* M.G.L. ch. 21E; *Nassr,* 394 Mass. at 773-75. In addition, MBTA was aware that the United States Coast Guard was issuing warnings and fines for discharges from the BET to nearby waterbodies. Bergeron Decl. ¶¶ 10, 11 & Exh. 7 (BM 000003). MBTA employees Walter Mark and Richard House attended meetings regarding environmental issues at the BET, Hennemann Decl. ¶ 30 & Exh. 41, at which discussions included concern about stopping any leaks to prevent further complaints from the Coast Guard and to prevent pollution of the property. Hennemann Decl. ¶ 31 & Exh. 42. Thus, MBTA was concerned about more than just the loss of an asset.

In any event, such facts are irrelevant to whether MBTA had a claim for environmental cleanup at the BET prior to June 30, 1983. MBTA had liability for environmental cleanup as the owner of the BET, M.G.L. ch. 21E; s*ee also Nassr,* 394 Mass. at 773-75, and the evidence shows that MBTA had actual knowledge of oil contamination at the BET prior to June 30, 1983, *see, e.g.,* Hennemann Decl. ¶¶ 18, 19 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39. MBTA employees were well aware of the oil-saturated ground at the BET prior to June 1983. Hennemann Decl. ¶ 11 & Exhs. 19-21 (House Dep. at 30:1-23; 52:14-22; Wilson Dep. at 50:16-51:11).

In the late 1970's, MBTA funded additional pumps and an above-ground oil separator for the oil trap system at the BET, Bergeron Decl. ¶ 18 & Exhs. 7-8 (BM 000003; BM 000007), which initially recovered approximately 35,000 gallons of petroleum product for MBTA per

year. Bergeron Decl. ¶ 20 & Exh. 7 (BM 000003). It is irrelevant that a further oil recovery study was not conducted until 1984.

42.  B&M does not dispute the facts alleged in Paragraph 42 of MBTA's Statement of Additional Facts. However, although the Boyd report does not mention Chapter 21E specifically, it evidences an awareness that releases of oil at the BET had been a concern. Declaration of Robert Culliford in Opposition to Defendant's Motion for Partial Summary Judgment ("Culliford Decl."), Exh. 2 (John Drobinski Expert Report) at p. 2 (noting "the Boyd report which covers the time period including the late 1970's and early 1980's likely evidences information gathering during that time period in recognition of increased compliance requirements"). Moreover, such facts are irrelevant to whether MBTA had a claim for environmental cleanup at the BET prior to June 30, 1983. MBTA had liability for environmental cleanup as the owner of the BET, M.G.L. ch. 21E; s*ee also Nassr,* 394 Mass. at 773-75, and the evidence shows that MBTA had actual knowledge of oil contamination at the BET prior to June 30, 1983, *see, e.g.,* Hennemann Decl. ¶¶ 18, 19 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39.

43.  B&M disputes the facts alleged in Paragraph 43 of MBTA's Statement of Additional Facts insofar as MBTA alleges that "[i]t was not until years later that DEP began to focus enforcement of Chapter 21E on landowners because indications were that, if remediation were required, it would not be by MBTA." First and foremost, to the extent that there is any evidence in the record that DEP did not focus its Chapter 21E efforts on MBTA, in respect of the BET site, until some time after 1983, that fact does not prove or tend to prove that DEP was not focusing on other property owners. Second, this statement is ambiguous, B&M requests clarification of such alleged facts, and B&M reserves its right to dispute such alleged facts upon clarification. Finally, as presented, such facts are irrelevant to whether MBTA had a claim for

environmental cleanup at the BET prior to June 30, 1983. MBTA had liability for environmental cleanup as the owner of the BET, M.G.L. ch. 21E; see also Nassr, 394 Mass. at 773-75, and the evidence shows that MBTA had actual knowledge of oil contamination at the BET prior to June 30, 1983, see, e.g., Hennemann Decl. ¶¶ 18, 19 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39, which is sufficient for MBTA to have had at least a contingent claim against B&M. Specifically, with regard to releases of oil from the BET to nearby rivers, as of the late 1970's, MBTA was aware that discharges of petroleum products originating at the BET occurred to the Millers River and occasionally the Charles River, and MBTA was aware that the United States Coast Guard was issuing warnings and fines for these discharges. Bergeron Decl. ¶¶ 10, 11 & Exh. 7 (BM 000003). MBTA's own documents indicate that in June 1982, 300 to 500 gallons of No. 2 fuel oil was released from the oil/water separator to the Millers River. Bergeron Decl. ¶ 12 & Exh. 2 (MBTA 00003089).

44.     B&M does not dispute the facts alleged in Paragraph 44 of MBTA's Statement of Additional Facts. However, such facts are irrelevant to whether MBTA had a claim for environmental cleanup at the BET prior to June 30, 1983. MBTA had liability for environmental cleanup as the owner of the BET, M.G.L. ch. 21E; see also Nassr, 394 Mass. at 773-75, and the evidence shows that MBTA had actual knowledge of oil contamination at the BET prior to June 30, 1983, see, e.g., Hennemann Decl. ¶¶ 18, 19 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39. Specifically, with regard to releases of oil from the BET to nearby rivers, as of the late 1970's, MBTA was aware that discharges of petroleum products originating at the BET occurred to the Millers River and occasionally the Charles River, and MBTA was aware that the United States Coast Guard was issuing warnings and fines for these discharges. Bergeron Decl. ¶¶ 10, 11 & Exh. 7 (BM 000003). MBTA's own documents indicate that in June 1982, 300 to 500 gallons of

No. 2 fuel oil was released from the oil/water separator to the Millers River. Bergeron Decl. ¶ 12 & Exh. 2 (MBTA 00003089). Also in the late 1970's, MBTA funded additional pumps and an above-ground oil separator for the oil trap system at the BET, Bergeron Decl. ¶ 18 & Exhs. 7-8 (BM 000003; BM 000007), which initially recovered approximately 35,000 gallons of petroleum product for MBTA per year from the BET. Bergeron Decl. ¶ 20 & Exh. 7 (BM 000003).

 45. B&M disputes the facts alleged in Paragraph 45 of MBTA's Statement of Additional Facts. Even if MBTA was not "involved" in releasing contaminants at the BET, it was certainly involved in the sense of (1) having knowledge of the releases, Hennemann Decl. ¶¶ 18, 19 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39, (2) having approved environmental cleanup expenses, Hennemann Decl. ¶ 28 & Exh. 35, and (3) having presumed knowledge of its statutory and common law cleanup duties. M.G.L. ch. 21E; *Nassr,* 394 Mass. at 773-75; *Roberts,* 48 F.3d at 1300. In short, the facts alleged by MBTA in Paragraph 45 are irrelevant to whether MBTA had a claim for environmental cleanup at the BET prior to June 30, 1983. MBTA had liability for environmental cleanup as the owner of the BET, M.G.L. ch. 21E; s*ee also Nassr,* 394 Mass. at 773-75, and the evidence shows that MBTA had actual knowledge of oil contamination at the BET prior to June 30, 1983, *see, e.g.,* Hennemann Decl. ¶¶ 18, 19 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39.

 In particular, with regard to releases of oil from the BET to nearby rivers, a document authored by William A. MacDonald, MBTA's Chief Engineering Officer and one of the MBTA supervisors at the BET, specifically states that as of the late 1970's, MBTA was aware that discharges of petroleum products originating at the BET occurred to the Millers River and occasionally the Charles River, and MBTA was aware that the United States Coast Guard was issuing warnings and fines for these discharges. Bergeron Decl. ¶¶ 10, 11 & Exh. 7 (BM

000003). MacDonald also indicates that in the late 1970's, MBTA funded additional pumps and an above-ground oil separator for the oil trap system at the BET, Bergeron Decl. ¶ 18 & Exhs. 7 (BM 000003), which initially recovered approximately 35,000 gallons of petroleum product for MBTA per year from the BET. Bergeron Decl. ¶ 20 & Exh. 7 (BM 000003). Another of MBTA's own documents indicates that in June 1982, 300 to 500 gallons of No. 2 fuel oil was released from the oil/water separator to the Millers River. Bergeron Decl. ¶ 12 & Exh. 2 (MBTA 00003089).

46.     B&M disputes the facts alleged in Paragraph 46 of MBTA's Statement of Additional Facts. In the 1982 to 1983 time period, in a discussion that took place at the MBTA's general office, Dan Breen of the MBTA engineering staff indicated to MBTA employee Peter Wilson that there might have to be a cleanup of hazardous substances at the BET site. Hennemann Decl. ¶ 35 & Exh. 46. Mr. Wilson further stated that between 1982 and 1984 MBTA was aware of fill, contaminated with fuel oil and lubricants, that had to be analyzed so it could be handled properly. Hennemann Decl. ¶ 36 & Exhs. 46-47. In addition, MBTA employees Walter Mark and Richard House attended meetings regarding environmental issues at the BET, including the leak in the one million gallon tank. Hennemann Decl. ¶ 30 & Exh. 41. Discussion at the meetings included concern about stopping any leaks to prevent further complaints from the Coast Guard and to prevent pollution of the property. Hennemann Decl. ¶ 31 & Exh. 42. At another meeting around 1980 or 1981, B&M employees Roger Bergeron and Gary Gordon and MBTA employees Bill MacDonald and Gene Scoroposki discussed environmental cleanup at areas at the BET that involved an accumulation of heavy greases, lubricants, and diesel fuel. Bergeron Decl. ¶ 22 & Exh. 9. George Covino of B&M and Walter Mark of MBTA were also involved in meetings at the BET, which began in approximately 1982,

to develop a more efficient fueling system for the BET. Hennemann Decl. ¶¶ 32, 41 & Exhs. 32, 44. The old fueling system caused a problem because it did not have automatic shutoff and fuel was leaking onto the ground right outside the main offices where the MBTA office was located. Hennemann Decl. ¶ 33 & Exh. 42. In or about 1984, MBTA installed new fueling nozzles at the BET with an automatic shut-off to address the fuel spillage problem. Hennemann Decl. ¶ 34 & Exhs. 30, 45 (BM 000003; BM 0000008).

In addition to being inaccurate, the facts alleged by MBTA in Paragraph 46 are irrelevant to whether MBTA had a claim for environmental cleanup at the BET prior to June 30, 1983. MBTA had liability for environmental cleanup as the owner of the BET, M.G.L. ch. 21E; s*ee also Nassr,* 394 Mass. at 773-75, and the evidence shows that MBTA had actual knowledge of oil contamination at the BET prior to June 30, 1983, *see, e.g.,* Hennemann Decl. ¶¶ 18, 19 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39.

47.     B&M does not dispute the facts alleged in Paragraph 47 of MBTA's Statement of Additional Facts. However, such facts are irrelevant to whether MBTA had a claim for environmental cleanup at the BET prior to June 30, 1983. MBTA had liability for environmental cleanup as the owner of the BET, M.G.L. ch. 21E; s*ee also Nassr,* 394 Mass. at 773-75, and the evidence shows that MBTA had actual knowledge of oil contamination at the BET prior to June 30, 1983, *see, e.g.,* Hennemann Decl. ¶¶ 18, 19 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39.

48.     B&M disputes the facts alleged in Paragraph 48 of MBTA's Statement of Additional Facts. The DEQE, which later became the DEP, kept incident files on releases at or from the BET during the early 1980's. Bergeron Decl. ¶ 13 & Exhs. 2-4. These included DEP incident response files on a fuel spill of approximately 1,100 gallons of No. 2 fuel oil at the BET in October 1981, and files on releases of oil from the BET into the Millers River and the Charles

River. Bergeron Decl. ¶ 14 & Exhs. 2-4. Furthermore, in contrast to MBTA's allegations, DEP was recently able to locate several records in its possession that show DEP was aware of, and addressed, contamination problems at the BET prior to 1988. *See* Declaration of Adeline DelBene ("DelBene Decl.") & Exhs. 1-7 thereto. In particular, DEP maintained records on the following releases at the BET prior to June 30, 1983:

 a. December 14, 1980 spill of 15,000 gallons of No. 2 fuel oil from a pipeline in the B&M Bud Yard at the BET to the MDC Prison Point Pumping Station;

 b. July 22, 1981 spill of No. 2 fuel oil (amount unknown) from B&M to Charles River; DEP indicates the case is closed;

 c. October 11, 1981 spill of 1,100 gallons of No. 2 Fuel Oil at the B&M Yard 5 at the BET; DEP indicates the case is closed;

 d. October 19, 1981 spill of 20 gallons of No. 6 Fuel Oil from the BET oil-water separator to the Millers River;

 e. December 16, 1981 spill of 100 gallons of No. 2 Fuel Oil from the B&M Railroad to the Millers River; DEP indicates the case is closed;

 f. March 8, 1982 spill of 20 gallons of No. 2 fuel oil from the B&M to the Mystic Junction; DEP indicates the case is closed.

 Thus, in contrast to MBTA's alleged statement of fact, there is certainly evidence that DEP was aware of the contamination problems at the BET, and opened and monitored cases regarding such problems, prior to 1988.

 B&M also disputes MBTA's statement in Paragraph 48 that "DEP's own Keeper of the Records has confirmed that there is nothing in DEP's files suggesting that it contacted MBTA concerning environmental conditions at the Terminal prior to 1988." This statement is derived

from a previous March 8, 2006 Affidavit of Adeline Delbene, in which Ms. Delbene stated "MassDEP does not possess any documents in its files regarding the Boston Engine Terminal dated prior to 1988 [with the exception of one permit]." *See* Exh. 11 to Affidavit of Alicia B. McDevitt in Support of Defendant Massachusetts Bay Transportation Authority's Motion for Partial Summary Judgment. This statement later proved to be incorrect, since DEP, as of June 21, 2006, located additional documents in its files regarding the BET dated prior to 1988. Likewise, Ms. Delbene's statement that DEP does not possess any documents in its files indicating that DEP contacted MBTA regarding environmental conditions at the BET prior to 1988 is incorrect. DEP recently was able to locate evidence of a spill of polychlorinated biphenyl ("PCB") oil at the old power house at the BET in 1986 for which both B&M and MBTA are listed as responsible parties. *See* DelBene Decl. at Exh. 8. DEP was also able to locate a record of a spill of miscellaneous oil at the gravel yard across from the Boston Edison (likely the BET) in 1985 for which MBTA is listed as the property owner. *See* DelBene Decl. at Exh. 9. Thus, in Ms. Delbene's prior affidavit she was referring only to files associated with one DEP release tracking number (RTN 3-2534), and merely noted that as of March 8, 2006, DEP had not been able to locate any documents in those files indicating DEP contacted MBTA regarding environmental conditions at the BET prior to 1988. This release tracking number is likely only one of many associated with the BET, and MBTA's failure to request documents associated with other releases and release tracking numbers hardly constitutes evidence that DEP did not maintain files on a substantial number of additional releases and remediation efforts at the BET. For its part, DEP does not, and cannot, verify that such documents never existed (since some have now been found), and additional documents may yet be located. Moreover, in addition to DEP's awareness of contamination at the BET in the early 1980's, during that time or

earlier, the United States Coast Guard was issuing fines and penalties for releases of oil from the BET to nearby rivers. Bergeron Decl. ¶¶ 7-9 & Exhs. 2-6. MBTA was aware that the Coast Guard was issuing warnings and fines for these discharges. Bergeron Decl. ¶¶ 10, 11 & Exh. 7.

In addition, although the alleged facts presented in Paragraph 48 of MBTA's Statement of Additional Facts are incorrect, such facts are irrelevant to whether MBTA had a claim for environmental cleanup at the BET prior to June 30, 1983. MBTA had liability for environmental cleanup as the owner of the BET, M.G.L. ch. 21E; s*ee also Nassr,* 394 Mass. at 773-75, and the evidence shows that MBTA had actual knowledge of oil contamination at the BET prior to June 30, 1983, *see, e.g.,* Hennemann Decl. ¶¶ 18, 19 & Exhs. 1-8, 10-12, 16-17, 19-24, 29-39.

        Respectfully submitted,

        WINSTON & STRAWN LLP

By:    /s/ Eric L. Hirschhorn
        Eric L. Hirschhorn
        Winston & Strawn LLP
        1700 K Street, N.W.
        Washington DC  20006
        202-282-5000
        Attorneys for Plaintiff,
        Boston & Maine Corporation

        Robert B. Culliford (BBO#638468)
        14 Aviation Avenue
        Pease International Tradeport
        Portsmouth NH  03801
        603-766-2002
        Counsel for Plaintiff,
        Boston & Maine Corporation

Dated: July 14, 2006

## CERTIFICATE OF SERVICE

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on July 14, 2006.

John M. Stevens
Alicia Barton McDevitt
Foley Hoag LLP
155 Seaport Blvd.
Boston, MA  02210-2600
(617) 832-1000

                                                           /s/ Eric L. Hirschhorn
                                                            Eric L. Hirschhorn

DC:463760.2