UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BOSTON AND MAINE CORPORATION,
    Plaintiff,


        v.                                          CIVIL ACTION NO.
                                                    05-11656-RCL

MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY,
    Defendant.

**REPORT AND RECOMMENDATION RE:
DEFENDANT MASSACHUSETTS BAY TRANSPORTATION AUTHORITY'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF
DISCHARGE IN BANKRUPTCY (DOCKET ENTRY # 16); PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT
(DOCKET ENTRY # 20)**

**January 26, 2007**

**BOWLER, U.S.M.J.**

Pending before this court are two motions for partial summary judgment filed by defendant Massachusetts Bay Transportation Authority ("MBTA") (Docket Entry # 16) and plaintiff Boston and Maine Corporation ("B & M") (Docket Entry # 20).  After conducting a hearing on September 5, 2006, this court took the motions (Docket Entry ## 16 & 20) under advisement.


PROCEDURAL BACKGROUND

B & M filed this action seeking to enforce a Consummation Order entered on June 17, 1983, in a bankruptcy proceeding in the United States District Court for the District of Massachusetts, In the Matter of Boston and Maine Corporation, No. 70-250-M ("the bankruptcy proceeding").  B & M filed for bankruptcy in 1970 and

operated under bankruptcy protection from 1970 to June 1983. The Consummation Order discharges and releases B & M from all claims and liabilities whether or not filed in the bankruptcy proceeding.

A few months prior to the Consummation Order on March 24, 1983, the Massachusetts Oil and Hazardous Material Release Prevention Act, Massachusetts General Laws chapter 21E ("chapter 21E"), was enacted into law and became effective immediately. The MBTA, however, did not file a proof of claim in the bankruptcy proceeding regarding the environmental contamination at the Boston Engine Terminal ("the Terminal"), property which the MBTA purchased from B & M's bankruptcy trustees in December 1976. The MBTA presently maintains it has incurred chapter 21E response and remediation costs of at least $15,340,810.

In a May 4, 2004 letter, the MBTA notified B & M that the MBTA was seeking reimbursement from B & M for the MBTA's response costs incurred to date and in the future for the releases of diesel fuel at the Terminal while B & M owned or operated the railroad maintenance facility and rail yard. See Mass. Gen. L. ch. 21E, §§ 4, 4A & 5(a)(1). Unable to resolve their differences, B & M filed suit in May 2005. The four count Complaint for Enforcement of Bankruptcy Consummation Order, Injunctive Relief and Contempt seeks to foreclose B & M's liability for releases at the Terminal that took place prior to June 30, 1983 ("the discharge date" or "the bar date"). The

2

MBTA's two counterclaims seek recovery of response costs under section four of chapter 21E and a declaratory judgment with respect to future chapter 21E costs.

The MBTA moves for partial summary judgment dismissing Count I, which seeks to enforce the Consummation Order, Count II, which seeks injunctive relief under the terms of the Consummation Order, and Count III, which seeks an order declaring the MBTA in contempt of the Consummation Order. The MBTA maintains that the Consummation Order does not discharge its chapter 21E claim against B & M because the claim was not in the fair contemplation of the parties at the time of the June 30, 1983 discharge date in the Consummation Order.[1]

B & M, in turn, moves for partial summary judgment seeking to enforce the Consummation Order and enjoin the MBTA from asserting its claim for chapter 21E reimbursement as to contamination occurring on or before June 30, 1983. B & M submits that the MBTA had a claim existing prior to the discharge date for environmental cleanup costs caused by contamination occurring prior to June 30, 1983. The Consummation Order thus discharged the claim and bars the MBTA from asserting it at the

---

[1] The prayer for relief in the complaint limits the requested injunctive relief to an injunction barring the MBTA's assertion of claims for contamination occurring before June 30, 1983, as opposed to relief occurring prior to the termination of B & M's operating contract in 1986. Accordingly, the counts do not seek recovery based upon contamination and events occurring after the June 30, 1983 discharge date.

present time, according to B & M.

The partial summary judgment motions therefore seek an adjudication regarding the effect of the bankruptcy proceeding and the Consummation Order on the MBTA's claim for chapter 21E response costs based upon contamination and events occurring prior to June 30, 1983.  B & M submits that the Consummation Order discharged such a claim thereby giving it a fresh start as contemplated by the bankruptcy laws whereas the MBTA maintains that the claim was not in the fair contemplation of the parties and therefore not discharged.  As a final matter, B & M's motion seeks an adjudication limiting B & M's liability to an amount equal to or less than $1,000,000 under the terms of a 1982 operating agreement between the parties.

With this framework and the June 30, 1983 date in mind, this court turns to the facts.  Unless otherwise noted, facts are construed against the non-moving party in the discussion section.


FACTUAL BACKGROUND

The MBTA is a body politic as well as a corporate and political subdivision of the Commonwealth of Massachusetts.  It provides mass transportation services throughout eastern Massachusetts by means of bus, subway and light rail.  It is the second largest property owner in Massachusetts.

B & M is a common carrier providing railroad freight

4

services in the northeastern United States.  It owned the
Terminal from approximately 1929, when the engine house and power
house were built, to 1976, when the MBTA purchased the property.
B & M continued to operate the Terminal until December 31, 1986,
under agreements between the MBTA and B & M's bankruptcy
trustees.  Under the final operating agreement, B & M operated
the MBTA commuter railroad as an independent contractor for the
benefit of the MBTA from January 1, 1982 to December 31, 1986
("the 1982 operating agreement").  (Docket Entry # 24, Ex. 12, ¶¶
2.01(13), 5.01 & 16.01).

The history of rail operations at the Terminal dates back to
the late 1800s.  In the 1700s, the property mainly consisted of
tidal marshland drained by the Millers River.  In the late 1920s,
B & M secured licenses to fill a portion of Boston harbor
concomitant with the obligation to collect and carry the drainage
interrupted by the fill operations.  As filling operations
proceeded, B & M constructed various yards and railroad
facilities.  In the 1940s, B & M began changing from steam to
diesel locomotives and built a storeroom and diesel house to
maintain the diesel locomotives.  Installation of a 1,000,000
gallon diesel fuel tank and a 100,000 gallon diesel fuel tank
took place respectively in 1949 and 1952.[2]  The change to diesel

---

[2]  In or around 1982, "the 1,000,000 gallon storage tank was
determined to have a leaky floor, which was subsequently
replaced.  [T]he 100,000 gallon tank likewise needed a
replacement floor."  (Docket Entry # 35, Ex. 8).

powered locomotives, however, produced a larger number of oil spills onto the ground during operations.

In the early 1960s, B & M acquired the rights to fill the remaining portion of the Millers River.  A culvert installed along the length of the open river picked up drainage from the Terminal which eventually lead to an oil trap or separator near the Prison Point Bridge and thereafter to the Millers River outfall and the Charles River.

The oil trap separated the oil from the water and the water then continued to "the Miller[s] River and then out to the Charles."  (Docket Entry # 33, Ex. 5).  The filling process pushed oil ahead of the filling operation at which point the oil entered the oil trap where it was pumped into tanks and carried off by waste oil contractors.

At the urging of B & M, the MBTA upgraded the oil trap in 1978 by installing additional pumps and an above ground oil separator.  As a requirement of funding the additional separator at a cost of approximately $70,000, the MBTA received "the recovered petroleum products to burn in the [Terminal's] boilers."  (Docket Entry # 35, Ex. 7).  The recovered petroleum product initially amounted to approximately 35,000 gallons per year.

In 1970, as noted above, B & M filed for bankruptcy protection under the Bankruptcy Act of 1898.  The Consummation Order issued on June 17, 1983, and set a discharge date of June

30, 1983.  Under the terms of the Consummation Order, the property, assets and claims of B & M and B & M's trustees were discharged on June 30, 1983, and then transferred or vested in the reorganized B & M.  The transfer to the reorganized B & M was "free and clear of all claims" whether or not approved or acknowledged in the bankruptcy proceedings.  (Docket Entry # 33, Ex. 2, ¶ 5.01).  The Consummation Order also enjoined and "permanently restrained" the prosecution of any suits against the reorganized B & M that existed on or before the June 30, 1983 discharge date.  (Docket Entry # 33, Ex. 2, ¶ 8.01).

In December 1976, the MBTA purchased the Terminal and entered into agreements with B & M's bankruptcy trustees regarding B & M's continued operation of the Terminal until December 31, 1986.  The agreements contained similar terms depicting B & M as an independent contractor with full authority over the conduct of its employees.

For example, the 1982 operating agreement described B & M as "an independent contractor" with "managerial control" over the operation of the MBTA commuter railroad.  (Docket Entry # 19, Ex. 8, ¶ 5.01).  B & M's employees and subcontractors were thereby "subject to the direction, supervision and control of [B & M] and not [the MBTA]."  Id.

After the December 1976 purchase and prior to the June 30, 1983 discharge date, a number of oil spills into the Millers and Charles Rivers took place at the Terminal.  On March 4, 1977, the

7

United States Coast Guard ("USCG") cited B & M and the
Metropolitan District Commission ("MDC") for an oil spill into
the Millers River.  As a result, daily monitoring of an oil
interceptor chamber took place with pumping of the oil into
storage tanks as needed until completion of an MDC project at the
Terminal.  There is no indication in the record that this spill
was not cleaned up and resolved.

It was not until 1979 that the MBTA maintained a full time
employee, Richard E. House ("House"), an MBTA mechanical officer,
at the Terminal.  (Docket Entry # 33, Ex. 6, p. 5).  The MBTA
also had an office at the Terminal.

The MBTA had a number of other employees on the premises
from 1979 to 1983.  During that time, Walter Mark ("Mark"),
House's supervisor, was at the property "occasionally" although
"in some cases quite a bit."  (Docket Entry # 33, Ex. 6; Docket
Entry # 35, Ex. 33 & 34).  In 1980, Peter Wilson ("Wilson") of
the MBTA began working at the Terminal anywhere from one to five
days a week.  Walter Williams, Chief Mechanical Officer of the
MBTA, worked at various times at the Terminal between 1979 and
1983.

During the 1979 to 1983 time period, both House and Wilson
knew about the presence of oil on the ground at the Terminal.
Their shoes often became soiled from walking on the tracks or
elsewhere at the Terminal.  House described certain areas of the
ground as "pretty saturated with oil, fuel oil."  (Docket Entry #

8

35, Ex. 20). Wilson recalled "seeing oil-saturated puddles" on the ground at various fueling areas. (Docket Entry # 35, Ex. 24).

Fuel was on the ground oftentimes right in front of B & M's main offices at the Terminal. (Docket Entry # 35, Ex. 42). Diesel fuel was "a constant smell" in "a lot of areas" from 1979 to 1983, according to Wilson. (Docket Entry # 35, Ex. 21). In fact, oil spillage in certain areas was "constant and often excessive," according to a 1986 report authored by Lawrence B. Boyd ("Boyd"), a longtime B & M employee as well as a consultant for Guilford Transportation Industries, Inc., B & M's parent corporation.[3]

House and Mark also knew about oil spills occurring at the Terminal. House testified "there probably was some" spills and fuel releases that he witnessed at the Terminal. (Docket Entry # 35, Ex. 39). "Occasionally" House discussed a spill with Mark regarding the extent of the spill and what was being done to clean it up. (Docket Entry # 35, Ex. 1). Mark estimated that he heard about "possibly as many as five" oil spills from pipes or tanks during the 1979 to 1983 time period. (Docket Entry # 35,

---

[3] The 1986 report, which covers a general time period that includes prior to 1983, identifies the areas as "the fueling stands, the filling points for the storage tanks, service areas of the shop, the ready tracks where locomotive and self propelled cars were stored awaiting dispatching to service [and] the tanks themselves, both of which were found to have leaky floors." (Docket Entry # 33, Ex. 3; capitalization omitted and commas added).

Ex. 2).  Wilson testified to hearing about oil spills during this time period from his "superiors at the [MBTA]."  (Docket Entry # 35, Ex. 3 & 6).  House and certain other MBTA employees were therefore "aware that releases of fuel occurred at the Terminal prior to June 1983."[4]  (Docket Entry # 39, ¶ 15).

House additionally recalls meetings at the Terminal between 1979 and 1983 but he could not remember any discussions or meetings about environmental conditions or regulators.  Rather, the subject matter of such meetings primarily consisted of equipment maintenance.[5]

_____

[4]  House could not, however, recall a July 1979 or a June 1982 spill into the Millers River.

[5]  The averment of James Hennemann ("Hennemann"), a B & M employee at the Terminal from 1979 to 1986, that MBTA personnel regularly attended meetings in the early 1980s regarding "environmental issues" and recognized the need for a cleanup (Docket Entry # 35, ¶ 29) does not constitute a discussion about the prospect of regulatory involvement other than by the USCG in connection with spillage into nearby rivers.  Depositions clarify that these "environmental meetings" addressed the leak in the 1,000,000 oil tank, see fn. 3, and the need to develop a better fueling system with tanks that would shut off automatically when full.  Roger D. Bergeron, Assistant Vice President of Engineering at B & M and a B & M  employee at the Terminal prior to 1983, also testified that to his knowledge neither he nor anyone else at B & M discussed environmental issues relating to the Terminal with the MBTA prior to 1984.  (Docket Entry # 33, Ex. 5).
There was also one meeting in 1980 of B & M officials and either one or two MBTA officials in which the participants discussed the need to clean up an area in and around the coach house, an engine house area used to service and repair diesel engines, in order to procure a building permit.  Thus, in 1982 or 1983 before undertaking the construction, Wilson discussed with Daniel Breen, a member of the MBTA's engineering staff, the need to clean up and remove contaminated soil before undertaking the construction.  As is typical of any engine house in the United States, there was an "accumulation of heavy greases."  The

Furthermore, Wilson did not know if the MBTA "ever received notices of any fines or penalties" relating to releases at the Terminal during the 1979 to 1983 time period. (Docket Entry # 35, Ex. 3). He had never heard of any state or federal environmental regulators coming to the Terminal during this four year period. Wilson never had any discussions with anyone from B & M or the MBTA about communications from state or federal regulators regarding the Terminal during the 1979 to 1983 time period. (Docket Entry # 47, Ex. C). Similarly, House could not remember seeing anyone from the USCG or any state or federal regulators at the Terminal between 1979 and 1983. (Docket Entry # 47, Ex. A).

In the 1970s and the early 1980s, "oil was released from the [Terminal] into the Millers River and/or the Charles River" on "several occasions." (Docket Entry # 39, ¶ 16). In addition to the aforementioned 1977 incident, a second incident involving the USCG occurred in July 1979. Specifically, on July 19, 1979, the USCG responded to an oil spill into the Millers River concerning the MDC. A USCG official visited a B & M office, advised a B & M official of the severity of the spill and then went down to the site to take samples of the chamber and the river. Shortly thereafter, J. L. Ford ("Ford"), a B & M Supervisor, arrived and

---

removed soil was contaminated with fuel oil and lubricants which were removed prior to the 1984 construction. (Docket Entry # 35, Ex. 43, 46 & 47; Docket Entry # 33, Ex. 1, p. 7).

"took control of the problem." (Docket Entry # 35, Ex, 6). Ford advised the USCG official that B & M would add new booms and pump out the oil in the chamber. Ford met with another USCG official at the Terminal a few days later to discuss the problem and ascertain the action taken to date. At that time, Ford stated that B & M would assume the cost of removing the 900 to 1,000 gallons of oil from the river. Ford was also in the process of installing new booms in the river. The relevant memoranda do not mention or refer to the MBTA as taking responsibility for the spill.

Also in July 1979, Ford testified that pit 42 at the Terminal was filled "up to track level with oil and water." (Docket Entry # 35, Ex. 25). He described "a one inch coat of heavy oil" or the equivalent of 200 gallons of oil and that the pit was "constantly filling" up with oil thereby necessitating pumping every week and half to two weeks. Id. He also noted that "the entire ground area" was "saturated with oil from engines." Id. Ford's expressed concern, however, was that the "whole area was a fire hazard" as opposed to an environmental hazard of oil contamination in the ground. Id.

On December 14, 1980, a spill took place at the Budd House, an area used to fuel and lubricate diesel locomotives. The spill made its way into the floor drains and then "to the Yard 14 oil pit." (Docket Entry # 35, ¶ 16). B & M contractors pumped the approximately 14,000 to 15,000 gallons of oil from the pit. Id.

12

Most of the oil was held in the oil separator.  (Docket Entry # 50, Ex. 2).  When Boyd found out about the spill on December 14th, he telephoned a National Spill Response Center and contacted the USCG.  He also accepted responsibility for the spill on behalf of B & M.  While at the Terminal that day, Boyd spoke with two USCG officials one of whom advised Boyd that the USCG "would not be involved until there was an actual spill." (Docket Entry # 35, ¶ 16 & Ex. 27).  The USCG collected samples and a few days after the spill Boyd sent the USCG's Marine Safety Office a copy of an internal memoranda describing the spill and the cleanup efforts.  The only state regulatory record with respect to this inland and coastal oil spill was authored by the Division of Water Pollution Control Eastern Regional Office ("DWPC") of the Massachusetts Department of Environmental Quality ("DEQE").[6]  The DEQE later became the Massachusetts Department of Environmental Protection ("DEP").

Oil spill logs of the "DEP Northeast Regional Office" additionally reflect that an oil spill impacting the Millers and Charles Rivers took place at the Terminal on or about July 22, 1981.  B & M retained a contractor and the relevant log reflects the matter as closed.

The same logs contain another incident report of an oil

---

[6]  When reviewing the MBTA's partial summary judgment motion, this court draws the reasonable inference that the DWPC is a division of the DEQE.

13

spill on October 11, 1981, involving 1,100 gallons in the area of "Yard 5." (Docket Entry # 50, Ex. 4). Again, B & M retained a contractor to cleanup the spill and the relevant oil spill log of the DEP Northeast Regional Office reflects the matter as closed.

A few days later on October 19, 1981, a 20 gallon spill into the Millers River occurred. The spill of 20 gallons in the area of "Yard 5" possibly resulted from an overflow of the oil separator due to heavy rains the previous night. (Docket Entry # 35, ¶ 14 & Ex. 2; Docket Entry # 50, Ex. 5). Boyd reported the spill to the Division of Water Pollution Control, Eastern Regional Office. B & M retained cleanup contractors and accepted full responsibility for the spill. (Docket Entry # 50, Ex. 5).

On December 16, 1981, 100 gallons of oil spilled into the Millers River. The DEP Northeast Regional Office logs identify B & M as the responsible party. B & M retained a contractor to cleanup the site and the logs reflect the matter as closed. (Docket Entry # 50, Ex. 6).

The only other spill at the Terminal noted in the foregoing logs prior to June 1983 consisted of a 20 gallon spill at Mystic Junction on March 8, 1982.[7] The relevant log again identifies B & M as the responsible party. B & M retained a contractor and

_____

[7] Additional spills took place after the discharge date including spills in December 1983, June 2 and 4, 1984, June 27, 1985, October 21, 1986, and November 18, 1988. (Docket Entry # 50).

the logs reflect the matter as closed.

In sum, the majority of the foregoing spills gave rise to a need to prevent the spill from reaching the Millers and Charles Rivers.  Viewing the record in B & M's favor, MBTA officials knew about several fuel spills prior to March 1983 which were cleaned up.  In addition, House and Wilson were aware of areas of oil saturated ground or puddles.  The MBTA, however, was never listed as a responsible party for the foregoing spills and, consistent with the operating agreements, was not involved in either the occurrence or the cleanup of these spills.  Citations, fines or penalties for the spills were issued to the operators, B & M and/or the MDC, as opposed to the MBTA, the property owner.[8]

Other than the USCG, no federal or state environmental regulator visited the Terminal prior to June 1983.  The record fails to reflect any follow up to the incident reports issued by DWPC or to the spills noted in DEP Northeast Regional Office logs.  The record also fails to indicate the existence of a DEQE or DEP investigation of soil or groundwater contamination at the Terminal that was ongoing as of March or June 1983.  Other than the few samples taken by USCG officials, neither state nor federal regulators took samples or tested the soil for

_____

[8]  B & M relies on documents created after June 1983 to establish that the MBTA knew about the USCG involvement and the citations.  (Docket Entry # 24, ¶¶ 10-12 & Ex. 2 & 7).  Construing reasonable inferences in B & M's favor, however, does not lead to this retrospective assumption.  Even if it did, this would not alter this court's recommendation.

contamination until after June 1983.

The focus of "environmental" meetings that occurred prior to the discharge date and included one or more MBTA officials was <u>inter</u> <u>alia</u> on upgrading the fueling system, obtaining a permit for the coach house, identifying and fixing a leak in the 1,000,000 gallon storage tank and/or avoiding a fire hazard. At such meetings, there was no discussion of the need to involve DEQE or DEP environmental regulators during these meetings.

Prior to June 1983, the MBTA was involved with environmental regulators at other sites. Specifically, in 1979 state environmental officials from the DEQE investigated the presence of 184 drums filled with hazardous material on property owned by the MBTA in Woburn, Massachusetts. Wilson also recalled hearing about spills or releases of oil at MBTA facilities other than the Terminal.

As previously noted, on March 24, 1983, chapter 21E became effective and on June 17, 1983, the Consummation Order issued. B & M had not scheduled any chapter 21E liability or potential liability to the MBTA for contamination at the Terminal. The MBTA did not file a proof of claim in the bankruptcy proceeding with respect to B & M's liability under chapter 21E. (Docket Entry # 18, ¶ 16; Docket Entry # 36, ¶ 16).

In July 1984, Groundwater Technology, Inc. ("GTI"), consultants acting at the behest of the MBTA, completed an Oil Recovery Study at the Terminal. The purpose of the study, which

16

included groundwater monitoring wells and testing, was to ascertain the economic feasibility of recovering petroleum product from the soil. The study documented the presence of petroleum in the soil and groundwater. It also concluded that the oil could not be reused and recommended notifying the DEQE of conditions at the Terminal. (Docket Entry # 18, ¶ 20; Docket Entry # 36, ¶ 20; Docket Entry # 33, Ex. 1, pp. MBTA 00002579 & 00002586-00002587).

In October 1986, Boyd completed the aforementioned report, a three page document providing a background of oil pollution problems at the Terminal, for B & M's parent corporation. The report notes the MBTA's approval in 1984 of new automatic shut off valves at certain fueling locations.

On October 21, 1986, DEP Northeast Regional Office logs evidence a spill of one gallon of "PCB oil" at the old power house at the Terminal. The MBTA as well as B & M are listed as responsible parties.[9] A contractor was retained and the relevant log reflects the matter as closed. (Docket Entry # 50, Ex. 8).

---

[9] Another DEP Northeast Regional Office log identifies the MBTA as the responsible party for a 20 gallon spill of oil on June 27, 1985, at the gravel yard across from Boston Edison, a location which B & M asserts is likely at the Terminal. Thus, at most, the DEP first cited the MBTA as a responsible party in the foregoing logs for spillage at the Terminal no earlier than June 27, 1985, two years after the Consummation Order. The possibility of missing or unavailable files reflecting spills at the Terminal prior to June 1983 naming the MBTA as a responsible party (Docket Entry # 35, Att. 2) amounts to speculation. Indeed, the logs themselves list spills "up to" September 30, 1993. (Docket Entry # 50, Ex. 3, 4 & 6-9).

B & M continued to conduct operations at the Terminal until December 31, 1986. On January 1, 1987, Amtrak took over operations under a contract with the MBTA. (Docket Entry # 18, ¶ 21; Docket Entry # 36, ¶ 21; Docket Entry # 16, MBTA 00000084).

On November 18, 1988, a spill of diesel fuel occurred at the Terminal in the area of Yard 5. Clean Harbors, Inc. removed approximately 20,000 gallons of the spill estimated at 47,000 gallons by Amtrak personnel. (Docket Entry # 33, Ex. 1, p. 16). More notably, DEQE personnel verbally notified Amtrak of its responsibility for the release the same day. (Docket Entry # 33, Ex. 10).

By letter dated April 10, 1989, and addressed to Amtrak, the DEQE issued its first chapter 21E notice of responsibility and request for information for an oil spill at the Terminal. The notice centered around the November 18, 1988 spill. The MBTA's safety department received a copy of the letter which amounted to the first formal notification to the MBTA that the DEQE would require response action at the Terminal.[10]

In 1990, the MBTA created a separate environmental department. Prior thereto, the MBTA had two employees with responsibilities relating to environmental issues. Neither of these two employees became aware of the MBTA's potential

---

[10] The MBTA received its first notice of responsibility from the DEQE of chapter 21E liability concerning hazardous materials other than at the Terminal in 1986.

liability for a chapter 21E cleanup at the Terminal until the late 1980s when the DEQE became involved with the site.  (Docket Entry # 33, Ex. 13 & 14).

By letter dated July 31, 1989, addressed to Amtrak and copied to the MBTA's safety department, the DEQE advised Amtrak that no further emergency response actions were required.  The letter, however, noted remaining concerns requiring preparation of a preliminary assessment and a limited site investment of the Terminal.

As owner of the Terminal, the MBTA therefore submitted the preliminary site assessment and a phase I limited site investigation report to the DEQE in November 1989.  (Docket Entry # 18, ¶ 28; Docket Entry # 36, ¶ 28; Docket Entry # 33, Ex. 16). The study as well as subsequent investigations on the part of the MBTA uncovered extensive soil contamination at the Terminal.  The MBTA was ultimately required to undertake remedial actions at the Terminal to address and remediate the oil present in the soil and the groundwater.  In October 2002, GZA GeoEnvironmental, Inc. ("GZA") completed a phase V completion report and a class C response action outcome report on behalf of the MBTA for the DEP. (Docket Entry # 18, ¶ 29; Docket Entry # 36, ¶ 29; Docket Entry # 33, Ex. 17).

By letter dated May 4, 2004, an attorney representing the MBTA sent a demand letter under section 4A of chapter 21E to B & M's corporate counsel.  The letter notified B & M of its chapter

21E liability to the MBTA for past and future response costs incurred by the MBTA in responding to the release of oil and hazardous materials at the Terminal. (Docket Entry # 18, ¶ 31; Docket Entry # 36, ¶ 31; Docket Entry # 33, Ex. 18).


DISCUSSION

I.  Bankruptcy Discharge

Because B & M filed for bankruptcy protection "prior to the passage of the Bankruptcy Reform Act of 1978 . . . , the Bankruptcy Act of 1898 governs this case." In the Matter of Chicago, Milwaukee, St. Paul & Pacific Railroad, 974 F.2d 775, 780 (7th Cir. 1992); Zulkowski v. Consolidated Rail Co., 852 F.2d 73, 76 n. 5 (3rd Cir. 1988); 11 U.S.C. § 205 (repealed 1978). Section 77 of the Bankruptcy Act of 1898 ("section 77" or the "Bankruptcy Code"), 11 U.S.C. § 205, governs railroad reorganization proceedings. Id.

The Bankruptcy Code encourages the filing of all claims against the debtor in order to equitably distribute the debtor's remaining funds among creditors and provide the debtor with a "fresh start." In re Chicago, Milwaukee, St. Paul & Pacific Railroad, 974 F.2d at 779; In re National Gypsum Co., 139 B.R. 397, 405 n. 19 (N.D.Tex. 1992) (fundamental policy of Bankruptcy Code is to treat "similarly situated creditors equally" and provide "'fresh start'" to debtor "'without the threat of lingering claims "riding through" the bankruptcy'"). Equitable

distribution among creditors and a fresh start for the debtor
constitute "critical features" of all bankruptcy proceedings.
Central Virginia Community College v. Katz, __ U.S. __, 126 S.Ct.
990, 996 (2006) ("critical features of every bankruptcy
proceeding are . . . the equitable distribution of that property
among the debtor's creditors, and the ultimate discharge that
gives the debtor a 'fresh start'").  The Consummation Order,
entered under section 77(f), serves these goals.

A section 77 reorganization of a railroad is also a unique
proceeding with a greater emphasis upon rehabilitation of the
debtor railroad:

> [A] proceeding under § 77, 11 U.S.C. § 205, is not an
> ordinary proceeding in bankruptcy.  It is a special
> proceeding which seeks only to bring about a reorganization,
> if a satisfactory plan to that end can be devised.  And to
> prevent the attainment of that object is to defeat the very
> end the accomplishment of which was the sole aim of the
> Section, and thereby to render its provisions futile.

Continental Illinois Bank & Trust Co. of Chicago v. Chicago, Rock
Island & Pacific Railroad Co., 294 U.S. 648, 676 (1935); see
generally In re Matter of Boston and Maine Corp., 600 F.2d 307,
312 (1st Cir. 1979) (noting that in "railroad reorganization, a
trustee takes those assets and, in order to facilitate
rehabilitation, the claims of pre-filing creditors take a back
seat while post-filing creditors obtain priority as expenses of
administration").  Unlike ordinary bankruptcy proceedings, "whose
objective is a fair distribution of assets among creditors," a
proceeding under section 77 is "for reorganization which [is]

aimed at rehabilitation, possibly with all claims ultimately paid in full." <u>In re Yale Exp. System, Inc.</u>, 362 F.2d 111, 116 (2nd Cir. 1966).

Before more closely examining the inter-relationship of the Bankruptcy Code and chapter 21E, it is helpful to explore the contours of chapter 21E inasmuch as the "[d]etermination of whether a claim arises in bankruptcy requires an analysis of interests created by non-bankruptcy substantive law."[11] <u>In re National Gypsum Co.</u>, 139 B.R. at 405; <u>see also</u> <u>Ohio v. Kovacs</u>, 469 U.S. 274, 286 (1985) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law") (O'Connor, J., concurring).

Chapter 21E serves to "compel the prompt and efficient cleanup of hazardous material." <u>Acme Laundry Co., Inc. v. Secretary of Environmental Affairs</u>, 575 N.E.2d 1086, 1089 (Mass. 1991). The "primary purpose" of the statute is "to improve the Commonwealth's capability to respond to environmental contamination and to recover response costs from persons

---

[11] The MBTA is seeking to impose liability against the B & M under section four of chapter 21E as opposed to liability under the common law of nuisance or other statutory laws including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 <u>et</u> <u>seq.</u> ("CERCLA"). The relevant inquiry therefore focuses on the substantive contours of chapter 21E. To the extent tangentially relevant to the contention that such common and statutory laws existing prior to chapter 21E's enactment made the liability of B & M under chapter 21E that much more foreseeable, this court has considered that issue in the course of making its recommendation.

responsible for the contamination." <u>Taygeta Corp. v. Varian Associates, Inc.</u>, 763 N.E.2d 1053, 1059 (Mass. 2002). Hence, the "overall purpose" of the statute "is to force parties who are responsible for environmentally hazardous conditions rather than the taxpayers, to bear the costs of cleanup." <u>Commonwealth v. Boston Edison Co.</u>, 828 N.E.2d 16, 26 (Mass. 2005); <u>Taygeta Corp. v. Varian Associates, Inc.</u>, 763 N.E.2d at 1059 (chapter 21E was written "to ensure that costs and damages are borne by the appropriate responsible parties").

"A second significant purpose" of the statute "is to enable private persons 'to obtain a certain measure of compensation for loss resulting from environmental damage.'" <u>Taygeta Corp. v. Varian Associates, Inc.</u>, 763 N.E.2d at 1059. This secondary purpose of chapter 21E thereby parallels the "subsidiary policy" of CERCLA which is to promote "equitable allocations of environmental cleanup costs among responsible parties."[12] <u>In re Hemingway Transport, Inc.</u>, 993 F.2d 915, 924 (1st Cir. 1993).

Chapter 21E accomplishes these goals by imposing joint and several liability on an owner or operator of "a site from which there has been a release or threat of release of oil or hazardous material." Mass. Gen. L. ch. 21E, § 5(a); <u>Commonwealth v. Boston Edison Co.</u>, 828 N.E.2d at 27 (discussing Commonwealth's authority

---

[12] Chapter 21E is nonetheless broader than CERCLA inasmuch as it imposes cleanup liability for releases of oil as well as hazardous material. Mass. Gen. L. ch. 21E, § 5(a); 42 U.S.C. § 9601(14).

to pursue joint and several liability against section 5(a) liable parties).  The "owner or operator of a site" must notify the DEQE[13] "as soon as he has knowledge of a release or threat of release of oil or hazardous material."[14]  Mass. Gen. L. ch. 21E, § 7.  The MBTA did not notify the DEQE of a release or a threat of release of oil until after the discharge date.[15]

Once the DEQE receives notification, it can subject the property owner, operator or other liable person "to a five-phase assessment and remediation process."  Taygeta Corp. v. Varian Associates, Inc., 763 N.E.2d at 1059.  Although preliminary response actions may be all that is needed, Id. at 1060, the Terminal required five phases.  Under the statute, the burdens of notification, investigation and remediation fell equally upon the owner (the MBTA) and the operator (B & M until 1989) of the Terminal.  See Id. at 1060 ("clear import" of chapter 21E "is that the burdens of notification, investigation, assessment, and remediation fall squarely on the owner" or "operator" of the property that is the source of the contamination).

---

[13]  Unless otherwise indicated, references to either the DEQ or the DEQE refer to both the DEQ and its predecessor, the DEQE.

[14]  Notification allows the responsible party to avail itself of defenses provided in section 5(c).  Oliveira v. Pereira, 605 N.E.2d 287, 289 (Mass. 1992).

[15]  B & M notified the USCG and/or the National Spill Response Center with respect to several spills prior to the discharge date.  These spills were fully resolved without the involvement of the MBTA or the MBTA incurring response costs.

24

Under chapter 21E, the DEQ is not required to file suit against a liable person.  Instead, once the DEQE discovers, through notification or otherwise, the presence or threat of release of hazardous material or oil, the agency has the discretion "to file suit if and when appropriate in [its] judgment." Commonwealth v. Boston Edison, 828 N.E.2d at 25.  The DEQE is therefore not obligated to file a section five suit against a liable person whenever it "learns of contamination." Id. (describing such a requirement as "extraordinarily broad and burdensome").  The DEQE also has the discretion to choose which liable person (owner, operator or other designated category of "persons liable" under section 5(a)) it will sue for cleanup costs.[16]  Id. at 24-25 ("[c]hapter 21E does not mandate suit against every potentially liable party").

Section four of the statute serves the secondary purpose behind chapter 21E of enabling an equitable allocation of response costs among responsible parties.  At the time of the discharge date, chapter 21E gave the "person who undertakes" a cleanup the ability to "sue other liable parties under § 4 for reimbursement of cleanup costs already paid." Black v. Coastal Oil New England, Inc., 699 N.E.2d 353, 355 (Mass.App.Ct. 1998); Redstone v. Signore, 1995 WL 1146177 at * 2 (Mass.Super. Dec. 8,

---

[16]  Prior to the discharge date, B & M, as opposed to the MBTA, was the responsible party named in the DEP Northeast Regional Office logs.

1995) (inasmuch as the "plaintiffs commenced the present suit on June 22, 1992, prior to the enactment and effectiveness of § 4A, the sufficiency of [the] plaintiffs' claim must be determined under the former version of G.L. ch. 21E, § 4").

In June 1983, the contours of section four gave "[a]ny person who undertakes assessment, containment or removal" the ability to seek "reimbursement from any other person liable" only for cleanup costs already paid. Mass. Gen. L. ch. 21E, § 4; Black v. Coastal Oil New England, Inc., 699 N.E.2d at 355.[17] Section four did not encompass liability for future or unincurred cleanup costs resulting from past releases. Mailman's Steam Carpet Cleaning v. Lizotte, 616 N.E.2d 85, 90-91 (Mass. 1993) (section four cause of action "is limited to reimbursement of cleanup costs already paid by the party seeking recovery"); accord Oliveira v. Pereira, 605 N.E.2d 287, 290 (Mass. 1992) ("[s]ection 4 simply allows for reimbursement of expenditures made").

The terms of section four in June 1983 also did not require the plaintiff to wait until the DEQE sought damages or corrective measures before filing a section four action. Sheehy v. Lipton Industries, 507 N.E.2d 781, 787 (Mass.App.Ct. 1987). Rather, as

---

[17] The Massachusetts legislature amended chapter 21E in 1992 to allow a party to seek reimbursement and contribution toward future response costs before commencing cleanup after complying with notice and dispute resolution procedures. Black v. Coastal Oil New England, Inc., 699 N.E.2d at 355; see Mass. Gen. L. ch. 21E, § 4A.

long as the person had undertaken assessment, containment or
removal action, section four gave the person the ability to
recoup existing or past expenditures from a person who fell
within one of the categories of persons liable under section
five. Martignetti v. Haigh-Farr, Inc., 680 N.E.2d 1131, 1135
(Mass. 1997) (a person liable under section four had to fall
under "one of the categories of liability listed in § 5"); Mass.
Gen. L. ch. 21E, § 4 (1983).

Dicta in footnote ten in the SJC's Reynolds decision,
Reynolds Brothers, Inc. v. Texaco, 647 N.E.2d 1205, 1209 n. 10
(Mass. 1995), relied upon by B & M, simply recognizes that a
section four cause of action arises before the DEP imposes
obligations upon a section four plaintiff. See Reynolds
Brothers, Inc. v. Texaco, 647 N.E.2d at 1209 n. 10 (rejecting
argument that section four claim did not arise until "DEP imposed
obligations on the plaintiff" and noting in dicta that section
four "private right of action exists regardless of any DEP
involvement"); Atlas Tack Corporation v. Crosby, 671 N.E.2d 954,
956 n. 5 (Mass.App.Ct. 1996) (citing footnote ten in Reynolds and
noting that "regardless of any involvement by the DEP, there is a
private right of action in favor of any person who undertakes the
removal of oil or hazardous material and who seeks recovery of
response costs from the person liable for the contamination").
By the terms of the statute, a section four private right of
action was nonetheless still dependent upon the person

27

voluntarily undertaking assessment, containment or recovery action, incurring response costs and then seeking reimbursement for such past costs from the other liable person.[18]

The interplay between the goals of chapter 21E and the Bankruptcy Code is not always without conflict.  Similar to the relationship between the Bankruptcy Code as amended by the Bankruptcy Reform Act of 1978 and CERCLA, the Bankruptcy Code and chapter 21E at times serve competing objectives.  See In re Chateaugay Corporation, 944 F.2d 997, 1002 (2nd Cir. 1991).

For example, prematurely cutting off environmental cleanup liability via bankruptcy by ensuring that all claims are before the bankruptcy court and giving the debtor a fresh start, see In re Chicago, Milwaukee, St. Paul & Pacific Railroad, 974 F.2d at 779 (bankruptcy court cannot properly evaluate a reorganization unless apprised of all claims against debtor), can frustrate chapter 21E's goal of ensuring that the parties responsible for the hazardous condition bear the costs of cleanup.  Commonwealth v. Boston Edison Co., 828 N.E.2d at 26.  Thus, construing the term "claim" to encompass an unliquidated or unforeseeable claim

---

[18]  Undertaking the "assessment, containment or removal action," terms which refer to a response action, Mass. Gen. L. ch. 21E, § 2 (defining "response action" as assessment, containment and removal), in section four required compliance with chapter 21E.  If licenses had been issued to professional cleanup contractors and requirements for permits had been promulgated, the section four plaintiff also had to obtain a building permit from the DEQE.  Mass. Gen. L. ch. 21E, § 3(d) (1983).

for a chapter 21E response action may leave the section four plaintiff incurring costs far greater in amount than his equitable share. See generally In re Hemingway Transport, Inc., 993 F.2d at 924 (because CERCLA's onerous remediation process may take years to complete, it may leave a potentially responsible party shouldering the bulk of the costs).

Conversely, excluding unincurred section five response costs and unincurred section four costs frustrates the Bankruptcy Code's goal of having all claims before it and equitably distributing the debtor's assets among all creditors. If unincurred chapter 21 response costs are not claims, then the reorganized entity faces the prospect of significant and possible insurmountable environmental liability in the future. See generally In re Chateaugay Corporation, 944 F.2d at 1005. Placing such future costs outside the reach of the term "claims" does not serve the public interest behind the statute of preserving the railroad "as a going concern." Gardner v. State of New Jersey, 329 U.S. 565, 577 (1947); Baker v. Southeastern Michigan Shippers Cooperative, Association, 376 F.Supp. 149, 155 (D.Mich. 1973) (characterizing the public interest in the survival of the railroad envisioned in section 77 as "compelling"). At the same time, such a construction more likely satisfies chapter 21E's goal of ensuring that the person responsible for the contamination and not the taxpayer pays the cost of remediation.

29

On the other hand, chapter 21E's goal of encouraging an efficient and prompt cleanup, <u>Taygeta Corporation v. Varian Associates, Inc.</u>, 763 N.E.2d 1053, 1059 (Mass. 2002), serves to fix contingent claims at an earlier date thereby serving the Bankruptcy Code's goal of ensuring that all claims against the debtor are before the court.  <u>See</u> <u>In the Matter of Chicago, Milwaukee, St. Paul & Pacific Railroad</u>, 974 F.2d at 779; <u>see</u> <u>In re Hemingway Transport, Inc.</u>, 993 F.2d at 925.  A broad interpretation of the term "claim" as encompassing unincurred costs for remediation fosters chapter 21E's goal of prompt and efficient cleanups by encouraging property owners to solidify their claims by engaging in necessary cleanup actions in time to file a viable claim against the debtor.  <u>See</u> <u>generally</u> <u>In re Hemingway Transport, Inc.</u>, 993 F.2d at 925.  The Bankruptcy Code's goal of giving debtors a fresh start is undeniably frustrated when creditors fail to file timely claims and then later attempt "to bring claims against a reorganized company after the close of bankruptcy."  <u>In the Matter of Chicago, Milwaukee, St. Paul & Pacific Railroad</u>, 974 F.2d at 779.  Likewise, chapter 21E's goal of a prompt cleanup is not well served.

Recognizing the presence or absence of conflicts between the policies of chapter 21E and the Bankruptcy Code, the analysis must nonetheless begin with the text of the Bankruptcy Code.  <u>See</u> <u>In the Matter of Chicago, Milwaukee St. Paul & Pacific Railroad</u>

<u>Co.</u>, 3 F.3d 200, 206 (7th Cir. 1993) ("[o]ur analysis must begin with the definition of a 'claim' under the Bankruptcy Act of 1898"); <u>see</u>, <u>e.g.</u>, <u>Ohio v. Kovacs</u>, 469 U.S. at 278-280 (focusing on Bankruptcy Reform Act's definition of "claim" in evaluating dischargeability of debtor's obligation to comply with state court injunction to cleanup site).  Thus, although the parties ably set forth the different tests employed in other circuits to ascertain when liability for environmental cleanup under CERCLA becomes a "claim" for purposes of bankruptcy proceedings, <u>see</u> Kevin J. Saville *Discharging CERCLA Liability in Bankruptcy: When Does a Claim Arise?*, 76 Minn.L.Rev. 327 (1991); <u>Signature Combs, Inc. v. United States</u>, 253 F.Supp.2d 1028, 1032-1038 (W.D.Tenn. 2003) (setting forth and analyzing in depth all four tests before adopting fair contemplation test),[19] the task of this court begins with the plain language of the statutory text.

This is the teaching of the only First Circuit opinion to address the interplay between the policies of CERCLA and the policies of the Bankruptcy Reform Act of 1978, codified as amended at 11 U.S.C. §§ 101-1330 (1988) ("the Bankruptcy Reform Act").  <u>In re Hemingway Transport, Inc.</u>, 993 F.2d at 924. Although the First Circuit in <u>Hemingway</u> addressed a different issue and a different section of the Bankruptcy Reform Act, its

---

[19]  These four tests or approaches are often referred to as the right to payment test, the underlying act test, the relationship test and the fair contemplation test.

instruction is to focus first on the language of the bankruptcy statute.[20]  Id. ("notwithstanding the purposive liberality with which courts are to construe CERCLA's remedial provisions, . . . Bankruptcy Code § 502(e)(1)(B) obliges a construction consistent with its plain terms") (citations omitted).  The plain language of a statute determines its meaning and when "it points in a single direction, an inquiring court ordinarily should look no further."  In re 229 Main Street Limited Partnership, 262 F.3d 1, 5 (1st Cir. 2001).

Turning to the language of the statute, section 77 of the Bankruptcy Code governs railroad reorganizations oftentimes to the exclusion of other Title 11 chapters.  See, e.g., 11 U.S.C. § 702 (repealed) (incorporating certain chapters but not the chapter applicable to railroad reorganizations).  It allows the

---

[20]  In urging application of the relationship test, B & M relies upon a different part of the Hemingway opinion, which quotes the lower court and reads as follows:

"Juniper's cause of action under CERCLA arose when the property containing the drums was transferred to Juniper or, alternatively, when Juniper expended money in response to the EPA's administrative order."

Id. at 928 n. 16.  The passage does not yield the result B & M seeks.  Instead, the foregoing dicta simply recognizes the existence of different and alternative approaches to fixing the time at which a claim for environmental response costs arises for bankruptcy purposes.  Indeed, the body of the opinion at this juncture merely notes and emphasizes that "at the earliest" the right to payment from Hemingway arose at the time Hemingway purchased the facility.  Id. at 928 (emphasis in original).  Hence, the opinion does not dictate an application of the relationship test adopted by the Second Circuit in Chateaugay, 944 F.2d at 1005.

railroad debtor to emerge from bankruptcy as a reorganized entity
"free and clear of all claims of the debtor . . . and the debtor
shall be discharged from its debts and liabilities."  11 U.S.C. §
205(f) (repealed 1978).[21]

The subsection of the statute directly at issue defines the
term "claims" broadly, 11 U.S.C. § 205(b), although not as
broadly as the language in the Bankruptcy Reform Act of 1978, 11
U.S.C. § 101(4)(A) & (B).  See 11 U.S.C. § 101(4) (1978)
(recognizing that the newly adopted definition of the term
"claim" in the Bankruptcy Reform Act of 1978 was "even broader"
than the definition in the existing rehabilitation chapters).[22]
Thus, the Bankruptcy Code does not include the express language
subsequently inserted in the Bankruptcy Reform Act defining the

_____

[21]  In greater detail, the statutory section reads as
follows:

> [T]he property dealt with by the plan, where transferred and
> conveyed to the debtor or to the other corporation or
> corporations provided for by the plan, or when retained by
> the debtor pursuant to the plan, shall be free and clear of
> all claims of the debtor, its stockholders and creditors,
> and the debtors shall be discharged from its debts and
> liabilities.

11 U.S.C. § 205(f).

[22]  Of course, these statements do not provide an indication
of Congress' intent at the earlier point in time when it enacted
section 77 of the Bankruptcy Code and this court does not
consider these statements as evidence of such intent.

term "claim" as a right to payment that includes "contingent"[23] and "unmatured" claims.[24]

The plain language of the Bankruptcy Code applicable to railroads defines the term "claims" to include "debts, whether liquidated or unliquidated, securities (other than stock option warrants to subscribe to stocks), liens, or other interests of whatever character." 11 U.S.C. § 205(b). The Code's use of the term "unliquidated" evidences that a "creditor need not have a cause of action that is ripe for suit outside bankruptcy in order for it to have a pre-petition claim for purposes of the Code." In re National Gypsum Co., 139 B.R. at 405 (use of the terms "'contingent' 'unliquidated' and 'unmatured'" in 11 U.S.C. §

---

[23] As discussed below, case law relying on the breadth of the definition of claims to include "interests of whatever character" extends the term "claims" to include contingent claims.

[24] Given the difference in language used in section 77(b) and the Bankruptcy Reform Act, case law interpreting the subsequently enacted broader versions of the bankruptcy laws in the context of the dischargeability of CERCLA claims based upon the pre-consummation conduct of the debtor, see, e.g., In re Chateaugay Corporation, 944 F.2d at 1002 & 1004-1005 (adopting debtor creditor relationship approach as means to ascertain when CERCLA claim based upon pre-consummation conduct of debtor arises), provides guidance but is nonetheless not exactly on point. But see Am International, Inc. v. Datacard Corp., 106 F.3d 1342, 1347 (7th Cir. 1997) (applying prior Seventh Circuit case law interpreting breadth of section 77's definition of term "claims" to interpretation of term "claim" under Bankruptcy Reform Act). Thus, the Second Circuit's decision in Chateaugay is distinguishable on the basis that the court heavily focused on the language used in the Bankruptcy Reform Act of 1978 which defines a "claim" as a "right to payment." See In re Chateaugay Corporation, 944 F.2d at 1002-1005.

101(4) supports foregoing finding).  The accrual of a cause of action under state law is therefore not required in order to have a "claim" within the meaning of section 77(b).  11 U.S.C. § 205(b).

In enacting section 77, 11 U.S.C. § 205, Congress also knew how to qualify the term "claims" to personal injury claims.  <u>See</u> 11 U.S.C. § 205(n) (affording preferential treatment to "claims for personal injuries" to railroad employees).  Whereas Congress chose to limit section 77(n) claims to personal injury claims, it chose not to limit section 77(b) claims to personal injury claims.  Because identifiable and compensable injuries constitute a "[b]asic element of a tort claim," <u>In re Matter of Reading</u>, 115 F.3d 1111, 1121 (3rd Cir. 1997), it is evident that Congress purposefully chose to include tort claims in section 77(b).  In other words, by choosing not to limit or otherwise qualify the term "claims" in subsection (b) to "personal injury" claims, even though Congress knew how to do so in subsection (n), Congress chose to give the term "claims" its full effect as including both tort as well as contract claims.  <u>See</u> <u>In re 229 Main Street Limited Partnership</u>, 262 F.3d at 5-6 (recognizing presumption that Congress acts intentionally "in the disparate inclusion or exclusion" of terms in statutory sections); <u>see</u> <u>also</u> <u>Schweitzer v. Consolidated Rail Corp.</u>, 758 F.2d 936, 941 (3rd Cir. 1985) ("[i]t is undisputed that a cause of action in tort is a 'claim' pursuant to Section 77").

35

Section 77(b) also defines "claims" as including liquidated and unliquidated debts. The plain meaning of a "liquidated" debt is a debt readily ascertainable in amount notwithstanding a dispute as to legal validity. In re Dow Corning Corp., 215 B.R. 346, 357 (Bankr.E.D.Mich. 1997) (albeit interpreting term under Bankruptcy Reform Act). "[E]very circuit and nearly every other court" to address the term "liquidated" concludes that the term "'relates only to the amount of any liability'" and "'does not concern the existence of liability itself.'" Id. (collecting authority). Conversely, an "unliquidated" debt is one where the amount is not readily ascertainable regardless of whether the underlying liability is in dispute. See generally Id. at 357-359 & nn. 9 & 13. Hence, a dispute as to the amount of a debt under section 77(b) does not place the dispute outside the reach of the term "claims."

Tort claims are commonly considered unliquidated, see In re Quigley Co., 346 B.R. 647, 653 (Bankr.S.D.N.Y. 2006), until a judgment at which point they became provable debts under general bankruptcy proceedings prior to the Bankruptcy Reform Act of 1978. See Lewis v. Robert, 267 U.S. 467 (1925); Miller v. Anckaitis, 436 F.2d 115, 120 (3rd Cir. 1970). Debts which may be proved consisted of debts with "a fixed liability, as evidenced by a judgment," 11 U.S.C. § 103(a), thereby leading to the inclusion of tort claims when reduced to a judgment. Thus, prior to the Bankruptcy Reform Act of 1978, "[p]rovable debts did not

36

include unliquidated tort claims" but did include tort judgments
under the Bankruptcy Act of 1898.  Miller v. Anckaitis, 436 F.2d
at 120; accord Vickers v. Home Indemnity Co., Inc., 546 F.2d
1149, 1151 (5th Cir. 1977) (Bankruptcy Code prior to 1978 deemed
unliquidated tort claims not provable and, hence, not
dischargeable).  The express and the more specific language in
the statutory section applicable to railroad reorganizations, 11
U.S.C. § 205(b), however, controls.

The language of the paragraph immediately preceding the
paragraph that defines the term "claims" in section 77(b) states
that the term "creditors" includes "all holders of claims of
whatever character against the debtor or its property, *whether or
not such claims would otherwise constitute provable claims* under
this title."  11 U.S.C. § 205(b) (emphasis added).  The plain
meaning of such language places creditors with claims, whether
arising in tort or contract, outside the reach of the Bankruptcy
Code's general requirement that claims be provable.[25]  See 11
U.S.C. §§ 93(d) & 103(d); In re Chicago, Milwaukee, St. Paul &

---

[25] The term "debts" is not defined in 11 U.S.C. § 205(b).
Normally, therefore, the definition of the term applicable to the
entire title would govern.  That definition defines "debt" as
including "any debt, demand or claim provable in bankruptcy."  11
U.S.C. § 1(14) (repealed 1978).  The more specific version of the
statute, however, defines "creditor" as any person with a "claim"
whether or not that claim is provable and "claims" as including
"debts" or "interests of whatever character."  11 U.S.C. §
205(b).  The term "claims" includes "debts" and hence debts under
section 77(b) do not have to be provable debts.

Pacific Railroad Co., 27 F.Supp. 685, 687-688 (N.D.Ill. 1939);
see, e.g., In re Radio-Keith-Orpheum Corp., 106 F.2d 22, 26 (2nd
Cir. 1939).  Indeed, General Order 49 expressly excludes section
77 proceedings from the general order applicable to proofs of
claims.  Order 49, 11 U.S.C. app. §§ 1-1200.

In light of the foregoing structure and language used in
section 77(b), unprovable tort claims disputed in amount fall
comfortably within the scope of the language "interests of
whatever character."  Such a construction lends meaning to the
words "interests of whatever character."  See Duncan v. Walker,
533 U.S. 167, 174 (2001) ("statute ought, upon the whole, to be
so construed that, if it can be prevented, no clause, sentence,
or word shall be superfluous, void, or insignificant") (internal
quotations marks omitted); Liberty Cablevision of Puerto Rico,
Inc. v. Municipality Of Caguas, 417 F.3d 216, 223 (1st Cir.
2005).  Unprovable tort claims disputed in amount also embrace
objects similar in character to unliquidated and unprovable
debts.  See Circuit City Stores, Inc. v. Adams, 532 U.S. 105,
114-115 (2001) (under statutory cannon "maxim ejusdem generis,"
where "general words follow specific words in a statutory
enumeration, the general words are construed to embrace only
objects similar in nature to those objects enumerated by the
preceding specific words").[26]  Accordingly, unprovable tort or

---

[26]  Construing the language "other interests of whatever
character" too broadly yields a construction wherein the specific

38

quasi tort claims disputed in amount and prior to a reduction to judgment constitute "claims" within the meaning of the Bankruptcy Code, 11 U.S.C. § 205(b).

The issue next arises as to whether "other interests of whatever character," 11 U.S.C. § 205(b), extends to contingent tort, quasi-tort or contract claims.[27]  Broadly speaking, contingent claims are claims that depend upon the happening of a future event.  See Black's Law Dictionary 241 (7th ed. 1999) (defining "contingent claim" as "claim that has not yet accrued and is dependent on some future event that may never happen"); see also Matter of Provincetown-Boston Airlines, Inc., 72 B.R. 307, 310 (Bankr.M.D.Fla. 1987) (case under Bankruptcy Reform Act of 1978 wherein court noted that, "contingent claim is by definition a claim which has not yet accrued and which is dependent upon some future event that may never happen").  More

---

words (debts, securities and liens) become superfluous because they would be subsumed by the all encompassing nature of "other interests of whatever character."  See Id. at 114.  This "canon does not control, however, when the whole context dictates a different conclusion."  Norfolk and Western Railway Co. v. American Train Dispatchers Association, 499 U.S. 117, 129 (1991).

[27]  Congress included "contingent debts" and "contingent contractual liabilities" as part of the list of debts that may be proved in the Chandler Act of 1938.  11 U.S.C. § 103(a)(8) (repealed 1978).  By abolishing the provability requirement for railroad reorganizations, however, Congress made this list inapplicable to railroad reorganizations.  As previously noted, the present Bankruptcy Reform Act includes the adjective contingent to describe "claims" whereas the Bankruptcy Code applicable to railroad reorganizations does not include this adjective.

specifically, "claims are contingent" if "the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor and if such triggering event or occurrence was one reasonably contemplated by the debtor and creditor at the time the event giving rise to the claim occurred."  In re All Media Properties, Inc., 5 B.R. 126, 133 (Bankr.S.D.Tex. 1980); accord In re Chateaugay Corporation, 944 F.2d at 1004 (words "contingent" and "unmatured" in the Bankruptcy Reform Act of 1978's definition of the term claim "usually refer to obligations that will become due upon the happening of a future event that was 'within the actual or presumed contemplation of the parties at the time'") (quoting In re All Media Properties, Inc., 5 B.R. at 133).

The foregoing definitions in the context of a tort claim are therefore similar to albeit more encompassing than an unprovable, unliquidated tort claim.[28]  Inasmuch as unprovable tort claims disputed in amount and, prior to a reduction to judgment, disputed as to liability, constitute "interests of whatever character" within the meaning of section 77(b), the language

---

[28]  As explained supra, tort claims are considered unliquidated until a judgment at which point they became provable debts under general bankruptcy proceedings prior to the Bankruptcy Reform Act of 1978.  Provable debts arise where liability is fixed as evidenced by a judgment.  Conversely, unprovable tort claims, which the plain language of section 77(b) encompasses, are tort claims that exist prior to final judgment which are disputed in amount.

40

encompasses the similar interest of a contingent tort claim.
Moreover, the official comment to section 77(b) supports the
inclusion of contingent claims as constituting section 77(b)
claims.  See Pinney Dock and Transportation Co. v. Penn. Central
Corp., 1982 WL 1914 at * 5 n. 3 (N.D.Ohio Nov. 9, 1982).  As
discussed below, however, Congress did not intend to include
contingent claims in the broader sense of the word but rather in
the narrower sense of the word as circumscribed by the future
events being within the presumed contemplation of the parties.

Quasi-tort or tort claims[29] to recover reimbursement from a
polluter under section four of chapter 21E are in the nature of
contingent claims.  See, e.g., In re Hemingway Transport, Inc.,
993 F.2d at 923 ("claim remained 'contingent' until such time (if
ever) as EPA were to call upon Juniper to pay any future CERCLA
response costs incurred for further cleanup or remediation of the
facility").  They depend upon the happening of future events such
as the discretionary decision of the Commonwealth to call upon a
responsible party to contain or remove the hazardous material,

---

[29]  The First Circuit in Hemingway characterizes CERCLA
obligations as "quasi tort."  In re Hemingway Transport, Inc.,
993 F.2d at 923.  CERCLA claims, like chapter 21E claims, are not
contract obligations inasmuch as the regulatory body's
relationship with the responsible party lacks the "bargained-for
obligation" among contractual parties who voluntarily enter into
a contract.  Signature Combs, Inc. v. United States, 253
F.Supp.2d at 1038.  The SJC characterizes the "essential nature"
of a section four claim prior to the 1992 amendments to chapter
21E as "sound[ing] in tort."  Oliveira v. Pereira, 605 N.E.2d at
290.

see Commonwealth v. Boston Edison Co., 828 N.E.2d at 25, or the
actual undertaking by "[a]ny person" of "assessment, containment
or removal action."  Mass. Gen. L. ch. 21E, § 4.  As previously
explained, the latter type of section four action does not depend
upon DEQE involvement but it does depend upon a person
undertaking assessment, containment or removal action for past
contamination and then seeking reimbursement from another person,
provided that the person falls under the categories of liable
persons set forth in section 5(a).[30]

     Classifying or characterizing a tort or quasi-tort claim as
contingent without the additional qualifying language in All
Media Properties and Chateaugay making the future event "within
the actual or presumed contemplation of the parties," In re All
Media Properties, Inc., 5 B.R. at 133; In re Chateaugay
Corporation, 944 F.2d at 1004, however, reaches a broad and
diverse group of claims including those that Congress did not
intend to encompass in the language "debts, whether liquidated or
unliquidated, securities . . ., liens or other interests of

---

     [30] Recognizing this fact, the SJC in Reynolds nevertheless
adhered to the fair contemplation test and employed indicia
largely dependent upon regulatory involvement such as DEQE
citations for noncompliance with cleanup requirements, citations
by a local board of health of the need to cleanup the site and
retention of an engineering firm that confirmed the soil
contamination and recommended a cleanup.  See Reynolds Brothers,
Inc. v. Texaco, 647 N.E.2d at 1208-1210 (applying fair
contemplation test as proper means to determine whether chapter
21E cause of action constituted a "claim" for purposes of the
Bankruptcy Reform Act of 1978).

whatever character." 11 U.S.C. § 205(b). For example, it is reasonable to assume that Congress did not intend to override the fundamental and constitutional requirements of due process. Like other bankruptcy statutes, the Bankruptcy Code requires that, "The judge shall cause reasonable notice of the period in which claims may be filed." 11 U.S.C. § 205(c)(8) (repealed 1978);[31] see also City of New York v. New York, 344 U.S. 293 (1953) (discussing notice requirements in railroad reorganizations under section 77); In re Savage Industries, Inc., 43 F.3d 714, 720 (1st Cir. 1994) ("[n]otice is the cornerstone underpinning Bankruptcy Code procedure").

Yet, conceivably, contingent claims merely dependent upon the happening of a future event include claims by tort victims who neither knew nor should have known of their injuries or claims prior to the bar date. See In the Matter of Chicago, Milwaukee, St. Paul & Pacific Railroad, 974 F.2d at 782 (discussing Schweitzer, 758 F.2d at 940-944, involving victims exposed to asbestos with subclinical injuries prior to railroad's section 77 reorganization whose injuries surfaced after bar date

---

[31] The plain statutory language of section 77(b) should be viewed within the context of the other statutory subsections. General Motors Corp. v. Darling's, 444 F.3d 98, 108 (1st Cir. 2006) ("we 'examin[e] the plain meaning of the statutory language and consider[ ] the language in the context of the whole statutory scheme'"); Goldings v. Winn, 383 F.3d 17, 32 (1st Cir. 2004); Plumley v. Southern Container, Inc., 303 F.3d 364, 370 (1st Cir. 2002) ("task of statutory construction often is informed by reading the whole of the statute").

as militating against discharge of claims or contingent claims);

Schweitzer v. Consolidated Rail Corp., 758 F.2d at 942,

(acknowledging that "person may hold a 'contingent' claim and

thereby be a 'creditor'" under section 77(b)).[32]  "[N]othing in

the legislative history" of the even broader Bankruptcy Reform

Act, which *expressly* includes estimation provisions, however,

"'suggests that Congress intended to discharge a creditor's

rights before the creditor knew or should have known that its

rights existed.'"  In re Jensen, 995 F.2d 925, 930 (9th Cir.

1993) (Bankruptcy Reform Act case); Signature Combs, Inc. v.

United States, 253 F.Supp.2d at 1035 (same); In re Hexcel Corp.,

239 B.R. 564, 570 (N.D.Cal. 1999).  Thus, a broad construction of

"interests of whatever character" in section 77(b) to include all

contingent interests that are simply dependent upon the happening

---

[32]  As pointed out by the court in Schweitzer, countless
railroad workers with contingent claims because they might never
manifest injuries would be forced to file claims resulting in
windfalls for those who never experience an illness.  Schweitzer
v. Consolidated Rail Corp., 758 F.2d at 942.  Although this court
does not endorse nor adhere to the right to payment approach
adopted by the Schweitzer court, this court agrees with the
reasoning that extending the interpretation of "interests" in
section 77(b) to include future tort actions with contingent
claims prior to the future event of a manifestation of their
injuries might raise "constitutional concerns."  Id. at 943; see
8 Collier on Bankruptcy ¶ 1141.06 (15th ed. 2006) ("it has been
suggested that . . . discharge of claims or the extinguishment of
interests without notice violates the Due Process Clause"); Kevin
J. Saville *Discharging CERCLA Liability in Bankruptcy:  When Does
a Claim Arise?*, 76 Minn.L.Rev. 327, 350 (1991) ("EPA's right to
notice under the Fifth Amendment also may limit the bankruptcy
court's ability to discharge CERCLA liability").

of any future event leads to the inclusion of claims which contravene constitutional and statutory notice provisions.  <u>See generally</u> <u>In re Chateaugay Corporation</u>, 944 F.2d at 1004 (collecting cases involving contingent claims by tort victims where injuries manifested after bar date).

　　As intimated above, in enacting section 77, Congress did not intend to cut off future creditors' environmental claims where the creditors neither knew nor had a reason to know of their claims.  <u>See</u> <u>In re Jensen</u>, 995 F.2d at 930 (nothing suggests congressional intent to discharge creditor's rights before "creditor knew or should have known that its rights existed"); <u>In re National Gypsum Co.</u>, 139 B.R. at 407-408 & n. 26 ("concept of 'fairly'" within fair contemplation test "is commensurate with the Code's requirement of adequate notice"); <u>see also</u> <u>Signature Combs, Inc. v. United States</u>, 253 F.Supp.2d at 1036 (criticizing one approach as running the risk of "violating the EPA's (or other creditors') right to reasonable notice prior to the discharge of a claim").  As these decisions clarify, any approach in determining the discharge of an environmental claim by a creditor for reimbursement of incurred cleanup costs arising from a debtor's pre-consummation conduct that fails to adequately account for the right of a creditor to receive notice of the bankruptcy proceeding and, more notably for the case at bar, have a reason to know of an environmental claim contravenes this intent.

The more specific qualifying language describing contingent claims as dependent upon the happening of a future event that was "within the actual or presumed contemplation of the parties," more closely comports with the concept of notice as well as the nature of debts, liens and securities, interests which typically involve original relationships among parties who know each other's identity.  See Circuit City Stores, Inc. v. Adams, 532 U.S. at 114-115.  Interpreting section 77(b) in this manner also mirrors the test used by the SJC in deciding when a cause of action under chapter 21E constitutes a "claim" under the Bankruptcy Reform Act of 1978.  Reynolds Brothers, Inc. v. Texaco, Inc., 647 N.E.2d at 1208 (adopting fair contemplation test as proper means to ascertain when chapter 21E action constitutes a "claim").  Like the fair contemplation test which forecloses future response costs based upon pre-consummation conduct "that can be fairly contemplated by the parties," Id., the narrower definition of a contingent claim depends upon "the happening of a future event that was 'within the actual or presumed contemplation of the parties at the time'" of their original relationship.  In re Chateaugay Corporation, 944 F.2d at 1004; In re All Media Properties, Inc., 5 B.R. at 133.

Of the various tests, the fair contemplation test provides the best means of drawing a line such that not all contingent tort or environmental claims fall under "other interests of whatever character" thereby adhering to the statutory cannon of

46

"maxim ejusdem generis." Circuit City Stores, Inc. v. Adams, 532
U.S. at 114-115. Although the words employed in section 77(b)
demonstrate Congressional intent to include a broad array of
claims including unprovable tort or quasi tort claims disputed in
amount, Congress did not intend to encompass every tangential or
contingent claim within the language "other interests of whatever
character" inasmuch as such a construction would render the more
specific terms (debts, liens and securities) superfluous. The
fair contemplation test further ensures that the potential
creditor has a reason to know of the claim against the debtor.
See In re Jensen, 995 F.2d at 930; In re Hexcel Corp., 239 B.R.
at 571; see generally In re Savage Industries, 43 F.3d at 721.

    The fair contemplation test dictates that "all future
response and natural resource damages cost based on prepetition
conduct that can be fairly contemplated by the parties at the
time of [d]ebtors' bankruptcy are claims under the [Bankruptcy]
Code." Reynolds Brothers, Inc. v. Texaco, Inc., 647 N.E.2d at
1208; In re Jensen, 995 F.2d at 930 (same). Relevant factors in
ascertaining whether the parties fairly contemplated the claim
include: "knowledge by the parties of a site in which a PRP
[potentially responsible party] may be liable, NPL [National
Priorities List] listing, notification by EPA [the Environmental
Protection Agency] of PRP liability, commencement of
investigation and cleanup activities, and incurrence of response
costs." Reynolds Brothers, Inc. v. Texaco, Inc., 647 N.E.2d at

47

1208.

Two cases involving CERCLA indemnity or response cost claims by private parties also apply the fair contemplation test.  <u>In the Matter of Chicago, Milwaukee St. Paul & Pacific Railroad Co.</u>, 3 F.3d 200 (7th Cir. 1993);[33] <u>Am International, Inc. v. Datacard Corp.</u>, 106 F.3d 1342, 1347 (7th Cir. 1997).[34]  Phrased slightly differently than in <u>Reynolds</u>, the Seventh Circuit in <u>Datacard</u> concludes that, "for discharge purposes, a CERCLA claim arises when the claimant can tie the bankruptcy debtor to a known release of a hazardous substance which this potential claimant knows will lead to CERCLA response costs."  <u>AM International, Inc. v. Datacard Corp.</u>, 106 F.3d at 1347.

Moreover, the majority of federal courts adhere to the fair contemplation approach in determining when an environmental cause of action under CERCLA becomes a claim subject to discharge in bankruptcy.  <u>See</u>, <u>e.g.</u>, <u>In re Crystal Oil Co.</u>, 158 F.3d 291, 296 (5th Cir. 1998); <u>AM International, Inc. v. Datacard Corp.</u>, 106 F.3d at 1347-1348; <u>In the Matter of Chicago, Milwaukee St. Paul & Pacific Railroad Co.</u>, 3 F.3d at 205; <u>In re Jensen</u>, 995 F.2d at 930; <u>In the Matter of Chicago, Milwaukee, St. Paul & Pacific</u>

---

[33]  The SJC in <u>Reynolds</u> cites this second <u>St. Paul</u> case as exemplifying the fair contemplation-foreseeability approach. <u>Reynolds Brothers, Inc. v. Texaco, Inc.</u>, 647 N.E.2d at 1208.

[34]  The court in <u>Combs</u> cites <u>Datacard</u> as an example of the fair contemplation approach.  <u>Signature Combs, Inc. v. United States</u>, 253 F.Supp.2d at 1037.

_Railroad_, 974 F.2d at 786-787; _Signature Combs, Inc. v. United States_, 253 F.Supp.2d at 1038-1039; _In re Hexcel Corp._, 239 B.R. at 570; _In re National Gypsum Co._, 139 B.R. at 393-394.  Finally, the approach embraces and attempts to reconcile the competing and at times conflicting goals of environmental and bankruptcy laws. _See Signature Combs, Inc. v. United States_, 253 F.Supp.2d at 1039 ("fair contemplation approach embraces and attempts to balance the sometimes competing goals of CERCLA and the Bankruptcy Code").

Under the fair contemplation test as well as the foregoing interpretation of section 77(b), the MBTA's chapter 21E cause of action is not a claim within the meaning of section 77(b).

First, against the backdrop of _St. Paul_, _Datacard_ and _Reynolds_, all of which apply the fair contemplation test in the context of CERCLA indemnity and response cost claims or a chapter 21E claim, the factual circumstances of this case fall significantly closer to those in _Datacard_, 106 F.3d at 1346-1348 (CERCLA claim seeking reimbursement for response costs was not discharged by debtor's bankruptcy), than to the factual circumstances in _St. Paul_, 3 F.3d at 203-206 (CERCLA indemnity claim barred by debtor's section 77(b) bankruptcy proceeding), and _Reynolds_, 647 N.E.2d at 1206-1209 (affirming summary judgment discharging the plaintiff's chapter 21E cause of action as barred by Texaco's bankruptcy).  Like the facts in _Datacard_, there was no soil testing for contamination until after the discharge date,

49

no EPA or significant involvement of the DEQE and not even B & M
recognized that it faced chapter 21E liability.

    In contrast, the facts in St. Paul included the location of
the contaminated railroad within a Superfund site, an internal
memorandum confirming saturation of oil that "will probably
require removal of surface oil as well as contaminated dirt," EPA
investigations in the area and a state environmental study
indicating possible permeation of the railroad with toxic
compounds all prior to the discharge date. St. Paul, 3 F.3d at
203-206.  The facts in Reynolds also made the plaintiff's chapter
21E claim in that case more foreseeable and fairly contemplated
by the parties than the MBTA's chapter 21E claim in the case at
bar.  Thus, prior to the discharge date in Reynolds, the DEQE
issued a notice of responsibility to the plaintiff, cited the
plaintiff for noncompliance with cleanup and containment
requirements and the plaintiff retained an engineering firm that
traced the contamination to the oil tanks on the property and
recommended their removal. Reynolds Brothers, Inc. v. Texaco,
Inc., 647 N.E.2d at 1208.  The plaintiff was also aware that
Texaco was a previous owner of the property and "had used the
site as an oil storage facility." Id. at 1209.

    Fair notice or the foreseeability of a section four cause of
action turns upon circumstances and events fairly contemplated by
the parties such as regulatory involvement raising the likelihood
of the imposition of response costs upon which a person would

then seek reimbursement from a "person liable" for the release or threat of release.[35]  Indeed, in applying the fair contemplation approach to a section 21E cause of action, the SJC in Reynolds set forth factors that predominantly involved a level of regulatory conduct.  See Reynolds, 647 N.E.2d at 1208 (listing relevant factors).

While the section four claim can be unprovable, 11 U.S.C. § 205(b) ("creditors" may hold "claims" against debtor "whether or not such claims would otherwise constitute provable claims under this title"), and disputed in amount, the potential creditor should have fairly known, contemplated or reasonably foreseen the existence of the section four claim.  In particular, the MBTA should have been aware not only of the existence of soil contamination but also that environmental regulators would likely impose cleanup costs on the MBTA such that the MBTA would or should have foreseen a need to seek reimbursement from B & M as a liable person.[36]  Prior to the discharge date, neither party contemplated the DEQE's involvement requiring a cleanup of the soil at the Terminal or that the DEQE would require the MBTA as

---

[35]  Undeniably, the parties knew or should have known that B & M, as operator of the Terminal, fell within a category of persons liable in section five.

[36]  Alternatively, as also discussed below, the facts and circumstances prior to the discharge date made it unlikely, i.e., not fairly contemplated by the parties, that the MBTA would voluntarily engage in a cleanup and then seek reimbursement for such past cleanup expenses from B & M.

opposed to B & M to undertake the cleanup.  There was also no discussion between the parties of the need to undertake a cleanup of the Terminal and little, if any, perceivable need for the MBTA, as opposed to B & M, to voluntarily undertake a cleanup.

On or before June 30, 1983, the parties did not discuss chapter 21E or environmental liability for soil contamination at the Terminal.  Documents fail to reference the need to cleanup the soil at the Terminal.  The 1982 operating agreement does not definitively evidence that the parties fairly contemplated an environmental reimbursement claim.  Rather, it names B & M as the operator of the facility and thereby the most logical entity to engage in cleanup activity and thereby incur response costs.

Prior to June 30, 1983, the DEP Northeast Regional Office logs identify B & M as the responsible party for the relatively minor oil spills all of which were resolved with B & M's acceptance of responsibility and cleanup of the spills. Moreover, the spills prior to the discharge date primarily involved the USCG and the discharge or threat of a discharge into bodies of water.  The DEP Northeast Regional Office logs do not name the MBTA as a responsible party prior to the discharge date. There was no ongoing cleanup effort or investigation as of the effective date of chapter 21E and no outstanding cleanup costs accrued or were likely to be accrued on the part of the MBTA as of June 30, 1983.  No significant soil testing had taken place.

To state the obvious, response costs for a large scale

cleanup of the soil were neither actually nor reasonably anticipated by the parties as of the discharge date.[37]  The Terminal was not identified as a hazardous waste site by the DEQE before June 30, 1983.

Prior to the June 1983 discharge date, there was no foreseeable need or reason for the MBTA to engage in a soil cleanup and then seek reimbursement from B & M for cleanup expenses.  All of the past spills had been caused by B & M, the relevant regulatory agencies had all named B & M as the responsible party for these minor spills and B & M had willingly undertaken the necessary cleanup.  There was no foreseeable prospect of the MBTA embarking upon a cleanup and it was not fairly contemplated by the MBTA or B & M at the time.  In short, such future events were not within the actual, presumed or fair contemplation of the parties prior to the discharge date.  Nor were they reasonably foreseeable.

B & M's argument based upon the language and breadth of the Consummation Order is equally unavailing.  In making the argument, B & M quotes and relies upon sections 5.03(a) and (b) and 8.01.

---

[37]  In fact, it was not until the time of GTI's Oil Recovery Study in July 1984 that testing of groundwater and wells documented the presence of petroleum product together with an express recommendation to notify the DEQE.  The MBTA commissioned this study to ascertain the feasibility of recovering oil from the soil as opposed to assessing its liability for environmental releases or threats of releases of oil.

Issued in accordance with section 77(f), the Consummation Order confirms the plan of reorganization and releases and discharges B & M or its successors and assigns from "all obligations, debts, liabilities and claims against" the Debtor "as of the Consummation Date."[38]  (Docket Entry # 33, Ex. 2, § 5.03(a); see also § 5.03(b)).  It also permanently enjoins actions against the reorganized company or its successors and assigns "based upon any right, claim or interest of any kind or nature whatsoever" which any person, including governmental entities and corporations, may have against the debtor, the debtor's trustees or "any of their assets or properties." (Docket Entry # 33, Ex. 2, § 8.01).

For reasons already explained, the MBTA's reimbursement claim was not within the fair contemplation of the parties as of the June 30, 1983 discharge date.  As noted by a number of courts, whether a consummation order discharges a claim begins with an interpretation of "claim" under the applicable Bankruptcy Code.  See In the Matter of Chicago, Milwaukee St. Paul & Pacific Railroad Co., 3 F.3d at 206; In re Conseco, Inc., 330 B.R. 673, 684-685 (Bankr.N.D.Ill. 2005).

In any event, the plain and unambiguous language of the Consummation Order does not bar the MBTA's section four claim based upon contamination occurring prior to June 30, 1983.

---

[38]  The Consummation Date refers to the June 30, 1983 discharge date.

54

Analogous to a contract, the Consummation Order is subject to
"relevant rules of contract interpretation and construction."  In
re Sergi, 233 B.R. 586, 589 (1st Cir. 1999); accord Salmon v.
Laser Plot, Inc., 189 B.R. 559, 561 (D.Mass. 1995); In re L & V
Realty Corporation, 76 B.R. 35, 37 (Bankr.E.D.N.Y. 1987).  In the
case at bar, the plain and unambiguous language of the
Consummation Order does not bar the section four cause of action.

Interpreting the language of section 5.03, the MBTA's
section four cause of action based upon pre-consummation
contamination and events was not an obligation, debt or liability
against B & M or its trustees *as of the consummation date* within
the meaning of section 5.03 of the Consummation Order.[39]  The
MBTA had not incurred any response costs or other debt and B &
M's liability or obligation to the MBTA under section four was
unforeseeable, inchoate and remote.  There were no discussions
about the MBTA's chapter 21E liability or about the MBTA
undertaking cleanup activities.  The parties' files at the time
are silent as to both matters.  Neither party had undertaken
tests to ascertain the degree of soil contamination at the
Terminal.  The claim was also not within the fair contemplation
of the parties or otherwise reasonably foreseeable as of June 30,
1983.  For these and reasons previously expressed, the terms of

---

[39]  This court has already concluded that the broader
language in section 77(b) which includes "interests of whatever
character" does not encompass the section four cause of action.

section 5.03 and the discharge provisions of the Consummation
Order do not reach the MBTA's section four cause of action for
events and contamination prior to July 1, 1983.

For similar reasons, the MBTA's section four cause of action
against B & M does not constitute a "right, claim or interest of
any kind" within the meaning of section 8.01.  Furthermore, the
court in Mesiti v. Microdot, Inc., 156 B.R. 113 (D.N.H. 1993),
addressed the issue of whether a former property owner's
contribution claims against B & M's reorganized successor for
environmental response costs were "of the type fairly falling
within the reach of the Reorganization Court's injunction" in
section 8.01.  Id. at 118 (finding Microdot's suit as falling
fairly within reach of section 8.01).  The court first discussed
the appropriate analysis to decide the discharge of a claim under
section 77(b).  Citing cases adhering to Reynolds' "fair
contemplation-foreseeability approach," Reynolds Brothers, Inc.
v. Texaco, 647 N.E.2d at 1208, but referring to the approach as
"the 'foreseeability' test" applicable to determining "whether
post-bankruptcy CERCLA claims are discharged," Mesiti v.
Microdot, Inc., 156 B.R. at 117, the court in Mesiti recognized
the discharge of CERCLA claims where under "the factual
circumstances[,] neither the debtor nor the claimant could have
reasonably contemplated the existence of an actual or contingent

bankruptcy claim."[40]  <u>Id.</u> at 118.  In finding that Microdot's

claims fell fairly within the reach of the Consummation Order's

injunction and retention of jurisdiction provisions, the court

also posited that the Microdot's claims might or might not have

been foreseeable but that jurisdiction properly lay in the

reorganization court to decide that issue.  <u>See</u> <u>Micrdot</u>, 156 B.R.

at 118 ("[w]hether Microdot's claims were or were not

foreseeable, were or were not discharged, and thus do or do not

come within the injunctive and jurisdiction retention orders of

Reorganization Court are all issues" that the Reorganization

Court reserved jurisdiction to perform).

     As explained above in the context of the fair contemplation

approach, the MBTA's section four chapter 21E claim based upon

pre-consummation events and contamination was not reasonably

_____

     [40]  This court finds little distinction between the two
approaches, particularly in light of the reliance by the <u>Meisti</u>
court upon cases employing the fair contemplation approach as
well as the "reasonably contemplated" language utilized by the
court.  Under the foreseeabilty approach or the strikingly
similar fair contemplation approach, the MBTA's section four
claim based upon pre-consummation events and contamination was
not discharged.
     Briefly stated, whether Microdot's claims were foreseeable
depended upon "what information Microdot actually or
constructively had available to it regarding [the] contamination
. . . ; what information it had regarding the B & M Railroad's
possible link to the contamination; and whether that information
was reasonably available between CERCLA's enactment in 1980 and B
& M's consummation date in 1983." <u>Id.</u> at 118.  Considering these
factors does not alter this court's finding that the MBTA's
reimbursement claim under section four based upon contamination
occurring before June 30, 1983, was not discharged.

foreseeable for similar reasons.[41]  Accordingly, section 8.01
does not enjoin the assertion of the present claim.

    In sum, neither the Consummation Order nor the statutory
discharge under section 77, considered separately or in tandem,
bar the MBTA's assertion of its section four chapter 21E
counterclaim for reimbursement of B & M's equitable share of
response costs as to contamination and events occurring on or
before June 30, 1983.


II. <u>Contractual Indemnity</u>

    In seeking partial summary judgment, B & M asserts that the
terms of the 1982 operating agreement contractually limit its
liability for all cleanup costs for contamination to no more than
$1,000,000.  The all encompassing effect of the argument
therefore reaches claims not discharged in bankruptcy.

    B & M relies upon the following language in the agreement's
Accident Responsibility section:

    The Authority [MBTA] agrees to indemnify and hold [B & M]
    harmless from any loss not fully insured against and with
    respect to losses incurred during the term of this Agreement
    and not fully covered by the Liability Fund hereinafter
    described, arising from injury (including death) to persons
    or damage to property, including but not limited to the
    Authority's Property, which shall arise out of or be in any
    way connected with the Service and from any such losses
    which remain unsettled as of the date hereof and which
    occurred during the term of the Agreement between Boston and

---

    [41]  The previous footnote sets forth the factors the court
identified as impacting the foreseeability of the environmental
claims.

Maine Corporation and the Massachusetts Bay Transportation
Authority dated December 14, 1964, as amended and extended;
. . ..

Notwithstanding anything to the contrary contained in this
Article XVI, the Authority shall not be required to
indemnify the Operator [B & M] or hold it harmless from or
against any losses not fully insured arising out of any act
or omission occurring during the term of this Agreement; for
which the Operator in its capacity as the Operator of its
freight service or in connection with Extra Work pursuant to
Article IX hereof, is legally responsible and for which
neither the Authority nor the Operator [B & M] qua Operator
of the Service is legally responsible.

(Docket Entry # 24, Ex. 13, § 14.01).  The section limited B &

M's annual deposits into the Liability Fund to $200,000.00.  Id.

In addition to briefly addressing the merits, the MBTA

submits that the argument is premature because the district judge

limited the present Phase I of this case to the bankruptcy

discharge issue.  This court agrees.

On November 8, 2005, the parties filed a joint statement as

required by Local Rule 16.1(d).  The parties suggested that this

action proceed in two phases with the initial phase consisting

of the "bankruptcy discharge issue."  (Docket Entry # 10, ¶ 4).

The second phase would then consist of "liability and damages

aspects."  Id.  Each phase set various time tables for completing

fact and expert discovery and filing summary judgment motions.

In the joint statement, B & M maintained that the MBTA's

attempt to recover environmental cleanup costs "violat[ed] the

bankruptcy consummation order issued by this Court in 1983."

(Docket Entry # 10, ¶ 2).  B & M made no mention of any

59

contractual limitation of liability for damages in the joint statement.[42]  The MBTA, in turn, described its position that its claims "were not discharged by the 1983 bankruptcy consummation order."  (Docket Entry # 10, ¶ 3).

On November 16, 2005, the district judge conducted a scheduling conference.  At the conference, the district judge adopted a discovery, expert and dispositive motion schedule for Phase I denoted as the "Bankruptcy Discharge Issue" on the docket.  The parties proceeded to limit discovery to the bankruptcy discharge issue.

The plain language of the court's limitation of Phase I to the "bankruptcy discharge issue" does not include the issue of a limitation of liability for damages under a contract.  Simply put, the interpretation and construction of a contractual provision for indemnity limiting certain losses incurred during the term of a contract is not a bankruptcy discharge issue.  The fact that the MBTA produced the 1982 Operating Agreement or that the parol evidence rule may or may not bar extraneous evidence, an issue not adequately briefed, does not permit B & M to venture outside the parameters of the clear and unambiguous terms of the scheduling order set by the district judge.

The argument is therefore premature.  This court's

_____

[42]  B & M also fails to mention this partial defense to damages in the complaint or in its answer to the MBTA's chapter 21E counterclaim.

recommendation to deny B & M's partial summary judgment motion does not foreclose B & M from raising the foregoing contractual argument after Phase I.

CONCLUSION

Accordingly, in light of the above discussion, this court **RECOMMENDS**[43] that the MBTA's motion for partial summary judgment (Docket Entry # 16) be **ALLOWED** dismissing counts I, II and III of the complaint[44] and that B & M's motion for partial summary judgment (Docket Entry # 20) be **DENIED**.

    /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[43]   Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  Any party may respond to another party's objections within ten days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.  United States v. Escoboza Vega, 678 F.2d 376, 378-379 (1st Cir. 1982); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

[44]   The MBTA's motion does not request a dismissal of Count IV which seeks to prohibit the MBTA's claim pursuant to the doctrine of laches.