# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOSTON AND MAINE CORPORATION ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| -v.- ) | Civil Action No. 05-11656-RCL |
| ) | Judge Reginald C. Lindsay |
| MASSACHUSETTS BAY ) | |
| TRANSPORTATION AUTHORITY ) | |
| ) | |
| Defendant. ) | |

## PLAINTIFF BOSTON & MAINE CORPORATION'S CORRECTED OBJECTIONS TO REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE
### (Leave to file granted pursuant to Court Order of February 14, 2007)

Eric L. Hirschhorn
Winston & Strawn LLP
1700 K Street N.W.
Washington DC 20006
Tel. 202-282-5706
Fax 202-282-5100
E-mail: ehirschhorn@winston.com

Robert B. Culliford, BBO #638468
Pease International Tradeport
14 Aviation Avenue
Manchester NH 03801
Tel. 603-766-2002
Fax 603-766-2094
E-mail: rculliford@flypanam.com
*Counsel for Plaintiff Boston and Maine Corporation*

Filed February 9, 2007; Corrected Version Filed February 16, 2007

# TABLE OF CONTENTS

**Page**

Request for Oral Argument ................................................................................................. 1

Introduction ....................................................................................................................... 1

Objections to Report and Recommendation ...................................................................... 3

Objection I.    The R&R construes the discharge provisions of Section 77 too narrowly. ........... 3

      A.    Requirements of Section 77 ........................................................................ 4

      B.    The "Relationship" Test versus the "Fair Contemplation" Test. ................ 5

          1.    The Relationship Test provides the appropriate standard. .............. 7

          2.    The Fair Contemplation Test ....................................................... 8

      C.    The text of Chapter 21E itself supports a finding that MBTA had a contingent claim within the meaning of § 77. ........................................... 9

      D.    The R&R's unduly narrow view of what constitutes a claim under § 77 disserves the goals of both bankruptcy *and* environmental laws ............................................................................................................ 11

Objection II.    Under the Relationship Test, MBTA's claims come within § 77. ...................... 13

Objection III.    The claims were discharged even if the "Fair Contemplation" Test applies ........ 16

Objection IV.    The Consummation Order also bars MBTA's claims. ......................................... 22

Objection V.    MBTA could have sought late filing of its claims but failed to do so. ................. 24

Conclusion .......................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**FEDERAL CASES:**

*AM International, Inc. v. Datacard Corp., DBS, Inc.,*
   106 F.3d 1342 (7th Cir. 1997) ................................................................12, 14, 16, 20

*In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,*
   3 F.3d 200 (7th Cir. 1993) ........................................................................................3

*In re Chicago, Milwaukee, St. Paul & Pac. R.R.. Co.,*
   974 F.2d 775 (7th Cir. 1992) ......................................................................14, 11, 12, 16

*In re Cleveland,*
   349 B.R. 522 (Bankr. E.D. Tenn. 2006)..............................................................8, 9, 13

*In re Crystal Oil Co.,*
   158 F.3d 291 (5th Cir. 1998) ................................................................................16

*In re Edge,*
   60 B.R. 690 (M.D. Tenn. 1986)..............................................................................25

*In re Emelity,*
   251 B.R. 151 (Bankr. S.D. Cal. 2000)......................................................................9

*Epstein v. Official Committee of Unsecured Creditors (In re Piper Aircraft Corp.),*
   58 F.3d 1573 (11th Cir. 1995) ..............................................................................15

*In re Hemingway Transport, Inc.,*
   73 B.R. 494 (Bankr. D. Mass. 1987)........................................................................7

*In re Hemingway Transport, Inc.,*
   993 F.2d 915 (1st Cir. 1993)............................................................................6, 13

*Hexcel Corp. v. Stepan Co.,* 239 B.R. 564 (N.D. Cal. 1999)........................................16

*In re Jensen,*
   127 B.R. 27 (B.A.P. 9th Cir. 1991), *aff'd,* 995 F.2d 925 (9th Cir. 1993)..........................7

*In re Jensen,*
   995 F.2d 925 (9th Cir. 1993) ..........................................................................16, 20

*Mesiti v. Microdot, Inc.,*
   156 B.R. 113 (D.N.H. 1993).............................................................................*passim*

*Nassr v. Commonwealth,*
   477 N.E.2d 987 (Mass. 1985) ....................................................................2, 6, 21

*In re National Gypsum, Co.*,
    139 B.R. 397 (N.D. Tex. 1992) ................................................................ 16, 20, 25

*NCL Corp v. Lone Star Building Ctrs. (Eastern) Inc.*,
    144 B.R. 170 (S.D. Fla. 1992) ................................................................ *passim*

*In re Penn Central Transport Co.*,
    944 F.2d 164 (3d Cir. 1991) ................................................................ 18

*Providence & W. R.R. Co., v. Penn Central Corp.*, Civ. No. 88-2119-MC,
    1989 U.S. Dist. LEXIS 7259 (D. Mass. 1989) ....................................... 4, 5, 23

*Roberts v. Maine*,
    48 F.3d 1287 (1st Cir. 1995) ................................................................ 15

*In re Russell*,
    193 B.R. 568 (Bankr. S.D. Cal. 1996) ................................................... 15

*Schweitzer v. Consolidated Rail Corp.*,
    758 F.2d 936 (3d Cir. 1985) ................................................................ 4

*Signature Combs v. United States*,
    253 F. Supp. 2d 1028 (W.D. Tenn. 2003) ...................................... 9, 11, 16, 19

*Sylvester Brothers Development Co. v. Burlington N. R.R.*,
    133 B.R. 648 (Bankr. D. Minn. 1991) ................................................... 18

*In re Texaco, Inc.*,
    182 B.R. 937 (Bankr. S.D.N.Y. 1995) ................................................... 5, 19

*United States v. LTV Corp., (In re Chateaugay Corp.)*,
    944 F.2d 997 (2d Cir. 1991) ................................................................ *passim*

**STATE CASES:**

*Reynolds Brothers, Inc. v. Texaco, Inc.*,
    647 N.E.2d 1205 (Mass. 1995) ............................................................. *passim*

**FEDERAL CODES, STATUTES AND RULES**

Bankruptcy Act of 1898, 11 U.S.C. § 205 (1976) ("Section 77") ...................... *passim*

Clean Water Act, Pub. L. No. 92-500, 86 Stat. 816 (1972) ............................... 11

Comprehensive Environmental Response, Compensation and Liability Act of 1980, Pub.
    L. No. 96-510, 94 Stat. 2767 ................................................................ 11

Resource Conservation and Recovery Act of 1976, Pub. L. No. 94-580, 90 Stat. 2795 ............. 11

Fed. R. Bankr. 9006(b)(1) ............................................................................................. 25

**STATE STATUTES:**

Massachusetts Oil and Hazardous Material Release Prevention Act,
    1983 Mass. Acts ch. 7, (M.G.L. ch. 21E) .................................................... *passim*

Uniform Contribution Among Tortfeasors Act,
    (M.G.L. ch. 231B) ................................................................................................. 21

**MISCELLANEOUS:**

*Hazardous Materials Found on MBTA Site*, THE DAILY TIMES (Woburn, Mass.), May 7,
    1979 ........................................................................................................................... 6

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

—————————————————————— x

BOSTON AND MAINE
CORPORATION,

                Plaintiff,

       -v.-

MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY,

               Defendant.

—————————————————————— x

Civil Action No. 05-11656-RCL

### PLAINTIFF BOSTON & MAINE CORPORATION'S CORRECTED OBJECTIONS TO REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE
### (Leave Granted to File by Court Order of Feb. 14, 2007)

On January 26, 2007, Hon. Marianne Bowler, United States Magistrate Judge, issued a

Report and Recommendation ("R&R") [Dkt. #58] regarding plaintiff Boston & Maine

Corporation's ("B&M") and defendant Massachusetts Bay Transportation Authority's ("MBTA")

motions for partial summary judgment. This Court should decline to adopt the R&R, should

grant B&M's motion for partial summary judgment, and should deny MBTA's motion for partial

summary judgment. B&M objects to the R&R as set forth below.[1]

### Request for Oral Argument

B&M hereby requests oral argument to assist the Court in its consideration of this matter.

### Introduction

Did MBTA have a "claim" against B&M, under § 77 of the Bankruptcy Act of 1898, for

environmental contamination of the Boston Engine Terminal ("BET") before June 30, 1983, the

---

[1] A longer version of this document was filed and served February 9, 2007. By order of the Court, it has been reduced in length and, as corrected, is being re-served and re-filed. B&M incorporates by reference the facts and argument set forth in the submissions supporting its motion for partial summary judgment and opposing MBTA's motion for partial summary judgment.

consummation date of B&M's bankruptcy proceeding ("Consummation Date")?  As explained

below, several undisputed facts establish B&M's right to summary judgment on this issue:

- MBTA had become the owner of the BET in 1976.  R&R at 7.

- MBTA was well aware, prior to the Consummation Date, of the extensive
  environmental contamination at the BET site.  Indeed, by the late 1970s, the
  MBTA had financed the installation of an oil-water separator that was recovering
  35,000 gallons per year of oil from the site for MBTA's use.  R&R at 6.

- MBTA knew of B&M's bankruptcy no later than 1976, when MBTA purchased
  the BET from B&M's bankruptcy estate.  R&R at 7.

- MBTA had at least two contingent claims against B&M for cleanup costs prior to
  the Consummation Date.  One was under the common law of nuisance.  *See Nassr
  v. Commonwealth*, 477 N.E.2d 987 (1985).  The second was under §§ 4 & 5 of the
  Massachusetts Oil and Hazardous Material Release Prevention Act ("Chapter
  21E"), M.G.L. ch. 21E, which had been enacted, and was immediately effective,
  more than three months before the Consummation Date.  R&R at 2.

- Section 77 broadly defined "claims" as including "debts, whether liquidated or
  unliquidated . . . or other interests of whatever character," and defined "creditor"
  to include "all holders of claims . . . against the debtor or its property, whether or
  not such claims would otherwise constitute provable claims under [the
  Bankruptcy Act]."  11 U.S.C. § 205(b) (1976).

- The R&R concedes that contingent, unprovable tort claims fall within § 77, R&R
  at 37-41, but then fails to recognize that both of MBTA's closely related claims
  against B&M—the common-law claim and the claim under Chapter 21E—
  qualified as § 77 "claims" that were extinguished when MBTA failed to file them
  in the B&M bankruptcy proceeding.

The R&R ignores MBTA's claim under common law, which comprehends cleanup costs.

MBTA's knowledge regarding this claim prior to the Consummation Date was more than

sufficient to require its classification as a "claim" under § 77. Indeed, even where a statute is

enacted *after* the bankruptcy consummation date, claims under it are discharged where the statute

imposes the same "type of liability" as did the law prior to its enactment. *See In re Chicago,*

*Milw, St. Paul & Pac. R.R. Co.*, 3 F.3d 200, 207-08 (7th Cir. 1993). Here, of course, Chapter

21E was enacted *before* the Consummation Date. In any event, MBTA's § 4 liability is not a

different "type of liability" from its common law liability.

Also, the R&R construes § 77 too narrowly in terms of its application to contingent

claims. As a result, addressing solely the MBTA's statutory claim under § 4 of Chapter 21E, the

R&R concludes that the chance the requisite contingency (a cleanup by the MBTA) would occur

was so remote as to render § 4 liability on the MBTA's part unforeseeable,[2] and that such

unforeseeability removed the contingent § 4 liability from the broad definition of a "claim" under

§ 77. R&R at 41-58. Citing due process, the R&R inaccurately characterizes this case as if it

were one in which the potential claimant "neither knew nor should have known of [its] injuries

or claims prior to the bar date." R&R at 43. The R&R then goes on to suggest—incorrectly—

that the critical, if not the sole factor, in determining foreseeability is whether the creditor knew

of regulatory agency involvement or environmental testing at the site. R&R at 47, 49-53.

### Objections to Report and Recommendation

**Objection I.    The R&R construes the discharge provisions of Section 77 too narrowly.**

The R&R takes an erroneously narrow view of the requirements for a "claim" under § 77

of the Bankruptcy Act. R&R at 41-53 & n. 39. The R&R recognizes that § 77's definition of

dischargeable claims includes contingent claims for environmental cleanup, *see* R&R at 32-41,

but says that "Congress did not intend to include contingent claims in the broader sense of the

---

[2] As discussed below, B&M does not believe that the foreseeability (or reasonable contemplation) test is
appropriate. Even if this test is applied, however, MBTA had a claim under § 4 before the Consummation Date.

word but rather in the narrower sense of the word as circumscribed by the future events being within the presumed contemplation of the parties." R&R at 41. The R&R also incorrectly indicates that for an environmental cleanup claim to be fairly contemplated, a creditor must know of regulatory involvement at the site. R&R at 50-53. As a result of these restrictions, the R&R incorrectly concludes that § 77 does not encompass MBTA's claims at common law or under Chapter 21E. R&R at 41-53 & n. 39.

### A.    Requirements of Section 77.

Section 77 "provides broad authorization for the discharge in bankruptcy of claims against the debtor in order to secure a fresh start for a company resulting from a [S]ection 77 reorganization." *In re Chicago, Milw., St. Paul & Pac. R.R.. Co.,* 974 F.2d 775, 780 (7th Cir. 1992) (*"Chicago, Milwaukee"*) (*quoting Schweitzer v. Consolidated Rail Corp.,* 758 F.2d 936, 941 (3d Cir. 1985)). A potential creditor who fails to file a claim before the bar date of a § 77 reorganization "is forever discharged from raising this claim against the debtor or its successors." *See Chicago, Milwaukee,* 974 F.2d at 780. Section 77 provided that "'creditors' shall include, for all purposes of this section all holders of *claims of whatever character* against the debtor or its property, *whether or not such claims would otherwise constitute provable claims* [under the Bankruptcy Act]." 11 U.S.C. § 205(b) (emphasis added). Moreover, "'claims' includes debts, whether liquidated or unliquidated, . . . or *other interests of whatever character.*" *Id.* (emphasis added); *see also Providence & W. R.R. Co., v. Penn Cent. Corp.,* Civ. No. 88-2119-Mc, 1989 U.S. Dist. LEXIS 7259 (D. Mass. 1989) (discussing breadth of key terms under Bankruptcy Act).

Pursuant to § 77, at the time of the Consummation Order in 1983, MBTA was a "creditor" with a "claim" against B&M. Courts consistently have given expansive interpretation to § 77's definition of "claim." *See, e.g. Chicago, Milwaukee,* 974 F.2d at 781 (party may have

preconsummation claim which must be raised in order to avoid discharge under § 77 even before party has cause of action). In addition, contingent claims for environmental cleanup costs fall within the broad definition of claims dischargeable in bankruptcy. *See, e.g., Mesiti v. Microdot, Inc.*, 156 B.R. 113, 118 & n. 4 (D.N.H. 1993) (noting that if environmental response costs *may* be incurred, "contingent debt" exists for Bankruptcy Act purposes); *Providence & W. R.R. Co.,* 1989 U.S. Dist. LEXIS 7259 at *2-7 (Chapter 21E and CERCLA claims of owner who acquired contaminated property from debtor railroad arose before Consummation Date and thus were barred even though claimant was unaware of contamination before conclusion of bankruptcy).

### B.    The "relationship" test versus the "fair contemplation" test.

The courts have employed a number of tests to ascertain when a contingent claim is a "claim" for purposes of discharge in bankruptcy. Viewed as a whole, though, the cases establish one basic precept: A claim for environmental cleanup generally will not be discharged if the claimant had no inkling, nor a means of learning, of an environmental problem at the site prior to the bankruptcy consummation. *See, e.g., United States v. LTV Corp., (In re Chateaugay Corp.),* 944 F.2d 997, 1005 (2d Cir. 1991) (regulatory agency's awareness of and relationship to debtor sufficient for claim to arise); *NCL Corp v. Lone Star Bldg. Ctrs. (Eastern) Inc.,* 144 B. R. 170, 177 (S.D. Fla. 1992) (creditor's knowledge of, and relationship with, site and debtor establish claims were fairly contemplated); *In re Texaco, Inc.*, 182 B.R. 937, 950-54 (Bankr. S.D.N.Y. 1995) (holding claims for subsurface environmental contamination discharged where debtor and creditors had long contractual relationship, source of environmental contamination was longstanding, and creditor could have detected contamination before conclusion of bankruptcy).

*Chateaugay* offers an example of what exceeds the reach of § 77, namely a situation where a bankrupt bridge manufacturer has built defective bridges but there is no way of knowing

before the Consummation Date who will use the bridges, let alone which users will be injured when some bridges fail. *In re Chateaugay Corp.*, 944 F.2d at 1005-06. It would be unfair to bar the future claims of injured parties where the potential claimants had no idea at the time of the bankruptcy that they someday might have claims.

The instant case, however, could not be more different. The record provides no basis for MBTA to claim ignorance of its contingent claims for environmental cleanup. Before the Consummation Date, MBTA: (1) knew of—and participated in—B&M's bankruptcy proceedings, *see* Bergeron Decl., ¶¶ 25-29 [Dkt. #24]; (2) knew of releases of fuel oil and/or other hazardous materials at the BET, the environmental condition of the BET, and the need for cleanup at the BET, *see* Hennemann Decl., ¶¶ 11-14, 18-27, 29 & Ex. 1-8, 10-12, 16-17, 19-24, 29-45 [Dkt. #25, 31]; Bergeron Decl. ¶¶ 10, 11, 12, 18-20 & Ex. 2, 7-8 [Dkt. #24, 32]; and (3) had owner liability not only under a prominent state statute, *see* Culliford Decl., ¶¶ 5, 10-12, & Ex. 2-3, 5-11 [Dkt. #26, 30], but also pursuant to long-established common law upon which Chapter 21E merely elaborated, *see* M.G.L. ch. 21E; *Nassr*, 477 N.E.2d at 991-93.[3]

The "relationship" test should be employed to test whether MBTA's contingent claims were "claims" within the meaning of § 77, but even under the fair contemplation test, MBTA's claims were discharged. Although the First Circuit and the Bankruptcy Court in this district have indicated that a claim like that of MBTA may arise as early as the creditor's purchase of the contaminated property (in this case, 1976), *see In re Hemingway Transp., Inc.*, 993 F.2d 915,

---

[3] MBTA's contention that it was unaware of the effect of environmental regulation are questionable. For instance, in 1979, state and local environmental officials investigated an illegal dump filled with hazardous material on MBTA property in Woburn and indicated that a cleanup would be required. *Hazardous Materials Found on MBTA Site*, THE DAILY TIMES (Woburn, Mass.), May 7, 1979 (attached as Exhibit 3 to Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment) [Dkt. # 29]. Also, MBTA employee Peter Wilson testified that during the period from 1979 to 1983, MBTA was aware of spills or releases of oil or hazardous substances at MBTA facilities other than the BET that required cleanup efforts by the MBTA. Hennemann Decl., ¶ 37 & Ex. 29 [Dkt. # 25, 31].

928 (1st Cir. 1993); *In re Hemingway Transp., Inc.*, 73 B.R. 494, 503 (Bankr. D. Mass. 1987),

the issue of which test to apply has not been decided definitively in this circuit.

### 1.     The relationship test provides the appropriate standard.

A leading case adopting the "relationship test" is *In re Chateaugay Corp.*, 944 F.2d 997

(2d Cir. 1991), which determined that, based on the relationship of the parties, the U.S.

Environmental Protection Agency ("EPA") had a contingent claim under bankruptcy law for

environmental response costs as of the time the releases of hazardous substances occurred, even

though EPA did not know the extent of the removal costs or all the sites where wastes might be

found. *See also In re Jensen*, 127 B.R. 27, 30 (B.A.P. 9th Cir. 1991) (bankruptcy claim arises

upon actual or threatened release of hazardous waste by debtor), *aff'd*, 995 F.2d 925 (9th Cir.

1993) (requiring actual interaction between creditor and debtor).  The rationale is that the

conduct giving rise to the release or threatened release of hazardous substances and the existence

of a relationship between the parties provide "sufficient 'contemplation' of contingencies to bring

most ultimately maturing payment obligations based on [the debtor's] conduct within the

definition of 'claims.'"  *Chateaugay*, 944 F.2d at 1005.

*NCL Corp. v. Lone Star Bldg. Ctrs. (Eastern) Inc.*, 144 B.R. 170, 177 (S.D. Fla. 1992), is

illustrative of the relationship approach.  The court there held that a claim arose where the

creditor owned the contaminated site for a long time, knew of the chemicals used at the site,

leased the site to the debtor with indemnification provisions, and had the right to inspect the

property.  As in *NCL,* MBTA owned the BET for many years prior to the Consummation Date,

Bergeron Decl. ¶ 25 [Dkt. #24], and knew of the use and releases of petroleum products there,

Hennemann Decl. ¶¶ 18, 19 & Ex. 1-8, 10-12, 16-17, 19-24, 29-39 [Dkt. #25, 31], MBTA and

B&M had a contractual relationship that contemplated the very issues giving rise to MBTA's

claims, Bergeron Decl. ¶¶ 29-35 & Ex. 12-17 [Dkt. #24, 32], and MBTA not only had a right of entry to inspect the property at the time of purchase, Bergeron Decl. ¶ 27 & Ex. 10 [Dkt. #24, 32], but also had personnel on site from 1979 on who knew of environmental conditions at the property, Hennemann Decl. ¶ 19 & Ex. 1-3, 5-7, 31-34, 36 [Dkt. #25, 31]. Accordingly, the substantial relationship between MBTA and B&M—which included both contractual interaction and day-to-day business interaction—gave MBTA sufficient knowledge to contemplate its contingent claims for cleanup, under common law, Chapter 21E, or otherwise, before the Consummation Date.[4]

### 2.     The fair contemplation test.

Another test that has been used in cases like this—and the test that the R&R has recommended—is the "fair contemplation" or "foreseeability" test. The R&R says that this test requires that a creditor "have a reason to know of an environmental claim" before its claim can be subject to § 77. R&R at 45. Elsewhere the R&R refers to "'the happening of a future event that was "within the actual or presumed contemplation of the parties at the time"' of their original relationship." R&R at 46 (quoting *In re Chateaugay*, 944 F.2d at 1004).

At the heart of both the relationship test and the fair contemplation approach is the need to ensure that at the time of the bankruptcy, the creditor is not clueless about its potential claim. *In re Cleveland*, 349 B.R. 522, 529-31 (Bankr. E.D. Tenn. 2006), recognizes the similarity of the

---

[4]  In addition, although the R&R asserts that the relationship test is not the appropriate standard, cases cited by the R&R in support of that position do examine the existence of a claim pursuant to the relationship test. For example, in *Reynolds Bros., Inc. v. Texaco, Inc.*, 647 N.E.2d 1205 (Mass. 1995), the Supreme Judicial Court analyzed the potential claim under not only the fair contemplation test, but also the relationship test. *See id.* at n. 12 (finding relationship test compels conclusion that plaintiff had bankruptcy claim because plaintiff-debtor relationship was such that plaintiff was aware of contamination at site, knew debtor was previous owner, and knew debtor had used site as oil storage facility); *see also NCL Corp.*, 144 B.R. at 177 (concluding both relationship test and fair contemplation tests dispositive). As in *Reynolds Bros.*, in the instant case MBTA was aware of the contamination at the BET, Hennemann Decl., ¶¶ 18, 19 & Ex. 1-8, 10-12, 16-17, 19-24, 29-39 [Dkt. # 25, 31], knew B&M was the previous owner, MBTA's Concise Statement of Undisputed Material Facts [Dkt. #18] at ¶ 3, and knew that the site had long been used as a railroad maintenance and fueling facility. *Id.* at ¶¶ 1-2 [Dkt. # 18].

approaches. Specifically, the court there noted that for a claim to arise under the relationship test, there must be some type of pre-petition relationship, such as contact, exposure, impact or privity, between the debtor's conduct and the claimant. *Id.* at 530. If the parties have a relationship "'where the parties could have fairly contemplated a claim prior to bankruptcy, the claim will be held to have arisen pre-petition, even when the actual right to payment matures post-petition.'" *Id.* (quoting *In re Emelity*, 251 B.R. 151, 156 (Bankr. S.D. Cal. 2000)). The court also noted that some courts have separated the relationship aspect from the contemplation aspect to construct another approach—fair contemplation—whereby "a claim accrues when the potential [tort] claimant, at the time of the bankruptcy, 'could have ascertained through the exercise of reasonable diligence that it had a claim' against the debtor." *Id.* at 530 n. 7 (quoting *Signature Combs v. United States*, 253 F. Supp. 2d 1028, 1037 (W.D. Tenn. 2003)).

Ultimately, the *Cleveland* court adopted what it termed the "relationship/fair contemplation" approach: A claim arises "if there was a relationship, existing pre-petition, between the debtor and the creditor such that the creditor could fairly contemplate the possibility of a claim against the debtor's bankruptcy estate at the time that the bankruptcy petition was filed.*" Id.* at 531. MBTA and B&M had such a relationship, and through the knowledge gained from that relationship MBTA could have contemplated the possibility of a claim against B&M.

As discussed further elsewhere in these objections, although B&M believes that the relationship test is the more appropriate, MBTA's common law and § 4 claims were discharged even if the fair contemplation test is applied.

### C.    The text of Chapter 21E itself supports a finding that MBTA had a contingent claim within the meaning of § 77.

In addition to § 77's broad coverage of contingent claims, the language of Chapter 21E supports the existence of MBTA's claim at the time of the bankruptcy consummation. A

contingent claim for purposes of bankruptcy discharge is a claim that is merely possible. It is "likely but not certain to occur" and "[d]ependent on conditions or events not yet established." Riverside Webster's II New College Dictionary, at 244 (1995 ed.).

When enacted in March 1983, Chapter 21E imposed immediate, joint and several liability on MBTA (as owner of the BET) and B&M (as operator), for past releases at the property. M.G.L. ch. 21E § 5(a). Chapter 21E also provided that MBTA could recover cleanup costs from other liable parties. M.G.L. ch. 21E § 4. That MBTA would have had to undertake cleanup measures (on its own or at the behest of a state regulator) before it had a state-law cause of action for reimbursement simply made the claim *contingent* at the time of the Consummation Order. It does not mean that the claim did not exist. *See Mesiti,* 156 B.R. at 118 & n. 4.

Given MBTA's knowledge of the site conditions, releases at the site, and generally high level of sophistication, MBTA knew or should have known that it could tie B&M to releases of a hazardous substance (oil) at the BET and that these releases could lead to environmental response costs. That MBTA would have had to perform a cleanup to assert its state law claim is what renders the claim contingent. It does not remove the claim from the realm of a dischargeable claim under § 77. *Cf.* R&R at 41-53 & n. 39.

Surely MBTA could have contemplated that it might have to clean up the saturated ground at the BET, even if the Department of Environmental Protection ("DEP"), or its predecessor, the Department of Environmental Quality Engineering ("DEQE"), had yet to approach MBTA about it. Hennemann Decl., ¶¶ 11-14 & Ex. 19-24 [Dkt. #25, 31]. As of the late 1970s, MBTA knew oil was being pressed out of the ground at the BET, caught by the oil trap/oil-water separator, and eventually going to MBTA for MBTA's use, at a rate of approximately 35,000 gallons per year. Bergeron Decl., ¶ 20 & Ex. 7 [Dkt. #24, 32]. Around

10

1978, five years before the Consummation Date, MBTA paid to upgrade the oil trap/separator.

Bergeron Decl., ¶ 18 & Ex. 7-8 [Dkt. #24, 32]. MBTA's documents indicate that MBTA also

knew, before the bankruptcy, that another regulatory agency, the Coast Guard, was issuing

penalties for, and requiring cleanup of, releases from the BET to nearby rivers, Bergeron Decl.,

¶¶ 7-11 & Ex. 2-7 [Dkt. #24, 32].[5] MBTA therefore had contingent claims for reimbursement of

environmental cleanup costs that might be incurred after the Consummation Date.

### D.    The R&R's unduly narrow view of what constitutes a claim under § 77 disserves the goals of both bankruptcy *and* environmental laws.

The R&R's view that a cleanup claim cannot arise until regulators tell a prospective

claimant that a cleanup is required does not serve the goals of bankruptcy law or environmental

law. Requiring regulatory action against the creditor before a claim can be recognized may

"encourage nefarious creditors to delay cleaning up sites—and thereby incurring response

costs—until the close of bankruptcy proceedings." *Signature Combs, Inc.*, 253 F. Supp. 2d at

1034; *accord Reynolds,* 647 N.E.2d at 1209. Such an approach "not only frustrate[s] the

bankruptcy court's interest in having all claims before it and the debtor's interest in a fresh start,

but [also] CERCLA's [and Chapter 21E's] interest in a speedy cleanup of hazardous sites."

*Signature Combs*, 253 F. Supp. 2d at 1034 (citing *Chicago, Milwaukee,* 974 F.2d at 786).

The R&R correctly recognizes that—

> excluding unincurred [Chapter 21E] section five response costs and section four
> costs frustrates the Bankruptcy Code's goal of having all claims before it and
> equitably distributing assets among creditors. If the unincurred chapter 21[E]

---

[5] Moreover, MBTA—a government agency and the second largest landowner in Massachusetts—hardly
can have been unaware of the enactment, in the years before the Consummation Date, of numerous federal and
Commonwealth laws—including Chapter 21E—addressing responsibility for environmental conditions on one's
property. *See, e.g.*, Clean Water Act, Pub. L. No. 92-500, 86 Stat. 816 (1972); Resource Conservation and Recovery
Act of 1976, Pub. L. No. 94-580, 90 Stat. 2795; Comprehensive Environmental Response, Compensation and
Liability Act of 1980, Pub. L. No. 96-510, 94 Stat. 2767; 1983 Mass. Acts c. 7 (ch. 21E).

response costs are not claims, then the reorganized entity faces the prospect of significant and possible insurmountable environmental liability in the future.

R&R at 29. The R&R also asserts, though, that refusing to recognize contingent claims for unincurred response costs advances Chapter 21E's goal of ensuring that the party responsible for the contamination will foot the cost of remediation. R&R at 29. Such is not the case.

B&M was purchased out of bankruptcy in 1983 by Guilford Transportation Industries ("Guilford") for $24 million. At the Consummation Date, Guilford—not the former B&M or its former owners—became liable for claims arising subsequent to the bankruptcy. *See* Consummation Order § 1.04 (approving acquisition agreement) [Dkt. #35, 42 Ex. 4]. The assertion, in the bankruptcy proceeding, of MBTA's $15 million claim for cleanup costs doubtless would have had a substantial effect on Guilford's willingness to pay $24 million for the railroad. Guilford, and any purchaser in similar circumstances, had a right to know what contingent claims were out there. That is a critical goal of the bankruptcy laws.

Refusing to recognize contingent claims for environmental cleanup thus disserves both bankruptcy and environmental law. Purchasers from the bankrupt's estate, rather than the bankrupt company and its owners, ultimately may be left with liability, and such purchasers cannot rely on the bankruptcy to provide notice of contingent claims that substantially reduce the value of their purchases. *See Chicago, Milwaukee,* 974 F.2d at 779 (bankruptcy court cannot evaluate whether reorganization plan is fair and equitable unless apprised of all claims against debtor); *AM Int'l, Inc. v. Datacard Corp., DBS, Inc.*, 106 F.3d 1342, 1347 (7th Cir. 1997) (recognizing creditor presumably paid less for company that owned property contaminated by bankrupt lessee, because it knew it was buying into costly cleanup).

For the reasons set forth above, the R&R erroneously determines that despite MBTA's extensive knowledge of the site, its contamination, and the bankruptcy proceeding, the absence

of regulatory involvement directed at MBTA removed MBTA's claims from the ambit of § 77. This sets the bar for discharge far higher than what the Bankruptcy Act provides.

**Objection II.  Under the relationship test, MBTA's claims come within § 77.**

B&M objects to the R&R's rejection of the "relationship test" to determine the existence of a contingent claim.  Where a creditor and debtor such as MBTA and B&M (1) have a substantial and longstanding contractual and business relationship and (2) the creditor is aware of the debtor's conduct giving rise to releases of hazardous substances, courts have found the creditor had sufficient notice of its contingent environmental claims to assert them in bankruptcy. *See In re Chateaugay*, 944 F.2d at 1005-06; *NCL Corp.*, 144 B.R. at 177; *Reynolds Bros.,* 647 N.E.2d at 1209, n. 12 (claim barred under relationship test where plaintiff knew of contamination at site, knew debtor had been previous owner, and knew debtor had used site as oil storage facility); *see also In re Hemingway Transport*, 993 F.2d at 928, n. 16 (claim for response costs may arise as early as time when contaminated property transferred to claimant).

The relationship test and the fair contemplation test are similar, *see In re Cleveland*, 349 B.R. at 529-31 (noting similarity of approaches), but the former is more appropriate in the circumstances of this case.  The relationship test recognizes contingent claims for environmental cleanup when the parties have a relationship to the point where relevant contingencies are within the parties' contemplation. *See Chateaugay*, 944 F.2d at 1005.  The record demonstrates that MBTA and B&M had just such a relationship with regard to environmental claims.  This is a far different situation from one in which the parties have little prior interaction or knowledge of activities at the site, such that additional indicia (e.g., regulatory involvement) may be required to assess whether the parties could have contemplated their claims prior to the conclusion of the

13

bankruptcy. *See, e.g., AM Int'l Inc.,*106 F.3d at 1345-46 (claims not discharged where claimant had no relationship with debtor or site until after polluting activities and bankruptcy occurred).

The relationship between B&M and MBTA was notably closer than those in *Chateaugay, NCL Corp.,* and even *Reynolds.* MBTA purchased the BET from B&M's bankruptcy estate in December 1976, and continued to own the BET when Chapter 21E was enacted in March 1983 and at the Consummation Date several months later. Bergeron Decl. ¶ 25 [Dkt. #24]. B&M's bankruptcy trustees contracted with MBTA for the operation of the BET during the 1970s and 1980s. Bergeron Decl. ¶¶ 28-29 & Ex. 11-12 [Dkt. #24, 32]. The 1976 Purchase and Sale Agreement authorized MBTA to inspect property conditions and referred to environmental assessments, and the 1982 Agreement expressly addressed liability for property damage at the BET, Bergeron Decl. ¶¶ 27, 30-31 & Ex. 10, 13-14 [Dkt. #24, 32].

Further, MBTA's relationship with B&M regarding the BET was not a hands-off, contractual relationship between owner and operator. MBTA had ongoing involvement with the site beginning years before the Consummation Date. MBTA had an office at the BET, staffed by MBTA employees who knew first-hand about environmental conditions there, including releases of fuel oil, beginning not later than 1979. Hennemann Decl. ¶¶ 18, 19 & Ex. 1-8, 10-12, 16-17, 19-24, 29-39 [Dkt. #25, 31]. Before June 1983, MBTA knew of contamination at the BET and the potential need for a cleanup there. Hennemann Decl. ¶¶ 11-14, 18-27 & Ex. 1-8, 10-12, 16-17, 19-24, 29-40 (¶¶ 68-72) [Dkt. #25, 31]. MBTA employees attended meetings about environmental issues at the BET, which included discussions regarding environmental cleanup. Hennemann Decl. ¶ 29 & Ex. 30, 41-45 [Dkt. #25, 31]; Bergeron Decl. ¶ 21 & Ex. 9 [Dkt #24, 32]. Further, MBTA was responsible for approving payment for all expenses at the BET site, including environmental expenses. Hennemann Decl. ¶ 28 & Ex. 35 [Dkt. #25, 31]. The nature

14

of the parties' conduct and MBTA's knowledge of specific activities giving rise to releases confirm that MBTA had a contingent claim before the conclusion of the bankruptcy. *See Chateaugay*, 944 F.2d at 1005. The R&R erroneously fails to acknowledge this.

Moreover, the R&R's main concern regarding application of the relationship test—that a broad construction of § 77 might exclude a prospective creditor who lacked adequate notice of the need to assert a claim, *see* R&R at 42-45—is not applicable to the present case. This concern is avoided if the relationship test is employed only where, as here, there is interaction between the creditor and debtor such that the creditor may anticipate its potential claim. *See In re Piper*, 58 F.3d 1573, 1577 (11th Cir. 1995) (claim arises only if there is relationship between identifiable claimant and conduct at issue); *see also In re Russell*, 193 B.R. 568, 571-72 (Bankr. S.D. Cal. 1996). The relationship between MBTA and B&M specifically involved the BET site, MBTA's knowledge of releases at the site, and MBTA's knowledge of B&M's bankruptcy proceedings. Given the extent of the relationship and the interaction between the parties, MBTA cannot claim ignorance of these facts.

Furthermore, the parties' contractual and business relationship involved the precise type of relationship—owner and operator of contaminated property—that forms the basis of liability under Chapter 21E. Chapter 21E and its legislative consideration were well publicized prior to its enactment several months before the Consummation Date, and MBTA knew or should have known of its liability under the statute. Culliford Decl., ¶¶ 10, 11 & Ex. 2-3, 5-11 [Dkt. #26, 30]; *Roberts v. Maine,* 48 F.3d 1287, 1300 (1st Cir. 1995) (citizens presumed to know the law). Also, in the late 1970s and early 1980s, environmental regulators investigated hazardous materials on other MBTA property, [Dkt. #29, Ex. 3], and there had been releases of oil or hazardous substances at MBTA facilities that required cleanup by MBTA. Hennemann Decl., ¶ 37 & Ex.

29 [Dkt. #25, 31]. Given these facts and applicable law, the R&R erred in not applying the relationship test—a standard under which MBTA possessed, before the Consummation Date, at least a contingent § 77 claim for environmental cleanup.

**Objection III.   The claims were discharged even if the "fair contemplation" test applies.**

For the reasons set forth in Objections I and II above, B&M objects to the R&R's use of the fair contemplation test to determine whether a contingent claim was within the actual or presumed contemplation of the parties at the time of the bankruptcy consummation. *See R&R* at 46-47; *NCL Corp.*, 144 B.R. at 177; *accord Reynolds Bros.*, 647 N.E.2d at 1209 n. 12 (Chapter 21E cleanup claim discharged under both fair contemplation and relationship tests).[6]

Even under the fair contemplation test, though, a contingent claim for environmental response costs arises if it is based upon "conduct that can be fairly contemplated by the parties" before the Consummation Date. *In re Jensen*, 995 F.2d at 930 (quoting *In re Nat'l Gypsum Co.*, 139 B.R. 397, 404 (N.D. Tex. 1992)); *Reynolds*, 647 N.E.2d at 1208; *see also Hexcel Corp. v. Stepan Co.*, 239 B.R. 564, 567 (N.D. Cal. 1999) (claim should not be discharged if parties could not reasonably contemplate its potential existence). "Thus, a claim accrues when the potential CERCLA claimant, at the time of the bankruptcy, '*could have ascertained through the exercise of reasonable diligence that it had a claim' against the debtor for a hazardous release*." *Signature Combs*, 253 F. Supp. 2d at 1037 (emphasis added) (quoting *In re Crystal Oil Co.*, 158 F.3d 291, 296 (5th Cir. 1998)); *see also AM Int'l, Inc.*, 106 F.3d at 1347-48.

The appropriate test is not whether MBTA actually knew, with certainty, that it had a claim for environmental cleanup, but whether MBTA *should have* contemplated the potential existence of such a claim. In making that determination, the Court must consider the wealth of

---

[6] The R&R indicates that two cases (*Chicago, Milwaukee* and *AM International*) involving private parties seeking environmental indemnity or response cost apply the fair contemplation test. *See R&R* at p. 48. However, additional private party cases (*NCL Corp.*, *Reynolds Bros.*) also have considered the relationship test.

16

information available to MBTA regarding: (1) contamination at the site; (2) B&M's possible link to the contamination; (3) and whether that information was reasonably available before the Consummation Date. *See Mesiti,* 156 B.R. at 118. The R&R's failure to do so constitutes error.

The record shows that prior to the Consummation Date, MBTA knew of contamination at the site and B&M's link to the contamination. MBTA maintained an office at the BET, staffed by MBTA employees who had actual, direct knowledge of environmental conditions at the site, including releases of fuel oil, during at least the 1979 to 1983 time period. Hennemann Decl., ¶¶ 18, 19 & Ex. 1-8, 10-12, 16-17, 19-24, 29-39 [Dkt. #25, 31]. MBTA also had payment responsibility for expenses at the BET site, including environmental expenses. Hennemann Decl., ¶ 28 & Ex. 35 [Dkt. #25, 31]. MBTA possessed this information not only when Chapter 21E was enacted in March 1983 and at the Consummation Date in June 1983, but years earlier. Hennemann Decl., ¶¶ 6, 9-14, 21-27, 29-33, 35-36 & Ex. 1-14-24, 38-47 [Dkt. #25, 31].

The record cannot support a conclusion that MBTA—the second largest landowner in Massachusetts and the owner of what it knew was contaminated property for which it had legal responsibility—could not have foreseen that it might have a *contingent* claim against B&M. *See Mesiti,* 156 B.R. at 118 & n. 4 ("contingent debt" exists when environmental response costs have not actually been incurred, but may or are likely to be incurred). Accordingly, even under the fair contemplation standard recommended by the R&R, MBTA's claims were discharged.

The R&R expresses concern that overinclusion of contingent interests would cut off creditors who "neither knew or had reason to know of their claims." R&R at pp. 44-45. B&M has no quarrel with this concept, but it is inapplicable to the instant case. The fair contemplation approach, like the relationship test, seeks to ensure that a cleanup claim will not be discharged if the claimant had no idea there was an environmental problem at the time of the bankruptcy

17

consummation. *See, e.g. In re Penn Cent. Transp. Co.*, 944 F.2d 164, 167-68 (3d Cir. 1991) (cleanup claims not discharged where CERCLA enacted after consummation date); *Sylvester Bros. Dev. Co. v. Burlington N. R.R.*, 133 B.R. 648, 653 (Bankr. D. Minn. 1991) (when government agency lacked knowledge before conclusion of bankruptcy proceedings that debtor was a potentially responsible party, potential CERCLA claim not discharged).

But the record here gives MBTA no basis to claim ignorance of, at a minimum, a contingent cleanup claim. It is undisputed that MBTA knew of releases of fuel oil at the BET and the environmental condition of the BET prior to the Consummation Date. Hennemann Decl., ¶¶ 11-14, 18-27, 29 & Ex. 1-8, 10-12, 16-17, 19-24, 29-45 [Dkt. #25, 31]; Bergeron Decl., ¶¶ 10, 11, 12, 18-20 & Ex. 2, 7-8 [Dkt. #24, 32]. Before the Consummation Date, MBTA personnel worked at the BET and had actual knowledge of releases at the site and the potential need for cleanup. Hennemann Decl., ¶¶ 6, 9-14, 21-27, 29-33, 35-36 & Ex. 1-14-24, 38-47 [Dkt. #25, 31]. MBTA also had extensive contractual relations with B&M, knowledge of B&M's bankruptcy proceedings, and knowledge of B&M's operations at the BET that resulted in releases. *See id;* Bergeron Decl., ¶¶ 10-12, 15-22, 25-29 & Ex. 2, 7-12 [Dkt. #24, 32]. Further, MBTA likely possessed actual knowledge, and certainly possessed constructive knowledge, of its potential liability under Massachusetts law, including Chapter 21E and common law, before the Consummation Date. *See* Culliford Decl., ¶¶ 4-12 & Ex. 1-11 [Dkt. #26, 30].

The R&R's determination that MBTA's claims were not discharged is based on a misapplication of the fair contemplation standard. In particular, the R&R concludes that regulatory involvement is a prerequisite to a contingent claim for environmental cleanup, that there was insufficient regulatory involvement before the Consummation Date for MBTA to

foresee that it might have to engage in a cleanup, and that accordingly, a cleanup claim was not within the contemplation of the parties prior to the bankruptcy discharge. R&R at 47-53.

Disregarding the parties' longstanding relationship and MBTA's substantial knowledge, the R&R appears to say that MBTA would have had claims *only* had it known by June 1983 that (1) DEP or DEQE would seek remediation of the property *and* (2) MBTA would be held liable for the costs thereof. R&R at 50-53. In so concluding, the R&R dismisses MBTA's awareness of conditions at the site merely because available records show that as of 1983, regulators had proceeded only against B&M as the operator. R&R at 52-53.

The R&R ignores evidence showing that, beginning years before the Consummation Date, the Coast Guard was issuing fines for releases from the BET to nearby rivers, Bergeron Decl., ¶¶ 7-9 & Ex. 2-6 [Dkt. #24, 32], MBTA was aware of such penalties, Bergeron Decl., ¶¶ 10-11 & Ex. 7 [Dkt. #24, 32], and DEQE/DEP had opened numerous cases regarding releases at the BET and was monitoring the site. Bergeron Decl., ¶ 13-14 & Ex. 2-4 [Dkt.# 24, 32]; DelBene Decl. & Ex. 1-9. Even if regulators may not have involved MBTA directly, MBTA could have discovered the extent of regulatory involvement at the BET had it applied minimal diligence. *See Signature Combs*, 253 F. Supp. 2d at 1028 (potential claim for environmental cleanup costs arises if claimant could have discovered through exercise of reasonable diligence that it had claim against debtor for hazardous release at time of bankruptcy); *In re Texaco Inc.*, 182 B.R. at 950-57 (Bankr. S.D.N.Y. 1995) (same). MBTA's responsibility for expenses at the BET, including payments for environmental expenditures, also would have alerted MBTA to the problem. Hennemann Decl., ¶ 28 & Ex. 35 [Dkt. #25, 31].

In any event, pre-consummation regulatory involvement, let alone involvement targeting the claimant, is not a prerequisite for a property owner such as MBTA to contemplate that it

might have a claim where MBTA knew of releases, the historically contaminated nature of the property, the debtor's bankruptcy proceedings, and applicable law. *See, e.g., NCL Corp.*, 144 B.R. at 177 (not requiring regulatory involvement to establish claims were fairly contemplated); *Mesiti,* 156 B.R. at 118 (setting forth test for foreseeable claim that does not require regulatory involvement). Some courts applying the fair contemplation test have focused on a non-exhaustive list of factors, including action by a regulatory agency, to establish that a contingent claim for environmental cleanup costs exists for bankruptcy purposes. *Jensen*, 995 F.2d at 930; *In re National Gypsum, Co.,* 139 B.R. 397, 408 (N.D. Tex. 1992) (finding that at least one of factors relevant to determination that claim had arisen was present for sites listed by EPA for future response costs). However, even under the fair contemplation test, where the property owner had actual knowledge of the site's condition and the ability to inspect the property for contamination, but chose not to inspect the property or to file a bankruptcy claim, the "inevitable finding" is that the parties fairly contemplated potential environmental claims. *NCL Corp.*, 144 B.R. at 177; *see also Mesiti*, 156 B.R. at 118.[7]

Further, Chapter 21E made MBTA, as an owner of contaminated property, liable for cleanup and conferred the right to recover its costs from other parties, without any state involvement. M.G.L. ch. 21E § 4. Thus, there is no requirement that regulators enforce the statute against MBTA in order for MBTA's claim to exist. *See Reynolds Bros.,* 647 N.E.2d at 1209 & n. 10 (Chapter 21E provides private right of action *regardless of DEP involvement*).

---

[7] The R&R claims that the facts of the instant case are akin to those in *AM International*, in which the court upheld a finding that certain environmental claims were not discharged in the debtor's bankruptcy. R&R at 49-50. This is incorrect. MBTA had far more actual knowledge regarding the contamination and cleanup requirements than did the claimant in *AM International*. In *AM International,* there was no visible contamination at the site, even the debtor had not involved regulators, and the only record of any release at the site was a warning notice in one employee's file relating to a loss over a decade before the close of the bankruptcy. 106 F.3d at 1347-48. Here, by contrast, MBTA employees knew the ground was saturated with oil, knew of numerous releases of petroleum products for years prior to the Consummation, and knew of regulatory involvement and the potential need for site cleanup. Bergeron Decl., ¶¶ 7-22 & Ex. 2-9 [Dkt. #24, 32], Hennemann Decl., ¶¶ 6-37 & Ex. 1-47 [Dkt. #25, 31].

Finally, the R&R fails to acknowledge the common law cleanup claim that MBTA had before the Consummation Date and could have filed in the bankruptcy proceeding. *See Nassr*, 477 N.E.2d at 991-93. Save for a passing reference in a footnote, R&R at 22 n. 11, the R&R addresses only the contingent claim that MBTA had under Chapter 21E, § 4. *See also* R&R at 4. But B&M seeks the discharge of all MBTA's claims (under Chapter 21E or other law) for environmental cleanup costs at the BET based on pre-June 30, 1983 conduct. Dkt. #1, 20.

MBTA's liability for contamination on its property, and its ability to recover from other liable parties for the cost of cleaning up such conditions, did not suddenly arise in March 1983 with the enactment of Chapter 21E. *See Nassr*, 477 N.E.2d at 991-93 (discussing statutory and common law predecessors of Chapter 21E). At common law, a landowner like MBTA had a duty to clean up a nuisance, including hazardous environmental conditions caused by a lessee, on its property. *See id.* This duty did not depend upon prior regulatory involvement, though the state could seek a court order compelling the owner to abate the nuisance *if the owner did not clean it up upon becoming aware of it. See id.* at 992-94. Moreover, had MBTA discharged this duty, it could have sought contribution from B&M. *See, e.g.,* M.G.L. ch. 231B (Uniform Contribution Among Tortfeasors Act (1962)) (right of contribution among jointly liable parties).

Thus, even before the enactment of Chapter 21E, a property owner such as MBTA was required, under common law and absent regulatory action, to clean up a nuisance on its property, including hazardous environmental conditions caused by a tenant or lessee. *See Nassr,* 477 N.E.2d at 991-93. This pre-existing duty was merely reinforced in March 1983, when the enactment of Chapter 21E provided for immediate, joint and several liability for both MBTA and B&M for releases of oil at the BET. M.G.L. ch. 21E § 5(a). It is undisputed that when Chapter 21E was enacted, MBTA knew of the oil-soaked nature of the property, Hennemann Decl., ¶¶ 6-

14 & Ex. 1-24 [Dkt. #25, 31], as well as of specific releases that had occurred at and from the BET.  Hennemann Decl., ¶¶ 6, 18, 20-27 & Ex. 1-12, 16-17, 19-24, 29-40 [Dkt. #25, 31]; Bergeron Decl., ¶¶ 10-12, 15-20 & Ex. 2, 7-8, [Dkt. #24, 32].

Therefore, based on common law, plus MBTA's knowledge of releases of fuel oil at the BET, MBTA had a contingent claim against B&M for environmental cleanup costs at the BET long before the enactment of Chapter 21E.  MBTA's failure to assert a claim for environmental cleanup costs at the time of the bankruptcy forecloses the assertion of any such claim now— under either common law or under Chapter 21E.

Given all the evidence, there is no merit to MBTA's position that as owner of what it knew was a contaminated property, it could not have realized that it might possess at least a *contingent* cleanup claim against B&M.  *See Mesiti*, 156 B.R. at 118 & n. 4.  Even under the fair contemplation standard adopted in the R&R, therefore, MBTA's claims were discharged.

**Objection IV.   The Consummation Order also bars MBTA's claims.**

B&M objects to the R&R's finding that "the plain and unambiguous language of the Consummation Order does not bar MBTA's section four claim based upon contamination occurring prior to June 30, 1983."  R&R at 54; *see also id.* at 53-58.  More than six years after MBTA purchased the BET from B&M's bankruptcy estate, this Court entered the Consummation Order in the B&M bankruptcy, closing the bankruptcy and discharging B&M from all claims that existed prior to June 30, 1983.  *See* Consummation Order § 5.03(a) & p. 33 [Dkt. #35, 42 Ex. 4] .  The Consummation Order is extremely broad as to the discharge of claims.  For instance, it transfers all remaining property to the Reorganized Company "free and clear of all claims, rights, demands, interests, liens and encumbrances of every kind and character, whether or not properly or timely filed and whether or not approved, acknowledged or

allowed in these proceedings." Consummation Order § 5.01 [Dkt. #35, 42 Ex. 4]. The Consummation Order also provides that as of the Consummation Date, B&M and its Trustees were *discharged and released from all claims and liabilities, whether or not filed in the bankruptcy,* Consummation Order § 5.03(a) [Dkt. #35, 42 Ex. 4] (emphasis added), and enjoins the assertion against B&M or any successor entity of any and all claims existing on or before the Consummation Date. Consummation Order § 8.01 [Dkt. #35, 42 Ex. 4].

Despite its knowledge of the B&M bankruptcy proceedings, of the environmental contamination at the BET, and of the potential cleanup liability, MBTA failed to file a claim in the bankruptcy. *See* Dkt. #1, ¶¶ 16, 17; Dkt. # 4, ¶ 42. MBTA's claim was therefore discharged, and the Consummation Order enjoins its assertion at this very late date. Consummation Order § 8.01 [Dkt. #35, 42 Ex. 4]; *Providence & W. R.R. Co.,* 1989 U.S. Dist. LEXIS 7259 at *2-*7 (holding, in context of § 77 reorganization, that CERCLA and Chapter 21E claims arose before Consummation Date and were barred by sweeping injunction in Consummation Order).

Further, for the reasons set forth above, the R&R erroneously rejects the relationship test as the standard for whether a contingent cleanup claim exists for purposes of bankruptcy discharge and then misapplies the fair contemplation test to determine that MBTA's claims were not discharged in B&M's bankruptcy. B&M objects to the R&R's conclusion that MBTA's claims are not barred by the Consummation Order, for application of the relationship test and/or proper application of the fair contemplation test would lead to the contrary conclusion.

In concluding that the Consummation Order does not bar assertion of MBTA's claims, the R&R also errs in stating that application of the factors set forth in *Mesiti* would not alter its conclusion. *See* R&R at 56-57 & n. 40. *Mesiti* specifically addressed the discharge of environmental liabilities in B&M's railroad reorganization—the same reorganization at issue

here. *Mesiti*, 156 B.R. at 114. Microdot argued that it was unaware of B&M's potential link to the contamination on the property before the Consummation Order was issued and that because its claims were not reasonably foreseeable, they were not discharged in the bankruptcy. *Id.* at 117. The court noted the "sweeping" nature of the bankruptcy injunction, *id.* at 115, and stated that whether claims for environmental cleanup costs "were foreseeable and 'arose,' or were at least 'contingent' for purposes of Section 77, before the consummation order's bar date," depends on (1) the information actually or constructively available to the prospective claimant regarding contamination at the site, (2) the claimant's information regarding B&M's possible link to the contamination, and (3) whether that information was reasonably available between the enactment of the environmental statute and B&M's bankruptcy Consummation Date. *Id.* at 118. Under this standard, MBTA had § 77 claims before the Consummation Date.[8]

Thus, MBTA had contingent claims before the Consummation Date—under § 4 and related common-law doctrine—for cleanup costs. MBTA's failure to assert such claims discharged them and bars their assertion now, over twenty years later. Consummation Order §§ 5.03, 8.01 [Dkt. #35, 42, Ex. 4]. The R&R's contrary conclusion is erroneous.

**Objection V. MBTA could have sought late filing of its claims but failed to do so.**

Finally, the R&R failed to address the fact that MBTA could have moved to file its cleanup claim after the Consummation Date. Despite substantial contrary evidence in the record, the R&R apparently accepted MBTA's assertion that it had no idea the BET was contaminated or that a cleanup might be required until its consultants conducted an oil recovery study in 1984, about a year after the Consummation Date. R&R at 16-17; 49-53. Upon receiving the study

---

[8]  Importantly, *Mesiti* does not mention or require regulatory involvement as a prerequisite to the creation of a contingent claim. *See id.* at 118. MBTA's knowledge (or lack thereof) of regulatory involvement is one factor that may be considered in determining whether a contingent claim has arisen, but it hardly is a *sine qua non*—especially

results, MBTA could have petitioned the bankruptcy court for leave to file its cleanup claim late. *See, e.g.*, Fed. R. Bankr. 9006(b)(1) (formerly Rule 906(b)) (when act required to be done within a specified time, "the court for cause shown may at any time in its discretion . . . after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect").

Instead, MBTA failed to notify either the bankruptcy court or B&M, and instead waited more than twenty years to seek reimbursement for pre-consummation contamination. [Dkt. #1, ¶ 8 & Ex. B; Dkt. #4, ¶ 1]. "The existence of a claim in bankruptcy 'should not depend on the victim's appraisal of the likely success of post-bankruptcy collection efforts.'" *In re Nat'l Gypsum*, 139 B.R. at 405 (quoting *In re Edge*, 60 B.R. 690, 700 n. 8 (M.D. Tenn. 1986)). The R&R's failure to consider this fact constitutes error.

## Conclusion

MBTA had claims against B&M for environmental cleanup of the BET, under Chapter 21E and at common law, prior to the Consummation Date. MBTA's failure to assert its claims prior to the Consummation Date discharged the claims, and MBTA may not now—decades later—circumvent the Consummation Order and deny B&M and its new owners the fresh start to which they are entitled under the bankruptcy laws.

Therefore, the Court should decline to adopt the R&R, should deny MBTA's motion for partial summary judgment, and should grant B&M's motion for partial summary judgment, by finding that MBTA's claims for environmental cleanup at the BET were discharged, and by enforcing the injunctive provisions of the Consummation Order against MBTA by barring MBTA's assertion of its claims.

---

given MBTA's extensive knowledge of contamination at the BET, B&M's bankruptcy, and common law and statutory liability.

Respectfully submitted,

WINSTON & STRAWN LLP

By:     /s/ Eric L. Hirschhorn
Eric L. Hirschhorn
Winston & Strawn LLP
1700 K Street, N.W.
Washington DC 20006
202-282-5706

Robert B. Culliford (BBO#638468)
14 Aviation Avenue
Pease International Tradeport
Portsmouth NH 03801
603-766-2002

*Attorneys for Plaintiff Boston & Maine
    Corporation*

Dated:  February 9, 2007 (corrected version Feb. 16, 2007)

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 16, 2007.

John M. Stevens
Alicia Barton McDevitt
Foley Hoag LLP
155 Seaport Blvd.
Boston, MA  02210-2600
(617) 832-1000

/s/ Eric L. Hirschhorn
Eric L. Hirschhorn